

SEALED

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA
OMAHA DIVISION

FILED
U.S. DISTRICT COURT
DISTRICT OF NEBRASKA

08 MAY 19 PM 2: 41

OFFICE OF THE CLERK

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* RUDY VIGIL,          Plaintiffs, <br><br> v. <br><br> NELNET INC., JP MORGAN CHASE & CO., and CITIGROUP INC. <br><br>          Defendants. | **FILED IN CAMERA AND UNDER SEAL UNDER THE FALSE CLAIMS ACT** <br><br> Case No. 8:07CV266 <br><br> **Jury Trial Demanded** |

## THIRD AMENDED COMPLAINT

COMES NOW Rudy Vigil ("Vigil" or "Relator"), pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, and hereby files this his Third Amended Complaint on behalf of himself and the United States of America ("U.S."), pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. §§ 3729-3732, and alleges the following, to wit:

### INTRODUCTION

1.    This is a civil action brought against Nelnet Inc. ("Nelnet"), JP Morgan Chase & Co. ("JP Morgan"), and Citigroup Inc. ("Citigroup"), to recover treble damages and civil penalties under the False Claims Act arising from Nelnet's false statements, records, claims and regulatory non-compliance, with respect to all FFELP loans it issues, administers or services. This suit also arises from JP Morgan and Citigroup's conspiracy with Nelnet to receive U.S. subsidies on a subset of the above to which they were not entitled by getting false claims allowed or paid through the Federal Family Educational Loan Program ("FFELP").

2.    The alleged False Claims Act violations arise out of Nelnet's false records,

statements and certifications of compliance with Higher Education Act ("HEA") statutes, regulations and Department of Education ("DOEd") policies that (1) forbid the offering of inducements to any individual in order to secure applicants for FFELP loans such as Consolidation, Stafford and PLUS loans and (2) forbid engaging in fraudulent or misleading advertising. The underlying fraudulent and false claims for payments are false or fraudulent because Nelnet falsely states on each Claim Form and LaRS/799 (1) the amount of U.S. money Nelnet is entitled to receive from the U.S, either on its behalf or on behalf of the other Defendants, (2) that the FFELP loans were administered in compliance with HEA statutes, regulations or DOEd policies, (3) that the data on the form is true and correct, and (4) that Nelnet is an eligible FFELP lender.

3.     The alleged False Claims Act violations arise out of Nelnet's false records and statements that it is an eligible lender and servicer in accordance with HEA statutes, regulations and DOEd policies that disqualify a lender or servicer from eligibility for U.S. subsidies on FFELP loans if it (1) offers inducements to any individual in order to secure applicants for FFELP loans such as Consolidation, Stafford and PLUS loans or (2) engages in fraudulent or misleading advertising.

4.     The alleged False Claims Act violations arise out of Nelnet's fraudulent course of conduct consisting of non-compliance with HEA statutes, regulations and DOEd policies, while presenting claims indicating compliance with the same statutes, regulations and DOEd policies, that (1) forbid the offering of inducements to any individual in order to secure applicants for FFELP loans such as Consolidation, Stafford and PLUS loans, and (2) forbid a lender from engaging in fraudulent or misleading advertising.

2

5.      Furthermore, the alleged False Claims Act violations arise out of Nelnet's non-compliance with HEA statutes, regulations and DOEd policies, while designated an Exceptional Performer ("EP") by the DOEd, that (1) forbid the offering of inducements to any individual in order to secure applicants for FFELP loans such as Consolidation, Stafford and PLUS loans and (2) forbid a lender from engaging in fraudulent or misleading advertising. Each claim presented by Nelnet for itself (or a closely related business vehicle, like a corporation, LLC or trust controlled by Nelnet), JP Morgan or Citigroup for interest subsidies, special allowance payments and insurance payments on default claims from May 26, 2004, through December 31, 2007, are false claims as a matter of law pursuant to 20 U.S.C. 1078-9(g). They are false claims during this period because Nelnet was designated an EP, and Nelnet is and was out of compliance with federal regulations applicable to FFELP.

## VENUE AND JURISDICTION

6.      This action arises under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.* This Court has jurisdiction over this action pursuant to 31 U.S.C. §§ 3732(a) and 3730(b). This court also has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1345.

7.      Venue is proper in this district pursuant to 31 U.S.C. § 3732 (a), because the acts proscribed by 31 U.S.C. §§ 3729, *et seq.* and complained of herein were orchestrated from, planned in and took place in this District. Venue is also proper pursuant to 28 U.S.C. § 1391(b) and (c) and 31 U.S.C. § 3732(a) because, at all times material and relevant, Nelnet resided and continues to reside in the District of Nebraska and all Defendants conduct substantial business within this district.

3

## THE PARTIES

8.      Rudy Vigil is an adult resident citizen of Colorado and the U.S.  Vigil was employed full time by Nelnet as a telemarketer or loan advisor from 2003 through 2004.  During his employment with Nelnet, Relator was engaged in marketing FFELP student loans designed to consolidate pre-existing FFELP student loans directly to consumers.  Vigil was trained and supervised pursuant to the nationally standardized marketing practices undertaken by Nelnet.  Relator brings this action based on his direct, independent, and personal knowledge and also on information and belief.  Relator has direct and independent knowledge of the information on which these allegations are based.

9.      The U.S., through the DOEd and under the FFELP, funds subsidies on Stafford Loans, PLUS loans, and Consolidation Loans.  The U.S., through the DOEd, funds insurance or guaranty claims upon default by the student borrower, and also funds interest payments, special allowance payments, and other payments to subsidize such college loan obligations.

10.      Defendant Nelnet is a Delaware corporation with its principal place of business at 121 S. 13th Street, Suite 201, Lincoln, Nebraska.  Attached as exhibit "A" is a list of Nelnet's subsidiaries of which it owns 100% of the stock, and does business through, using the Nelnet trademark and name.  Nelnet does business throughout the entire United States, including the Omaha division of the District of Nebraska.  Attached as exhibit "B" is a non-exhaustive list of the lender names and numbers used by Nelnet to identify itself to the DOEd.  At all relevant times, Nelnet acted by and through its subsidiaries, agents, servants, workers, employees, officers and directors, all of whom were acting through the course and scope of their actual and apparent authority, agency, duties or employment. Nelnet is one of the leading providers of student loans and loan servicing for companies holding FFELP loans. Nelnet is comprised of

4

five (5) primary businesses: Asset Management, Student Loan & Guarantee Servicing, Software Services, Direct Marketing, and Payment Management Services. At its peak, Nelnet had 20 offices nationwide, $21.3 billion in student loan assets, $5 billion in origination assets, and propriety software used by clients to service over $65 billion in student loans. Nelnet is a publically traded company on the New York Stock Exchange. Nelnet received U.S. money pursuant to the false claims herein at issue. At least one of Nelnet's employees had the authority to apply for and receive funds from the United States on Nelnet's behalf. Vigil is not privy to who at Nelnet had the authority to sign the claim forms, participation agreements and other certifications alleged in this Complaint, but this is a fact to which Nelnet has access by examining the executed document.

11.    Defendant JP Morgan is a Delaware corporation with its principal place of business at 270 Park Avenue, New York, New York. Nelnet provided and/or currently provides, through a contractual agreement, student loan services to JP Morgan, such as loan origination, marketing and collection, and acts as JP Morgan's claims agent, getting false claims for federal subsidies allowed on JP Morgan's behalf. JP Morgan does business throughout the entire U.S. including the Omaha division of the District of Nebraska. JP Morgan was formed in 2000 when Chase Manhattan Corporation acquired J.P. Morgan & Co. Attached as exhibit "C" is a SEC filing identifying JP Morgan's subsidiaries. Attached as exhibit "D" is a promissory note on a FFELP Plus loan to be distributed by JP Morgan that lists the lender as JP Morgan Chase Bank, N.A., a 100% owned subsidiary of JP Morgan. JP Morgan and JP Morgan Chase Bank, N.A., are alter-egos of one another, subject to, *inter alia*, common control and leadership. Attached as exhibit "E" is a non-exhaustive list of the names and lender numbers JP Morgan used and uses to identify itself to the DOEd. JP Morgan is a publically traded company on the New York Stock Exchange. At all relevant times, JP Morgan acted by and through its subsidiaries, agents, servants, workers, employees, officers and directors, all of whom were acting through the course

and scope of their actual and apparent authority, agency, duties or employment.

12.    Defendant Citigroup is a Delaware corporation with its principal place of business at 399 Park Avenue, New York, New York. Nelnet provided or currently provides student loan services for Citigroup, through a contractual agreement, and acts as Citigroup's claims agent, submitting claims for federal subsidies on Citigroup's behalf. Citigroup does business throughout the entire U.S. including the Omaha division of the District Court of Nebraska. Attached as exhibit "F" is a SEC filing identifying Citigroup's subsidiaries. Attached as exhibit "G" is a non-exhaustive list of the names and lender numbers Citigroup used and uses to identify itself to the DOEd. Citigroup is a publically traded company on the New York Stock Exchange. At all relevant times, Citigroup acted by and through its subsidiaries, agents, servants, workers, employees, officers and directors, all of whom were acting through the course and scope of their actual and apparent authority, agency, duties or employment.

13.    Beginning no later than when Vigil began working for Nelnet, Nelnet was and is the agent of JP Morgan and Citigroup, and in performing the acts of loan servicing, marketing and presenting claims, Nelnet was acting within the course and scope of such agency. JP Morgan and Citigroup ratified and/or authorized the wrongful acts of Nelnet and have benefitted from such conduct. JP Morgan and Citigroup are individually sued as participants and as aiders and abettors to Nelnet, who knowingly assisted in the improper acts, plans, schemes and transactions that are the subject of this Complaint. JP Morgan and Citigroup have participated as members of a conspiracy or acted with or in furtherance of the scheme alleged in the Complaint, or aided or assisted in carrying out the scheme's purposes, and have performed acts and made records and statements in furtherance of the regulatory violations, false claims and conspiracy. There was a single plan for Nelnet, JP Morgan and Citigroup to obtain payment of U.S. money by presenting as many FFELP claims as possible. JP Morgan and Citigroup took advantage of this plan to obtain the maximum amount of U.S. money, with overt wrongful acts in the

6

presentment of false claims by Nelnet to achieve this purpose.

14.    The agency and conspiracy allegations set forth herein are based on, among other things, Nelnet's student loan servicing and marketing services contracts with JP Morgan and Citigroup, the agreement providing for Nelnet to be JP Morgan and Citigroup's claims agent, and the Credit Agreement, dated August 19, 2005, to which Nelnet, JP Morgan and Citigroup are parties.

## FACTS

15.    Pursuant to Title IV of the HEA, 20 U.S.C. §1071 *et seq.*, most federally-backed college student loans in the U.S. are funded by private financial institutions. The funding is guaranteed and subsidized by the U.S. under the FFELP. The FFELP includes federally subsidized loans including Stafford, PLUS, and Consolidation loans.

16.    The U.S., through the DOEd, funds: 1) loan default payments, 2) interest payments, 3) special allowance payments, and 4) other payments to subsidize each such college loan obligations. Payments to private lenders for default claims are made from Agency reserve funds, all of which is U.S. property.

17.    Payments to FFELP lenders for claims of interest subsidies and special allowance payments are presented to the DOEd by the lender or servicer electronically through the presentment of a LaRS/799 form. A copy of this form is attached hereto as exhibit "H". Payments arising from the presentment of a LaRS/799 come directly from the DOEd. This form is presented directly to the DOEd by Nelnet for payment of claims. Payments to FFELP lenders for default claims are presented by the FFELP lender, or servicer acting on the lenders' behalf, directly to an Agency through the submission of a Claim Form. A copy of this Claim Form is attached hereto as Exhibit "I". Payments arising from the presentment of the Claim Form come directly from an Agency, but the Agency pays the lender or servicer with U.S. monies the Agency holds as a fiduciary for the U.S.

7

18.    Nelnet entered into default insurance agreements with the Agencies in each state. As a result of these agreements, Nelnet also acted as agents of the Agencies in marketing and servicing student loan applications pursuant to those agreements. The Agencies enter into Basic Program Agreements with the DOEd assuring their program complies with the HEA statutes and regulations. As a legal prerequisite to serving, or to presenting any reinsurance claim to the U.S., as a lawful Agency as to any federally-guaranteed FFELP student loan, in turn, is that no Agency (and no marketer or servicer acting on behalf of any Agency) may offer, directly or indirectly, any payments or other inducements to any lender or any person acting as employee, agent or independent contractor of any lender in order to secure applicants for any FFELP loan. 20 U.S.C. § 1078(b)(3)(B); 34 C.F.R. § 682.401(e)(2); Dear Colleague Letter 89-L-129. Compliance with this agreement is a condition of payment for all claims the Agency presents or causes to be presented to the U.S. for reinsurance on default FFELP loan claims the Agency pays a lender or servicer. Nelnet causes the Agency to present false claims to the U.S., in derogation of an Agency Organization Participation Agreement that requires the certifications of regulatory and statutory compliance alleged herein, as a condition of payment for reinsurance from the U.S. on default claims presented to the Agency by private lenders with whom the Agency has a contract to provide said default insurance.

19.    Beginning at the latest when Vigil started working for Nelnet, until present, Nelnet entered into and performed under contracts wherein Nelnet would perform servicing duties for various lenders, including, but not limited to, presenting to the DOEd and causing to be paid by the DOEd, claims for special allowance payments, interest subsidies and default claims on the loans these lenders hold and Nelnet services. Relator does not have a copy of these agreements because of the confidential nature attached thereto by Defendants. The fact

8

Nelnet has such contracts to submit claims on behalf of JP Morgan and Citigroup specifically has been confirmed. FFELP lenders typically use companies such a Nelnet as a conduit to make claims on FFELP loans in order to (a) conceal the fact they were the entity making the claims and (b) to take advantage of the company's EP designation. Upon information and belief, the same holds true for JP Morgan and Citigroup's relationship with Nelnet. JP Morgan and Citigroup knew, should have known, and continue to know that Nelnet's servicing and marketing activities were in violation of HEA statutes, regulations and DOEd policies, but still entered into these servicing agreements with Nelnet, inducing Nelnet to get false and fraudulent claims allowed or paid on their behalf for interest subsidies, special allowance payments and default claim payments. Nelnet was compensated by JP Morgan and Citigroup for its action as conduit making the false claims on JP Morgan and Citigroup's behalf. For all of Nelnet's claims presented to the U.S. or a Guaranty Agency ("Agency") for subsidies from at least when Vigil began working for Nelnet until present, JP Morgan, Citigroup and Nelnet are jointly and severally liable for the repayment of those interest payments, special allowance payments and default claim payments made from U.S. funds as a result of Nelnet's violation of applicable HEA requirements and violations of the False Claims Act while servicing JP Morgan's and Citigroup's FFELP lender program. 34 C.F.R. §682.413(a)(2). This Complaint is not, however, limiting Nelnet's liability to claims made in connection with the JP Morgan and Citigroup contracts.

20.     Moreover, since Nelnet contracted with more than one FFELP lender to perform those lenders' loan servicing, Nelnet was subject to yearly independent audits of its administration of JP Morgan's and Citigroup's loan portfolios. JP Morgan and Citigroup ostensibly (1) examined Nelnet's compliance with the HEA statutes and regulations, and (2)

9

examined Nelnet's financial management of its FFELP activities. 34 C.F.R. 682.416(e). JP Morgan and Citigroup either reviewed these audits before contracting with Nelnet, thus knowing Nelnet serviced and marketed its loans out of HEA compliance, were deliberately ignorant as to whether Nelnet complied with HEA statutes and regulations, or recklessly disregarded Nelnet's regulatory non-compliance.

21.    On August 19, 2005, Nelnet, JP Morgan and Citigroup entered into a credit agreement wherein a $500,000,000 loan commitment was made to Nelnet, with $120,000,000 committed by JP Morgan and Citigroup. A copy of this credit agreement is attached hereto as exhibit "J". According to Section 5.08 of the credit agreement, Nelnet is required to use the loan proceeds "for general corporate purposes" and "payments required to be made in connection with investigations, actions, suits or proceedings by or before any arbitrator, court or administrative agency." This war chest of credit promised by JP Morgan and Citigroup to Nelnet was created, according to section 3.07 of the credit agreement, to pay for Nelnet's liabilities arising from its non-compliance with laws, regulations and orders of any court or administrative agency that were present upon entry of the credit agreement. JP Morgan and Citigroup are liable to the U.S. as principal to Nelnet for the false claims Nelnet got allowed or paid on their behalf by the U.S.. This includes all claims Nelnet presented to the U.S. for special allowance payments or interest subsidies on a quarterly LaRS/799 form and all claims Nelnet presented to an Agency for the loan principle and accrued interest on a Claim Form when a borrower enters default.

22    Beginning at the latest when Vigil began working for Nelnet, and continuing until present, JP Morgan, Citigroup and Nelnet entered into the servicing agreements and the credit agreement referred to above with the common objective of maximizing each Defendants'

10

income through the presentment of and receipt of payment for as many FFELP claims to the U.S. as possible. Nelnet's overt acts of presenting or causing to be paid claims while not in compliance with HEA statutes, regulations and DOEd policies, and while an EP, notwithstanding its certifications that its claims were in compliance with HEA statutes, regulations and policies, were intended to and caused the U.S. to make payments to Nelnet that were not otherwise due Nelnet, including the claims Nelnet made on JP Morgan's and Citigroup's behalf. The U.S. suffered damages as a result of this conspiracy between Nelnet, JP Morgan and Citigroup.

## NELNET'S EXCEPTIONAL PERFORMER DESIGNATION

23.    On May 26, 2004, Nelnet received the DOEd's EP designation. From May 26, 2004, until the EP program ended on December 31, 2007, Nelnet was designated an EP by the U.S.

24.    Under 20 USC § 1078-9, and the implementing regulations at 34 C.F.R. § 682.415, the DOEd determines whether to designate a lender or lender servicer for EP based upon, *inter alia*, evidence indicating that the lender or lender servicer has complied with the requirements for converting FFELP loans to repayment under 34 C.F.R. § 682.209(a), and the timely filing requirements under 34 C.F.R. §§ 682.402(g)(2) and 682.406(a)(5), in accordance with the audit guide published by the U.S. Department of Education, Office of Inspector General. *See* 34 C.F.R. § 682.415. 20 U.S.C. § 1978-9(g) states that a lender or servicer designated an EP, such as Nelnet, that fails "to comply with *applicable program regulations* shall be considered in violation of section 3729 of Title 31." This condition of compliance with all FFELP regulations is a condition of payment for all claims submitted by Nelnet, on behalf of itself, as well as on behalf of JP Morgan or Citigroup, while an EP, or from October 5, 2004,

11

through December 31, 2007, the period Nelnet was an EP.

## NELNET'S INCENTIVE PROGRAMS

25.    Using an automated dialing system, Nelnet's loan advisors, including Vigil, were required to make 100 or more telephone calls per day, soliciting people to complete Nelnet FFELP loan consolidation loan. The loan advisors were also required to process 15 hard applications and 15 e-signed applications bi-weekly ("15/15 minimum"). Nelnet paid its loan advisors who achieve the 15/15 minimum, a $15-18 bonus for each loan consolidation application the loan advisor convinces the borrower to complete or e-sign in excess of said minimum.

26.    During the telephone solicitations for loan consolidation, loan advisors were instructed to and made misleading statements to consumers that FFELP loan consolidation was only available during the first six months following graduation. Nelnet also mislead consumers on their website by representing that if the consumer consolidated her student loans with Nelnet, she could save thousands in interest payments over the life of the consolidation loan. Individuals who consolidate their student loans with Nelnet, however, end up paying more interest over the life of their loans and make payments for longer periods of time.

27.    Nelnet generally refrained from utilizing written scripts for its loan advisors, except with regard to outbound calls to alumni association lists. Nelnet had a different script for each college alumni association. Nelnet's quality control, however, monitored the loan advisors' telephone calls to ensure that they covered certain topics pertaining to loan consolidation with people whom were targeted for loan consolidations. Nelnet also made fraudulent and misleading statements to consumers on its website that consolidating their FFELP loans with Nelnet entitled them to a six month payment payment forbearance.

12

28.     Nelnet performed quarterly evaluations of its loan advisors, although these evaluations were held earlier if daily call and completed FFELP loan application volume requirements were not met. Nelnet evaluated loan advisors based on how many completed FFELP loan applications they convinced a consumer to complete and telephone call volume. Nelnet terminated loan advisors who did not persuade enough students to complete Nelnet FFELP consolidation loan applications.

29.     Scott Willey, a manager at Nelnet, held monthly meetings with the loan advisors, including Vigil, where volumes of applications/calls were openly discussed, employees successful in securing a high rate of FFELP student loan volume were recognized and certificates of achievement handed out. Each month, Nelnet presented a trophy to the top loan seller. Once a week, Nelnet published a list comparing loan advisors by the amount of completed FFELP applications they convinced consumers to complete. The published list was mounted on the wall for Nelnet employees to view. For Vigil, commissions constituted approximately $600-$800 per month, or 25-33% of Vigil's income. Commissions were reflected as a separate line-item on Vigil's pay-check stubs.

30.     Continually, beginning no later than when Vigil began working for Nelnet and throughout all of its activities as a lender and servicer of FFELP student loans, Nelnet has offered and paid, directly to the individuals it trains to solicit and secure applicants for FFELP loans, including Vigil while he was employed with Nelnet, bonus payments based directly on the number of completed FFELP student loan applications each such individual persuaded consumers to submit.

31.     Additionally, as an inducement for college financial aid units, alumni associations and their employees to recommend Nelnet as lender to the exclusion of other lenders and

13

servicers for FFELP Consolidation Loans, Nelnet entered into agreements with the student financial aid offices and alumni associations of many higher education institutions throughout the U.S. As a part of Nelnet's agreements with such higher education institutions and alumni associations, their student financial aid offices and alumni associations steer and direct their students and graduates to use Nelnet's exit counseling software and website to fulfill the students' and the institution's exit counseling requirement. The institutions receive prohibited inducements and incentives in return for steering students to Nelnet's exit counseling software and website, because Nelnet, on its website, undertakes, free of charge to the institution, the institution's regulatory duty to conduct exit counseling. The institutions benefit financially from the arrangement because they do not have to expend money or resources to provide exit counseling to their students.

32.     These institutions included: Boise State University, Bowie State University, Central Michigan University, Cleary University, Clemson University, Cleveland State University, College of Charleston, Colorado State University, The Community College of Baltimore County, East Carolina University, Eastern University, Eastern Washington University, Embry-Riddle University, Emporia State University, Florida Coastal School of Law, Florida International University, Fort Hays State, Georgia College & State University, Georgia State University, Georgia Tech, Grand Canyon University, Hawaii Pacific University, Idaho State University, Indiana University, Iona College, James Madison University, The University of Kansas, Kansas State University, Langston University, Le Moyne College, Life University, Louisiana State University, Louisiana State University-Alexandria, Louisiana State University-Shreveport, Manhattan College, Medical University of Ohio, Miami University, Midland Lutheran College, Nebraska, North Carolina State University, Northeastern State University,

14

Northern Illinois University, Northern Kentucky University, Northern Michigan University, Northwestern State University, Norwich University, Ohio University, Oklahoma Christian University, Old Dominion University, Prescott College, Queens University of Charlotte, San Jose State University, South Dakota State University, Southeastern Louisiana University, Southeastern University, Southwestern Oklahoma State University, SUNY-Cortland, SUNY-Upstate Medical University, Tarleton, Texas A&M, Texas Tech, Troy University, University of California-Santa Cruz, Union College, The University of Akron, University of Alaska-Fairbanks, The University of Arizona, University of Central Oklahoma, University of Colorado, University of Dayton, University of Detroit-Mercy, University of Illinois, University of Kentucky, University of Louisiana, University of Maryland, The University of Memphis, University of Missouri-Kansas City, University of Missouri, University of Missouri-St. Louis, University of Nevada, University of New England, University of New Mexico, University of North Florida, University of South Alabama, The University of South Dakota, University of South Florida, University of Texas at Tyler, University of Texas at Arlington, University of Texas at San Antonio, University of Toledo, University of Wisconsin, University of Wisconsin-Platteville, University of Wisconsin-Stevens Point, University of Wisconsin-Superior, University of Wisconsin-Whitewater, University of Nebraska at Kearney, University of New Orleans, Washburn, Wilkes University, and Wisconsin.

33. Through these agreements, Nelnet agrees to discharge, at Nelnet's expense, the colleges' legal duty, to ensure that exit counseling is conducted . . . before (each) student borrower ceases at least half-time study at the school. 34 C.F.R. § 682.604(g). The provision of such counseling is a legal prerequisite for the institution's entitlement to receive proceeds from FFELP loans under 34 C.F.R. § 682.604(g).

15

34. However, Nelnet's internet website of material and software is sponsored and authored solely by Nelnet and directs and induces students or graduates undertaking such exit counseling on Nelnet's website into a transaction with Nelnet as the lender for any FFELP consolidation loans. Through its websites, and as alleged herein, Nelnet violates the HEA prohibition on engaging in fraudulent or misleading advertising with respect to its FFELP loan activities. *See* 20 U.S.C. § 1085(d)(5)(D); 34 C.F.R. § 682.200.

## NELNET SUBMITS FALSE STATEMENTS WITH ITS QUARTERLY CLAIMS FOR INTEREST AND SPECIAL ALLOWANCE PAYMENTS

35. The DOEd pays the interest subsidies and special allowance payments directly to lenders and servicers who make claims on lenders' behalf. The DOEd relies on lenders and servicers to maintain current, complete and accurate loan files, submit accurate information of the LaRS/799 and make any necessary billing adjustments promptly. The billing statements that lenders and servicers submit to the DOEd only show summary information, such as the total amount of eligible loan volume for interest subsidies and special allowance payments at the various interest rates charged student borrowers. Lenders do not submit supporting documents along with their LaRS/799.

36. In order to present claims for interest subsidies and special allowance payments on the loans it holds and services, which are made electronically through the Lender Reporting System ("LaRS"), Nelnet is required to sign a certification in a Lender/Servicer Organization Participation Agreement, as a condition of participation in FFELP and as a condition of payment of federal subsidies, a copy of which is attached hereto as exhibit "K". On the Lender/Servicer Organization Participation Agreement, the lender or servicer certifies and states that (1) it is an eligible lender or servicer, (2) the data submitted on a LaRS/799 on behalf of itself or as servicer

16

for another lender will be accurate, and (3) the data complies with all FFELP statutes, regulations or DOEd policies. For all claims Nelnet submits on behalf of itself as lender or on behalf of JP Morgan or Citigroup as servicer, this executed Lender/Servicer Organization Participation Agreement is a false record or statement because Nelnet is not an eligible lender due to its illegal marketing activities. As such, the data submitted by Nelnet on a LaRS/799 on behalf of itself or as servicer for JP Morgan or Citigroup is false, and the data does not comply with FFELP statutes, regulations or policies as a result of Nelnet's offering of prohibited inducements and fraudulent and misleading advertising.

37.    Nelnet presents quarterly billing statements to the DOEd through the LaRS/799, entitled, "Lender's Request for Interest and Special Allowance." Nelnet uses the LaRS/799 to present interest subsidy and special allowance payment claims to the DOEd on the loans it holds and lons JP Morgan and Citigroup hold. When presenting the LaRS/799 to the DOEd, since at least the time Vigil began working for Nelnet until present, Nelnet has made and used false statements on behalf of JP Morgan, Citibank and Nelnet in order to get false claims paid by the U.S. The statements and claims are false because under CERTIFICATION on the LaRS/799, Nelnet represents to the U.S. it is eligible for the claimed subsidies. Nelnet is not eligible because of Nelnet's offering of prohibited inducements and acts of misleading consumers in violation of federal statutes and regulations. In addition, on the same CERTIFICATION, Nelnet certifies that it is only seeking payment for amounts which are proper under the FFELP laws, regulations and policies. Nelnet's marketing tactics make all claims for interest subsidies or special allowance payments presented by Nelnet on behalf of itself, JP Morgan or Citigroup improper and false. JP Morgan and Citigroup are ineligible for FFELP subsidies because of Nelnet's statutory and regulatory non-compliance and because hiring a third party servicer does

17

not relieve a lender from complying with its duties under the HEA. 34 C.F.R. § 682.203. Finally, the CERTIFICATION is false because it states the data submitted conforms to all FFELP statutes, regulations or policies which is untrue because the amount of each subsidy claimed due by Nelnet is false.

38.     The LaRS/799 claim forms that Nelnet completes on its own behalf and on behalf of Citigroup and JP Morgan are presented to an employee of the DOEd where they are processed at the DOEd's Student Loan Processing Center. The DOEd reviews all LaRS/799s for accuracy and subjects them to limited tests and edits to identify obvious errors. Once the DOEd verifies the accuracy of the interest calculation on the LaRS/799, calculates the special allowance payment owed, and makes any needed adjustments, the DOEd determines the total amount of interest and special allowance subsidy due to the lender or servicer. The DOEd then pays the lender or servicer the amount due. The DOEd relies upon Nelnet to provide accurate claims information on behalf of each lender for which it services loans. Nelnet has failed the DOEd in this regard. JP Morgan and Citigroup have been complicit in this failure.

## SUBMITTING THE LARS/799 FOR INTEREST AND SPECIAL ALLOWANCE PAYMENTS AND CLAIM FORMS FOR DEFAULT CLAIMS CONSTITUTE CLAIMS FOR PAYMENT UNDER THE FALSE CLAIMS ACT

39.     The LaRS/799 presented to the DOEd for interest subsidies and special allowance payments is a claim within the meaning of 31 U.S.C. § 3729(c) of the False Claims Act. Additionally, the Claim Form submitted to the Agency for payment of a default claim is a claim within the meaning of 31 U.S.C. § 3729(c) of the False Claims Act. A claim is any request or demand, whether under contract or otherwise, for money or property which is made by a contractor, grantee, or other recipient if the U.S. Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is

18

requested or demanded.

40.    When Nelnet entered into agreements with Agencies in each State, Nelnet represented and certified that as to each claim it would present to each such Agency that Nelnet would comply with all federal statutes and regulations applying to each such transaction.  Thus, compliance with the HEA is a necessary condition of initial and continued eligibility and participation in the FFELP program, in addition to being a condition of payment for interest subsidies, special allowance payments and default claims.

41.    In the course of, and as a prerequisite to, presenting the required Claim Form to the Agencies for payment with U.S. funds on a borrower default upon any FFELP student loan, the lender and/or servicer submitting any such claim expressly certifies that:

> by submitting this claim to the guarantor for reimbursement, the lender/holder certifies, to the best of its knowledge . . . that the loan(s) included in the claim was (were) made, disbursed (including remittance of origination fees) and serviced in compliance with all federal regulations.

Nelnet provided such certifications with each default claim presented to the Agency and is required to execute such certification as a condition of payment from the Agency.  When Nelnet presented each Claim Form to the Agency on behalf of itself, JP Morgan or Citigroup for payment of a default claim, it certified the underlying loans were made, disbursed and serviced in compliance with all federal regulations.  This is a lie because of Nelnet's non-compliant marketing tactics.  The Agency pays the claims, out of U.S. funds, because of that lie.

## NELNET'S INDUCEMENT PAYMENTS ARE ILLEGAL

42.    A legal prerequisite to serving, or to submitting any claim, as an elgible lender or servicer of federally-guaranteed FFELP student loans, in turn, is that no lender (and no marketer or servicer acting on behalf of any lender) may offer, directly or indirectly, any payments or other inducements *to any individual* (or to any educational institution) for purposes of securing

19

applicants for FFELP student loans. 20 U.S.C. § 1085(d), 20 U.S.C. § 1086(a), 34 C.F.R. § 682.200, 34 C.F.R. § 682.401(e) and 34 C.F.R. § 682.415(b); Dear Colleague Letter 89-L-129 (emphasis added). As Dear Colleague Letter 89-L-129 notes, the DOEd views payments by a lender to its own employees as a prohibited act.[1]

43.    Lenders such as Nelnet, JP Morgan and Citigroup which hire a sales representative or loan solicitor, such as Vigil, to persuade prospective borrowers to apply for a loan with a FFELP lender, offer individuals a specifically enumerated "Prohibited Inducement" pursuant to Dear Colleague Letter 89-L-129. Nelnet, as an EP, knew, should have known and continues to know of the DOEd pronouncements regarding the prohibited inducement rule in DCL 89-L-129.

44.    Nelnet, acting as an agent for the Agencies, improperly compensates its employees by offering paying them bonuses and other inducements in order to secure applicants for FFELP loans. As a result, Nelnet causes the Agencies that guarantee Nelnet loans to violate their Agency Organization Participation Agreement with the DOEd by Nelnet providing its employees payments and other inducements in order to secure applicants for FFELP loans. A copy of the Agency Organization Participation Agreement with the DOEd is attached hereto as exhibit "L" and execution of, and compliance with, same is a condition of entitlement to reinsurance payments from the U.S. Executing and complying with an Agency Organization Partticipation Agreement is required before an Agency can submit claims to the DOEd. The Agreement requires the Agency authorizing official to certify that the data he submits to the DOEd complies with all DOEd laws, regulations and policies. Here is where Nelnet causes the

---

[1]
      "The department believes these provisions were broadly intended to prohibit direct or indirect offering or payment of any kind of financial incentive by a lender to any entity or person to secure applicants ...". Dear Colleague Letter 89-L-129.

Agency to present a false claim to an employee of the U.S. When presenting a default re-insurance claim with the DOEd, after paying Nelnet's default claim, the loan forming the basis of the claim with the DOEd was not compliant with HEA laws, regulations and policies because of Nelnet's systemic practice of offering inducements and misleading consumers. Thus, Nelnet knowingly *causes the Agency to present* to an officer or employee of the United States Government ... a false or fraudulent claim for payment or approval .... *See* 31 U.S.C. § 3729(a)(1)(emphasis added).

45.     As a legally necessary part of each and every Claim Form through which Nelnet asserted a claim to an Agency for payment with U.S. funds upon the default of any loan serviced by Nelnet, Nelnet signed and made an explicit statement that by submitting claims to the Agency for reimbursement, the lender/holder certifies, to the best of its knowledge, that the information in this claim is true and accurate and that the loan(s) included in the claim was (were) made ... in compliance with all federal regulations and appropriate Agency rules.

46.     All such statements, certifications, records and claims were false, with respect to all FFELP consolidation loans made by Nelnet, and all FFELP loans made by JP Morgan or Citigroup for which Nelnet acts as their claims agent or loan servicer, to students or alumni as a result of direct telemarketing by Nelnet, in violation of 20 U.S.C. § 1085(d)(5). All such statements, certifications and records were made by Nelnet in order to obtain, and as a legally necessary and material prerequisite to obtain, payment on such default claims with funds of the U.S.. Since Nelnet violates HEA statutes, regulations and DOEd policies with regards to the FFELP loans it services and holds, it lied to the Agency in the Claim Form to get default claims paid.

47.     If the Agency or DOEd employees had known that Nelnet had a systemic practice and policy of non-compliance, no such claims or funds would have been paid to Nelnet,

21

and Nelnet would be obligated to re-pay U.S. funds received by Nelnet, beginning no later than the date Vigil began working for Nelnet until present.

48.     As a legally necessary part of making and undertaking each and every individual federal consolidation loan, and of being entitled to receive payment with funds of the U.S. for any interest payments, special allowance payments, or insurance or guaranty payments for default claims as to each such loan, Nelnet was required to and did sign and submit to the consolidation lender, a Federal Consolidation Loan Verification Certificate ("LVC"), which, as required by 20 U.S.C. § 1078-3(b)(3), included an express certification by Nelnet as follows: Each such loan was made and serviced in compliance with all applicable laws and regulations. A duplicate of that LVC is attached hereto as exhibit "M". In order for any individual consolidation loan to be covered by federal insurance with an Agency, the loan itself had to be covered by a LVC which included that explicit certification. 20 U.S.C. § 1078-3(a)(2).

49.     All such statements, certifications and records were false, with respect to all FFELP consolidation loans made by Nelnet to consumers as a result of direct telemarketing solicitations by Nelnet recruiters, in violation of 20 U.S.C. § 1085(d)(5), and the remaining authorities for the inducement and misleading and fraudulent advertising prohibitions.

50.     All such false statements, certifications and records were made in order to obtain, and as a legally necessary and material prerequisite to obtain, all such interest payments, special allowance payments, and default claims paid to Nelnet with U.S. funds. If the Agency or DOEd representatives had known of the truth of such statements, no such claims or funds would have been paid to Nelnet, and Nelnet would have been found ineligible to claim any federal subsidies and been obligated to re-pay U.S. money received pursuant to 20 U.S.C. § 1085(d)(5).

51.     Additionally, Nelnet actively concealed its false claims through its false

22

statements. Nelnet knowingly violated the anti-inducement provision, and the fraudulent and misleading advertising prohibition provision of the HEA and purposefully kept the government and Agency in the dark. With respect to claims presented by (or other activities of) FFELP lenders or servicers having an EP designation, Congress decided expressly to provide that lenders found non-compliant with applicable program regulations shall be considered in violation of Section 3729 of Title 31, which of course is the substantive provision of the False Claims Act. *See* 20 U.S.C. §1078-9(g). In presenting claims for default, special allowance payments, and interest payments to Agencies and the DOEd, Nelnet committed *per se* violations of the False Claims Act, 31 U.S.C. § 3729. In other words, Nelnet's policy of non-compliance with the anti-inducement law and misleading consumers makes any claim submitted by Nelnet on Nelnet's, JP Morgan's or Citigroup's behalf, while Nelnet was an EP, a legally and factually false claim, on which payment is not due, within the meaning of 31 U.S.C. § 3729.

## NELNET CONDUCTS FRAUDULENT AND MISLEADING ADVERTISING

52.    On its websites, Nelnet violated the HEA's prohibition on engaging in fraudulent or misleading advertising with respect to its FFELP loan activities, disqualifying Nelnet as an eligible lender. 20 U.S.C. § 1085(d)(5)(D); 34 C.F.R. § 682.200.

53.    Such activities by Nelnet include Nelnet's maintenance as a part of its internet website of material and software, which purports to be official exit counseling affiliated with, sponsored by, and endorsed by the student's own University, but which is in fact sponsored and authored only by Nelnet, that directs and induces students or graduates undertaking such exit counseling at Nelnet's website to enter into a transaction with Nelnet as the lender for a FFELP consolidation loan.

54.    Moreover, the Nelnet websites misrepresent the available interest rates for consolidated loan applications and that loan consolidation will reduce the total interest paid by

23

the borrower over the life of the loan. While visiting a 2007 Nelnet website, the average consumer is misled into believing that when a consumer submits a FFELP consolidation loan application to Nelnet, Nelnet holds the application until the lowest interest rate is available. However, upon information and belief, Nelnet does not hold the application for the lowest rate, but instead applies the interest rate available at the time the application is submitted (which may not be the lowest rate available). Additionally, Nelnet misleads consumers by inducing them to consolidate their FFELP loans before their grace period runs out by offering them forbearance which they are not entitled, which yields higher interest payments and larger loan balances for those consumers and the U.S. This is a prohibited inducement to persuade the consumer to submit a Nelnet loan application. Also, Nelnet fails to reveal to the borrower that in consolidating, he will be losing certain rights the government grants on Perkins Loans (i.e. lower interest rates, discharge ability of Perkins loan). Finally, the Nelnet loan advisors who telephone consumers mislead them into believing that the Nelnet loan advisors are associated with the borrower's University. *Cf. generally* Dear Colleague Letter 95-L-178.

### NELNET HAD KNOWLEDGE OF THE FALSE CLAIMS

55. It has long been known and discussed in the industry that inducements offered and/or paid to secure loan applications is a violation of 20 U.S.C. § 1085(d)(5). Although the issue of inducements to institutions and their alumni associations has received recent attention from various state attorneys general and Senate investigations, inducements to a lender's own employees has thus far escaped the public spotlight (or knowledge). However, the industry itself has long been on notice that such inducements are equally illegal and run afoul of the pertinent rules, regulations, and policies.

56. The best source for such notice comes from the DOEd itself. First, in response to a query by Senator Kennedy, in an April 17, 2007, letter from the DOEd, Secretary Spellings

24

noted that in November 2006, the DOEd began the process of negotiating rulemaking on, *inter alia*, prohibited inducements. She noted specifically that the

> HEA *currently* prohibits a guaranty agency and lender in the FFEL program from: (1) offering, directly or indirectly, premiums, payments, and other inducement to any educational institution or its employees, *or to other individuals* in order to secure FFEL loan applications; (2) conducting *unsolicited mailings of student loan applications*, except to borrowers who have previously received loans through that lender or guaranty agency; and (3) engaging in the fraudulent or misleading advertising.

Thus, not only is there a current ban on offering inducements (including inducements to a lender's own employees), but blind solicitations and promotions (i.e. "cold calls", mass mailings) are also banned.

57.    On June 12, 2007, the DOEd announced a Notice of Proposed Rulemaking (Docket ID # ED-2007-OPE-0133 ) wherein it sought to further define and clarify the activities that constitute prohibited inducements. Specifically, the proposed regulation states:

> Lenders would also be *prohibited from making payments or providing other benefits to a ... a loan solicitor or sales representative* who visits campuses, in exchange for loan applications secured from individual prospective borrowers. The proposed regulations would also modify prior program guidance by prohibiting all payments of loan application referral or processing fees between lenders, (whether or not the lender receiving the payment participates in the FFEL Program), or between lenders and any other entity.

http://www.ed.gov/legislation/FedRegister/proprule/2007-2/061207a.html (emphasis added).

58.    Additionally, the DOEd issues guidance on DOEd policy in Dear Colleague Letters ("DCL"). The first DCL on the topic of prohibited inducments was issued in 1989. *See* DCL 89-L-129. DCL 89-L-129, signed by the Deputy Assistant Secretary for Student Financial Assistance and the Director of Financial Assistance Programs, specifically identified as an illegal inducement the practice of employing "a loan solicitor or sales representative who visits schools for the purpose of persuading individual prospective borrowers to apply for a loan with the

lender." Given the passage of time and advances in technology in the intervening 18 years, loan solicitors and sales representatives like Vigil no longer need to physically travel to the schools but can solicit individual prospective borrowers to apply for a loan with Nelnet by telephone or email. However, although the mode of execution may have changed, the conduct itself has not changed.

59.    Nearly a decade later, the DOEd reiterated its stance against inducements for loan applications. DCL-95-G-178. The DOEd stated:

> Congress has provided severe sanctions for conduct by an eligible lender exceeding the limitations of paragraphs (d)(2) and (d)(5). In addition to the general sanctions in the Higher Education Act, paragraph (d)(5) expressly provides for the disqualification of the lender from participation in FFELP.... The Department considers lender activity exceeding these statutory limitations as extremely serious and will not tolerate its continuance.

*Id.* Of importance here, DCL-95-G-178 states, "the Secretary will look at the substance of any arrangements rather than merely their form" in determining whether there has been a violation of the anti-inducement provision.

60.    These DOEd statements and guidelines are also supplemented by industry drafted materials. For example, FinAid (www.finaid.org), an entity aimed at serving the consumer, has a thirty-eight (38) page article devoted exclusively to illegal inducements under the Higher Education Act. http://www.finaid.org/educators/ illegalinducements.phtml. As the FinAid article notes, it is the "offering of an inducement [which] is prohibited, and not just the provision or payment of any inducement." *Id* at 3. And the "rules prohibit inducement to educational institutions, *individuals, or other parties...*in securing applicants and loan applications." *Id.* (emphasis added).

61.    A pamphlet by the National Association of Student Financial Aid Administrators, titled "Avoiding Illegal Lender Inducements", notes that the HEA's anti-inducement ban broadly

26

prohibits "lenders giving inducements" but provides some limited "safe harbor" activities. "Safe harbor" activities, or activities that do not constitute prohibited inducements under the law include a lender supporting schools in meeting their responsibilities to provide borrowers with initial counseling, exit counseling (provided that the school maintains control of the exit counseling event), and general debt counseling. In the instant case, Nelnet's offering and provision of misleading exit counseling for the institution's students in exchange for steering potential loan applicants to Nelnet's website does not fall within the safe harbor because the institution does not maintain control over the exit counseling event nor provide the consumer with objective information.

62.     On November 16, 2004, guidelines were collectively issued by Consumer Bankers Association, Education Finance Council, and National Council of Higher Education Loan Programs, Inc. These guidelines were developed to aid post-secondary institutions and loan industry participants in their efforts to comply with the statutory provisions of the HEA and was intended to supplement the DOEd's existing guidance. The sum and substance of these 10 guidelines is a prohibition of offering inducements to anyone by lenders for FFELP loan applications.

63.     Nelnet, by its own admission, knew that inducements it offered and/or paid for loan applications was illegal. In its August 19, 2003 Form S-1, Nelnet stated:

> The Higher Education Act generally prohibits a lender from providing inducements to educational institutions *or individuals* in order to secure applicants for FFELP loans. We have entered into various agreements to acquire marketing lists of prospective FFELP loan borrowers from sources such as college alumni associations. We pay to acquire these lists and for the completed applications for loans resulting therefrom. We believe that such arrangements are permissible and do not violate restrictions on inducements, as they fit within a regulatory exception recognized by the DOE for generalized marketing and advertising activities. The DOE has provided informal guidance to us that such arrangements do not raise any improper inducement issues, since such arrangements fall within the generalized marketing exception. If the DOE were to

27

change its position, this could hurt our reputation and could potentially result in the DOE imposing sanctions on us. These sanctions could negatively impact our business.

*Id.* at page 8 (emphasis added). Thus, Nelnet previously disclosed its recently halted practice of paying money to schools for lists of potential borrowers of consolidation loans, but has thus far failed to disclose, or halt, its practice of paying inducements to its own employees, or the offering of misleading and free exit counseling to institutions for use by that institution's students. Nelnet continues to violate the HEA prohibition of offering inducements in order to secure FFELP applicants.

## NELNET'S FRAUDULENT COURSE OF CONDUCT

64.    Nelnet engaged in a fraudulent course of conduct, namely its false certifications that its loans were made in compliance with applicable HEA regulations, statutes and DOEd policies in the Lender/Servicer Organization Participation Agreement, LaRS/799, LVC and Claim Forms when it knew it was ineligible to receive special allowance payments, interest subsidies from the DOEd and payments of principal and accrued interest on defaulted loans from Agencies, because of its offering of prohibited inducements, and its false and misleading advertising in violation of HEA regulations, statutes and DOEd policies.

65.    Refraining from the offering of inducements and misleading consumers is a condition of Nelnet's participation in the FFELP program as an eligible lender or servicer, and a condition of payment from the U.S. and Agencies. Thus, Nelnet's fraudulent course of conduct of concealing its non-compliance with, and false certifications of compliance with, the HEA's prohibition on the offering of inducements for loan applications and provision of false and misleading advertising to consumers was

28

material to the DOEd's and Agency's decision to pay Nelnet's claims for federal subsidies.

66.     Nelnet's fraudulent course of conduct consisting of brazenly offering inducements to its employees and schools for loan applicants, while keeping the DOEd in the dark by virtue of its implied and express certifications of compliance with all HEA statutes, regulations and DOEd policies caused the transfer of U.S. money to Nelnet in the form of federal interest subsidies, special allowance payments and default claims. Further, by making and causing to be made false records, statements and claims to conceal its obligations to the government, Nelnet caused the government to forfeit monies and other obligations due to it by virtue of keeping the DOEd in the dark and concealing the DOEd's right to recoup the U.S. monies it paid to Nelnet pursuant to 20 USC §1085.

67.     Although a publicly traded company, Nelnet's public financial statements do not provide specific data to estimate the total loss to the government by virtue of Nelnet's false claims for special allowance payments, interest subsidies, and loan guarantees. For fiscal years 2003-2006, total special allowance payments reported equal $353,801,000. Also using figures in these 10-Ks, it is estimated that Nelnet's default insurance claims for FY 2002-2006 amount to $1,783,872,407. Similar figures could not be estimated for interest subsidies based on SEC filings.

## CAUSES OF ACTION

### Count 1 – Violations of False Claims Act - 31 U.S.C. §3729(a)(1) - Nelnet Presented or Caused to be Presented False and Fraudulent Claims for Loan Interest, Special Allowance Payments, and Default Claims

68. Relator hereby re-alleges and incorporates by reference all allegations set forth in this Complaint.

69. By virtue of the acts and conduct described above, Nelnet since at least when relator began working for Nelnet in 2003, has knowingly presented or caused to be presented false and/or fraudulent claims to employees of the DOEd (and to Agencies operating as agents of the DOEd and expending U.S. money) for payment in violation of 31 U.S.C. § 3729(a)(1):

    a. through each and every claim for interest payments on each and every FFELP loan of which Nelnet has been a lender or servicer for itself, JP Morgan or Citigroup;

    b. through each and every claim for special allowance payments on each and every FFELP loan of which Nelnet has been a lender or servicer for itself, JP Morgan or Citigroup; and

    c. through each and every default claim on each and every FFELP loan of which Nelnet has been a lender or servicer for itself, JP Morgan or Citigroup.

70. Nelnet concealed its offering of inducements to its loan advisors, institutions, and consumers and its misleading advertising scheme, in order to obtain U.S. money it would not otherwise have obtained because of the prohibition on paying inducements to secure loan applications and misleading consumers, and consequently,

presented false claims.

71.    Defendants JP Morgan and Citigroup as principals of Nelnet, are vicariously, jointly and severally liable, along with Nelnet, for Nelnet's false claims presented to the U.S. and Agencies for payment of interest subsidies, special allowance payments and default claims on those loans which Nelnet acted as their servicer or claims agent and are also jointly and severally liable, along with Nelnet, for Nelnet's false claims pursuant to 34 C.F.R. § 682.413.

72.    The U.S., unaware of the falsity of the claims, in reliance on the accuracy thereof, and by virtue of and as a result of the false claims presented or caused to be presented by Nelnet, JP Morgan and Citigroup, has suffered actual damages and is entitled to recover three times the amount by which it is damaged, plus civil money penalties of not less than $5,500 and not more than $11,000 for each of the false claims presented or caused to be presented, and other monetary relief as appropriate.

## Count 2: Violations of False Claims Act - 31 U.S.C. §3729(a)(2) - Nelnet, JP Morgan and Citigroup Caused False Certifications, Records and Other Statements to be Made and Used to Get False Claims Paid and Approved

73.    The Plaintiff hereby re-alleges and incorporates by reference all allegations set forth in this Complaint.

74.    By virtue of the acts and conduct described above, Nelnet has knowingly caused to be made or used, false certifications and other false records or statements to the DOEd (and to Agencies acting on behalf of the DOEd and disbursing U.S. funds) through explicit and implicit certifications of Nelnet and Agency compliance with statutes, regulations and DOEd policies and the accuracy of data on the Agency Organization Participation Agreement, LVC, the Lender/Servicer Organization Participation Agreement, the LaRS/799 and the Claim Form, all required to be executed as a condition

31

of payment from the U.S. or an Agency of FFELP federal subsidies, pertaining to service as lender and servicer as to FFELP loans (including the certifications described above), in violation of 31 U.S.C. § 3729(a)(2):

a. as a part of each and every claim for interest payments on each and every FFELP loan of which Nelnet has been a lender or servicer on behalf of itself, JP Morgan or Citigroup;

b. as a part of each and every claim for special allowance payments on each and every FFELP loan of which Nelnet has been a lender or servicer on behalf of itself, JP Morgan or Citigroup; and

c. as a part of each and every insurance payment made upon the claimed default of each and every default claim on each and every FFELP loan of which Nelnet has been a lender or servicer on behalf of itself, Citigroup or JP Morgan.

75.    Nelnet concealed its payment of inducements to its loan advisors and institutions, consumers, and its scheme of misleading consumers, in order to obtain U.S. money it would not otherwise have been able to obtain because of the prohibition against payment of inducements to Nelnet's loan advisors, consumers and institutions, and the prohibition against engaging in fraudulent or misleading advertising, and consequently, submitted false claims.

76.    JP Morgan and Citigroup, as principals, are vicariously, jointly and severally liable, along with Nelnet, for Nelnet's false records and statements made and used, and caused to be made and used, to get false claims approved by the U.S. and Agencies for payment on the loans Nelnet acted as their servicer or claims agent and are also jointly and severally liable, along with Nelnet, for Nelnet's false claims pursuant to

32

34 C.F.R. § 682.413.

77.    The U.S. Government, unaware of the falsity of the claims and/or statements, in reliance on the accuracy thereof, and by virtue of and as a result of the false claims paid or approved as a result of the knowing making or use of such false certifications, records, and other statements caused by Nelnet, the U.S. has suffered actual damages and is entitled to recover three times the amount by which it is damaged, plus civil money penalties of not less than $5,500 and not more than $11,000 for each of the false claims paid or approved or caused to be paid or approved, and other monetary relief as appropriate.

## Count 3: Violations of False Claims Act – 31 U.S.C. § 3729(a)(3) - JP Morgan, Citigroup and Nelnet Conspired to Defraud the U.S. by Getting False and Fraudulent Claims Paid

78.    The Plaintiff hereby re-alleges and incorporates by reference all allegations set forth in this Complaint.

79.    Through JP Morgan and Citigroup's servicing and marketing agreements with Nelnet, and JP Morgan and Citigroup's line of credit agreement with Nelnet, JP Morgan, Citigroup and Nelnet conspired to defraud the U.S. by getting false or fraudulent claims paid by the DOEd and Agencies. The DOEd and Agencies paid these false or fraudulent claims causing the U.S. damages. The single plan of all three Defendants was to obtain as much U.S. money as possible from the FFELP by taking advantage of Nelnet's exceptional performer designation, and presenting as many FFELP claims as possible.

80.    By virtue of the acts and conduct described above, beginning no later than when Vigil began working for Nelnet, Nelnet, JP Morgan and Citigroup have knowingly conspired defraud the U.S. by getting Nelnet to make and use, and caused to be made and

used, false records and certifications and other false statements to the DOEd (and to Agencies acting on the DOEd's behalf and disbursing U.S. money) through false records and statements pertaining to Nelnet compliance with HEA statutes, regulations and DOEd policies, Nelnet's status as an eligible lender and the accuracy of the data contained on the LaRS/799 Nelnet submits to the DOEd and Claim Form Nelnet submits to the Agency on behalf of itself, JP Morgan or Citigroup, pertaining to Nelnet's service as lender and servicer as to FFELP loans (including the certifications described above), and in violation of 31 U.S.C. § 3729(a)(3):

> a. as a part of each and every claim for interest payments on each and every FFELP loan of which Nelnet has been a lender or servicer of FFELP loans held by itself, JP Morgan or Citigroup;
>
> b. as a part of each and every claim for special allowance payments on each and every FFELP loan of which Nelnet has been a lender or servicer on FFELP loans held by itself, JP Morgan or Citigroup; and
>
> c. as a part of each and every default claim for each and every FFELP loan of which Nelnet has been a lender or servicer on FFELP loans held by itself, JP Morgan or Citigroup.

81.     As a result of Defendants' conspiracy to defraud the U.S. by getting false claims paid, the U.S. has suffered actual damages and is entitled to recover three times the amount by which it is damaged, plus civil money penalties of not less than $5,500 and not more than $11,000 for each of Nelnet's claims presented to the DOEd or an Agency or caused to be paid by the DOEd or a guaranty agency, and other monetary relief as appropriate.

34

### Count 4- False Claims *Per Se*

82.     The Plaintiff hereby re-alleges and incorporates by reference all allegations set forth in this Complaint.

83.     With respect to claims made through (or other activities of) FFELP lenders or servicers having an EP designation, Congress decided expressly to provide that lenders or servicers exhibiting non-compliance with applicable program regulations shall be considered in violation of Section 3729 of Title 31, which of course is the substantive provision of the False Claims Act. *See* 20 U.S.C. § 1078-9(g). In submitting claims for defaulted FFELP loans, special allowance payments, and interest payments, Nelnet committed *per se* violations of the False Claims Act, 31 U.S.C. § 3729. In other words, Nelnet's policy of non-compliance with the HEA regulations as described above makes any and all claims submitted by Nelnet on behalf of JP Morgan, Citigroup or Nelnet, while Nelnet was an EP, a legally and factually false claim, on which payment is not due, within the meaning of 31 U.S.C. § 3729. Nelnet was initially designated an EP on May 26, 2004, and ceased being designated an EP on December 31, 2007.

84.     As a result of Nelnet's alleged regulatory non-compliance while an EP, Nelnet, JP Morgan and Citigroup are liable, jointly and severally, for:

> a. each and every claim for interest payments on each and every FFELP loan of which Nelnet has been a lender or servicer of loans held by itself, JP Morgan or Citigroup;
>
> b. each and every claim for special allowance payments on each and every FFELP loan of which Nelnet has been a lender or servicer of loans held by itself, JP Morgan or Citigroup; and

35

c. each and every default claim for each and·every FFELP loan of which Nelnet has been a lender or servicer of loans held by itself, JP Morgan or Citigroup.

85.    As a result of Nelnet's *per se* violations of the False Claims Act, the U.S. has suffered actual damages and is entitled to recover three times the amount by which it is damaged, plus civil money penalties of not less than $5,500 and not more than $11,000 for each claim Nelnet presented to the DOE or an Agency or caused to be paid by the DOEd or an Agency, from October 5, 2004, until December 31, 2007, and other monetary relief as appropriate.

## Count 5: Violations of False Claims Act – 31 U.S.C. §3729(a)(7) - Nelnet Caused False Certifications and Other Statements to be Used to Avoid Obligations to Pay Government

86.    The Plaintiff hereby re-alleges and incorporates by reference all allegations set forth in this Complaint.

87.    By virtue of the acts and conduct described above, Nelnet beginning no later than when Relator began working for Nelnet, has knowingly made, used or caused to be made or used false records or statements to the DOEd (and to Agencies on behalf of the DOEd and disbursing U.S. funds) through explicit and implicit certifications of Nelnet compliance with regulations and the accuracy of data on forms required to be submitted as a condition of payment from the U.S., pertaining to service as lender and servicer as to FFELP loans (including the certifications described above), in violation of 31 U.S.C. § 3729(a)(7):

a.  in order to avoid or decrease obligations to pay or return funds to the DOEd;

b.  as a part of each and every claim for interest payments on each and

every FFELP loan of which Nelnet has been a lender or servicer;

c. as a part of each and every claim for special allowance payments on each and every FFELP loan of which Nelnet has been a lender or servicer, and

d. as a part of each and every default claim for each and every FFELP loan of which Nelnet has been a lender or servicer.

88.    Nelnet falsely concealed its payment of inducements to its loan advisors and institutions and its false and misleading advertising in order to obtain U.S. funding it would not otherwise have been able to obtain because of the prohibition against payment of inducements to individuals for securing Nelnet FFELP loan applicants and misleading consumers, consequently submitting false claims.

89.    The U.S. Government, unaware of the falsity of the claims and/or statements, in reliance on the accuracy thereof, and by virtue of and as a result of the absence of demands to Nelnet for refunds or returns of claims paid and approved as a result of the knowing making or use of such false certifications, records, and other statements caused by Nelnet, the U.S. has suffered actual damages and is entitled to recover three times the amount by which it is damaged, plus civil money penalties of not less than $5,500 and not more than $11,000 for each of the false claims presented or caused to be presented, and other monetary relief as appropriate.

## PRAYER FOR RELIEF

WHEREFORE, the U.S. demands and prays that judgment be entered in favor of the U.S.:

A.    On Counts 1-5, under the False Claims Act, against each Defendant, jointly and severally, for treble (or three times) the amount of U.S. claim payments and other actual damages (including investigative costs), plus civil penalties as are allowable by law for each false claim;

37

B.      For all costs of this civil action; and

C.      For such other and further relief as the Court deems just and equitable.

WHEREFORE, Relator Rudy Vigil demands and prays that judgment be entered in his favor as follows:

A.      On Counts 1-5, under the False Claims Act, for a percentage of all civil penalties and damages obtained from Defendants pursuant to 31 U.S.C. § 3730,

B.      Reasonable attorneys' fees, and all costs incurred in the prosecution of this action against Defendants; and

C.      Such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Relator, on behalf of himself and the U.S., demands a jury trial on all claims alleged herein.

Respectfully submitted,

RUDY VIGIL,
Relator
By his Attorneys,

By: _____
Timothy J. Matusheski (Miss. Bar No. 100998)
**The Law Offices of Timothy J. Matusheski**
4363 Highway 145 North
P.O. Box 1421
Waynesboro, Mississippi 39637
Tel. (601) 735-5222
Fax: (601) 735-5008

Tracy D. Rezvani (D.C. Bar No. 464293)
Rosalee B. Connell (D.C. Bar No. 492770)
**Finkelstein Thompson, LLP**
1050 30th Street, N.W.
Washington, D.C. 20007
Tel: (202) 337-8000
Fax: (202) 337-8090

Rosemary M. Rivas (Cal. Bar No. 209147)
**Finkelstein Thompson, LLP**

38

100 Bush Street
Suite 1450
San Francisco, CA 94104
Tel: (415) 398-8700
Fax: (415) 398-8704

Scott H. Peters (Neb. Bar No. 21844)
**PETERS LAW FIRM, P.C.**
233 Pearl Street, P.O. Box 1078
Council Bluffs, IA 51502-1078
Tel. (712) 328-3157
Fax: (712) 328-9092

Filed by Bowne Pure Compliance

http://www.sec.gov/Archives/edgar/data/1258602/000136231008001 1...

E

## List of Direct and Indirect Subsidiaries of Nelnet, Inc.
### as of February 7, 2008

| | Name | City | State | Date Established | Description of Operations | Relationship to Nelnet, Inc. | Percenta Ownersl |
|---|---|---|---|---|---|---|---|
| 1. | National Education Loan Network, Inc. (organized in Nevada) (dba American Card Services) | Lincoln | NE | 01/27/00 | Student loans and associated products, services and financing, including marketing services. Also provides corporate services (legal, accounting, etc.) for Nelnet and its related entities, and provides payment processing and web-based software applications. | Direct Subsidiary | 100% |
| 2. | Nelnet Capital LLC (organized in Nebraska) | Lincoln | NE | 03/03/00 | Broker — Dealer Services | Direct Subsidiary | 100% |
| 3. | Nelnet Guarantor Solutions, LLC (organized in Florida) (formerly Nelnet Guarantee Services LLC; formerly GuaranTec LLP) | Jacksonville | FL | 01/01/06 (was converted from LLP in 2006 — LLP formed 11/1/96) | Provides services to student loan guaranty agencies. | Indirect Subsidiary | 100% |
| 4. | National Higher Education Loan Program, Inc. (organized in Nebraska) | Lincoln | NE | 11/05/97 | Student loan financing | Indirect Subsidiary | 100% |
| 5. | 5280 Solutions LLC (f/k/a Nelnet Technology Services LLC) (organized in Colorado) (d/b/a Idaho Financial Associates, Charter Account Systems and 5280 Solutions) | Littleton | CO | 11/30/00 (was converted from a corporation to an LLC in 2005) | Provides IT products and technical consulting; develops and licenses loan processing/servicing software. | Indirect Subsidiary | 100% |
| 6. | FirstMark Services, LLC (organized in Colorado) | Woodbury | MN | 02/26/02 | Origination and servicing of private educational loans | Indirect Subsidiary | 100% |
| 7. | ClassCredit, Inc. (organized in Florida) | Lincoln | NE | 08/02/94 | Student loan origination | Indirect Subsidiary | 100% |
| 8. | InTuition, Inc. (organized in Florida) | Lincoln | NE | 12/20/91 | Student loan servicing and financing | Indirect Subsidiary | 100% |
| 9. | EFS Finance Co. (organized in Indiana) | Lincoln | NE | 01/13/95 | Student loan financing | Indirect Subsidiary | 100% |
| 10. | Nelnet Management Corporation-1 (organized in Nevada) (formerly Nelnet Student Loan Warehouse | Lincoln | NE | 01/23/02 | Student loan financing | Indirect Subsidiary | 100% |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Corporation — 1) | | | | | | |
| 11. | Nelnet Student Loan Funding Management Corporation (organized in Nevada) | Lincoln | NE | 05/14/02 | Student loan financing | Indirect Subsidiary | 100% |
| 12. | Nelnet Student Loan Funding, LLC (organized in Delaware) | Lincoln | NE | 01/25/02 | Student loan financing | Indirect Subsidiary | 100% |
| 13. | NELNET Student Loan Corporation-1 (organized in Nevada) | Lincoln | NE | 02/28/96 | Student loan financing | Indirect Subsidiary | 100% |

Filed by Bowne Pure Compliance    http://www.sec.gov/Archives/edgar/data/1258602/000136231008001l...

| | Name | City | State | Date Established | Description of Operations | Relationship to Nelnet, Inc. | Percent; Owners! |
|---|---|---|---|---|---|---|---|
| 14. | NELNET Student Loan Corporation-2 (organized in Nevada) | Lincoln | NE | 10/08/99 | Student loan financing | Indirect Subsidiary | 100% |
| 15. | NHELP-I, Inc. (organized in Nevada) | Lincoln | NE | 09/25/98 | Student loan financing | Indirect Subsidiary | 100% |
| 16. | NHELP-II Inc. (organized in Nevada) | Lincoln | NE | 01/13/98 | Student loan financing | Indirect Subsidiary | 100% |
| 17. | NHELP-II, LLC (organized in Nevada) | Lincoln | NE | 01/13/98 | Student loan financing | Indirect Subsidiary | 100% |
| 18. | NHELP-III, Inc. (organized in Nevada) | Lincoln | NE | 09/07/99 | Student loan financing | Indirect Subsidiary | 100% |
| 19. | EMT Corp. (organized in Indiana) | Lincoln | NE | 04/14/98 | Student loan financing | Indirect Subsidiary | 100% |
| 20. | Nelnet Loan Corp.(organized in Nevada) | Lincoln | NE | 10/25/01 | Private Student loan financing | Indirect Subsidiary | 100% |
| 21. | Nelnet Education Loan Funding, Inc. (f/k/a NEBHELP, INC.) (organized in Nebraska) | Lincoln | NE | 04/20/03 | Student loan financing | Indirect Subsidiary | 100% |
| 22. | MELMAC, Inc. (organized in Nevada) | Portland | ME | 06/28/00 | Student loan financing | Indirect Subsidiary | 100% |
| 23. | MELMAC, LLC (organized in Delaware) | Portland | ME | 06/29/00 | Student loan financing | Indirect Subsidiary | 100% |
| 24. | National Education Loan of New England, Inc. (organized in Rhode Island) | Warwick | RI | 03/09/04 | Student loan origination | Indirect Subsidiary | 100% |
| 25. | Student Loan Acquisition Authority of Arizona, LLC (organized in Delaware) | Lincoln | NE | 09/01/03 | Student loan financing | Indirect Subsidiary | 100% |
| 26. | SLAAA Acquisition Corp. (organized in Nebraska) | Lincoln | NE | 08/01/03 | Student loan financing | Indirect Subsidiary | 100% |
| 27. | Shockley Financial Corp. (organized in Colorado) | Aurora | CO | 10/01/02 | Capital Markets activities | Indirect Subsidiary | 100% |
| 28. | Nelnet Canada, Inc. (organized in Canada) | Mississauga | Ontario | 05/10/07 | Canadian Student loan origination and servicing | Indirect Subsidiary | 100% |
| 29. | Nelnet Business Solutions, Inc. (f/k/a FACTS Management | Lincoln | NE | 12/26/92 | Tuition payment plans, online payment processing and campus commerce | Indirect Subsidiary | 100% |

Filed by Bowne Pure Compliance http://www.sec.gov/Archives/edgar/data/1258602/000136231008 0011...

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Co.) (organized in Nebraska) (dba FACTS Management and infiNET Integrated Solutions) | | | . | solutions. | | |
| 30. | Student Marketing Group, Inc. (organized in New York) | Lynbrook | NY | 02/04/99 | Direct marketing services | Direct Subsidiary | 100% |
| 31. | National Honor Roll, L.L.C. (organized in New York) | Lynbrook | NY | 01/01/01 | High School Student Honor Roll publication and mailing list services | Indirect Subsidiary | 100% |
| 32. | LoanSTAR Funding Group, Inc. (organized in Texas) | Bryan | TX | 12/08/97 | Student loan originations and secondary market. | Indirect Subsidiary | 100% |
| 33. | Nelnet Academic Funding Solutions, LLC (organized in Nebraska) | Lincoln | NE | 08/15/05 | Student loan financing and management | Indirect Subsidiary | 100% |
| 34. | College Bound Loans, Inc. (organized in Rhode Island) (f/k/a/ BST Holdings, Inc.) | Warwick | RI | 11/05/80 | Student loan origination | Indirect Subsidiary | 100% |
| 35. | Nelnet Academic Services LLC (organized in Nebraska) (f/k/a Nelnet Mentor, LLC) | Lincoln | NE | 12/18/03 | Student loan services | Indirect Subsidiary | 100% |
| 36. | Chela Education Funding, Inc. (organized in Nebraska) (f/k/a Student Partner Services, Inc.) | Lincoln | NE | 05/09/02 | Student loan origination | Indirect Subsidiary | 100% |
| 37. | Loanstar Assets GP, LLC (organized in Delaware) | Lincoln | NE | 01/30/01 | Student loan financing and management | Indirect Subsidiary | 100% |

| | Name | City | State | Date Established | Description of Operations | Relationship to Nelnet, Inc. | Percenta Ownersl |
|---|---|---|---|---|---|---|---|
| 38. | Loanstar Assets LP, LLC (organized in Delaware) | Lincoln | NE | 01/30/01 | Student loan financing | Indirect Subsidiary | 100% |
| 39. | Loanstar Assets Partners, LP (organized in Delaware) | Lincoln | NE | 01/30/01 | Student loan financing and management | Indirect Subsidiary | 100% |
| 40. | Nelnet Academic Private Loan Warehouse — I, LLC (organized in Delaware) | Lincoln | NE | 08/12/05 | Student loan financing | Indirect Subsidiary | 100% |
| 41. | CUnet, LLC (organized in Delaware) | Wyckoff | NJ | 02/02/04 | Performance-based educational marketing, lead generation, and vendor management services. | Indirect Subsidiary | 100% |
| 42. | Peterson's Nelnet, LLC (formerly NELN Acquisition, LLC) (organized in Nebraska) | Lawrenceville | NJ | 07/19/06 | College search and selection, test preparation, and financial aid; online services for essay editing and instruction as well as resume writing. | Indirect Subsidiary | 100% |
| 43. | M & P Building, LLC (organized in Nebraska) | Lincoln | NE | 10/06/06 | Real Estate | Direct/Indirect | 100% |
| 44. | Nelnet Student Asset Funding Extendable CP, LLC (organized in Nebraska) | Lincoln | NE | 10/13/06 | Student Loan Financing | Indirect Subsidiary | 100% |
| 45. | Lincoln Square Funding LLC (organized in Nebraska) | Lincoln | NE | 10/03/06 | Student Loan Financing | Indirect Subsidiary | 100% |
| 46. | First National Life Insurance Company of the USA (a Nebraska domiciled life insurance company) | Lincoln | NE | 3/25/07 | Insurance programs | Indirect Subsidiary | 100% |
| 47. | Education Solutions, Inc. | Lincoln | NE | 01/01/08 | Student Loan Financing | Indirect Subsidiary | 100% |

Note: this list does not include Nelnet Student Loan Trusts utilized in asset backed security financings.

 STATE HERE
GO FURTHER
FEDERAL STUDENT AID

# Lender Default Rate
## Search Results
### FY 2005



**7 Records found with specified criteria ( NAME = nelnet )**
**Records from 1 to 7**

| Rec | Lender's OPE ID | Name | Address | City | State |
|---|---|---|---|---|---|
| 1 | 83320500 | UNION BANK & TRUST ELT NELNET | PO BOX 82535 | LINCOLN | NE |
| 2 | 83350000 | WELLS FARGO ELT NELNET ED LOAN FUND | 121 SOUTH 13TH STREET | LINCOLN | NE |
| 3 | 83393400 | ZIONS BANK ELT NELNET TRUST | 121 SOUTH 13TH STREET | LINCOLN | NE |
| 4 | 83370200 | ZIONS ELT NELNET II | 121 SOUTH 13TH STREET | LINCOLN | NE |
| 5 | 83389500 | ZIONS ELT NELNET MGMT CORP-1 & AFF. | 121 SOUTH 13TH STREET | LINCOLN | NE |
| 6 | 83410000 | ZIONS FNB ELT NELNET ACADEMIC SVCS | 121 SOUTH 13TH STREET | LINCOLN | NE |
| 7 | 83345700 | ZIONS FNB ELT NELNET I | 121 S. 13TH STREET | LINCOLN | NE |





1 of 1

**Exhibit 21.1**
JPMorgan Chase & Co.

List of subsidiaries

JPMorgan Chase had the following subsidiaries at December 31, 2006:

| Name | Organized under the laws of | Percentage of voting securities owned by immediate parent |
|---|---|---|
| Banc One Building Management Corporation | Wisconsin | 100 |
| Banc One Capital Holdings LLC | Delaware | 100 |
| BOCP Holdings Corporation | Ohio | 100 |
| Banc One Capital Partners BC, LLC | Ohio | 80 |
| Banc One Capital BIDCO-1998, LLC | Louisiana | 100 |
| Banc One Capital Partners Holdings, Ltd. | Ohio | 100 |
| Banc One Capital Partners, LLC | Delaware | 100 |
| Banc One Capital Partners II, LLC | Delaware | 100 |
| Banc One Capital Partners IV, Ltd. | Ohio | 100 |
| Banc One Capital Partners VI, Ltd. | Ohio | 100 |
| Banc One Stonehenge Capital Fund Wisconsin, LLC | Delaware | 100 |
| BOCF, LLC | Delaware | 80(a) |
| BOCNY, LLC | Delaware | 100 |
| BOME Investors, Inc. | Delaware | 100 |
| Tax Credit Acquisitions, LLC | Ohio | 100 |
| Chase Investment Services Corp. | Delaware | 100 |
| Banc One Deferred Benefits Corporation | Ohio | 98 |
| Banc One Financial LLC | Delaware | 100 |
| JPMorgan Capital Corporation | Delaware | 100 |
| Bank One Investment Corporation | Delaware | 100 |
| OEP Holding Corporation | Delaware | 100 |
| Banc One Equity Capital Fund II, L.L.C. | Delaware | 99.5 |
| Banc One Equity Capital SBIC Fund II, L.L.C. | Delaware | 100 |
| One Equity Partners II, L.P. | Cayman Islands, BWI | 99.9 |
| One Equity Partners LLC | Delaware | 99.8 |
| First Chicago Capital Corporation | Delaware | 100 |
| JPMorgan Capital (Canada) Corp. | Canada | 100 |
| One Mortgage Partners Corp. | Vermont | 100 |
| First Chicago Leasing Corporation | Delaware | 100 |
| FCL Ship Fifteen, Inc. | Delaware | 100 |
| FCL Ship Fourteen, Inc. | Delaware | 100 |
| First Chicago Lease Holdings, Inc. | Delaware | 100 |
| Palo Verde Leasing Corporation | Delaware | 100 |
| FM Holdings I, Inc. | Delaware | 100 |
| FM Holdings II, Inc. | Delaware | 100 |
| Fountains FSC, Ltd. | Bermuda | 100 |
| GHML Holdings I, Inc. | Delaware | 100 |
| GHML Holdings II, Inc. | Delaware | 100 |
| GTC Fund III Holdings, Inc. | Delaware | 100 |
| GTC Fund IV Holdings, Inc. | Delaware | 100 |
| GTC Fund V Holdings, Inc. | Delaware | 100 |
| JPMorgan Housing Corporation | Delaware | 100 |
| Cooper Project, L.L.C. | Delaware | 100 |
| JPMorgan Housing Upper Tier Limited Partnership 2 | Ohio | 100 |
| JPMorgan Housing Upper Tier Limited Partnership | Delaware | 100 |
| NLTC Fund Holdings I, Inc. | Delaware | 100 |

| | | |
|---|---|---|
| OX FCL Two, Inc. | Delaware | 100 |
| SAHP130 Holdings, Inc. | Delaware | 100 |
| JPMorgan Capital Management LLC | Delaware | 100 |

164

| Name | Organized under the laws of | Percentage of voting securities owned by immediate parent |
|---|---|---|
| Banc One Kentucky Insurance Company | Kentucky | 100 |
| Banc One Neighborhood Development Corporation | Ohio | 100 |
| BOI Leasing Corporation | Indiana | 100 |
| Bridge Acquisition Holdings, Inc. | Delaware | 100 |
| Hambrecht & Quist Group | Delaware | 100 |
| Hambrecht & Quist California | California | 100 |
| H&Q Holdings Inc. | Delaware | 100 |
| CCC Holding, Inc. | Delaware | 100 |
| Chase Commercial Corporation | Delaware | 100 |
| Chase Home Mortgage Corporation of the Southeast | Florida | 100 |
| Chase Lincoln First Commercial Corporation | Delaware | 100 |
| Chase Manhattan Realty Leasing Corporation | New York | 100 |
| Palo Verde 1-PNM August 50 Corporation | Delaware | 100 |
| Palo Verde 1-PNM December 75 Corporation | Delaware | 100 |
| PV2-APS 150 Corporation | Delaware | 100 |
| PV2-PNM December 35 Corporation | Delaware | 100 |
| Chatham Ventures, Inc. | New York | 100 |
| J.P. Morgan Partners (BHCA) , L.P. | California | 80(b) |
| J.P. Morgan Partners (SBIC), LLC | California | 100 |
| Chemical Equity Incorporated | New York | 100 |
| Chemical Investments, Inc. | Delaware | 100 |
| Clintstone Properties Inc. | New York | 100 |
| CMRCC, Inc. | New York | 100 |
| Hatherley Insurance Ltd. | Bermuda | 100 |
| Homesales, Inc. | Delaware | 100 |
| J.P. Morgan Capital Financing Limited | England | 100 |
| Aldermanbury Investments Limited | England | 100 |
| J.P. Morgan Chase International Financing Limited | England | 100 |
| Robert Fleming Holdings Limited | England | 100 |
| Copthall Overseas Limited | England | 100 |
| Robert Fleming (Luxembourg) (Joint Ventures) S.à r.l. | Luxembourg | 100 |
| Robert Fleming Investment Trust Limited | England | 100 |
| J.P. Morgan Chase Community Development Corporation | Delaware | 100 |
| J.P. Morgan Chase National Corporate Services, Inc. | New York | 100 |
| J.P. Morgan Corporate Services Limited | England | 100 |
| Robert Fleming Holdings Inc. | Delaware | 100 |
| J.P. Morgan Equity Holdings, Inc. | Delaware | 100 |
| CBD Holdings Ltd. | Delaware | 100 |
| Great Lakes Insurance Company | Delaware | 100 |
| CMC Holding Delaware Inc. | Delaware | 100 |
| Chase Bank USA, National Association | United States | 100 |
| Card Acquisition Funding LLC | Delaware | 100 |
| Chase BankCard Services, Inc. | Delaware | 100 |
| First USA Services, Inc. | Delaware | 100 |
| First USA Management Services, Inc. | Delaware | 100 |
| J.P. Morgan Investor Services Co. | Delaware | 100 |
| JPMorgan Insurance Agency, Inc. | Delaware | 100 |
| Chase Re Limited | Bermuda | 100 |
| J.P. Morgan Trust Company of Delaware | Delaware | 100 |
| J.P. Morgan Trust Company, National Association | United States | 100 |
| JPM Capital Corporation | Texas | 100 |
| J.P. Morgan Funding Corp. | England | 99.99 |

| | | |
|---|---|---|
| J.P. Morgan Futures Inc. | Delaware | 100 |
| J.P. Morgan GT Corporation | Delaware | 100 |
| J.P. Morgan Insurance Holdings, L.L.C. | Arizona | 100 |
|   Banc One Insurance Company | Vermont | 100 |
|   Banc One Life Reinsurance Company | Arizona | 100 |
|   Chase Insurance Agency, Inc. | Wisconsin | 100 |
| J.P. Morgan International Holdings LLC | Delaware | 100 |
|   J.P. Morgan Trust Company (Bahamas) Limited | Bahamas | 100 |
|   J.P. Morgan Trust Company (Cayman) Limited | Cayman Islands, BWI | 100 |
|   JPMAC Holdings Inc. | Delaware | 100 |
| J.P. Morgan Invest Holdings LLC | Delaware | 100 |
| J.P. Morgan Retirement Plan Services LLC | Delaware | 100 |

165

| Name | Organized under the laws of | Percentage of voting securities owned by immediate parent |
|---|---|---|
| CCA Strategies LLC | Illinois | 100 |
| Small Business Group LLC | Delaware | 100 |
| J.P. Morgan Private Investments Inc. | Delaware | 100 |
| J.P. Morgan Services Asia Holdings Limited | Mauritius | 100 |
| J.P. Morgan Services India Private Limited | India | 100 |
| J.P. Morgan Services Inc. | Delaware | 100 |
| J.P. Morgan Ventures Corporation | Delaware | 100 |
| J.P. Morgan Ventures Energy Corporation | Delaware | 100 |
| JPMorgan Asset Management Holdings Inc. | Delaware | 100 |
| Highbridge Capital Management, LLC | Delaware | 55 |
| Highbridge Capital Management (Hong Kong), Limited | Hong Kong | 100 |
| J.P. Morgan Alternative Asset Management, Inc. | Delaware | 100 |
| J.P. Morgan Investment Management Inc. | Delaware | 100 |
| JPMorgan Asset Management (Asia) Inc. | Delaware | 100 |
| JF Asset Management (Singapore) Limited | Singapore | 100 |
| JF Asset Management Limited | Hong Kong | 100 |
| JF Funds Limited | Hong Kong | 100 |
| JF Asset Management (Taiwan) Limited | Taiwan | 100 |
| JFAM Securities Taiwan Limited | Taiwan | 100 |
| JPMorgan Asset Management (Japan) Limited | Japan | 100 |
| JPMorgan Asset Management (Canada) Inc. | Canada | 100 |
| JPMorgan Asset Management International Limited | England | 100 |
| JPMorgan Asset Management Holdings (UK) Limited | England | 100 |
| JPMorgan Asset Management (UK) Limited | England | 100 |
| J.P. Morgan Investment Management Limited | England | 100 |
| JPMorgan Asset Management (London) Limited | England | 100 |
| JPMorgan Asset Management Holdings (Luxembourg ) S.à r.l. | Luxembourg | 100 |
| JPMorgan Asset Management (Europe) S.à r.l. | Luxembourg | 100 |
| JPMorgan Asset Management France SAS | France | 100 |
| JPMorgan Asset Management Societa di Gestione del Risparmio SpA | Italy | 99.9 |
| JPMorgan Asset Management Luxembourg S.A. | Luxembourg | 99.99 |
| JPMorgan Asset Management Advisory Company S.à r.l. | Luxembourg | 99.99 |
| JPMorgan Fleming srl | Italy | 100 |
| JPMorgan Asset Management Marketing Limited | England | 100 |
| JPMorgan Equity Plan Managers Limited | England | 100 |
| JPMorgan Funds Limited | Scotland | 100 |
| Perth Investments Limited | England | 100 |
| Save & Prosper Insurance Limited | England | 100 |
| Save & Prosper Pensions Limited | England | 100 |
| JPMorgan Investments Limited | England | 100 |
| JPMorgan Life Limited | England | 100 |
| JPMorgan LDHES LLC | Delaware | 100 |
| JPMorgan Chase Bank, Dearborn | Michigan | 100 |
| Pierpont Real Estate Company | Delaware | 100 |
| JPMorgan Chase Bank, National Association | United States | 100 |
| Banc One Acceptance Corporation | Ohio | 100 |
| Banc One Arizona Leasing Corporation | Arizona | 100 |
| Banc One Building Corporation | Illinois | 100 |
| Banc One Community Development Corporation | Delaware | 100 |
| Banc One Equipment Finance, Inc. | Indiana | 100 |
| Banc One Kentucky Leasing Corporation | Kentucky | 100 |

| | | |
|---|---|---|
| Banc One Kentucky Vehicle Leasing Company | Kentucky | 100 |
| Banc One National Processing Corporation | Delaware | 100 |
| Banc One POS Services Corporation | Ohio | 100 |
| Banc One Real Estate Investment Corp. | Delaware | 100 |
| Bank One Auto Securitization LLC | Delaware | 100 |
| Bank One Education Finance Corporation | Ohio | 100 |
| Bank One Equity Investors – BIDCO, Inc. | Louisiana | 100 |
| Bank One International Corporation | United States | 100 |
| BOILL IHC, Inc. | Nevada | 100 |
| Chase BankCard LLC | Delaware | 100 |
| BONA Capital I, LLC | Delaware | 100 |
| BONA Capital II, LLC | Delaware | 100 |
| BOTAC, Inc. | Nevada | 100 |

166

| Name | Organized under the laws of | Percentage of voting securities owned by immediate parent |
|---|---|---|
| Cedar Hill International Corp. | Delaware | 100 |
| Chase Access Services Corporation | Delaware | 100 |
| Chase Auto Finance Corp. | Delaware | 100 |
| Chase Community Development Corporation | Delaware | 100 |
| Chase Education Holdings, Inc. | Delaware | 100 |
| Chase Equipment Leasing Inc. | Ohio | 100 |
| Chase Funding Corporation | Delaware | 100 |
| Chase Home Finance Inc. | Delaware | 100 |
| Chase Home Finance LLC | Delaware | 100 |
| Chase Merchant Ventures, Inc. | Delaware | 100 |
| Chase Mortgage Holdings, Inc. | Delaware | 100 |
| Chase New Markets Corporation | Delaware | 100 |
| Chase Preferred Capital Corporation | Delaware | 100 |
| CPCC Delaware Statutory Trust | Delaware | 100 |
| CPCC Texas Limited Partnership | Texas | 99.5 |
| CPCC Massachusetts Business Trust | Massachusetts | 100 |
| Chase Ventures Holdings, Inc. | New Jersey | 100 |
| The Home Loan Group, LP | California | 50 |
| Cheshire Holding Corp. | Delaware | 100 |
| Collegiate Funding Services, Inc. | Delaware | 100 |
| Collegiate Funding Services, L.L.C. | Virginia | 100 |
| CFS Servicing, LLC | Delaware | 100 |
| CFS-SunTech Servicing LLC | Delaware | 100 |
| Collegiate Funding of Delaware, L.L.C. | Delaware | 100 |
| Collegiate Funding Services Education Loan Trust 2003A | Delaware | 100 |
| Collegiate Funding Services Education Loan Trust 2003B | Delaware | 100 |
| Collegiate Funding Services Education Loan Trust 2004A | Delaware | 100 |
| Collegiate Funding Services Education Loan Trust 2005A | Delaware | 100 |
| Collegiate Funding Services Education Loan Trust 2005B | Delaware | 100 |
| Collegiate Funding Originations, LLC | Delaware | 100 |
| Collegiate Funding Services Resources I, LLC | Delaware | 100 |
| Collegiate Funding Services Resources III, LLC | Delaware | 100 |
| Members Connect Inc. | Delaware | 100 |
| eGrad, LLC | Delaware | 100 |
| Cross Country Insurance Company | Vermont | 100 |
| CSL Leasing Inc. | Delaware | 100 |
| DNT Asset Trust | Delaware | 100 |
| Ventures Business Trust | Delaware | 100 |
| FC Energy Finance I, Inc. | Delaware | 100 |
| FC Energy Finance II, Inc. | Delaware | 100 |
| FNBC Leasing Corporation | Delaware | 100 |
| ICIB Fund I Holdings, Inc. | Delaware | 100 |
| Genesis Holding Corporation | Delaware | 100 |
| Georgetown/Chase Phase I LLC | Delaware | 99 |
| Georgetown/Chase Phase II, LLC | Delaware | 99 |
| Harvest Opportunity Holdings Corp. | New York | 100 |
| Independence Park Building Inc. | Delaware | 100 |
| J.P. Morgan Chase Custody Services, Inc. | Delaware | 100 |
| J.P. Morgan Electronic Financial Services, Inc. | New York | 100 |
| J.P. Morgan FCS Corporation | Texas | 100 |
| J.P. Morgan International Inc. | United States | 100 |
| Bank One International Holdings Corporation | United States | 100 |

| | | |
|---|---|---|
| Bank One Europe Limited | England | 100 |
| J.P. Morgan International Finance Limited | United States | 100 |
| Banco J.P. Morgan S.A. | Brazil | 99.27 |
| J.P. Morgan Corretora de Cambio e Valores Mobiliarios S.A. | Brazil | 100 |
| J.P. Morgan S.A. Distribuidora de Titulos e Valores Mobiliarios | Brazil | 100 |
| Bedford Holdings, Inc. | Delaware | 100 |
| BOL (C) II, Inc. | Delaware | 100 |
| BOL Canada II Sub, Inc. | Delaware | 100 |
| BOL Canada II Trust | Delaware | 100 |
| BO Leasing II ULC | Canada | 100 |
| BOL Canada I, Inc. | Delaware | 100 |
| BOL Canada I Sub, Inc. | Delaware | 100 |

167

| Name | Organized under the laws of | Percentage of voting securities owned by immediate parent |
|---|---|---|
| BO Leasing I ULC | Canada | 100 |
| BOL Canada III, Inc. | Delaware | 100 |
| BOL Canada III Sub, Inc. | Delaware | 100 |
| BO Leasing III ULC | Canada | 100 |
| Chase Manhattan Holdings Limitada | Brazil | 99.99 |
| Dearborn Merchant Services, Inc | Canada | 100 |
| Inversiones Y Asesorias Chase Manhattan Limitada | Chile | 99.94 |
| J.P. Morgan & Cie S.A.S. | France | 100 |
| J.P. Morgan (Suisse) SA | Switzerland | 100 |
| J.P. Morgan Bank (Ireland) plc | Republic of Ireland | 100 |
| J.P. Morgan Administration Services (Ireland) Limited | Republic of Ireland | 100 |
| JPMorgan Tranaut Holdings Limited | Bermuda | 100 |
| JPMorgan Hedge Fund Services (Ireland) Limited | Republic of Ireland | 100 |
| J.P. Morgan Bank Canada | Canada | 100 |
| J.P. Morgan Bank International LLC | Russian Federation | 99 |
| J.P. Morgan Bank Luxembourg S.A. | Luxembourg | 99.99 |
| J.P. Morgan Beteiligungs-und Verwaltungsgesellschaft mbH | Germany | 99.8 |
| J.P. Morgan AG | Germany | 100 |
| J.P. Morgan Services GmbH | Germany | 100 |
| J.P. Morgan Capital Holdings Limited | England | 72.72(c) |
| CaTO Finance II C.V. | Netherlands | 98.79 |
| CaTO Finance V Limited Partnership | England | 99 |
| J.P. Morgan Chase (UK) Holdings Limited | England | 100 |
| J.P. Morgan Chase International Holdings | England | 100 |
| J.P. Morgan EU Holdings Limited | England | 100 |
| J.P. Morgan (SC) Limited | England | 100 |
| J.P. Morgan Equities Limited | South Africa | 100 |
| J.P. Morgan Europe Limited | England | 100 |
| Crosby Sterling (Holdings) Limited | England | 79    (d) |
| J.P. Morgan Markets LLP | England | 36.02(e) |
| J.P. Morgan Chase Finance Limited | England | 65    (f) |
| JPMorgan Cazenove Holdings | England | 50.01 |
| J.P. Morgan Securities Ltd. | England | 98.95 |
| Robert Fleming (Overseas) Number 2 Limited | England | 100 |
| J.P. Morgan plc | England | 100 |
| J.P. Morgan Trustee and Depositary Company Limited | England | 100 |
| J.P. Morgan Holdings B.V. | The Netherlands | 100 |
| J.P. Morgan Chase Bank Berhad | Malaysia | 100 |
| J.P. Morgan Chile Limitada | Chile | 99.8 |
| J.P. Morgan Funding South East Asia Private Limited | Singapore | 100 |
| J.P. Morgan (S.E.A.) Limited | Singapore | 70    (g) |
| J.P. Morgan Grupo Financiero S.A. De C.V. | Mexico | 99.46 |
| Banco J.P. Morgan S.A., Institucion de Banca Multiple, J.P. Morgan Grupo Financiero | Mexico | 99.99 |
| Banco J.P. Morgan Socio Liquidador | Mexico | 100 |
| J.P. Morgan Servicios, S.A. de C.V., J.P. Morgan Grupo Financiero | Mexico | 99 |
| J.P. Morgan Holdings (Hong Kong) Limited | Hong Kong | 100 |
| Copthall Mauritius Investment Limited | Mauritius | 100 |
| J.P. Morgan Futures (Korea) Limited | South Korea | 100 |
| J.P. Morgan Securities (Far East) Limited | Hong Kong | 100 |
| J.P. Morgan Broking (Hong Kong) Limited | Hong Kong | 100 |

| | | |
|---|---|---|
| J.P. Morgan International Derivatives Ltd. | Channel Islands | 100 |
| J.P. Morgan International Holdings Limited | Cayman Islands, BWI | 100 |
| Fledgeling Nominees International Limited | Cayman Islands, BWI | 100 |
| J.P. Morgan India Securities Holdings Limited | Mauritius | 100 |
| J.P. Morgan India Private Limited | India | 99.99 |
| J.P. Morgan Indonesia Holdings (B.V.I.) Limited | British Virgin Islands | 100 |
| J.P. Morgan Securities Holdings (Bermuda) Limited | Bermuda | 100 |
| J.P. Morgan Securities Singapore Private Limited | Singapore | 100 |
| J.P. Morgan Securities Thailand Holdings Limited | British Virgin Islands | 100 |
| PGW Limited | Thailand | 100 |
| JPMorgan Securities (Thailand) Limited | Thailand | 50.1  (h) |
| Jadeling Malaysia Holdings Limited | British Virgin Islands | 100 |
| J.P. Morgan Services (Malaysia) Sdn. Bhd. | Malaysia | 100 |

168

| Name | Organized under the laws of | Percentage of voting securities owned by immediate parent |
|---|---|---|
| JPMorgan Securities (Malaysia) Sdn. Bhd. | Malaysia | 100 |
| J.P. Morgan Investimentos e Financas Ltda. | Brazil | 99.79 |
| J.P. Morgan Luxembourg International S.a.r.l. | Luxembourg | 100 |
| J.P. Morgan Malaysia Ltd. | Malaysia | 100 |
| J.P. Morgan Overseas Capital Corporation | Delaware | 100 |
| J.P. Morgan Australia Group Pty Limited | Australia | 100 |
| J.P. Morgan Operations Australia Limited | Australia | 100 |
| J.P. Morgan Administrative Services Australia Limited | Australia | 100 |
| J.P. Morgan Australia Limited | New South Wales | 100 |
| J.P. Morgan Global Capital Australia Limited | New South Wales | 100 |
| J.P. Morgan Financial Services New Zealand Limited | Australia | 100 |
| J.P. Morgan Nominees Australia Limited | Australia | 100 |
| J.P. Morgan Portfolio Services Limited | Australia | 100 |
| JFOM Pty Limited | Australia | 100 |
| JPMorgan Investments Australia Limited | Australia | 100 |
| J.P. Morgan Markets Australia Pty Limited | Australia | 100 |
| J.P. Morgan Espana S.A. | Spain | 100 |
| JPMorgan Gestion, Sociedad Gestora de Instituciones de Inversion Colectiva, S.A. | Spain | 100 |
| JPMorgan Sociedad de Valores, S.A. | Spain | 80.61(i) |
| J.P. Morgan International Bank Limited | England | 100 |
| J.P. Morgan Securities Canada Inc. | Canada | 100 |
| J.P. Morgan Whitefriars Inc. | Delaware | 100 |
| J.P. Morgan Whitefriars (UK) | England | 99.99 |
| JPMorgan Corporacion Financiera S.A. | Colombia | 90(j) |
| Morgan Guaranty Trust Company Limited | England | 100 |
| PT J.P. Morgan Securities Indonesia | Indonesia | 42.5(k) |
| J.P. Morgan Partners (CMB Reg K GP), Inc. | Delaware | 100 |
| J.P. Morgan Securities (C.I.) Limited | Channel Islands | 100 |
| J.P. Morgan (Jersey) Limited | Channel Islands | 100 |
| J.P. Morgan Securities (Taiwan) Limited | Taiwan | 65.3(l) |
| J.P. Morgan Securities Asia Private Limited | Singapore | 88.47(m) |
| JPMorgan Securities Japan Co., Ltd. | Japan | 68.99(n) |
| J.P. Morgan Securities Holdings (Hong Kong) Limited | Hong Kong | 86.38(o) |
| J.P. Morgan Securities (Asia Pacific) Limited | Hong Kong | 100 |
| J.P. Morgan Securities Holdings (Caymans) Limited | Cayman Islands, BWI | 100 |
| J.P. Morgan Securities India Private Limited | India | 99.99 |
| J.P. Morgan Securities South Africa (Proprietary) Limited | South Africa | 100 |
| JPMorgan Administration Services (Proprietary) Limited | South Africa | 100 |
| J.P. Morgan Trust Company (Jersey) Limited | Channel Islands | 100 |
| JPMorgan Trust Bank Limited | Japan | 72.16(p) |
| Norchem Holdings e Negocios S.A. | Brazil | 48.97(q) |
| NorChem Participacoes e Consultoria S.A. | Brazil | 50 |
| Sibelius Corporation | Delaware | 100 |
| J.P. Morgan Mortgage Acquisition Corp. | Delaware | 100 |
| J.P. Morgan Partners (23A SBIC Manager), Inc. | Delaware | 100 |
| J.P. Morgan Partners (23A SBIC), L.P. | Delaware | 80(r) |
| J.P. Morgan Property Exchange Inc. | Delaware | 100 |
| J.P. Morgan Real Estate S.p.A. | Italy | 100 |
| J.P. Morgan Treasury Technologies Corporation | Delaware | 100 |
| JPMorgan Chase Vastera, Inc. | Delaware | 100 |

| | | |
|---|---|---|
| JP Morgan Chase Vastera Professional Services Inc. | Delaware | 100 |
| JPMorgan Investment Advisors Inc. | Ohio | 100 |
| Security Capital Research & Management Incorporated | Delaware | 100 |
| Kscott Holding Corp. | Delaware | 100 |
| Liberty Payment Services, Inc. | Kentucky | 100 |
| Manufacturers Hanover Leasing International Corp. | Delaware | 100 |
| Chase Leasing of Texas, Inc. | Delaware | 100 |
| Naugatuck Holding Corp. | Delaware | 100 |
| Orcas Island Corp. | Delaware | 100 |
| South Cutler Corporation | Delaware | 100 |
| Systems & Services Technologies, Inc. | Delaware | 100 |
| JPMorgan Distribution Services, Inc. | Delaware | 100 |
| JPMorgan Funds Management, Inc. | Delaware | 100 |

169

| Name | Organized under the laws of | Percentage of voting securities owned by immediate parent |
|---|---|---|
| JPMorgan Mezzanine Corporation | Delaware | 100 |
| JPMorgan Securities Holdings LLC | Delaware | 100 |
| J.P. Morgan Institutional Investments Inc. | Delaware | 100 |
| J.P. Morgan Securities Inc. | Delaware | 100 |
| Neovest Holdings, Inc. | Delaware | 100 |
| Neovest, Inc. | Utah | 100 |
| JPMorgan Special Situations Asia Corporation | Delaware | 100 |
| J.P. Morgan Investment Holdings II (Mauritius) Limited | Mauritius | 67 |
| Tong Yuan Asset Management Limited Liability Company | China | 90 |
| JPMorgan Special Situations (Mauritius) Limited | Mauritius | 100 |
| Silver Summit (Delaware) Corporation | Delaware | 100 |
| JPMP Capital Corp. | New York | 100 |
| J.P. Morgan Partners, LLC | Delaware | 100 |
| JPMP Capital, LLC | Delaware | 100 |
| J.P. Morgan Capital, L.P. | Delaware | 99.5 |
| J.P. Morgan SBIC Holdings LLC | Delaware | 100 |
| JPMCC Luxembourg Corporation | Luxembourg | 100 |
| J.P. Morgan Capital Luxembourg S.a.r.l. | Luxembourg | 100 |
| JPMCC Belgium S.P.R.L. | Belgium | 100 |
| JPMCC Belgium (SCA) | Belgium | 100 |
| J.P. Morgan Partnership Capital Corporation | Delaware | 100 |
| J.P. Morgan Partnership Investment Corporation | Delaware | 100 |
| J.P. Morgan Whitney Partnership Corporation | Delaware | 100 |
| Peabody Real Estate Partnership Corporation | Delaware | 100 |
| The Peabody Fund Consultants, Inc. | Delaware | 100 |
| LabMorgan Corporation | Delaware | 100 |
| LabMorgan Investment Corporation | Delaware | 100 |
| MorServ, Inc. | Delaware | 100 |
| NBD Community Development Corporation | Michigan | 100 |
| Offshore Equities, Inc. | New York | 100 |
| Park Assurance Company | Vermont | 100 |
| Special Situations Investing Inc. | Delaware | 100 |
| Support Development Corporation | Delaware | 100 |

(a)    JPMorgan Capital Corporation owns 20%

(b)    JPMP Master Fund Manager, L.P. owns 20%

(c)    J.P. Morgan Overseas Capital Corporation owns 27.28%

(d)    J.P. Morgan Chase International Holdings owns 21%

(e)    J.P. Morgan Securities Ltd., J.P. Morgan plc, and J.P. Morgan Whitefriers (UK) own 27.29%, 27.07%, and 9.62%, respectively.

(f)    J.P. Morgan Securities Ltd. owns 35%

(g)    J.P. Morgan International Finance Limited owns 30%

(h)    J.P. Morgan International Finance Limited and J.P. Morgan International Holdings Limited own 30 28% and 19.61%, respectively.

(i)    J.P. Morgan & Cie S.A.S. owns 19.39%

(j)    J.P. Morgan International Finance Limited owns 10%

(k)    J.P. Morgan Indonesia Holdings (B.V.I.) Limited and J.P. Morgan Securities Asia Private Limited own 42.5% and 13.75%, respectively.

(l)    J.P. Morgan International Holdings Limited, Robert Fleming Investment Trust Limited, JF Securities Overseas Limited own 27.7%, 3.5%, and 3.5%, respectively.

(m)    J.P. Morgan Securities Holdings (Bermuda) Limited owns 11.53%

(n)    J.P. Morgan International Finance Limited and J.P. Morgan Securities Holdings (Bermuda) Limited own 27.77% end 3.24%, respectively.

(o)    JPMorgan Securities Japan Co., Ltd.and J.P. Morgan Securities (Far East) Limited own 10.77% and 2.85%, respectively.

(p)    J.P. Morgan & Cie S.A. owns 27.84%

(q)    Chase Manhattan Holdings Limitada owns 29.28%

(r)    JPMP Master Fund Manager, L.P. owns 20%

170

# Federal Family Education Loan Program (FFELP)

## Federal PLUS Loan
## Application and Master Promissory Note

**WARNING:** Any person who knowingly makes a false statement or misrepresentation on this form is subject to penalties which may include fines, imprisonment, or both, under the United States Criminal Code and 20 U.S.C. 1097.

| Guarantor, Program, or Lender Identification | OMB No.1845-0069 Form approved Exp date 01/31/2006 |
| --- | --- |

## Borrower (Parent) Section

*Please print neatly in ink or type. Read the instructions carefully.*

1. Last Name    First Name    MI    2. Social Security Number

3. Permanent Street Address (If P.O. Box, see instructions.)    4. Home Area Code/Telephone Number ( )

City    State    Zip Code    5. Date of Birth (Month/Day/Birth Year)

6. E-mail Address    7. Driver's License State and Number    State    #

8. U.S. Citizenship Status (Check a or b, and if b is checked, list Registration No.)
☐ a. Citizen/National    ☐ b. Permanent Resident/Other Eligible Non-Citizen    If "b", Alien Registration No.

9. Lender Name    City    State    Zip Code    10. Lender Code, if known

JPMorgan Chase Bank, N.A.

11. Employer (Name, Address, City, State, Zip)    12. Employer Telephone Number ( )

13. Borrower References: You must provide two separate references with different U.S. addresses who have known you for at least three years. Both references must be completed in full. Do not list the the student as a reference.

| Name | A. | | B. | |
| --- | --- | --- | --- | --- |
| Permanent Address | | | | |
| City, State, Zip Code | | | | |
| E-mail Address | | | | |
| Area Code/Telephone Number | ( ) | | ( ) | |
| Relationship to Borrower | | | | |

## Student Information Section

14. Last Name    First Name    MI

15. Social Security Number    16. Date of Birth (Month/Day/Birth Year)

## Borrower Request, Certifications, and Authorizations

*Read carefully before signing below.*

17. **Requested Loan Amount:** This is an Application and Master Promissory Note (hereafter, "MPN") for one or more Federal PLUS Loans. I request a Federal PLUS Loan under this MPN in an amount not to exceed the annual cost of attendance for the student identified in the Student Information Section of this MPN, minus other financial aid that the student receives each academic year. For each loan, the school will notify me of the loan amount that I am eligible to receive. I may cancel my loan or request a lower amount by contacting my lender or the school. Additional information about my right to cancel a loan or request a lower amount is included in the Borrower's Rights and Responsibilities Statement and disclosure statements that have been or will be provided to me. If I have an adverse credit history and obtain an endorser to receive a PLUS Loan, only one loan may be made to me under this MPN.

18. Under penalty of perjury, I certify for any loan I receive under this MPN that:
A. The information I have provided on this MPN and as updated by me from time to time is true, complete, and correct to the best of my knowledge and belief and is made in good faith.
B. I am: (i) the biological or adoptive parent; or (ii) the spouse of a parent and my income and assets were reported on the Free Application for Federal Student Aid (FAFSA) or would be reported if a FAFSA were filed.
C. Loan proceeds will be used for authorized educational costs incurred by the dependent student named in the Student Information Section and that I will immediately repay any loan proceeds that cannot be attributed to educational costs for attendance on at least a half-time basis at the school that certified my loan eligibility.
D. (i) I do not now owe an overpayment on a Federal Pell Grant, Federal Supplemental Educational Opportunity Grant, or Leveraging Educational Assistance Partnership Grant (formerly State Student Incentive Grant); or, if I owe an overpayment, I have made repayment arrangements with the holder to repay the amount owed, (ii) I am not now in default on any loan received under the Federal Perkins Loan Program (including NDSL loans), the Federal Direct Loan Program, or the Federal Family Education Loan Program ("FFELP" as defined in the Borrower's Rights and Responsibilities Statement); or I am in default on a loan and I have made satisfactory payment arrangements with the holder of the defaulted loan.

19. For all Federal PLUS Loans (as described in the additional MPN provisions and the Borrower's Rights and Responsibilities Statement) I receive under this MPN, and for certain other loans as described below, I make the following authorizations:
A. I authorize the school to certify my eligibility for Federal PLUS Loans under this MPN.
B. I authorize the lender, the guarantor, or their agents, to investigate my credit record and report information concerning my loan status to persons and organizations permitted by law to receive such information.
C. I authorize the school to pay to the lender any refund that may be due up to the full amount of the loan(s).
D. I authorize the school to transfer loan proceeds received by electronic funds transfer (EFT) or master check to my dependent student's account at the school.
E. I may tell my lender that I want to pay the interest that accrues. However, in all cases, unless I pay the interest, my lender will add the unpaid interest that accrues during forbearance and deferment and other periods on each PLUS Loan made under this MPN to the principal balance of that loan ("capitalization") as provided under the Act. Capitalization will increase the principal balance on my loan(s) and the total amount of interest costs I must pay.
F. I authorize the release of information pertinent to my loan(s): (i) by the school, the lender, and the guarantor, or their agents, to the references on the applicable loan(s) and to members of my immediate family unless I submit written directions otherwise; and (ii) by and among the schools, lenders, guarantors, the U.S. Department of Education (the Department), and their agents.
G. So that the loan(s) requested can be approved, I authorize the Department to send any information about me that is under its control, including information from the FAFSA, to the school, to the lender, and to state agencies and nonprofit organizations that administer financial aid programs under the FFELP. I understand that information reported on this MPN may be shared with the Department, and that the Department has the authority to verify that information with other federal agencies.
H. I authorize my lender to defer repayment of principal on my loan(s) based on my in-school status.

## Promise to Pay
*In this MPN, "lender" refers to, and this MPN benefits, the original lender and its successors and assigns, including any subsequent holder of this MPN.*

20. I promise to pay to the order of the lender all loan amounts disbursed (hereafter "loan" or "loans") under the terms of this Application and Master Promissory Note (hereafter "MPN"), plus interest and other charges and fees that may become due as provided in this MPN. **I understand that multiple loans may be made to me under this MPN for the dependent identified in the Student Information Section.** I understand that by accepting any disbursements issued at any time under this MPN, I agree to repay the loan(s). I understand that, within certain time frames, I may cancel or reduce the amount of any loan by refusing to accept or by returning all or a portion of any disbursement that is issued. Unless I make interest payments, interest that accrues on my loan(s) during deferment or forbearance periods or other periods will be added as provided under the Act to the principal balance of such loan(s). If I fail to make any payment on any loan made under this MPN when due, I will also pay reasonable collection costs, including but not limited to attorney's fees, court costs, and other fees. I will not sign this MPN before reading the entire MPN, even if I am told not to read it, or told that I am not required to read it. I am entitled to an exact copy of this MPN and the Borrower's Rights and Responsibilities Statement. My signature certifies I have read, understand, and agree to the terms and conditions of this MPN, including the Borrower Request, Certifications, and Authorizations printed above, the Notice About Subsequent Loans Made Under This MPN, and the Borrower's Rights and Responsibilities Statement.

I UNDERSTAND THAT I MAY RECEIVE ONE OR MORE LOANS UNDER THIS MPN AND THAT I MUST REPAY ALL LOANS THAT I RECEIVE UNDER THIS MPN.

21. Parent Borrower's Signature _____    22. Today's Date *(Month/Day/Year)* _____



*Additional MPN provisions follow*

# Federal PLUS Loan Master Promissory Note (continued)

## Disclosure of Loan Terms

Loans disbursed under this MPN are subject to the loan limits specified in the Higher Education Act of 1965, as amended (20 U.S.C. 1070, et seq.), and applicable U.S. Department of Education regulations (collectively referred to as the "Act"). Under this MPN, the principal amount that I owe and am required to repay, will be the sum of all disbursements issued (unless I reduce or cancel any disbursements as provided below).

My lender will determine whether to make any loan to me under this MPN after my loan eligibility is determined by my dependent's school. At or before the time of the first disbursement for each loan, a disclosure statement will be issued to me identifying the amount of the loan and additional terms of the loan. Important additional information is also disclosed in the Borrower's Rights and Responsibilities Statement accompanying this MPN. The Borrower's Rights and Responsibilities Statement and any disclosure statement I receive in connection with any loan under this MPN are hereby incorporated into this MPN.

I may request additional loan funds to pay for my dependent's educational costs. The school will determine my eligibility and notify the lender. I will be notified of any increase or other change in the amount of my loan(s).

I agree that the lender may sell or assign this MPN and/or my loan(s) and acknowledge that any loan may be assigned independently of any other loan to which this MPN applies. I agree that each loan is separately enforceable based on a true and exact copy of this MPN.

## Loan Cancellation

I may pay back all or a portion of a disbursement within time frames set by the Act and explained in the Borrower's Rights and Responsibilities Statement or other disclosure statement I receive at or before disbursement. In such case, the origination fee and guarantee fee will be reduced or eliminated in proportion to the amount of the disbursement returned. I will not incur interest charges if I return the full loan amount as provided in the Act.

## Interest

Unless my lender notifies me in writing of a lower rate(s), the rate(s) of interest for my loan(s) is that specified in the Act. Interest rate information is presented in the Borrower's Rights and Responsibilities Statement accompanying this MPN. The interest rate is presented in a disclosure that is issued to me.

Interest accrues on the unpaid principal balance of each loan from the date of disbursement by the lender until the entire principal balance is paid in full. This includes interest accruing during any period of deferment or forbearance. I agree to pay all interest charges on my loan(s).

I will begin paying interest upon disbursement of my loan. If I do not make required payments of interest before the beginning of principal repayment, or during a period of authorized deferment or forbearance, I agree that the lender may capitalize such interest to the extent permitted by the Act.

## Origination Fee and Guarantee Fee

For each loan, the federal government charges an origination fee equal to the amount required by the Act. The guaranty agency(ies) that guarantee(s) my loan(s) (in each case, the "guarantor") may charge a per loan guarantee fee not to exceed a maximum amount specified in the Act. I will pay these fees, as identified in the disclosure statement, which will be deducted proportionately from each disbursement of my loan(s). I understand the origination and guarantee fees may be refundable only to the extent permitted by the Act.

## Late Charges and Collection Costs

The lender may collect from me. (i) a late charge for each late installment payment if I fail to make any part of a required installment payment within 15 days after the date it becomes due, and (ii) any other charges and fees that are permitted by the Act for the collection of my loan(s). If I default on any loan(s), I will pay reasonable collection fees and costs, plus court costs and attorney fees.

## Repayment

I must repay the full amount of the loan(s) made under this MPN and the accrued interest. I will repay the principal of each loan in periodic installments during a repayment period that begins on the day of the final disbursement for that loan.

My lender must provide me with a choice of repayment plans consistent with the provisions of the Act. My principal repayment period for each loan, exclusive of any period(s) of deferment or forbearance, generally lasts five years but may not exceed 10 years unless I am eligible for an extended repayment plan.

The lender will provide me with a repayment schedule that identifies my payment amounts and due dates. Except as otherwise provided in the Act, the minimum annual payment required on all my FFELP loans is $600 or the amount of interest due and payable, whichever is larger. Payments submitted by me or on my behalf (exclusive of refunds) may be applied first to charges and collection costs that are due, then to accrued interest that has not been capitalized, and finally to the principal amount.

If I am unable to make my scheduled loan payments, the lender may allow me to reduce my payment amount, to extend the time for making payments, or to temporarily stop making payments as long as I intend to repay my loan(s). Allowing me to temporarily delay or reduce loan payments is called forbearance. I agree that the lender may align payment dates on my loans or grant me a forbearance to eliminate a delinquency that persists even though I am making scheduled payments.

I may prepay all or any part of the unpaid balance on my loan(s) at any time without penalty. If I do not specify which loan(s) I am prepaying, the lender will determine how to apply the prepayment in accordance with the Act. Upon repayment in full of each loan under this MPN, I agree to accept written notification of such loan payoff in place of receiving the original MPN.

## Acceleration and Default

At the option of the lender, the entire unpaid balance of a loan made under this MPN will become immediately due and payable if any one of the following events occurs: (i) the dependent for whom I am borrowing fails to enroll as at least a half-time student at the school that certified my loan eligibility, (ii) I fail to use the proceeds of the loan(s) solely for educational costs of the dependent student for whom I am borrowing, (iii) I make a false representation(s) that results in my receiving any loan(s) for which I am not eligible, or (iv) I default on the loan(s).

The following events will constitute a default on my loan(s): (i) I fail to pay the entire unpaid balance of the applicable loan(s) after the lender has exercised its option under items (i), (ii), or (iii) in the preceding paragraph; (ii) I fail to make installment payments when due, provided my failure has persisted for at least 270 days for payments due monthly or 330 days for payments due less frequently than monthly; or (iii) I fail to comply with other terms of the loan(s), and the lender or guarantor reasonably concludes I no longer intend to honor my repayment obligation. If I default, the guarantor may purchase my loan(s) and capitalize all outstanding interest into a new principal balance. The new principal balance and collection fees will become immediately due and payable.

If I default, this will be reported to all national credit bureaus and will significantly and adversely affect my credit history. I understand that a default will have additional adverse consequences to me as disclosed in the Borrower's Rights and Responsibilities Statement.

Following default, the loan(s) may be subject to income-contingent repayment (including potential collection of amounts in excess of the principal and interest) in accordance with the Act.

## Governing Law and Notices

The terms of this MPN will be interpreted in accordance with the Higher Education Act of 1965, as amended (20 U.S.C. 1070, et seq.), other applicable federal statutes and regulations, and the guarantor's policies. Applicable state law, except as preempted by federal law, may provide for certain borrower rights, remedies, and defenses in addition to those stated in this MPN.

If a particular loan under this MPN is made by the school, or if the proceeds of a particular loan made under this MPN are used to pay tuition and charges at a for-profit school that refers loan applicants to the lender, or that is affiliated with the lender by common control, contract, or business arrangement, any lender holding such loan is subject to all claims and defenses that I could assert against the school with respect to such loan. My recovery under this provision shall not exceed the amount I paid on such loan.

If I reside in the state in which the principal office of the guarantor is located, the guarantor may sue to enforce the applicable loan(s) in the county in which the guarantor's office is located. However, if I object to being sued there and I mail a written objection to the guarantor that is postmarked no later than 30 days after I am served with the suit, the guarantor will either have the court transfer the suit to the county in which I live or will dismiss the lawsuit.

Any notice required to be given to me will be effective if sent by first class mail to the latest address the lender has for me or by electronic means to an address that I have provided. I will immediately notify the lender of any change of address or status as specified in the Borrower's Rights and Responsibilities Statement. Failure by the lender to enforce or insist on compliance with any term on this MPN will not be a waiver of any right of the lender. No provision of this MPN may be modified or waived except in writing. If any provision of this MPN is determined to be unenforceable, the remaining provisions shall remain in force.

### Notice About Subsequent Loans Made Under This MPN

This Master Promissory Note authorizes the lender to disburse multiple loans to pay the educational costs of the dependent student identified in the Student Information Section during the multi-year term of this MPN upon my request and upon the school's certification of my loan eligibility. Subsequent loans for this dependent may be made for the same or subsequent periods of enrollment at schools designated by the Secretary of the U.S. Department of Education.

I understand that no subsequent loan(s) will be made under this MPN after the earliest of the following dates: (i) the date my lender receives my written notice that no further loans may be disbursed under the MPN; (ii) one year after the date of my signature on this MPN if no disbursement is made during such twelve-month period; or (iii) ten years after the date of my signature on this MPN; or the date the lender receives this MPN.

Any amendment to the Act governs the terms of any loan(s) disbursed on or after the effective date of such amendment, and such amended terms are hereby incorporated into this Master Promissory Note.

| Federal Family Education Loan Program (FFELP) | Guarantor, Program, or Lender Identification |
|---|---|
| **Federal PLUS Loan Application and Master Promissory Note Instructions and Notices** | |

*This is a Master Promissory Note under which you may receive multiple Federal PLUS Loans for the same dependent student over a maximum ten-year period. A Federal PLUS Loan is a loan available to certain parent(s) of dependent undergraduate students ("dependent" is defined in the Higher Education Act and may be different from the definition used by the Internal Revenue Service) attending participating postsecondary schools. You are responsible for paying the principal amount of your loan(s) and all interest that accrues from the date of disbursement until the loan(s) is paid in full.*

*Your lender will perform a standard credit check with a national credit bureau before approving each loan. As required under federal law, if your lender determines you have adverse credit, you may not receive a Federal PLUS Loan unless: 1) you provide information to your lender's satisfaction that there are extenuating circumstances, or 2) you obtain an endorser who does not have an adverse credit history. An endorser is someone who agrees to repay the loan if you fail to do so. The endorser may not be the student for whom the loan is being made.*

*This form is to be completed by the parent borrower. Use a dark ink, ballpoint pen or typewriter. Do not complete this form in pencil. If an item has been completed for you and it is incorrect, cross out the incorrect information and print the correct information. Incorrect, incomplete, or illegible information may cause the processing of your loan to be delayed.*

**■**

**Item 1:** Enter your last name, then your first name and middle initial.

**Item 2:** Enter your nine-digit Social Security Number. If this item has been completed for you, review it for correctness. If it is incorrect, cross out the entire number and print the entire correct Social Security Number in this box. Your loan(s) cannot be processed without a Social Security Number. **Read the Privacy Act and Financial Privacy Act Notices in these instructions before completing this item.**

**Item 3:** Enter your permanent home street address, apartment number, city, state and zip code. If you have a Post Office Box and a street address, list both.

**Item 4:** Enter the area code and telephone number for the address listed in Item 3. If you do not have a telephone, enter N/A.

**Item 5:** Using only numbers, enter the month, day, and four-digit year of your birth. (For example, for June 24, 1982, you would enter 06/24/1982.) Be careful not to enter the current year.

**Item 6:** Enter your preferred e-mail address for receiving correspondence. If you do not have an e-mail address, or do not wish to provide it, enter N/A. If you provide your e-mail address, the lender or holder of your loan(s) may use it to communicate with you.

**Item 7:** Enter the two-letter abbreviation for the state that issued your driver's license followed by the driver's license number. If you do not have a driver's license, enter N/A.

**Item 8:** Indicate your U.S. citizenship status. Contact the school's financial aid office if you are unsure of your eligibility.

  **Item (a):** Check this box if you are a U.S. citizen or U.S. national. A U.S. citizen includes citizens of the 50 states, the District of Columbia, Puerto Rico, the U.S. Virgin Islands, Guam, and the Northern Mariana Islands. A U.S. national includes all U.S. citizens and citizens of American Samoa and Swain's Island.

  **Item (b):** Check this box if you are a permanent resident/other eligible non-citizen. Write in your eight- or nine-digit Alien Registration Number. "Permanent Resident" means someone who can provide documentation of this status from the U.S. Immigration and Naturalization Service. "Other Eligible Non-Citizen" includes individuals who can provide documentation from the U.S. Immigration and Naturalization Service that they are in the United States for a purpose that is not temporary, with the intention of becoming a citizen or permanent resident. This category includes refugees, persons granted asylum, Cuban-Haitian entrants, temporary residents under the Immigration Reform and Control Act of 1986, and others.
**NOTE:** If your citizenship status is not one of the categories described above, you are not eligible to receive a Federal PLUS Loan.

**Item 9:** Enter the name and address of the lender from which you wish to borrow. If you do not have a lender, contact the school's financial aid office, a bank or other financial institution, or the guarantor or program listed in the upper right-hand corner of this form for information on lenders willing to make Federal PLUS Loans.

**Item 10:** If you know the lender code, enter it here. Otherwise, leave this item blank.

**Item 11:** *It is important that the lender be able to reach you during the process of making your loan(s) and during repayment.* Enter your employer's name and address, including city, state, and zip code. If you are self-employed, enter the name and address of your business. If you are not employed, enter N/A.

**Item 12:** Enter the area code and telephone number of your employer. If you are self-employed, enter the area code and telephone number of your business. If you do not have a business telephone number, enter N/A.

**Item 13:** Enter the requested reference information for two adults with different U.S. addresses who have known you for at least three years. Do not list the student as a reference. References with addresses outside the U.S. are not acceptable. If a reference

does not have a telephone number or e-mail address, or does not wish to provide an e-mail address, enter N/A. If you provide an e-mail address for a reference, the lender or holder of your loan(s) may use it to communicate with the reference. All requested items must be completed or the processing of your loan will be delayed.

**■**

**Item 14:** Enter the last name of the dependent student for whom you are borrowing, then first name and middle initial.

**Item 15:** Enter the student's nine-digit Social Security Number.

**Item 16:** Enter the month, day, and four-digit year of the student's birth. Use only numbers. Be careful not to enter the current year.

**■**

**Item 17:** The school will notify you of the amount of Federal PLUS Loan you are eligible to receive each time you request Federal PLUS funds. You may decline a loan or request a lower amount by contacting your lender or the school. You should apply only for what you will need to pay your dependent's educational costs each year. Additional information is included under "Loan Cancellation" in the Borrower's Rights and Responsibilities Statement.

**Items 18 and 19:** *Read these items carefully.*

**■**

**Item 20:** Read the entire MPN carefully. Then complete Items 21 and 22.

**Item 21:** Sign your legal name, including your first name, middle initial, and last name.

**Item 22:** Enter the date you are signing this MPN in month/day/year format.

**Privacy Act Notice**

The Privacy Act of 1974 (5 U.S.C. 552a) requires that the following notice be provided to you:

The authority for collecting the requested information from and about you is §428(b)(2)(A) et seq. of the Higher Education Act of 1965, as amended (20 U.S.C. 1078(b)(2)(A) et seq.), and the authority for collecting and using your Social Security Number (SSN) is 428B(f) of the HEA (20 U.S.C. 1078-2(f)). Participating in the Federal Family Education Loan Program (FFELP) and giving us your SSN are voluntary, but you must provide the requested information, including your SSN, to participate.

The principal purposes for collecting the information on this form, including your SSN, are to verify your identity, to determine your eligibility to receive a loan(s) or a benefit on a loan(s) (such as a deferment, forbearance, discharge, or forgiveness) under the FFELP, to permit the servicing of your loan(s), and, if it becomes necessary, to locate you and to collect on your loan(s) if your loan(s) become delinquent or in default. We also use your SSN as an account identifier and to permit you to access your account information electronically.

The information in your file may be disclosed to third parties as authorized under routine uses in the appropriate systems of records. The routine uses of this information include its disclosure to federal, state, or local agencies, to other federal agencies under computer matching program, to agencies that we authorize to assist us in administering our loan programs, to private parties such as relatives, present and former employers, business and personal associates, to credit bureau organizations, to educational and financial institutions, to guaranty agencies, and to contractors in order to verify your identity, to determine your eligibility to receive a loan(s) or a benefit on a loan(s), to permit the servicing or collection of your loan(s), to counsel you in repayment efforts, to enforce the terms of the loan(s), to investigate possible fraud and to verify compliance with federal student financial aid program regulations, to locate you if you become delinquent in your loan payments or if you default, to provide default rate calculations, to provide financial aid history information, to assist program administrators with tracking refunds and cancellations, or to provide a standardized method for educational institutions efficiently to submit student enrollment status.

In the event of litigation, we may send records to the Department of Justice, a court, adjudicative body, counsel, party, or witness if the disclosure is relevant and necessary to the litigation. If this information, either alone or with other information, indicates a potential violation of law, we may send it to the appropriate authority for action. We may send information to members of Congress if you ask them to help you with federal student aid questions. In circumstances involving employment complaints, grievances, or disciplinary actions, we may disclose relevant records to adjudicate or investigate the issues. If provided for by a collective bargaining agreement, we may disclose records to a labor organization recognized under 5 U.S.C. Chapter 71. Disclosures may also be made to qualified researchers under Privacy Act safeguards.

**Financial Privacy Act Notice**

Under the Right to Financial Privacy Act of 1978 (12 U.S.C. 3401-3421), the U.S. Department of Education will have access to financial records in your student loan file maintained by the lender in compliance with the administration of the Federal Family Education Loan Program.

**Paperwork Reduction Notice**

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a currently valid OMB control number. The valid OMB control number for this information collection is 1845-0069. The time required to complete this information is estimated to average 1.0 hours (60 minutes) per response, including the time to review instructions, search existing data resources, gather and maintain the data needed, and complete and review the information collection. **If you have any comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to:**

U.S. Department of Education
Washington, DC 20202-4651

**If you have any comments or concerns regarding the status of your individual submission of this form, contact the lender, guarantor, or program identified in the upper right-hand corner of this form.**

# Borrower's Rights and Responsibilities Statement

*Important Notice: The Borrower's Rights and Responsibilities Statement provides additional information about the terms and conditions of loans you receive under the Federal PLUS Loan Application and Master Promissory Note (MPN). Please keep a copy of this statement because it applies to present and subsequent loans received under the MPN. You may contact your lender at any time for another copy of this statement.*

The Federal Family Education Loan Program (FFELP) includes the following loans:

- Subsidized Federal Stafford Loan (formerly known as Guaranteed Student Loan [GSL]),
- Unsubsidized Federal Stafford Loan,
- Federal Insured Student Loan (FISL),
- Federal Supplemental Loans for Students (SLS), also known as ALAS,
- Federal PLUS (parent) Loan,
- Federal Consolidation Loan.

The FFELP is authorized by Title IV, Part B of the Higher Education Act of 1965, as amended.

**1. Governing Law** — Loans disbursed under this Master Promissory Note ("MPN") are subject to the Higher Education Act of 1965, as amended (20 U.S.C. 1070 et seq.), and applicable U. S. Department of Education regulations (collectively referred to as the "Act"). **NOTE: Any change to the Act applies to the terms of any loan(s) disbursed on or after the effective date of the change.**

**2. Use of this MPN** — I may receive more than one loan under this MPN over a period not to exceed 10 years. I may receive loans under this MPN for only the dependent identified on the MPN. I may receive loans under this MPN from the original lender, or a lender who assumes the right to offer loans under this MPN, even if my dependent changes schools and even if the guaranty agency changes. I may request in writing that no further loans be disbursed under my MPN. If I wish to use a new lender, I must sign a new MPN. I must also sign a new MPN before receiving a new loan, if requested to do so by my lender.

**3. Maximum Program Loan Amounts** — Under the Federal PLUS Loan Program, I may borrow amounts under this MPN not to exceed my dependent student's estimated cost of attendance minus any estimated financial aid he or she has been or will be awarded for the period of enrollment.

**4. Use of Loan Money** — I must use the loan money for authorized educational costs incurred by my dependent student for attendance at the school that certified my eligibility for the time period shown on my disclosure statement. Authorized expenses include the following:

- Tuition,
- Room,
- Board,
- Institutional fees,
- Books,
- Supplies,
- Equipment,
- Dependent child care,
- Transportation,

- Commuting expenses,
- Rental or purchase of a personal computer,
- Origination fee and guarantee fee, and/or
- Other documented, authorized costs.

**5. Loan Fees** — I will be charged an origination fee and may be charged a guarantee fee for each loan made under this MPN. Neither fee may exceed the rate specified for that fee in the Act. The amount of these fees will be deducted proportionately from each disbursement.

**6. Disbursement of Loan Money** — My loan money will be disbursed to my dependent's school by electronic funds transfer (EFT), master check (one check covering multiple students), or individual check. If my loan money is disbursed by individual check, the check will be copayable to me and the school and sent to the school.

Generally, my loan money will be disbursed to my dependent's school in multiple installments based on the academic terms at the school. If the school does not have academic terms, my loan money will generally be disbursed in at least two installments, one at the beginning and one at the midpoint of my dependent student's enrollment period for the applicable loan.

If my loan money exceeds the amount owed to the school, the school will forward the remainder of my loan money to me or, if I authorize, to my dependent.

If my dependent student is enrolled in a foreign school, my loan money will be disbursed directly to me or to the foreign school in one installment by a check made copayable to me and the foreign school.

**7. Change of Status** — I must notify my lender or any subsequent holder of my loan(s) if any of the following events take place before my loan(s) is repaid:

- I change my address, telephone number, or e-mail address,
- I change my name (for example, maiden name to married name),
- My dependent student fails to enroll A) at least half time, or B) for the loan period certified, or C) at the school that certified my eligibility for a PLUS Loan,
- My dependent student withdraws from school or begins attending less than half time,
- My dependent student transfers to another school,
- My dependent student graduates or his or her expected graduation date changes,
- I change my employer or my employer's address or telephone number changes, or
- I have any other change in status that would affect my loan status (for example, the loss of eligibility for an unemployment deferment by obtaining a job).

**8. Effect of Loans on Other Student Aid** — My receipt of a Federal PLUS Loan(s) may affect my dependent student's eligibility for other financial aid. Therefore, it may be beneficial to contact the school to determine my dependent student's eligibility for grants, work-study funds, subsidized loans, and other forms of student assistance before I apply for a Federal PLUS Loan(s).

**9. Interest Rates** — For Federal PLUS Loans first disbursed on or after July 1, 1998, the interest rate will be a variable rate, adjusted annually each July 1, not to exceed 9%. The actual interest rate applicable to each of my loans will be disclosed to me. After reviewing the actual interest rate, I may cancel or reduce any loan obtained under this MPN in accordance with the provisions of Item 11, Loan Cancellation.

**10. Payment of Interest** — It is my responsibility to pay interest on the unpaid principal amount of my loan(s) from the date of disbursement until the loan(s) is paid in full. I am responsible for payment of all interest that accrues on my loan(s).

Under certain circumstances, for example, during deferment, I will not be required to make principal payments, but interest charges on my Federal PLUS Loan(s) will accrue. This interest may be paid or capitalized (added to the principal of my loan(s)). If I inform my lender that I wish to pay interest as it accrues, but I do not submit the payments, my lender may capitalize that interest. If I inform my lender that I do not wish to pay interest as it accrues, my lender will capitalize such interest. Capitalized interest increases the principal balance of my loan(s) and the total amount of interest charges I must pay.

Interest on my loan(s) will be capitalized as provided under the Act. Generally, capitalization may occur no more frequently than quarterly. (See the chart entitled, "Capitalization of Federal PLUS Loan Interest," for further information on capitalization.) The charts entitled, "Repaying Your Loans" allow me to estimate the cost of capitalization and the effect it will have on my monthly payments. If my total outstanding balance exceeds the maximum on the chart, I understand I must add two or more estimates of the monthly payment amounts together to approximate more closely the total monthly payment for my total debt amount.

I may be able to claim a federal income tax deduction for interest payments as well as possible tax credits. For further information, I may refer to the IRS Publication 970, available at http://www.irs.gov.

**11. Loan Cancellation** — I understand that the terms of a full or partial loan cancellation depend on when I request the cancellation.

■ At any time before my loan money is disbursed, I may decline all or part of my loan money by notifying my lender or my dependent's school. No origination fee, guarantee fee, or interest will be charged on the amount of a loan that is declined.

■ If the school receives the money by EFT and credits it to my dependent's account, **I may cancel all or a part of that loan by informing the school within 14 days** after the date the school sends me a disbursement notice, or by the first day of the school's payment period, whichever is later. (The school can tell me the first day of the payment period). If I cancel all or a portion of a loan as described in this paragraph, the school will return to my lender the cancelled amount of the loan money and the loan fees will be reduced or eliminated in proportion to the amount returned.

■ At any time within 120 days of disbursement, I may pay back all or a part of that loan. The loan fees will be reduced or eliminated in proportion to the amount returned.

**12. Repayment** — All of my loans made under this MPN must be repaid.

The repayment period for each loan made under this MPN begins on the date of the final disbursement for that loan. This means that each loan I receive under this MPN will start repayment on a different date. My first payment on each loan will be due within 60 days of the final disbursement of that loan. My lender will notify me of the date my first payment is due. My repayment schedule may include all of my FFELP loans that are owned by the lender.

I must make payments on my loan(s) even if I do not receive a bill or repayment notice. Billing information is sent to me as a convenience, and I am obligated to make payments even if I do not receive any notice.

My minimum annual payment required on all my FFELP loans will not, unless the lender otherwise agrees, be less than $600, except as provided in a graduated or income-sensitive repayment plan. Notwithstanding the preceding sentence, my minimum annual scheduled payments will not be less than the amount of interest due and payable.

My repayment period for each loan generally lasts 5 years but may not exceed 10 years (except under an extended repayment plan).

I will be given the opportunity to choose one of the following repayment plans (for the following repayment plans, the time limits shown do not include periods of deferment and forbearance):

■ **Standard Repayment Plan** — If I choose this plan, I will make fixed monthly payments and repay my loan(s) in full within 10 years from the date the loan(s) entered repayment. Payments must be at least $50 a month and will be more if necessary to repay the loan(s) within the required time period.

■ **Graduated Repayment Plan** — If I choose this plan, I will usually make lower monthly payments at first, and my payments will increase over time. No single payment will be more than three times greater than any other payment.

■ **Extended Repayment Plan** — If I choose this plan, I will make monthly payments based on fixed annual or graduated repayment amounts over a period not to exceed 25 years. Payments must be at least $50 a month and will be more if necessary to repay the loan(s) within the required time period. I am only eligible for this plan if (i) at the time I sign this MPN I have no outstanding balance on a FFELP loan made before October 7, 1998, and (ii) I accumulate outstanding FFELP loans exceeding $30,000.

■ **Income-Sensitive Repayment Plan** — If I choose this plan, my monthly payments will be adjusted annually, based on my expected total monthly

gross income from all sources. I may contact my lender at any time for more information about this repayment plan option.

Under each plan, the number or amount of payments may need to be adjusted to reflect annual changes in the variable interest rate or to reflect additional loans I incur.

If I do not choose an income-sensitive, graduated, or extended repayment plan within 45 days after notification of my repayment choices, or if I choose an income-sensitive repayment plan but do not provide the required documentation within the lender-specified time frame, my lender will require that I repay the loan(s) under a standard repayment plan. I may change the repayment plan on my loan(s) once a year.

There will be no penalty for prepaying any portion of my loan(s).

All payments and prepayments may be applied in the following order: late charges, fees, and collection costs first, outstanding accrued interest second, and outstanding principal last.

If I fail to make any part of an installment payment within 15 days after it becomes due, I may owe a late charge. This charge may not exceed six cents for each dollar of each late installment.

**13. Sale or Transfer of Loan(s)** — The lender may sell or otherwise transfer one or all of my loans without my consent. Should ownership of a loan be transferred, I will be notified of the name, address, and telephone number of the new lender if the address to which I must make payments changes. Sale or transfer of my loan(s) does not affect my rights and responsibilities under such loan(s). If the lender sells my loan(s) to another originating lender, the lender may also transfer the right to offer subsequent loans under the MPN to such purchaser. I always have the right to terminate a lender's ability

---

### What is Capitalization?

Capitalization is a process whereby a lender adds unpaid interest to the principal balance of a loan(s). I am responsible for paying the interest due on my Federal PLUS Loan(s) from the date the lender disburses the loan funds until the loan(s) is paid in full.

If I am granted a deferment or forbearance and I choose to defer and capitalize interest charges, the principal balance of my loan(s) will increase each time my lender capitalizes unpaid interest. As a result, I will pay more interest charges over the life of the loan(s). When I resume repaying my loan(s), my monthly payment amount may be higher or, if my loan(s) is subject to the $50 minimum payment, I may be required to make more payments.

I should contact my lender if I have any questions or need more information.

This chart compares the monthly payments on a loan(s) where interest is paid while the loan is in a deferment or forbearance status and a loan(s) where the interest is capitalized. This example uses an interest rate of 9% and represents the loan amount outstanding when the borrower first enters repayment. This is an estimate only. The actual interest capitalized will depend on factors such as disbursement date, number of disbursements, the variable interest rate, and the frequency of capitalization. The estimate of interest capitalized in these examples is based on quarterly capitalization over a 12-month period.

| Treatment of Interest | Loan Amount | Capitalized Interest for 12 months | Principal to be Repaid | Monthly Payment | Number of Payments | Total Amount Repaid |
|---|---|---|---|---|---|---|
| When you pay the interest | $15,000 | $0 | $15,000 | $190 | 120 | $24,152* |
| When you don't pay the interest | $15,000 | $1,396 | $16,396 | $208 | 120 | $24,924 |

*Total amount repaid includes $1,350 of interest paid by the borrower during the 12-month period of deferment or forbearance.

**Results:** During repayment, you pay $18 less per month and $772 less over the lifetime of your loan(s) when you pay the interest as it is charged.

to make loans to me under this MPN by written notice to the lender.

**14. Loan Discharge** — My loan(s) will be discharged if documentation of my death or the death of my dependent student for whom I acquired a loan is submitted to my lender.

My loan(s) may also be discharged if a physician certifies that I am totally and permanently disabled as defined by the Act. In addition, I must meet certain income requirements and may not receive any additional FFELP, Direct, or Federal Perkins Loans during a 3-year conditional discharge period. I may not receive a discharge due to total and permanent disability based on a condition that existed before the loan was made, unless a physician certifies that the condition substantially deteriorated after the loan was made.

My loan(s) will not automatically be discharged in bankruptcy. In order to discharge a loan(s) in bankruptcy, I must prove undue hardship in an adversary proceeding before the bankruptcy court.

In certain cases, the Act provides for loan discharge for borrowers whose dependent students are unable to complete a course of study because the institution closes, or whose loan eligibility was falsely certified by the institution. The Act also provides for loan discharge in the amount of any required refund that my dependent's school failed to make to my lender on my behalf.

Neither the lender, the guarantor, nor the Department of Education vouch for the quality or suitability of the academic programs offered by participating schools. Unless I qualify for loan discharge under the Act, I must repay the loan(s) even if my dependent student does not complete his or her education, the student is unable to obtain employment in his or her field of study, or the student is dissatisfied with, or does not receive, the education I paid for with the loan(s).

**15. Consequences of Default** — Default is defined in detail in my MPN. If I default, the entire unpaid balance and collection fees on the applicable loan(s) will become immediately due and payable. Failure to repay any loan made under this MPN may result in any or all of the following:

■ Loss of federal and state income tax refunds,
■ Loss of other federal or state payments,
■ Legal action against me,
■ Collection charges (including attorney fees) being assessed against me,
■ Loss of my professional license,
■ An increase in my interest rate,
■ Loss of eligibility for other student aid and assistance under most federal benefit programs,
■ Loss of eligibility for loan deferments,
■ Negative credit reports to credit bureaus, and/or
■ My employer withholding part of my wages to give them to my guarantor (administrative wage garnishment).

**16. Credit Bureau Notification** — Information concerning the amount, disbursement, and repayment status (current or delinquent) of my loan(s) will be reported by my lender to one or more national credit bureaus on a regular basis. If I default on any loan(s) made under this MPN, the default will also be reported by the guarantor to all national credit bureaus. Before any guarantor reports such a default, it will give me at least 30 days notice that default information will be disclosed to the credit bureaus unless I enter into a repayment arrangement within 30 days of the date on the notice. The guarantor will give me a chance to ask for a review of the debt(s) before the default is reported. My lender or guarantor, as applicable, must provide a timely response to a request from any credit organization regarding objections I might raise with that organization about the accuracy and completeness of information reported by the lender or guarantor.

**17. Special Repayment Arrangements** —

■ A Federal Consolidation Loan Program is available under which I (or my spouse and I jointly) may consolidate federal education loans received from different lenders, the same lender, and/or under different education loan programs into one loan. Depending on the amount I borrow, this program may provide for an extension of my repayment period. Consolidation permits multiple debts to be combined into one monthly payment. For additional information, I should contact my lender or guarantor.

■ Under certain circumstances, military personnel may have their loan(s) repaid by the Secretary of Defense. I should address any questions to the local service recruiter. This is a recruiting program and does not pertain to prior service individuals or those not eligible for enlistment in the Armed Forces.

**18. Deferments** — Under certain circumstances, I have a right to defer (postpone) repayment. The types of deferments that are available to me depend on when I first obtained a FFELP loan. Upon request, my lender will provide me with a deferment application that explains the eligibility requirements. If I am in default on my loan(s), I am not eligible for a deferment.

*If at the time I sign this MPN I have no outstanding balance on a FFELP loan made before July 1, 1993,* deferment of repayment is available while I am:

■ Enrolled at least half time at an eligible school,
■ Engaged in a full-time course of study in a graduate fellowship program,
■ Engaged in a full-time rehabilitation training program for individuals with disabilities (if the program is approved by the Department of Education),
■ Conscientiously seeking, but unable to find, full-time employment (for up to three years),
■ Experiencing an economic hardship as determined by federal law (for up to three years).

For in-school deferments, my lender will process the deferment based on **(i)** my request along with

documentation verifying my eligibility, or **(ii)** the lender's receipt of a school certification of eligibility in connection with a new loan, or **(iii)** the lender's receipt of student status information indicating that I am enrolled on at least a half-time basis.

For all other deferments, I must provide my lender with a deferment request and evidence that verifies my eligibility.

*If at the time I sign this MPN I have an outstanding balance on a FFELP loan disbursed before July 1, 1993,* information on applicable deferment opportunities will be found in my earlier promissory note materials.

**19. Forbearance** — If I am unable to make any scheduled loan payment(s), the lender may allow me to reduce my payment amount, to extend the time for making payments, or to temporarily stop making payments as long as I intend to repay my loan(s). Allowing me to temporarily delay or reduce loan payments is called a forbearance. Interest charges continue to accrue during a forbearance period.

The lender may grant me a forbearance in the following circumstances:

■ Financial hardship, and/or
■ Illness.

My lender is generally not required to grant a forbearance and may require me to provide my reasons for the request and other information. The lender may grant me a forbearance to eliminate a delinquency that persists even though I am making scheduled installment payments. My lender may grant me an administrative forbearance for up to 60 days in order to collect and process documentation supporting my request for a deferment, forbearance, change in repayment plan, consolidation, or discharge.

Circumstances that require my lender to grant me a forbearance include:

■ Serving in a medical or dental internship or residency program, if I meet certain criteria.
■ Having a monthly debt burden for Title IV Loans that collectively equals or exceeds 20% of my total monthly gross income (for up to three years).

Upon request, my lender will provide me with forbearance information and a forbearance request form.

*Repayment information follows*

Follow these steps to estimate your loan payment.

### Step 1: Calculate Your Monthly Interest Charges

Round your Federal PLUS Loan balance up to the nearest $500. If your loan amount is not on the table, follow the example below to estimate your monthly accrued interest.

**Example:**
PLUS Loan of $5,479 at 6% interest.
Round up to nearest $500 = $5,500.

$5,000 = $25.00/month
+ 500 =    2.50/month
————————————
$27.50/month*

Your Monthly Interest  $ _____ .

**Approximate Monthly Interest**

| Loan Amount | 5.0% | 6.0% | 7.0% | 8.0% | 9.0% |
|---|---|---|---|---|---|
| $500 | $2.08 | $2.50 | $2.92 | $3.33 | $3.75 |
| $1,000 | $4.17 | $5.00 | $5.83 | $6.67 | $7.50 |
| $3,000 | $12.50 | $15.00 | $17.50 | $20.00 | $22.50 |
| $5,000 | $20.83 | $25.00 | $29.17 | $33.33 | $37.50 |
| $6,000 | $25.00 | $30.00 | $35.00 | $40.00 | $45.00 |
| $7,000 | $29.17 | $35.00 | $40.83 | $46.67 | $52.50 |
| $9,000 | $37.50 | $45.00 | $52.50 | $60.00 | $67.50 |
| $10,000 | $41.67 | $50.00 | $58.33 | $66.67 | $75.00 |
| $15,000 | $62.50 | $75.00 | $87.50 | $100.00 | $112.50 |
| $20,000 | $83.33 | $100.00 | $116.67 | $133.33 | $150.00 |
| $25,000 | $104.17 | $125.00 | $145.83 | $166.67 | $187.50 |

### Step 2: Estimate Your Capitalized Interest

Complete this step only if you will capitalize interest on a Federal PLUS Loan. *This is an estimate only.* Actual interest capitalized will depend on factors such as disbursement dates, number of disbursements, the variable interest rate, and the frequency of capitalization.

| | Monthly Interest (From Step One) | | Number of Months In deferment or forbearance | | Estimate of Capitalized Interest |
|---|---|---|---|---|---|
| Example | $ 27.50 | X | 22 | = | $ 605.00 |
| Your capitalized interest | $ _____ | X | _____ | = | $ _____ |

### Step 3: Estimate Your Monthly Payment

Round your loan balance up to the nearest $500. If your principal amount is not on the table, follow the example below to estimate your monthly payment. If you previously had interest capitalized, add it to the outstanding loan amount to get the new principal amount.

**Example:**
Federal PLUS Loan of $6,105.00 (5,500.00 + 605.00) at 6% interest.
Round up to nearest $500 = $6,500.

$6,000 = $66.61/month
+ 500 =    5.55/month
————————————
$72.16/month

Estimated Monthly Payment = $72.16

*Minimum monthly payment = $50 or amount of interest accruing each month

**Estimated Monthly Payments (10-Year Term)**

| Loan Amount | 5.0% | 6.0% | 7.0% | 8.0% | 9.0% |
|---|---|---|---|---|---|
| $500* | $5.30 | $5.55 | $5.81 | $6.07 | $6.33 |
| $1,000* | $10.61 | $11.10 | $11.61 | $12.13 | $12.67 |
| $3,000* | $31.82 | $33.31 | $34.83 | $36.40 | $38.00 |
| $5,000 | $53.03 | $55.51 | $58.05 | $60.66 | $63.34 |
| $6,000 | $63.64 | $66.61 | $69.67 | $72.80 | $76.01 |
| $7,000 | $74.25 | $77.71 | $81.28 | $84.93 | $88.67 |
| $9,000 | $95.46 | $99.92 | $104.50 | $109.19 | $114.01 |
| $10,000 | $106.07 | $111.02 | $116.11 | $121.33 | $126.68 |
| $15,000 | $159.10 | $166.53 | $174.16 | $181.99 | $190.01 |
| $20,000 | $212.13 | $222.04 | $232.22 | $242.66 | $253.35 |
| $25,000 | $265.16 | $277.55 | $290.27 | $303.32 | $316.69 |

| | Loan Amount | | Estimate of Capitalized Interest (From Step Two) | | New Principal Balance | | Estimated Monthly Payment |
|---|---|---|---|---|---|---|---|
| Example | $ 5,500 | + | $ 605.00 | = | $ 6,105.00 | | $ 72.16 |
| Your Monthly Payment | $ _____ | + | $ _____ | = | $ _____ | | $ _____ |

 GO FURTHER
FEDERAL STUDENT AID

# Lender Default Rate
## Search Results
## FY 2005



**33 Records found with specified criteria ( NAME = jp )**
Records from 1 to 30

| Rec | Lender's OPE ID | Name | Address | City | State |
|---|---|---|---|---|---|
| 1 | 80780700 | JP MORGAN CHASE BANK | 900 STEWART AVENUE | GARDEN CITY | NY |
| 2 | 81585400 | JP MORGAN CHASE BANK | 900 STEWART AVENUE | GARDEN CITY | NY |
| 3 | 83018600 | JP MORGAN CHASE BANK | 900 STEWART AVE | GARDEN CITY | NY |
| 4 | 83126900 | JP MORGAN CHASE BANK | 900 STEWART AVE | GARDEN CITY | NY |
| 5 | 83142000 | JP MORGANCHASE BANK | 900 STEWART AVENUE | GARDEN CITY | NY |
| 6 | 83121600 | JP MORGANCHASE BANK | 900 STEWART AVENUE | GARDEN CITY | NY |
| 7 | 81916600 | JP MORGANCHASE BANK | 900 STEWART AVE | GARDEN CITY | NY |
| 8 | 80803700 | JP MORGANCHASE BANK | 900 STEWART AVE | GARDEN CITY | NY |
| 9 | 82550900 | JPMORGAN CHASE BANK N A | 900 STEWART AVENUE | GARDEN CITY | NY |
| 10 | 82017700 | JP MORGAN CHASE BANK, NA | 270 PARK AVE., 10TH FL | NEW YORK | NY |
| 11 | 82062200 | JPMORGAN CHASE BANK, NA | PO BOX 711004 | COLUMBUS | OH |
| 12 | 82108700 | JPMORGAN CHASE BANK, NA | P O BOX 711004 | COLUMBUS | OH |
| 13 | 82420600 | JPMORGAN CHASE BANK, NA | P O BOX 711004 | COLUMBUS | OH |
| 14 | 81962800 | JPMORGAN CHASE BANK, NA | P O BOX 711004 | COLUMBUS | OH |
| 15 | 81809300 | JPMORGAN CHASE BANK, NA | PO BOX 711004 | COLUMBUS | OH |
| 16 | 82835200 | JPMORGAN CHASE BANK, NA | PO BOX 711004 | COLUMBUS | OH |
| 17 | 80862600 | JPMORGAN CHASE BANK, NA | PO BOX 711004 | COLUMBUS | OH |
| 18 | 80885700 | JPMORGAN CHASE BANK, NA | P O BOX 711004 | COLUMBUS | OH |
| 19 | 80886500 | JPMORGAN CHASE BANK, NA | PO BOX 711004 | COLUMBUS | OH |
| 20 | 81157100 | JPMORGAN CHASE BANK, NA | PO BOX 711004 | COLUMBUS | OH |
| 21 | 81192500 | JPMORGAN CHASE BANK, NA | P O BOX 711004 | COLUMBUS | OH |
| 22 | 81432100 | JPMORGAN CHASE BANK, NA | PO BOX 711004 | COLUMBUS | OH |
| 23 | 80024100 | JPMORGAN CHASE BANK, NA | PO BOX 711004 | COLUMBUS | OH |
| 24 | 80300000 | JPMORGAN CHASE BANK, NA | PO BOX 711004 | COLUMBUS | OH |
| 25 | 80331000 | JPMORGAN CHASE BANK, NA | PO BOX 711004 | COLUMBUS | OH |
| 26 | 80346300 | JPMORGAN CHASE BANK, NA | PO BOX 711004 | COLUMBUS | OH |
| 27 | 80353800 | JPMORGAN CHASE BANK, NA | PO BOX 711004 | COLUMBUS | OH |
| 28 | 80363400 | JPMORGAN CHASE BANK, NA | P O BOX 711004 | COLUMBUS | OH |
| 29 | 80506900 | JPMORGAN CHASE BANK, NA | PO BOX 711004 | COLUMBUS | OH |
| 30 | 80514700 | JPMORGAN CHASE BANK, NA | PO BOX 711004 | COLUMBUS | OH |



4/12/2008 1:24 AM

8:07-cv-00266-LSC-FG3     Doc # 25     Filed: 05/19/08     Page 68 of 285 - Page ID # 215

8:07-cv-00266-LSC-FG3    Doc # 25    Filed: 05/19/08    Page 69 of 285 - Page ID # 216

 GO FURTHER
FEDERAL STUDENT AID

Lender Default Rate
Search Results
FY 2005



**33 Records found with specified criteria ( NAME = jp )**
**Records from 31 to 33**

| Rec | Lender's OPE ID | Name | Address | City | State |
|---|---|---|---|---|---|
| 31 | 80515600 | JPMORGAN CHASE BANK, NA | PO BOX 711004 | COLUMBUS | OH |
| 32 | 80597400 | JPMORGAN CHASE BANK, NA | PO BOX 711004 | COLUMBUS | OH |
| 33 | 83205700 | JPMORGAN CHASE ELT GTSLC | 700 LAVACA | AUSTIN | TX |

Previous 30



8:07-cv-00266-LSC-FG3   Doc # 25   Filed: 05/19/08   Page 70 of 285 - Page ID # 217

EX-21.01 8 dex2101.htm SUBSIDIARIES OF THE COMPANY

**Exhibit 21.01**

**Exhibit 21.01 Citigroup Inc. Principal Subsidiaries as of December 31, 2006**

| LEGAL VEHICLE | INCORPORATION |
|---|---|
| 192 Baker Avenue, LLC | Delaware |
| 2490827 Nova Scotia Limited | Canada |
| 3086148 Nova Scotia Company | Canada |
| 3121615 Canada Inc. | Canada |
| 44-26 Hunter Street Realty Corporation | New York |
| 525 Participacoes S.A. | Brazil |
| ABA SIS, S.A. de C.V. | Mexico |
| Absolute Value Fund, L.P. | Cayman Is. |
| ACC CBNA Loan Funding LLC | Delaware |
| ACC CFPI Loan Funding LLC | Delaware |
| Acciones y Valores Banamex, S.A. de C.V. Casa de Bolsa, Integrante del Grupo Financiero Banamex | Mexico |
| Achtundzwanzigste Gamma Trans Leasing Verwaltungs GmbH & Co. Finanzierungs-Management KG | Germany |
| ACONA B.V. | Netherlands |
| Adam Capital Trust I | Delaware |
| Adam Capital Trust II | Delaware |
| Adam Capital Trust III | Delaware |
| Adam Statutory Trust I | Connecticut |
| Adam Statutory Trust II | Connecticut |
| Adam Statutory Trust III | Connecticut |
| Adam Statutory Trust IV | Connecticut |
| Adam Statutory Trust V | Connecticut |
| Adams Aircraft Ltd. | Japan |
| Administradora de Fondos de Pensiones y Cesantias S.A. Colfondos | Colombia |
| Administradora de Portafolios EuroAmerican Capital S. de R.L. de C.V. | Mexico City |
| ADV One, Inc. | Delaware |
| ADV Three, Inc. | Delaware |
| Advanced Molded Packaging LLC | Delaware |
| AEL Leasing Co., Inc. | Pennsylvania |
| Afore Banamex, S.A. de C.V. | Mexico |
| AFSC Agency, Inc. <DE> | Delaware |
| AIC Card Services, Inc. | Japan |

8:07-cv-00266-LSC-FG3    Doc # 25    Filed: 05/19/08    Page 71 of 285 - Page ID # 218

| | |
|---|---|
| Airlie CBNA Loan Funding LLC | Delaware |
| Airlie CFPI Loan Funding LLC | Delaware |
| Alaska CBNA Loan Funding LLC | Delaware |
| Alaska CFPI Loan Funding LLC | Delaware |

1

**Exhibit 21.01 Citigroup Inc. Principal Subsidiaries as of December 31, 2006**

| | |
|---|---|
| Albacore Investments, Ltd. | Bahamas |
| Alternative Investments MGR, Ltd. | Cayman Is. |
| AMAD Holdings Inc. | Delaware |
| American Financial Life Insurance Company | Texas |
| American Health and Life Insurance Company | Texas |
| Anglesea LLC | Delaware |
| Anson Aircraft Ltd. | Japan |
| Antares Associates Limited | Bahamas |
| Arcadia Receivables Capital Corp. | Delaware |
| Arcadia Receivables Finance Corp. VII | Delaware |
| Arizant Inc. | Minnesota |
| Arrendadora Banamex, S.A. de C.V., Organización Auxiliar del Crédito, Grupo Financiero Banamex | Mexico |
| Arrendadora Financiera Associates, S.A. de C.V., Organización Auxiliar del Crédito, Grupo Financiero Associates | Mexico |
| ARX CBNA Loan Funding LLC | Delaware |
| ARX CFPI Loan Funding LLC | Delaware |
| Ascot Aircraft Ltd. | Japan |
| Asesores Corporativos de Costa Rica, S.A. | Costa Rica |
| Asia Investors II GP Holding LLC | Delaware |
| Asia Investors II Services Holding LLC | Delaware |
| Asia Investors LLC | Delaware |
| Asia Mortgage Finance | Cayman Is. |
| Asset D Vehicle, Inc. | Delaware |
| Associated Madison Companies, Inc. | Delaware |
| Associates Asset Backed Securities Corp. | Delaware |
| Associates Auto Club Services International, Inc. | Delaware |
| Associates Capital Investments, L.L.C. | Delaware |
| Associates Capital Limited | England & Wales |
| Associates Capital Services Corporation | Indiana |
| Associates Corporation of North America <A Texas Corporation> | Texas |
| Associates Credit Services, Inc. | Delaware |
| Associates Finance (Taiwan) Inc. | Taiwan |
| Associates Financial Services (Mauritius) LLC | Mauritius |
| Associates First Capital Corporation | Delaware |

| | |
|---|---|
| Associates First Capital Mortgage Corporation | Delaware |
| Associates Housing Finance, LLC | Delaware |
| Associates India Holding Company Private Limited | India |
| Associates Information Services, Inc. | Delaware |
| Associates International Holdings Corporation | New York |

2

**Exhibit 21.01 Citigroup Inc. Principal Subsidiaries as of December 31, 2006**

| | |
|---|---|
| Associates International Services, LLC | Delaware |
| Associates Mexico Holdings, LLC | Delaware |
| Associates Real Estate Financial Services Company, Inc. | Delaware |
| Associates Servicios de Mexico, S.A. de C.V. | Mexico |
| Associates Venture Capital, LLC | Delaware |
| Associates/Trans-National Leasing, Inc. | Delaware |
| AST StockPlan, Inc. | Delaware |
| Astaire Associates Limited | Bahamas |
| Atlantic General Insurance Limited | Bermuda |
| Atlantic Vista Offshore Fund Ltd. | Cayman Is. |
| Atlantic Vista, LLC | Delaware |
| ATV Loan Funding LLC | Delaware |
| ATV2 Loan Funding LLC | Delaware |
| Auriga Amusement Properties KK | Japan |
| Avco Trust | England & Wales |
| Avi Escindida, S. de R.L. de C.V. | Mexico |
| AVL Loan Funding LLC | Delaware |
| AVL2 Loan Funding LLC | Delaware |
| Azabu Credit Management Company Ltd. | Cayman Is. |
| B.I.H. Brasseries Internationales Holding (Eastern) Limited | Gibraltar |
| Ball (Nominee) & Co., L.L.C. | Delaware |
| BALTIC AIRCRAFT LTD. | Japan |
| Banamex Accival Asset Management, Ltd. | Ireland |
| Banamex USA Bancorp | California |
| Banco Citibank S.A. | Brazil |
| Banco Citicard S.A. | Brazil |
| Banco de Honduras S.A. | Honduras |
| Banco J.P. Morgan, S.A., Institución de Banca Multiple, JP Morgan Grupo Financiero, División Fiduciaria Bajo El Fideicomiso No. F/00202 | Mexico |
| Banco J.P. Morgan, S.A., Institución de Banca Multiple, JP Morgan Grupo Financiero, en su Caracter de Institución Fiduciaria bajo el Fideicomiso No. F/0003 | Mexico |
| Banco Nacional de Mexico, S.A. | Mexico |
| Bangkok e'Service Ltd. | Thailand |
| Bank Handlowy w Warszawie S.A. | Poland |
| Bank Rozwoju Cukrownictwa S.A. | Poland |

8:07-cv-00266-LSC-FG3    Doc # 25    Filed: 05/19/08    Page 75 of 285 - Page ID # 222

| | |
|---|---|
| Bankers Leasing Corporation | Massachusetts |
| Barnes & Co., L.L.C. | Delaware |
| Barrow Aircraft Ltd. | Japan |
| Beecher CBNA Loan Funding LLC | Delaware |
| Beecher CFPI Loan Funding LLC | Delaware |

3

**Exhibit 21.01 Citigroup Inc. Principal Subsidiaries as of December 31, 2006**

| | |
|---|---|
| Benco & Co., L.L.C. | Delaware |
| Bershaw & Company | Canada |
| Biofarm Ilac Sanayi ve Ticaret A.S. | Turkey |
| Biofarma Ilac Sanayi ve Ticaret A.S. | Turkey |
| Birchwood EHP, L.P. | Tennessee |
| Bismarck CBNA Loan Funding LLC | Delaware |
| Bismarck CFPI Loan Funding LLC | Delaware |
| Blackwater Aircraft Ltd. | Japan |
| BLC Corporation | Utah |
| Blue One Asset Securitization Specialty Limited | South Korea |
| Blue Three Asset Securitization Specialty Limited | South Korea |
| Blue Two Asset Securitization Specialty Limited | South Korea |
| Boldwater CBNA Loan Funding LLC | Delaware |
| Boldwater CFPI Loan Funding LLC | Delaware |
| Bond Collateral Agency GmbH | Germany |
| Borden & Co., L.L.C. | Delaware |
| Bow Lane Nominees Pty Ltd | Australia |
| Bowery CBNA Loan Funding LLC | Delaware |
| Bowery CFPI Loan Funding LLC | Delaware |
| Bowyang Nominees Pty Limited | Australia |
| Bracewood Developments Limited | British Virgin Is. |
| Brazil Bond Trust | New York |
| Brazil Holdings Inc. Limited | Bahamas |
| Brennan Limited | Cayman Is. |
| Brisbane Aircraft Ltd. | Japan |
| Bristol Aircraft Ltd. | Japan |
| Bronte Aircraft Ltd. | Japan |
| Bronte Finance Pty Limited | Australia |
| Brooklyn Excellence Investment Fund, LLC | Delaware |
| Buchanan Limited | Cayman Is. |
| Buconero LLC | Delaware |
| Bushnell CBNA Loan Funding LLC | Delaware |
| Bushnell CFPI Loan Funding LLC | Delaware |
| C-Cayco Co-Investment Limited | Cayman Is. |
| C-Cayco Investment Holding, L.P. | Cayman Is. |

8:07-cv-00266-LSC-FG3    Doc # 25    Filed: 05/19/08    Page 77 of 285 - Page ID # 224
http://www.sec.gov/Archives/edgar/data/831001/0001193125070385O...

| | |
|---|---|
| CAJ RE Mezzanine Advisor III, LLC | Delaware |
| CAIROLI FINANCE S.R.L. | Italy |
| Cal Fed Holdings, Inc. | California |
| Cal Fed Insurance Agency, Inc. | California |

4

**Exhibit 21.01 Citigroup Inc. Principal Subsidiaries as of December 31, 2006**

| | |
|---|---|
| Calex Nominees Pty Limited | Australia |
| Campus West S.a r.l. | Luxembourg |
| Camwil Lease, Inc. | Delaware |
| Canary Fundo De Aplicação Em Quotas De Fundo De Investimento | Brazil |
| Canberra Aircraft Ltd. | Japan |
| Capital Fundo De Investimento Financeiro | Brazil |
| Capital Residential Fund Nominee No.1 Limited | England |
| Capital Residential Fund Nominee No.2 Limited | England |
| Casa de Bolsa Banamex, S.A. de C.V., Grupo Financiero Banamex | Mexico |
| CayCo Noteholder Limited | Cayman Is. |
| CBC International Real Estate LP LLC | Delaware |
| CBC/TST Investments LLC | Delaware |
| CBL Capital Corporation | Delaware |
| CC Consumer Services of Alabama, Inc. | Alabama |
| CC Finance System Incorporated | Delaware |
| CC Home Lenders Financial, Inc. | Georgia |
| CC Home Lenders, Inc. | Ohio |
| CC Retail Services, Inc. | Delaware |
| CCD Immobilien Beteiligungs GmbH | Germany |
| CCIL (Nominees) Limited | Jersey, Channel Is. |
| CCIL Pension Scheme Trustees Limited | Jersey, Channel Is. |
| CCP NA Equity I LLC | Delaware |
| CCP NA Equity II LLC | Delaware |
| CCP NA Equity III LLC | Delaware |
| CCSCI, Inc. | Puerto Rico |
| CDC Holdings Inc. | Delaware |
| CDL Loan Funding LLC | Delaware |
| CEFOF GP I Corp. | Delaware |
| CELFOF GP Corp. | Delaware |
| Centaur Investment Corporation | Delaware |
| CFG 1, LLC | Delaware |
| CFG 2, LLC | Delaware |
| CFJ K.K. | Japan |
| CG Casey I, LLC | Delaware |

8:07-cv-00266-LSC-FG3    Doc # 25    Filed: 05/19/08    Page 79 of 285 - Page ID # 226

http://www.sec.gov/Archives/edgar/data/83...00/000119312507703850...

| | |
|---|---|
| CGB Holdings, S. de R.L. de C.V. | Mexico |
| CGI Capital, Inc. | Delaware |
| CGI Private Equity LP LLC | Delaware |
| CGSNW-Willows, LLC | Delaware |
| Cheapside Holdings (Jersey) Limited | Jersey, Channel Is. |

5

8:07-cv-00266-LSC-FG3    Doc # 25    Filed: 05/19/08    Page 80 of 285 - Page ID # 227

**Exhibit 21.01 Citigroup Inc. Principal Subsidiaries as of December 31, 2006**

| | |
|---|---|
| Chelsea Participacoes Societarias e Investimentos Ltda. | Brazil |
| Chesapeake Appraisal and Settlement Services Agency of Alabama, Inc. | Alabama |
| Chesapeake Appraisal and Settlement Services Inc. | Maryland |
| Chesapeake Title Reinsurance Company, Inc. | Vermont |
| Chesapeake West Escrow Services Inc. | California |
| China Real Estate I Limited | Hong Kong |
| China Real Estate II Limited | Hong Kong |
| China Real Estate III Limited | Hong Kong |
| China Real Estate V Limited | Hong Kong |
| China Real Estate VI Limited | Hong Kong |
| CHUD Corp. | Delaware |
| CIB Properties Limited | England |
| CIGPF CREAR PAIS LTDA | Colombia |
| CIGPF I CORP. | New York |
| CIP IRPUT Fund Nominee No 1 Limited | England |
| CIP IRPUT Fund Nominee No 2 Limited | England |
| Citi (Nominees) Limited | Hong Kong |
| Citi Argentina (ABF) Trust | Bahamas |
| Citi Assurance Services, Inc. | Maryland |
| CITI BB-1 INVESTMENT FUND LLC | Delaware |
| Citi Cards Canada Inc. | Canada |
| Citi Cards Japan Kabushiki Kaisha | Japan |
| Citi Cards South Dakota Acceptance Corp. | Delaware |
| Citi Center Building Corporation | Philippines |
| Citi Commerce Solutions of Canada Ltd. | Canada |
| Citi Inversiones, S.A. de C.V. | El Salvador |
| Citi Islamic Investment Bank E.C. | Bahrain |
| Citi Islamic Portfolios S.A. | Luxembourg |
| Citi Omni-S Finance LLC | Delaware |
| Citi Operaciones A.I.E. | Spain |
| Citi Overseas Investments Bahamas Inc. | Bahamas |
| Citi Pensions & Trustees Ltd | England |
| Citi Recovery, A.I.E. | Spain |
| Citi Renewable Investments 1 LLC | Delaware |
| Citi Valores de El Salvador S.A. de C.V. | El Salvador |

| | |
|---|---|
| Citi-Colombia (Nassau) Limited | Bahamas |
| Citi-Europe Co-Invest, L.P. | Delaware |
| Citi-Info, S.A. de C.V. | Mexico |
| Citi-Inmobiliaria e Inversiones, S.A. de C.V. | Honduras |

6

8:07-cv-00266-LSC-FG3    Doc # 25    Filed: 05/19/08    Page 82 of 285 - Page ID # 229

**Exhibit 21.01 Citigroup Inc. Principal Subsidiaries as of December 31, 2006**

| | |
|---|---|
| Citibank (Banamex USA) | California |
| Citibank (Channel Islands) Limited | Jersey, Channel Is. |
| Citibank (Costa Rica) Sociedad Anonima | Costa Rica |
| Citibank (Hong Kong) Limited | Hong Kong |
| Citibank (Slovakia) a.s. | Slovak Republic |
| Citibank (South Dakota), National Association | United States |
| Citibank (Switzerland) | Switzerland |
| Citibank (Trinidad & Tobago) Limited | Trinidad & Tobago |
| Citibank a.s. | Czech Republic |
| Citibank Agencia de Valores S.A. | Chile |
| Citibank Anonim Sirketi | Turkey |
| Citibank Aruba N.V. | Aruba |
| Citibank Australia Staff Superannuation Pty Limited | Australia |
| Citibank Belgium S.A./N.V. | Belgium |
| Citibank Berhad | Malaysia |
| Citibank Brazilian Annex VI Trust | New York |
| Citibank Broker Correduria de Seguros S.A. | Spain |
| Citibank Canada | Canada |
| Citibank Canada Investment Funds Limited | Canada |
| Citibank Capital Corporation | Cayman Is. |
| Citibank Cartoes Investimentos Ltda. | Brazil |
| Citibank Consumers Nominee Pte. Ltd. | Singapore |
| Citibank Corredores de Seguros Limitada | Chile |
| Citibank Cote d'Ivoire S.A. | Ivory Coast |
| Citibank del Peru S.A. | Peru |
| Citibank Domestic Investment Corp. | Delaware |
| Citibank Employee Benefit Plan Trustees Ireland Limited | Ireland |
| Citibank España S.A. | Spain |
| Citibank Europe plc | Ireland |
| Citibank Finance Limited | Singapore |
| Citibank Holdings Ireland Limited | Ireland |
| Citibank Insurance Brokerage S.A. | Greece |
| Citibank International | United States |
| Citibank International plc | England |
| Citibank Investments Limited | England |

| Citibank Korea Inc. | South Korea | . |
| Citibank Leasing S.A.-Arrendamento Mercantil | Brazil | |
| Citibank London Nominees Limited | England | |
| Citibank Maghreb | Morocco | |

7

**Exhibit 21.01 Citigroup Inc. Principal Subsidiaries as of December 31, 2006**

| | |
|---|---|
| Citibank Malaysia (L) Limited | Malaysia |
| CITIBANK MERCADO DE CAPITALES, C.A. CITIMERCA, CASA DE BOLSA | Venezuela |
| Citibank Mortgage Reinsurance, Inc. | Vermont |
| Citibank NMTC Corporation | Delaware |
| Citibank Nominees (Ireland) Limited | Ireland |
| Citibank Nominees (New Zealand) Limited | New Zealand |
| Citibank Nominees Ltd. | Canada |
| Citibank Nominees Singapore Pte. Ltd. | Singapore |
| Citibank Overseas Investment Corporation | United States |
| Citibank Pensions Trustees Ireland Ltd. | Ireland |
| Citibank Privatkunden AG & Co. KGaA | Germany |
| Citibank Romania S.A. | Romania |
| Citibank Savings, Inc. | Philippines |
| Citibank Securities (Japan) Limited | Japan |
| Citibank Securities (Taiwan) Limited | Taiwan |
| Citibank Senegal S.A. | Senegal |
| Citibank Singapore Limited | Singapore |
| Citibank Strategic Technology Inc. | Delaware |
| Citibank Tanzania Limited | Tanzania |
| Citibank Uganda Limited | Uganda |
| Citibank Zambia Limited | Zambia |
| Citibank Zrt. | Hungary |
| Citibank, N.A. | United States |
| Citibank-Colombia S.A. | Colombia |
| Citibank-Corretora de Cambio, Titulos e Valores Mobiliarios S.A. | Brazil |
| Citibank-Corretora de Seguros S.A. | Brazil |
| Citibank-Distribuidora de Titulos e Valores Mobiliarios S.A. | Brazil |
| Citibrazil Bond Fund–Fundo De Investimento Financeiro | Brazil |
| CitiCapital Commercial Corporation | Delaware |
| CitiCapital Commercial Corporation | Canada |
| CitiCapital Commercial Corporation <AL> | Alabama |
| CitiCapital Commercial Corporation of Louisiana | Louisiana |
| CitiCapital Commercial Leasing Corporation | Indiana |

8:07-cv-00266-LSC-FG3    Doc # 25    Filed: 05/19/08    Page 85 of 285 - Page ID # 232

| | |
|---|---|
| CitiCapital Commercial Leasing Corporation | Canada |
| Citicapital Fleet Limited | England & Wales |
| CitiCapital Leasing (June) Limited | England & Wales |
| CitiCapital Leasing (March) Limited | England |
| CitiCapital Limited | Canada |
| CitiCapital Small Business Finance, Inc. | Delaware |

8

8:07-cv-00266-LSC-FG3    Doc # 25    Filed: 05/19/08    Page 86 of 285 - Page ID # 233
http://www.sec.gov/Archives/edgar/data/831001/000119312507038550...

---

**Exhibit 21.01 Citigroup Inc. Principal Subsidiaries as of December 31, 2006**

| | |
|---|---|
| CitiCapital Technology Finance Ltd. | Canada |
| CitiCapital Technology Finance, Inc. | Pennsylvania |
| Citicard S.A. | Argentina |
| Citicards Credit Services, Inc. | Puerto Rico |
| Citiclient (CPF) Nomi:.ees Limited | Wales |
| Citiclient (CPF) Nominees No 2 Limited | Wales |
| Citiclient Nominees No 1 Limited | Wales |
| Citiclient Nominees No 2 Limited | Wales |
| Citiclient Nominees No 3 Limited | Wales |
| Citiclient Nominees No 4 Limited | Wales |
| Citiclient Nominees No 5 Limited | Wales |
| Citiclient Nominees No 6 Limited | Wales |
| Citiclient Nominees No 7 Limited | Wales |
| Citiclient Nominees No 8 Limited | Wales |
| Citiclient Nominees No 9 Limited | England & Wales |
| Citicom de Mexico, S.A. de C.V. | Mexico |
| Citicorp (Jersey) Limited | Jersey, Channel Is. |
| Citicorp (Mexico) Holdings LLC | Delaware |
| Citicorp (Thailand) Ltd. | Thailand |
| Citicorp Administradora de Inversiones S.A. | Argentina |
| Citicorp Administrative Services, Inc. | Texas |
| Citicorp Aircraft Management, Inc. | Delaware |
| Citicorp Akademie GmbH | Germany |
| Citicorp Bankers Leasing Corporation | Delaware |
| Citicorp Bankers Leasing Finance Corporation | Delaware |
| Citicorp Banking Corporation | Delaware |
| Citicorp Capital Asia (Taiwan) Ltd. | Taiwan |
| Citicorp Capital I | Delaware |
| Citicorp Capital II | Delaware |
| Citicorp Capital Investors Europe Limited | Delaware |
| Citicorp Capital Investors Ltd. | Canada |
| Citicorp Capital Investors, Limited | Delaware |
| Citicorp Capital Markets Australia Limited | Australia |
| Citicorp Capital Markets Limited | India |
| Citicorp Capital Markets Sociedad Anonima | Argentina |

| | | |
|---|---|---|
| . | Citicorp Capital Markets Uruguay S.A. | Uruguay | . |
| | Citicorp Capital Philippines, Inc. | Philippines | |
| | Citicorp Card Services, Inc. | Delaware | |
| | Citicorp Churchill Lease, Inc. | Delaware | |

9

**Exhibit 21.01 Citigroup Inc. Principal Subsidiaries as of December 31, 2006**

| | |
|---|---|
| Citicorp Clearing Services India Limited | India |
| Citicorp Community Development, Inc. | New York |
| Citicorp Credit Services, Inc. | Delaware |
| Citicorp Credit Services, Inc. (Delaware) | Delaware |
| Citicorp Credit Services, Inc. (USA) | Delaware |
| Citicorp Credit, Inc. | Japan |
| Citicorp Customer Services S.L. | Spain |
| Citicorp Data Systems Incorporated | Delaware |
| Citicorp Del-Lease, Inc. | Delaware |
| Citicorp Delaware Equity, Inc. | Delaware |
| Citicorp Delaware Services, Inc. | Delaware |
| Citicorp Deutschland GmbH | Germany |
| Citicorp Development Center, Inc. | Delaware |
| Citicorp Dienstleistungs GmbH | Germany |
| Citicorp Diners Club Inc. | Delaware |
| Citicorp Diners Club Japan Kabushiki Kaisha | Japan |
| Citicorp Epic Finance, Inc. | Delaware |
| Citicorp Finance (India) Limited | India |
| Citicorp Finance International Ltd. | Bermuda |
| Citicorp Finance Taiwan Inc. | Taiwan |
| Citicorp Financial Services and Insurance Brokerage Philippines, Inc. | Philippines |
| Citicorp Financial Services Corporation | Puerto Rico |
| Citicorp Financial Services Limited | Hong Kong |
| Citicorp Finanziaria S.p.A. | Italy |
| Citicorp FSC I Ltd. | Bermuda |
| Citicorp FSC II Ltd. | Bermuda |
| Citicorp Funding, Inc. | Delaware |
| Citicorp General Insurance Agency Corporation | Taiwan |
| Citicorp Global Holdings, Inc. | Delaware |
| Citicorp Global Lease, Inc. | Delaware |
| Citicorp Holdings Inc. | Delaware |
| Citicorp Home Equity, Inc. | North Carolina |
| Citicorp Home Mortgage Services, Inc. | North Carolina |
| Citicorp Insurance Agency Co., Ltd. | Taiwan |
| Citicorp Insurance Agency, Inc. | Delaware |

http://www.sec.gov/Archives/edgar/data/831001/000!1931250703850..

| | |
|---|---|
| Citicorp Insurance Services S.A./N.V. | Belgium |
| Citicorp Insurance Services, Inc. | Delaware |
| Citicorp Insurance USA, Inc. | Vermont |
| Citicorp International Finance Corporation | Delaware |

10

**Exhibit 21.01 Citigroup Inc. Principal Subsidiaries as of December 31, 2006**

| | |
|---|---|
| Citicorp International Limited | Hong Kong |
| Citicorp International Securities Finance Ltd | England |
| Citicorp International Trading Company Argentina S.A. | Argentina |
| Citicorp International Trading Company, Inc. | Delaware |
| Citicorp Inversora S.A. Gerente de Fondos Comunes de Inversion | Argentina |
| Citicorp Investment Bank (Singapore) Limited | Singapore |
| Citicorp Investment Partners, Inc. | Delaware |
| Citicorp Investment Services | Delaware |
| Citicorp Investments Limited | Australia |
| Citicorp Investor Lease, Inc. | Delaware |
| Citicorp Leasing (Deutschland) GmbH | Germany |
| Citicorp Leasing (Thailand) Limited | Thailand |
| Citicorp Leasing Argentina S.A. | Argentina |
| Citicorp Leasing International LLC | Delaware |
| Citicorp Leasing, Inc. | Delaware |
| Citicorp Lescaman, Inc. | New York |
| Citicorp Management AG | Germany |
| Citicorp Maruti Finance Ltd. | India |
| Citicorp Mercantil-Participacoes e Investimentos S.A. | Brazil |
| Citicorp Merchant Bank Limited | Trinidad & Tobago |
| Citicorp Mezzanine Partners III, L.P. | Delaware |
| Citicorp Mezzanine Partners, L.P. | New York |
| Citicorp Mortgage Securities, Inc. | Delaware |
| Citicorp MT Aquarius Ship, Inc. | Delaware |
| Citicorp MT Aries Ship, Inc. | Delaware |
| Citicorp Multilease (SEF), Inc. | Delaware |
| Citicorp National Services, Inc. | Delaware |
| Citicorp Nevada Credit, Inc. | Nevada |
| Citicorp Nevada Leasing, Inc. | California |
| Citicorp Nominees Pty. Limited | Australia |
| Citicorp North America, Inc. | Delaware |
| Citicorp Operations Consulting GmbH | Germany |
| Citicorp Payment Services, Inc. | Delaware |
| Citicorp Pension Management Ltd. | Bahamas |
| Citicorp Peru S.A. Sociedad Agente de Bolsa | Peru |

http://www.sec.gov/Archives/edgar/data/831001/000119312507038500...

| | |
|---|---|
| Citicorp Peru Sociedad Titulizadora S.A. | Peru |
| Citicorp Petrolease, Inc. | Delaware |
| Citicorp Pty Limited | Australia |
| Citicorp Railmark, Inc. | Delaware |

11

**Exhibit 21.01 Citigroup Inc. Principal Subsidiaries as of December 31, 2006**

| | |
|---|---|
| Citicorp Real Estate, Inc. | Delaware |
| Citicorp Residential Mortgage Securities, Inc. | Delaware |
| Citicorp Securities (Japan) Limited | Cayman Is. |
| Citicorp Securities (Thailand) Ltd. | Thailand |
| Citicorp Securities Asia Pacific Limited | Hong Kong |
| Citicorp Securities International (RP), Inc. | Philippines |
| Citicorp Securities Investment Consulting Inc. | Taiwan |
| Citicorp Securities Services, Inc. | Delaware |
| Citicorp Securities West Africa | Ivory Coast |
| Citicorp Services Inc. | Delaware |
| Citicorp Services Limited | New Zealand |
| Citicorp Servium S.A. | Peru |
| Citicorp Sierra Lease, Inc. | Delaware |
| Citicorp Software and Technology Services (Shanghai) Limited | China |
| Citicorp Strategic Technology Corporation | Delaware |
| Citicorp Subsahara Investments, Inc. | Delaware |
| Citicorp Technology Holdings Inc. | Delaware |
| Citicorp Translease, Inc. | Delaware |
| Citicorp Trust Bank, fsb | United States |
| Citicorp Trust South Dakota | South Dakota |
| Citicorp Trust, National Association | United States |
| Citicorp Trustee (Singapore) Limited | Singapore |
| Citicorp Trustee Company Limited | England |
| Citicorp Tulip Lease, Inc. | Delaware |
| Citicorp USA, Inc. | Delaware |
| Citicorp Valores S.A. Sociedad de Bolsa | Argentina |
| Citicorp Vendor Finance, Inc. | Delaware |
| Citicorp Vendor Finance, Ltd. | Canada |
| Citicorp Venture Capital (Cayman) Ltd. | Cayman Is. |
| Citicorp Venture Capital Investors Limited | Cayman Is. |
| Citicorp Venture Capital Ltd. | Delaware |
| Citicorp Vermogensverwaltungs GmbH | Germany |
| Citicorp Vermogensverwaltungs GmbH & Co. Finanz KG | Germany |
| Citicorporate Limited | England |
| Citicredito S.A. | Honduras |

8:07-cv-00266-LSC-FG3    Doc # 25    Filed: 05/19/08    Page 93 of 285 - Page ID # 240

| | |
|---|---|
| Citidatos S.A. | Ecuador |
| CitiDel, Inc. | Delaware |
| CitiEquity Pan Europe Smaller Companies | Luxembourg |
| Citifin S.A. E.F.C. | Spain |

12

**Exhibit 21.01 Citigroup Inc. Principal Subsidiaries as of December 31, 2006**

| | |
|---|---|
| Citifinance Limited | Jamaica |
| Citifinance S.A. | Haiti |
| Citifinancial (Guernsey) Limited | Guernsey, Channel Is. |
| CitiFinancial (Isle of Man) Limited | England & Wales |
| CitiFinancial (Jersey) Limited | Jersey, Channel Is. |
| CitiFinancial Administrative Services of Canada, Inc. | Canada |
| CitiFinancial Auto Corporation | South Carolina |
| CitiFinancial Auto Credit, Inc. | Texas |
| CitiFinancial Auto, Ltd. | Minnesota |
| CitiFinancial Canada East Corporation | Canada |
| CitiFinancial Canada, Inc. | Canada |
| CitiFinancial Company | Delaware |
| Citifinancial Consumer Finance India Limited | India |
| CitiFinancial Consumer Services, Inc. | Delaware |
| CITIFINANCIAL CORPORATION | Philippines |
| CitiFinancial Corporation <CO> | Colorado |
| CitiFinancial Corporation Limited | England & Wales |
| CitiFinancial Corporation, LLC | Delaware |
| CitiFinancial Credit Company | Delaware |
| CitiFinancial Delaware LLC | Delaware |
| CitiFinancial Europe plc | England & Wales |
| CitiFinancial Holdings Limited | England & Wales |
| CitiFinancial Insurance Agency of Florida, Inc. | Florida |
| CitiFinancial Insurance Agency of Nevada, Inc. | Nevada |
| CitiFinancial Insurance Agency of Washington, Inc. | Washington |
| CitiFinancial Insurance Agency, Inc. | Wyoming |
| CitiFinancial Insurance Services India Limited | India |
| Citifinancial Limited | England & Wales |
| CitiFinancial Management Corporation | Maryland |
| CitiFinancial Mortgage Company (FL), LLC | Delaware |
| CitiFinancial Mortgage Company, LLC | Delaware |
| CitiFinancial Mortgage Securities Inc. | Delaware |
| CitiFinancial of Virginia, Inc. | Virginia |
| CitiFinancial of West Virginia, Inc. | West Virginia |
| CitiFinancial Print Limited | England & Wales |

| | |
|---|---|
| Citifinancial Promotora De Negocios & Cobranca Ltda. | Brazil |
| CitiFinancial Retail Services India Limited | India |
| CitiFinancial Services of Mississippi, LLC | Delaware |
| CitiFinancial Services of Puerto Rico, Inc. | Puerto Rico |

13

**Exhibit 21.01 Citigroup Inc. Principal Subsidiaries as of December 31, 2006**

| | |
|---|---|
| CitiFinancial Services, Inc. <CA> | California |
| CitiFinancial Services, Inc. <DE> | Delaware |
| CitiFinancial Services, Inc. <GA> | Georgia |
| CitiFinancial Services, Inc. <KY> | Kentucky |
| CitiFinancial Services, Inc. <MA> | Massachusetts |
| CitiFinancial Services, Inc. <MN> | Minnesota |
| CitiFinancial Services, Inc. <MO> | Missouri |
| CitiFinancial Services, Inc. <OH> | Ohio |
| CitiFinancial Services, Inc. <OK> | Oklahoma |
| CitiFinancial Services, Inc. <PA> | Pennsylvania |
| CitiFinancial Services, Inc. <UT> | Utah |
| CitiFinancial Services, Inc. <VA> | Virginia |
| CitiFinancial, Inc. <HI> | Hawaii |
| CitiFinancial, Inc. <IA> | Iowa |
| CitiFinancial, Inc. <KY> | Kentucky |
| CitiFinancial, Inc. <MD> | Maryland |
| CitiFinancial, Inc. <NY> | New York |
| CitiFinancial, Inc. <OH> | Ohio |
| CitiFinancial, Inc. <SC> | South Carolina |
| CitiFinancial, Inc. <TN> | Tennessee |
| CitiFinancial, Inc. <TX> | Texas |
| CitiFinancial, Inc. <WV> | West Virginia |
| CitiFinancial, Inc. NC | North Carolina |
| Citifinanzberatung GmbH | Germany |
| Citiflight, Inc. | Delaware |
| CitiFriends Nominee Limited | England |
| Citigroup (Chile) S.A. Corredores de Bolsa | Chile |
| Citigroup (Congo) S.A.R.L. | Dem. Republic of Congo |
| Citigroup (Jersey) Limited | Jersey, Channel Is. |
| Citigroup (UK) Pension Trustee Limited | England |
| Citigroup Alternative Investments (Ireland) Limited | Ireland |
| Citigroup Alternative Investments European Fund Advisor, LLC | Delaware |
| Citigroup Alternative Investments General Real Estate Mezzanine Investments II, LLC | Delaware |
| Citigroup Alternative Investments GP, LLC | Delaware |

| | |
|---|---|
| Citigroup Alternative Investments Limited Real Estate Mezzanine Investments III LLC | Delaware |
| Citigroup Alternative Investments LLC | Delaware |
| Citigroup Alternative Investments Multi-Adviser Hedge Fund Portfolios LLC | Delaware |
| Citigroup Alternative Investments Opportunity Fund IV Associates, LLC | Delaware |
| Citigroup Alternative Investments Opportunity Fund V Associates (Domestic), LLC | Delaware |

14

8:07-cv-00266-LSC-FG3    Doc # 25    Filed: 05/19/08    Page 98 of 285 - Page ID # 245
http://www.sec.gov/Archives/edgar/data/831001/000119312507038850...

**Exhibit 21.01 Citigroup Inc. Principal Subsidiaries as of December 31, 2006**

| | |
|---|---|
| Citigroup Alternative Investments Opportunity Fund V Associates (International), LLC | Delaware |
| Citigroup Alternative Investments Private Equity GP LLC | Delaware |
| Citigroup Alternative Investments Real Estate GP LLC | Delaware |
| Citigroup Alternative Investments Structuring Facility Ltd. | Cayman Is. |
| Citigroup Asia Pacific Holding Corporation | Delaware |
| Citigroup Asset Management Investments LLC | Delaware |
| Citigroup BUSA Holdings Inc. | Delaware |
| Citigroup Business Process Solutions Pte. Ltd. | Singapore |
| Citigroup Capital Finance Ireland Limited | England |
| Citigroup Capital II | Delaware |
| Citigroup Capital III | Delaware |
| Citigroup Capital IX | Delaware |
| Citigroup Capital Korea Inc. | South Korea |
| Citigroup Capital Sdn. Bhd. | Malaysia |
| Citigroup Capital VII | Delaware |
| Citigroup Capital VIII | Delaware |
| Citigroup Capital X | Delaware |
| Citigroup Capital XI | Delaware |
| Citigroup Capital XIV | Delaware |
| Citigroup CCDE Investment Fund LLC | Delaware |
| Citigroup Commercial Mortgage Participation LLC | Delaware |
| Citigroup Commercial Mortgage Securities Inc. | Delaware |
| Citigroup Counterparty Risk LLC | Delaware |
| Citigroup Credit Management Company Ltd. | Cayman Is. |
| Citigroup Delaware Finance General Partner LLC | Delaware |
| Citigroup Delaware Finance Limited Partnership | Delaware |
| Citigroup Delaware First Finance LLC | Delaware |
| Citigroup Delaware Second Finance LLC | Delaware |
| CITIGROUP DEPOSITARY SERVICES (FRANCE) | France |
| Citigroup Derivatives Markets Inc. | Delaware |
| Citigroup Diversified Futures Fund L.P. | New York |
| Citigroup Emerging CTA Portfolio L.P. | New York |
| Citigroup Employee Fund of Funds (Cayman) I, LP | Cayman Is. |
| Citigroup Employee Fund of Funds (DE-UK) I, LP | Delaware |
| Citigroup Employee Fund of Funds (Master Fund) I, LP | Delaware |

8:07-cv-00266-LSC-FG3    Doc # 25    Filed: 05/19/08    Page 99 of 285 - Page ID # 246

| | |
|---|---|
| Citigroup Employee Fund of Funds (UK) I, LP | England |
| Citigroup Employee Fund of Funds (US-UK) I, LP | Delaware |
| Citigroup Employee Fund of Funds I, LP | Delaware |
| Citigroup Energy Canada Holdings ULC | Canada |

15

**Exhibit 21.01 Citigroup Inc. Principal Subsidiaries as of December 31, 2006**

| | |
|---|---|
| Citigroup Energy Canada ULC | Canada |
| Citigroup Energy Holdings Inc. | Delaware |
| Citigroup Energy Inc. | Delaware |
| Citigroup Fairfield Futures Fund L.P. II | New York |
| Citigroup Finance Canada Inc. | Canada |
| Citigroup Finance Limited Partnership | Delaware |
| Citigroup Finance LLC | Delaware |
| Citigroup Financial Products Inc. | Delaware |
| Citigroup Financial Strategies Inc. | Delaware |
| Citigroup FOF LLC | Delaware |
| Citigroup Forex Inc. | Delaware |
| Citigroup Fund Services (Bermuda) Ltd. | Bermuda |
| Citigroup Fund Services (BVI) Ltd. | British Virgin Is. |
| Citigroup Fund Services (Cayman) Ltd. | Cayman Is. |
| Citigroup Fund Services Canada Holding Co. | Canada |
| Citigroup Fund Services Canada, Inc. | Canada |
| Citigroup Fund Services, LLC | Delaware |
| Citigroup Funding Inc. | Delaware |
| Citigroup Funding Limited Partnership | Delaware |
| Citigroup General Partner LLC | Delaware |
| Citigroup GHS Holdings, Inc. | Delaware |
| Citigroup Global Investments Japan K.K. | Japan |
| Citigroup Global Investments Offshore Investment Holdings Ltd. | Cayman Is. |
| Citigroup Global Investments Real Estate LP LLC | Delaware |
| Citigroup Global Markets (Chile) S.A. | Chile |
| Citigroup Global Markets (International) Finance AG | Switzerland |
| Citigroup Global Markets (Loan Notes) Inc. | Delaware |
| Citigroup Global Markets (Proprietary) Limited | South Africa |
| Citigroup Global Markets Asia Capital Corporation Limited | Ireland |
| Citigroup Global Markets Asia Limited | Hong Kong |
| Citigroup Global Markets Asia Pacific Limited | Delaware |
| Citigroup Global Markets Australia Financial Products Limited | Australia |
| Citigroup Global Markets Australia Holdings Pty Limited | Australia |

| | |
|---|---|
| Citigroup Global Markets Australia Nominees No. 2 Pty Limited | Australia |
| Citigroup Global Markets Australia Pty Limited | Australia |
| Citigroup Global Markets Brasil Holdings Inc. | Delaware |
| Citigroup Global Markets Canada Inc. | Canada |
| Citigroup Global Markets China Limited | Hong Kong |
| Citigroup Global Markets Commercial Corp. | Delaware |

16

**Exhibit 21.01 Citigroup Inc. Principal Subsidiaries as of December 31, 2006**

| | |
|---|---|
| Citigroup Global Markets Deutschland AG & Co. KGaA | Germany |
| Citigroup Global Markets Eastern Europe Limited | England |
| Citigroup Global Markets Europe Finance Limited | England |
| Citigroup Global Markets Europe Limited | England |
| Citigroup Global Markets Finance Corporation & Co. beschrankt haftende KG | Germany |
| Citigroup Global Markets Finance Limited | New Zealand |
| Citigroup Global Markets Finance LLC | Delaware |
| Citigroup Global Markets Financial Products LLC | Delaware |
| Citigroup Global Markets Holdings GmbH | Switzerland |
| Citigroup Global Markets Holdings Inc. | New York |
| Citigroup Global Markets Hong Kong Futures And Securities Limited | Hong Kong |
| Citigroup Global Markets Hong Kong Holdings Limited | Hong Kong |
| Citigroup Global Markets Hong Kong Nominee Limited | Hong Kong |
| Citigroup Global Markets Inc. | New York |
| Citigroup Global Markets India Private Limited | India |
| Citigroup Global Markets International LLC | Delaware |
| Citigroup Global Markets Korea Securities Limited | South Korea |
| Citigroup Global Markets Limited | England |
| Citigroup Global Markets Malaysia Sdn. Bhd. | Malaysia |
| Citigroup Global Markets Management AG | Germany |
| Citigroup Global Markets Mauritius Private Limited | Mauritius |
| Citigroup Global Markets New Zealand Limited | New Zealand |
| Citigroup Global Markets Nominees (Proprietary) Limited | South Africa |
| Citigroup Global Markets Overseas Finance Limited | Cayman Is. |
| Citigroup Global Markets Polska Spolka z ograniczona odpowiedzialnoscia | Poland |
| Citigroup Global Markets Puerto Rico Inc. | Puerto Rico |
| Citigroup Global Markets Realty Corp. | New York |
| Citigroup Global Markets Representacoes Ltda. | Brazil |
| Citigroup Global Markets Singapore Holdings Pte. Ltd. | Singapore |
| Citigroup Global Markets Singapore Pte. Ltd. | Singapore |
| Citigroup Global Markets Singapore Securities Pte. Ltd. | Singapore |
| Citigroup Global Markets Taiwan Limited | Taiwan |
| Citigroup Global Markets U.K. Equity Limited | England |

8:07-cv-00266-LSC-FG3    Doc # 25    Filed: 05/19/08    Page 103 of 285 - Page ID # 250

| | |
|---|---|
| Citigroup Global Services Limited | India |
| Citigroup GSP Employees Fund, L.P. | Delaware |
| Citigroup Holdco Delaware Finance Inc. | Delaware |
| Citigroup Holdco Finance Inc. | Delaware |
| Citigroup Holding (Singapore) Private Limited | Singapore |
| Citigroup Holdings (Bermuda) Ltd. | Bermuda |

17

**Exhibit 21.01 Citigroup Inc. Principal Subsidiaries as of December 31, 2006**

| | |
|---|---|
| Citigroup Holdings Mauritius Ltd | Mauritius |
| Citigroup Index LLC | Delaware |
| Citigroup Information Technology Operations and Solutions Limited | India |
| Citigroup Institutional Trust Company | Delaware |
| Citigroup Insurance Holding Corporation | Georgia |
| Citigroup International Finance | Cayman Is. |
| Citigroup International Luxembourg Limited | England |
| Citigroup International Netherlands B.V. | Netherlands |
| Citigroup International Overseas Funding | Cayman Is. |
| Citigroup Investment Advisory Services Inc. | Delaware |
| Citigroup Investment Deutschland Kapitalanlagegesellschaft mit beschrankter Haftung | Germany |
| Citigroup Investment Holdings Inc. | Delaware |
| Citigroup Investments Inc. | Delaware |
| Citigroup Irish Investor LLC | Delaware |
| Citigroup IT Consulting GmbH | Germany |
| Citigroup Leasing Financial Services Company Limited | Hungary |
| Citigroup Managed Futures LLC | Delaware |
| Citigroup Management Consulting (Shanghai) Co., Ltd. | China |
| Citigroup Management Corp. | Delaware |
| Citigroup Mortgage Loan Trust Inc. | Delaware |
| Citigroup Netherlands B.V. | Netherlands |
| Citigroup Nominee (Malaysia) Sdn. Bhd. | Malaysia |
| Citigroup Nominees (Asing) Sdn. Bhd. | Malaysia |
| Citigroup Nominees (Tempatan) Sdn. Bhd. | Malaysia |
| Citigroup Participation Luxembourg Limited | England |
| Citigroup Partners UK | England |
| Citigroup Payco I LLC | Delaware |
| Citigroup Payco II LLC | Delaware |
| Citigroup Payco III LLC | Delaware |
| Citigroup Payco LLC | Delaware |
| Citigroup Principal Investments Japan Kabushiki Kaisha | Japan |
| Citigroup Principal Investments Japan Ltd. | Cayman Is. |
| Citigroup Private Bank GP, Inc. | Delaware |
| Citigroup Private Equity (Offshore) LLC | Delaware |

| | |
|---|---|
| Citigroup Property Investors Asia Kingsville II Ltd. | Cayman Is. |
| Citigroup Property Investors Asia Limited | Hong Kong |
| Citigroup Property Investors China Limited | Hong Kong |
| Citigroup Property Investors Global Real Estate Public Securities LLC | Delaware |
| Citigroup Property Investors US Real Estate Public Securities LLC | Delaware |

18

**Exhibit 21.01 Citigroup Inc. Principal Subsidiaries as of December 31, 2006**

| | |
|---|---|
| Citigroup Property Limited | England |
| Citigroup Pty Limited | Australia |
| Citigroup Real Estate Finance Asia | Cayman Is. |
| Citigroup Real Estate Partners II (Institutional), L.P. | Delaware |
| Citigroup Real Estate Partners II, L.P. | Delaware |
| Citigroup Realty Services GmbH | Germany |
| Citigroup Risk Brokers Holding Company Inc. | Delaware |
| Citigroup Risk Brokers Inc. | Delaware |
| Citigroup Sales and Outsourcing Services Sdn. Bhd. | Malaysia |
| Citigroup Securities Clearing Australia Limited | Australia |
| Citigroup Securities S.A.E. | Egypt |
| Citigroup Securities Services (Bermuda) Ltd. | Bermuda |
| Citigroup Services (Japan) Ltd. | Cayman Is. |
| Citigroup Services Japan Ltd. | Japan |
| Citigroup Services LLC | Delaware |
| Citigroup South Africa Credit Products (Proprietary) Limited | South Africa |
| Citigroup Strategic Holdings Mauritius Ltd | Mauritius |
| Citigroup Technology, Inc. | Delaware |
| Citigroup Trade Services (Malaysia) Sendirian Berhad | Malaysia |
| Citigroup Trust—Delaware, National Association | United States |
| Citigroup Vehicle Securities Inc. | Delaware |
| Citigroup Venture Capital Equity Partners, L.P. | Delaware |
| Citigroup Venture Capital GP Holdings, Ltd. | Delaware |
| Citigroup Venture Capital International Africa Fund G.P. Limited | Channel Is. |
| Citigroup Venture Capital International Africa Fund, L.P. | Cayman Is. |
| Citigroup Venture Capital International Asia Pacific Limited | Bahamas |
| Citigroup Venture Capital International Bio-Fuel, L.P. | Delaware |
| Citigroup Venture Capital International Brazil LLC | Delaware |
| Citigroup Venture Capital International Brazil, L.P. | Cayman Is. |
| Citigroup Venture Capital International Carried Interest Program Limited | Cayman Is. |
| Citigroup Venture Capital International Carried Interest, L.P. | Cayman Is. |
| Citigroup Venture Capital International CDX LLC | Delaware |

8:07-cv-00266-LSC-FG3   Doc # 25   Filed: 05/19/08   Page 107 of 285 - Page ID # 254
http://www.sec.gov/Archives/edgar/data/831001/000119312507038850...

| | |
|---|---|
| Citigroup Venture Capital International Co-Investment Program Limited | Cayman Is. |
| Citigroup Venture Capital International Co-Investment, L.P. | Cayman Is. |
| Citigroup Venture Capital International Delaware Corporation | Delaware |
| Citigroup Venture Capital International Ebene Limited | Mauritius |
| Citigroup Venture Capital International Growth Partnership (Cayman), L.P. | Cayman Is. |
| Citigroup Venture Capital International Growth Partnership (Delaware), L.P. | Delaware |
| Citigroup Venture Capital International Growth Partnership (Offshore), L.P. | Delaware |

19

## Exhibit 21.01 Citigroup Inc. Principal Subsidiaries as of December 31, 2006

| | |
|---|---|
| Citigroup Venture Capital International Growth Partnership Mauritius Limited | Mauritius |
| Citigroup Venture Capital International Growth Partnership, L.P. | Cayman Is. |
| Citigroup Venture Capital International Investment G.P. Limited | Channel Is. |
| Citigroup Venture Capital International Jersey Limited | Jersey, Channel Is. |
| Citigroup Venture Capital International Mauritius Limited | Mauritius |
| Citigroup Venture Capital International Partnership G.P. Limited | Jersey, Channel Is. |
| Citigroup Venture Capital LP Holdings, Ltd. | Delaware |
| Citigroup Venture Capital Manager Holdings, Ltd. | Delaware |
| Citigroup Washington, Inc. | District of Columbia |
| Citigroup Wealth Advisors Pty Limited | Australia |
| CitiHousing, Inc. | South Dakota |
| Citilease Company Ltd. | Japan |
| Citilease Finansal Kiralama Anonim Sirketi | Turkey |
| CitiLeasing (Hungary) Ltd. | Hungary |
| Citileasing Egypt S.A.E. | Egypt |
| Citileasing OOO | Russia |
| Citileasing S.A. | Peru |
| Citileasing s.r.o. | Czech Republic |
| CitiLife Financial Limited | Ireland |
| CitiMae, Inc. | Delaware |
| Citimarlease (Burmah I), Inc. | Delaware |
| Citimarlease (Burmah I), Inc. UTA (9/28/72) | Delaware |
| Citimarlease (Burmah Liquegas), Inc. | Delaware |
| Citimarlease (Burmah Liquegas), Inc. UTA (9/28/72) | Delaware |
| Citimarlease (Burmah LNG Carrier), Inc. | Delaware |
| Citimarlease (Burmah LNG Carrier), Inc. UTA (9/28/72) | Delaware |
| Citimarlease (Fulton), Inc. | Delaware |
| Citimarlease (Whitney), Inc. | Delaware |
| Citimerchant Bank Limited | Jamaica |
| CitiMortgage Asset Management, Inc. | New York |
| Citimortgage Holdings, Inc. | Delaware |
| CitiMortgage, Inc. | New York |
| Citinet Limited | England |

8:07-cv-00266-LSC-FG3   Doc # 25   Filed: 05/19/08   Page 109 of 285 - Page ID # 256

| | |
|---|---|
| Citinversiones de Titulos y Valores (Puesto de Bolsa) S.A. | Dominican Republic |
| Citinversiones, S.A. | Guatemala |
| Citinvestment Chile Limited | Bahamas |
| Citipartners Services Group A.I.E. | Spain |
| CitiProperties (BVI) Limited | British Virgin Is. |
| CitiRealty China (BVI) Limited | British Virgin Is. |

20

8:07-cv-00266-LSC-FG3   Doc # 25   Filed: 05/19/08   Page 110 of 285 - Page ID # 257

http://www.sec.gov/Archives/edgar/data/831001/0001193125070385O...

**Exhibit 21.01 Citigroup Inc. Principal Subsidiaries as of December 31, 2006**

| | |
|---|---|
| Citisecurities Limited | Australia |
| Citiseguros Puerto Rico, Inc. | Puerto Rico |
| CitiService S.p.A. | Italy |
| Citishare Corporation | Delaware |
| CITISOLUTIONS FINANCIAL (UK) LIMITED | England & Wales |
| CitiSolutions Financial Limited | Ireland |
| CitiStreet Advisors LLC * | New Jersey |
| CitiStreet Australia Pty Limited * | Australia |
| CitiStreet International, LLC * | Delaware |
| CitiStreet LLC [i] | Delaware |
| CitiStreet Mortgage Services, Inc. * | New Jersey |
| Cititrading S.A. Casa de Valores | Ecuador |
| Cititrust (Bahamas) Limited | Bahamas |
| Cititrust (Cayman) Limited | Cayman Is. |
| Cititrust (Jersey) Limited | Jersey, Channel Is. |
| Cititrust (Kenya) Limited | Kenya |
| Cititrust (Mauritius) Limited | Mauritius |
| Cititrust (New Jersey) Limited | Delaware |
| Cititrust (Singapore) Limited | Singapore |
| Cititrust (Switzerland) Limited | Switzerland |
| Cititrust Colombia S.A. Sociedad Fiduciaria | Colombia |
| Cititrust Limited | Hong Kong |
| Cititrust S.p.A.-Istituto Fiduciario | Italy |
| Cititrust Services Limited | Bahamas |
| Citivalores Puesto de Bolsa, S.A. | Costa Rica |
| Citivalores S.A. Comisionista de Bolsa | Colombia |
| Citivalores, S.A. | Guatemala |
| Citivalores, S.A. | Panama |
| Citivic Nominees Limited | England |
| CJP Holdings Inc. | Delaware |
| Clovelly Aircraft Ltd. | Japan |
| CM FSC I LTD. | Bermuda |
| CM FSC II Limited | Bermuda |
| CM FSC III Limited | Bermuda |
| CM FSC IV, Ltd. | Bermuda |

8:07-cv-00266-LSC-FG3   Doc # 25   Filed: 05/19/08   Page 111 of 285 - Page ID # 258

http://www.sec.gov/Archives/edgar/data/831001/0001193125070385O...

| | |
|---|---|
| CM Leasing Company | Canada |
| CM Leasing Member 1995 Trust-A1 | Delaware |
| CM Leasing Member 1995 Trust-A2 | Delaware |
| CM North America Holding Company | Canada |

21

**Exhibit 21.01 Citigroup Inc. Principal Subsidiaries as of December 31, 2006**

| | |
|---|---|
| CM Tulip Holding Company | Canada |
| CMF Altis Partners Master Fund L.P. | New York |
| CMF Aspect Master Fund L.P. | New York |
| CMF Avant Master Fund L.P. | New York |
| CMF Campbell Master Fund L.P. | New York |
| CMF Capital Fund Management Master Fund L.P. | New York |
| CMF Drury Capital Master L.P. | New York |
| CMF Graham Master Fund L.P. | New York |
| CMF Institutional Futures Portfolio L.P. | New York |
| CMF SandRidge Master Fund L.P. | New York |
| CMF Willowbridge Argo Master Fund L.P. | New York |
| CMF Winton Feeder I L.P. | New York |
| CMF Winton Master L.P. | New York |
| CMFC, Inc. | Puerto Rico |
| CMI of Delaware, Inc. | Delaware |
| Co-Investment II Luxco S.a.r.l. | Luxembourg |
| Co-Investment Limited II (M-Tel) | Cayman Is. |
| Co-Investment Limited Partnership I | Cayman Is. |
| Co-Investment Limited Partnership V (SOL) | Cayman Is. |
| Co-Investment LLC IX (Cordillera) | Delaware |
| Co-Investment LLC VII (Intcomex) | Delaware |
| Co-Investment LLC VIII (Palink) | Delaware |
| Cole Brook CBNA Loan Funding LLC | Delaware |
| Cole Brook CFPI Loan Funding LLC | Delaware |
| Collister Loft Finance LLC | Delaware |
| Commercial Credit International, Inc. | Delaware |
| Commonwealth Control, Inc. | Delaware |
| Commonwealth Plan, Inc., The | Massachusetts |
| Commonwealth System, Inc., The | Massachusetts |
| Communico | California |
| Compañia Exportadora Cityexport S.A. en Liquidación | Colombia |
| Coogee Aircraft Ltd. | Japan |
| Coogee Finance Pty Limited | Australia |
| Coon Rapids Leased Housing Associates II, Limited Partnership | Minnesota |
| Copelco Capital (Puerto Rico), Inc. | Puerto Rico |

| | |
|---|---|
| Copelco Capital Funding Corp. IX | Delaware |
| Copelco Capital Funding Corp. VI | Delaware |
| Copelco Capital Funding Corp. VIII | Delaware |
| Copelco Capital Funding LLC 99-B | Delaware |

22

8:07-cv-00266-LSC-FG3    Doc # 25    Filed: 05/19/08    Page 114 of 285 - Page ID # 261
http://www.sec.gov/Archives/edgar/data/831001/000119312507038350...

**Exhibit 21.01 Citigroup Inc. Principal Subsidiaries as of December 31, 2006**

| | |
|---|---|
| Copelco Capital Residual Funding LLC 1 | Delaware |
| Copelco Manager, Inc. | Delaware |
| Copelco Reinsurance Company, Ltd. | Bermuda |
| CORPIFEXSA, Corporación de Inversiones y Fomento de Exportaciones S.A. | Ecuador |
| Corporación Citibank G.F.C. S.A. | Costa Rica |
| Corporate Loan Funding I LLC | Delaware |
| Corporate Loan Funding III LLC | Delaware |
| Corporate Loan Funding IV LLC | Delaware |
| Corporate Loan Funding IX LLC | Delaware |
| Corporate Loan Funding V LLC | Delaware |
| Corporate Loan Funding VI LLC | Delaware |
| Corporate Loan Funding VII LLC | Delaware |
| Corporate Loan Funding XI LLC | Delaware |
| Corporate Loan Funding XIII LLC | Delaware |
| Corporativo Vitamedica, S.A. De C.V. | Mexico |
| Corvus Investments Y.K. | Japan |
| Court Square Capital Limited | Delaware |
| Courtney Park Leasehold, LLC | Florida |
| Coventry Aircraft Ltd. | Japan |
| CPI 2004 European Carried Interest Program (Delaware), L.P. | Delaware |
| CPI 2004 Global Carried Interest Program (Delaware), L.P. | Delaware |
| CPI 2004 North America Carried Interest Program, L.P. | Delaware |
| CPI 2005 Asia Pacific Carried Interest Program, L.P. | Delaware |
| CPI 2005 European Carried Interest Program, L.P. | Delaware |
| CPI 2005 Global Carried Interest Program, L.P. | Delaware |
| CPI 2005 North America Carried Interest Program, L.P. | Delaware |
| CPI Asia Academy ABS Specialty Company, L.L.C. | South Korea |
| CPI Asia Academy Ltd. | British Virgin Is. |
| CPI Asia G Tower Limited | British Virgin Is. |
| CPI Asia Investment B.V. | Netherlands |
| CPI Asia Investment Sarl | Luxembourg |
| CPI Asia JYL Limited | Barbados |
| CPI Asia JYL SRL | Barbados |
| CPI Asia Moon River SRL | Barbados |

| | | |
|---|---|---|
| CPI Asia National 1 Limited | British Virgin Is. | |
| CPI Asia National 2 Limited | British Virgin Is. | |
| CPI Asia NP, Ltd. | British Virgin Is. | |
| CPI C-REP GP LLC | Delaware | |
| CPI C-REP II GP, L.P. | Delaware | |

23

**Exhibit 21.01 Citigroup Inc. Principal Subsidiaries as of December 31, 2006**

| | |
|---|---|
| CPI Capital Partners Asia Pacific (Cayman), L.P. | Cayman Is. |
| CPI Capital Partners Asia Pacific (Delaware), L.P. | Delaware |
| CPI Capital Partners Asia Pacific GP Ltd. | Cayman Is. |
| CPI Capital Partners Asia Pacific, L.P. | Cayman Is. |
| CPI Capital Partners Europe (NFR), L.P. | England |
| CPI Capital Partners Europe GP LLC | Delaware |
| CPI Capital Partners Europe Holdings S.a.r.l. | Luxembourg |
| CPI Capital Partners Europe, L.P. | England |
| CPI Capital Partners Financing S.a.r.l. | Luxembourg |
| CPI Capital Partners North America LP | Delaware |
| CPI Capital Partners North America Offshore (Cayman) L.P. | Cayman Is. |
| CPI Capital Partners North America Offshore LP | Delaware |
| CPI CMBS Equity I LLC | Delaware |
| CPI Co-Investment Fund LP | Delaware |
| CPI CPEH 2 S.a r.l. | Luxembourg |
| CPI Darlington Limited | Jersey, Channel Is. |
| CPI European Fund GP LLC | Delaware |
| CPI Fund Investments LLC | Delaware |
| CPI Global RE Securities HP LLC | Delaware |
| CPI India I Limited | Mauritius |
| CPI Kildare S.a r.l. | Luxembourg |
| CPI Leuna GmbH | Germany |
| CPI Milton Keynes Ltd. | Jersey, Channel Is. |
| CPI NA Cayman Fund GP L.P. | Cayman Is. |
| CPI NA Fund GP LP | Delaware |
| CPI NA GP LLC | Delaware |
| CPI Nanterre E.U.R.L. | France |
| CPI Pomezia S.r.l. | Italy |
| CPI Retail Active Management Programme Limited Partnership | Scotland |
| CPI Shepshed Ltd. | Jersey, Channel Is. |
| CPI Surprise Farms, LLC | Delaware |
| CPI-LCP Jackson Hole Operator, LLC | Delaware |
| CPI-LCP Jackson Hole Owner, LLC | Delaware |
| CPI-LCP Jackson Hole Venture, LLC | Delaware |

8:07-cv-00266-LSC-FG3 Doc # 25 Filed: 05/19/08 Page 117 of 285 - Page ID # 264

| | |
|---|---|
| CPI-Sage Focused Service Urban Hotels Venture, LLC | Delaware |
| CPI-Sage Hotels Atlanta Mezz, LLC | Delaware |
| CPI-Sage Hotels Atlanta Owner, LLC | Delaware |
| CPI-Sage Hotels Brisbane Mezz, LLC | Delaware |
| CPI-Sage Hotels Brisbane Owner, LLC | Delaware |

24

**Exhibit 21.01 Citigroup Inc. Principal Subsidiaries as of December 31, 2006**

| | |
|---|---|
| CPI-Sage Hotels Denver Mezz, LLC | Delaware |
| CPI-Sage Hotels Denver Owner, LLC | Delaware |
| CPI-Sage Hotels Hoffman Mezz, LLC | Delaware |
| CPI-Sage Hotels Hoffman Owner, LLC | Delaware |
| CPI-Sage Hotels Lessee Mezz, LLC | Delaware |
| CPI-Sage Hotels Lessee Venture, LLC | Delaware |
| CPI-Sage Hotels Lessee, LLC | Delaware |
| CPI-Sage Hotels Mezz Manager, LLC | Delaware |
| CPI-Sage Hotels Orlando Mezz, LLC | Delaware |
| CPI-Sage Hotels Orlando Owner, LLC | Delaware |
| CPI-Sage Hotels Owner Manager, LLC | Delaware |
| CPL CBNA Loan Funding LLC | Delaware |
| CPL CFPI Loan Funding LLC | Delaware |
| Cramer Finance LLC | Delaware |
| CReAM Trust | Jersey, Channel Is. |
| Crédito Familiar, S.A. de C.V., Sociedad Financiera de Objeto Limitado, Grupo Financiero Associates | Mexico |
| CSA ROBIN AIRCRAFT LTD. | Japan |
| CSA SWAN AIRCRAFT LTD. | Japan |
| CSO Partners Limited | England |
| CT Mezzanine Fund III Manager LLC | Delaware |
| CT Mezzanine Partners II, L.P. | Delaware |
| CTA Capital LLC | Delaware |
| CTCL (BOPPF) Fund Nominee No. 1 Limited | England |
| CTCL (BOPPF) Fund Nominee No. 2 Limited | England |
| CTCL (BUKP) Fund Nominee No. 1 Limited | England |
| CTCL (BUKP) Fund Nominee No. 2 Limited | England |
| CTCL Property MHI Nominees No 1 Limited | England |
| CTCL Property MHI Nominees No 2 Limited | England |
| CTK Investors 1 LP | Delaware |
| CTK Investors 2 LP | Delaware |
| CUIM NOMINEE LIMITED | England |
| CVC Capital Funding, Inc. | Delaware |
| CVC Capital Funding, LLC | Delaware |
| CVC Executive Fund LLC | Delaware |
| CVC International (Palink) B.V. | Netherlands |

8:07-cv-00266-LSC-FG3    Doc # 25    Filed: 05/19/08    Page 119 of 285 - Page ID # 266

http://www.sec.gov/Archives/edgar/data/851001/000119312507038506...

| | |
|---|---|
| CVC Management LLC | Delaware |
| Cyburt Hall Chandler Spectrum, LLC | Delaware |
| Czech Real Estate Regions S.a.r.l. | Luxembourg |

25

**Exhibit 21.01 Citigroup Inc. Principal Subsidiaries as of December 31, 2006**

| | |
|---|---|
| Davis Associates, L.P. | Mississippi |
| Dayton CBNA Loan Funding LLC | Delaware |
| Dayton CFPI Loan Funding LLC | Delaware |
| DCE Investments, Inc. | Delaware |
| Delphi I Asset Holding LLC | Delaware |
| Delphi I LLC | Delaware |
| Delphi Immobilien I GmbH | Germany |
| Delphi Servicing Holding Limited | England |
| Department Stores National Bank | United States |
| Dervat Nominees Pty Limited | Australia |
| Di Net Club S.r.l. | Italy |
| Diners Assurances SARL | France |
| Diners Club (Thailand) Limited, The | Thailand |
| Diners Club Argentina S.R.L.C. y de T. | Argentina |
| Diners Club de Mexico S.A. de C.V. | Mexico |
| Diners Club Europe S.p.A. | Italy |
| Diners Club International (Hong Kong) Limited | Hong Kong |
| Diners Club International (Taiwan) Limited | Taiwan |
| Diners Club International Ltd. | New York |
| Diners Club Italia S.r.l. | Italy |
| Diners Club of Greece Finance Company S.A. | Greece |
| Diners Club Pty Limited | Australia |
| Diners Club Switzerland Ltd. | Switzerland |
| Diners Club UK Limited | England |
| Diners Club Uruguay S.A. | Uruguay |
| Diners Travel S.A.C. y de T. | Argentina |
| Dirección Profesional de Empresas Afiliadas, S.A. | Mexico |
| DN Capital European Digital Infrastructure Fund I, L.P. | Jersey, Channel Is. |
| Dom Maklerski Banku Handlowego S.A. | Poland |
| Donat Investments S.A. | Bahamas |
| Donau Aircraft Ltd. | Japan |
| Dory 1 S.a.r.l. | Luxembourg |
| Dory 2 S.a.r.l. | Luxembourg |
| Dory 3 S.a.r.l. | Luxembourg |
| Dory 4 S.a.r.l. | Luxembourg |

8:07-cv-00266-LSC-FG3   Doc # 25   Filed: 05/19/08   Page 121 of 285 - Page ID # 268

http://www.sec.gov/Archives/edgar/data/851001/000119312507038 50..

| Drake & Co., LLC | Delaware |
| Drake Aircraft Ltd. | Japan |
| Dreiundzwanzigste Gamma Trans Leasing Verwaltungs GmbH & Co. Finanzierungs-Management KG | Germany |

26

8:07-cv-00266-LSC-FG3   Doc # 25   Filed: 05/19/08   Page 122 of 285 - Page ID # 269

http://www.sec.gov/Archives/edgar/data/831001/000119312507038850...

**Exhibit 21.01 Citigroup Inc. Principal Subsidiaries as of December 31, 2006**

| | |
|---|---|
| Dritte Gamma W(ertpapier) I(nvestitions) P(ortfolio) GbR | Germany |
| Dunhill-Lexington Leasehold LLC | Delaware |
| Dynasty Three Limited | Hong Kong |
| Dynasty Three Ocean (Tianjin) Real Estate Co., Ltd. | China |
| Dynasty Two Limited | Hong Kong |
| Dynasty Two Ocean (Tianjin) Real Estate Co., Ltd. | China |
| EAB Community Development Corp. | New York |
| Eagle Aircraft Ltd. | Japan |
| ECL Funding LLC | Delaware |
| ECL2 Funding LLC | Delaware |
| Educational Loan Center, Inc. | Delaware |
| Eiffel Aircraft Ltd. | Japan |
| EKB Kereskedelmi es Szolgaltato Kft. | Hungary |
| EM Special Opportunities Citigroup Ltd. | Cayman Is. |
| EM Special Opportunities Fund III LLC | Delaware |
| Empaques Moldeados de America Internacionales SRL de C.V. | Mexico |
| Empaques Moldeados de America SRL de C.V. | Mexico |
| Empaques Moldeados de America Techologias SRL de C.V. | Mexico |
| EMSO Partners Limited | England |
| Entretenimientos Pedro de Valdivia Limitada | Chile |
| Erico International Corporation | Ohio |
| Esmeril Trading Lda. | Portugal |
| ESO GP L.L.C. | Delaware |
| ESSL 1, Inc. | Delaware |
| ESSL 2, Inc. | Delaware |
| Estithmaar IRE (GP) Limited | Cayman Is. |
| Estithmaar Islamic Real Estate Fund Limited Partnership | Cayman Is. |
| Eurasian Brewery Holdings Limited | Channel Is. |
| Euromaia Finance LLC | Delaware |
| Europe Aircraft Ltd. | Japan |
| European GREIO/TIC Real Estate Investments LLC | Delaware |
| Event Driven Portfolio LLC | Delaware |
| Everett Bluffs LLC | Washington |
| Evergreen CBNA Loan Funding LLC | Delaware |

8:07-cv-00266-LSC-FG3    Doc # 25    Filed: 05/19/08    Page 123 of 285 - Page ID # 270

http://www.sec.gov/Archives/edgar/data/831001/000119312507038350...

| | |
|---|---|
| Evergreen CFPI Loan Funding LLC | Delaware |
| EXCT Holdings, Inc. | Hawaii |
| EXCT Limited Partnership | Hawaii |
| EXCT LLC | Hawaii |
| FAB Financial, LP | Texas |

27

.

8:07-cv-00266-LSC-FG3    Doc # 25    Filed: 05/19/08    Page 124 of 285 - Page ID # 271

http://www.sec.gov/Archives/edgar/data/831001/000119312507038350...

**Exhibit 21.01 Citigroup Inc. Principal Subsidiaries as of December 31, 2006**

| | |
|---|---|
| FAB Holdings GP, LLC | Delaware |
| FAB Holdings LP, LLC | Delaware |
| Fairfax Holdings, Inc. | Delaware |
| Fairfield Aircraft Ltd. | Japan |
| FBS CBNA Loan Funding LLC | Delaware |
| FBS CFPI Loan Funding LLC | Delaware |
| FCL Ship One, Inc. | Delaware |
| FCL Ship Three, Inc. | Delaware |
| FCL Ship Two, Inc. | Delaware |
| Feingold O'Keeffe Credit Fund CBNA Loan Funding LLC | Delaware |
| Feingold O'Keeffe Credit Fund CFPI Loan Funding LLC | Delaware |
| Feta Nominees Pty Limited | Australia |
| Fideicomiso de Administración y Pago, Socio Liquidador de Posición de Terceros, número 14016-1 | Mexico |
| Fideicomiso de Administración y Pago, Socio Liquidador de Posición Propia, número 13928-7 | Mexico |
| Fifth Bai Yun Aircraft Ltd. | Japan |
| Fimen S.A. | Belgium |
| Financial Leasing Corporation | Massachusetts |
| Financial Reassurance Company, Ltd. | Bermuda |
| First Bai Yun Aircraft Ltd. | Japan |
| First Century Management Company | New York |
| First Collateral Services, Inc. | Delaware |
| First Estate Corporation | California |
| First Family Financial Services, Inc. <DE> | Delaware |
| First National Nominees, Ltd. | Bahamas |
| Five Star Service Corporation | California |
| FiveStarz LLC | Delaware |
| FloridaUrbana, L.P. | Illinois |
| FNB Real Estate Corp. | Texas |
| FNC Insurance Agency, Inc. | California |
| FNC-Comercio e Participacoes Ltda. | Brazil |
| FOFIP S.A. | Uruguay |
| Fonet Consultants Private Limited | India |
| Foreign Fund 1 Fundo de Investimento Financeiro | Brazil |
| Foreign Investment—Fundo De Investimento Financeiro | Brazil |

8:07-cv-00266-LSC-FG3    Doc # 25    Filed: 05/19/08    Page 125 of 285 - Page ID # 272

http://www.sec.gov/Archives/edgar/data/831009/000119312507038501...

| | |
|---|---|
| Foremost Investment Corporation | Delaware |
| Forthright Investment Limited | Hong Kong |
| Forum Financial Group Polska Spolka z o.o. | Poland |

28

8:07-cv-00266-LSC-FG3    Doc # 25    Filed: 05/19/08    Page 126 of 285 - Page ID # 273
http://www.sec.gov/Archives/edgar/data/831001/000119312507038850...

**Exhibit 21.01 Citigroup Inc. Principal Subsidiaries as of December 31, 2006**

| | |
|---|---|
| FourStarz LLC | Delaware |
| Franciscan Financial Corporation | California |
| Franklin Loft Finance LLC | Delaware |
| Fremont CBNA Loan Funding LLC | Delaware |
| Friday Services Pty Ltd | Australia |
| Fruehauf Finance Company | Michigan |
| FS Asia Holdings LLC | Delaware |
| FS Securities Holdings Inc. | Delaware |
| Fscwil Funding Limited Partnership | Delaware |
| Fuenfundzwanzigste Gamma Trans Leasing Verwaltungs GmbH & Co. Finanzierungs-Management KG | Germany |
| Future Mortgages 1 Limited | England & Wales |
| Future Mortgages Limited | England & Wales |
| Futuretel S.A. | Brazil |
| Gamma Trans Leasing Verwaltungs GmbH | Germany |
| Gamma Trans Leasing Verwaltungs GmbH & Co. Achte Finanzierungs-Management KG | Germany |
| Gamma Trans Leasing Verwaltungs GmbH & Co. Neunte Finanzierungs-Management KG | Germany |
| Gamma Trans Leasing Verwaltungs GmbH & Co. Sechste Finanzierungs-Management KG | Germany |
| Gamma Trans Leasing Verwaltungs GmbH & Co. Siebte Finanzierungs-Management KG | Germany |
| Gamma Trans Leasing Verwaltungs GmbH & Co. Vierte Finanzierungs-Management KG | Germany |
| Gamma W(ertpapier) (Investitions) P(ortfolio) 1 GbR | Germany |
| Gamma W(ertpapier) (Investitions) P(ortfolio) II GbR | Germany |
| Gatehouse Leasehold LLC | Delaware |
| Geneva Capital Markets, LLC | Delaware |
| Geneva II LLC | Delaware |
| Geno Asset Finance GmbH | Germany |
| Gera Realty India Private Limited | India |
| Gerlach (Nominee) & Co., L.L.C. | Delaware |
| GFII Australia Holdings Pty Limited | Australia |
| GFII Capital Pty Limited | Australia |
| Gilligan Developments Limited | British Virgin Is. |
| GLENFED Development Corp. | California |

8:07-cv-00266-LSC-FG3     Doc # 25     Filed: 05/19/08     Page 127 of 285 - Page ID # 274

http://www.sec.gov/Archives/edgar/data/831001/000119312507038350...

| | |
|---|---|
| Global Hedge Strategies, LLC | Delaware |
| Global Packaging Corporation N.V. | Netherlands |
| GOF Loan Funding LLC | Delaware |
| GOF2 Loan Funding LLC | Delaware |

29

**Exhibit 21.01 Citigroup Inc. Principal Subsidiaries as of December 31, 2006**

| | |
|---|---|
| Gongpyung PFV Co., Ltd. | So. Korea |
| Grand River Navigation Company | Delaware |
| Great Dane Finance Company | Delaware |
| Green One Asset Securitization Specialty Limited | South Korea |
| Greenwich (Cayman) I Limited | Cayman Is. |
| Greenwich (Cayman) II Limited | Cayman Is. |
| Greenwich (Cayman) III Limited | Cayman Is. |
| GREIO Al-Soor Realty L.P. | Delaware |
| GREIO Islamic GP LLC | Delaware |
| Grupo Avantel, S.A. de C.V. | Mexico |
| Grupo Financiero Associates, S.A. de C.V. | Mexico |
| Grupo Financiero Banamex, S.A. de C.V. | Mexico |
| Hancock Place Apartments Associates, L.P. | New York |
| Handlowy—Inwestycje Sp. z o.o. | Poland |
| Handlowy—Leasing Sp. z o.o. | Poland |
| Handlowy Investments II S.a.r.l. | Luxembourg |
| Handlowy Investments S.A. | Luxembourg |
| Hank & Co., L.L.C. | Delaware |
| Hanseatic Real Estate B.V. | Netherlands |
| Healthcote Limited | Hong Kong |
| Hibiscus CBNA Loan Funding LLC | Delaware |
| Hibiscus CFPI Loan Funding LLC | Delaware |
| Highpoint Investors LP | Delaware |
| Hillco Insurance Agency, Inc. | Ohio |
| Hipotecaria Associates, S.A. de C.V., Sociedad Financiera de Objeto Limitado, Grupo Financiero Associates | Mexico |
| Hispanic Growth LLC | Delaware |
| Hispanic Venture Corp. | Delaware |
| Hitchcock Investments S.A. | Bahamas |
| Holland Leasehold LLC | Delaware |
| Home MAC Government Financial Corporation | District of Columbia |
| Home MAC Mortgage Securities Corporation | District of Columbia |
| Housing Securities, Inc. | Delaware |
| Huizhou One Limited | Mauritius |
| Hurley & Co., L.L.C. | Delaware |
| Hutton Investors Futures Fund, L.P. II | Delaware |

| Huwest Company, L.L.C. | Delaware |
| Iguacu Participacoes Ltda. | Brazil |
| Impulsora de Fondos Banamex, S.A. de C.V., Sociedad Operadora de Sociedades de Inversión | Mexico |

30

**Exhibit 21.01 Citigroup Inc. Principal Subsidiaries as of December 31, 2006**

| | |
|---|---|
| Imref S.A. de C.V. | Mexico |
| Inmobiliaria Provincial del Norte, S.A. de C.V. | Mexico |
| Inmobirentsa S.A. | Ecuador |
| Inmobusiness S.A. | Ecuador |
| Inmociti S.A. | Ecuador |
| Inmuebles Banamex, S.A. de C.V. | Mexico |
| Intcomex, Inc. | Delaware |
| Inteligia, S.A. | Mexico |
| International Capital Funding Limited LLC | Delaware |
| International Equity Investments, Inc. | Delaware |
| International Finance Associates, B.V. | Netherlands |
| Inverfin Sdn. Bhd. | Malaysia |
| Inversiones Citiminera S.A. | Chile |
| Inversiones y Adelantos, C.A. | Venezuela |
| Investment CBNA Loan Funding LLC | Delaware |
| Investment CFPI Loan Funding LLC | Delaware |
| Ironwood CPI Empire Pass JV LLC | Delaware |
| Ironwood CPI Empire Pass LLC | Delaware |
| Ironwood CPI Empire Pass MB LLC | Delaware |
| Isanne S.a.r.l. | Luxembourg |
| IWCO Direct Holdings Inc. | Delaware |
| JHSW Limited | England |
| JL Crest Lease Co., Ltd. | Japan |
| JL Rouge Lease Co., Ltd. | Japan |
| JL Skyline Lease Co., Ltd. | Japan |
| JNC Partners Limited | Japan |
| Joliet Generation II, LLC | Delaware |
| JSC Citibank Kazakhstan | Kazakhstan |
| JSCB Citibank (Ukraine) | Ukraine |
| Juegos Electrónicos S.A. | Chile |
| Jupiter Aircraft Ltd. | Japan |
| JWH Strategic Allocation Master Fund LLC | New York |
| K2 Holdings (Cayman) Ltd. | Cayman Is. |
| K2 Macau Development Ltd. | Macau |
| K2 Macau Holdings (BVI) I Ltd. | British Virgin Is. |

| | |
|---|---|
| K2 Macau Holdings (BVI) II Ltd. | British Virgin Is. |
| Kalyani Tech Park Private Limited | India |
| Keeper Holdings LLC | Delaware |

31

.

**Exhibit 21.01 Citigroup Inc. Principal Subsidiaries as of December 31, 2006**

| | |
|---|---|
| KIL Loan Funding LLC | Delaware |
| KIL2 Loan Funding LLC | Delaware |
| King (Nominee) & Co., L.L.C. | Delaware |
| Kingsbridge Limited | Cayman Is. |
| Kingston Place, LLC | Mississippi |
| Knight CBNA Loan Funding LLC | Delaware |
| Knight CFPI Loan Funding LLC | Delaware |
| Kordula & Co., L.L.C. | Delaware |
| Lakeshore CBNA Loan Funding LLC | Delaware |
| Lakeshore CFPI Loan Funding LLC | Delaware |
| Latin American Investment Bank Bahamas Limited | Bahamas |
| Lava Trading Inc. | Delaware |
| Lava Trading Limited | England |
| LavaFlow, Inc. | Florida |
| Leasing Citibank S.A. Compañia de Financiamiento Comercial | Colombia |
| Legg Mason Financial Services of Alabama, Inc. | Alabama |
| Legg Mason Financial Services, Inc. | Maryland |
| Legg Mason Insurance Agency of Massachusetts, Inc. | Massachusetts |
| Legg Mason Insurance Agency of Texas, Inc. | Texas |
| Legg Mason Insurance Agency, Inc. | Maryland |
| Legion Portfolios (Luxembourg) | Luxembourg |
| Legion Strategies LLC | Delaware |
| Leo Investments Yugen Kaisha | Japan |
| LEONE LEASE LTD. | Japan |
| LFC2 CFPI Loan Funding LLC | Delaware |
| LFC2 Loan Funding LLC | Delaware |
| Lindfield Trading Pty Limited | Australia |
| Liquidation Properties Holding Company Inc. | New York |
| Liquidation Properties Inc. | New York |
| Livingston CBNA Loan Funding LLC | Delaware |
| Livingston CFPI Loan Funding LLC | Delaware |
| LM Falcon Investment Strategies, Inc. | Maryland |
| Loan Funding I LLC | Delaware |
| Loan Funding III LLC | Delaware |
| Loan Funding IV LLC | Delaware |

8:07-cv-00266-LSC-FG3     Doc # 25     Filed: 05/19/08     Page 133 of 285 - Page ID # 280

http://www.sec.gov/Archives/edgar/data/831001/0001193125070385O..

| | |
|---|---|
| Loan Funding IX LLC | Delaware |
| Loan Funding V LLC | Delaware |
| Loan Funding VI LLC | Delaware |
| Loan Funding VII LLC | Delaware |

32

**Exhibit 21.01 Citigroup Inc. Principal Subsidiaries as of December 31, 2006**

| | |
|---|---|
| Loan Funding XI LLC | Delaware |
| Loan Funding XIII LLC | Delaware |
| Loan Participation Holding Corporation | Delaware |
| Localto S.p.A. | Italy |
| London and Midland General Insurance Company | Canada |
| Long Stone Asset Holdings Limited | Ireland |
| Long Stone Funding LLC | Delaware |
| Lower Lakes Towing Ltd. | Canada |
| Lower Lakes Transportation Company | Delaware |
| LT Investment I, LLC | New York |
| LT Investment II, LLC | New York |
| MacA Inn LLC | Delaware |
| Madeleine Investments S.A. | Bahamas |
| Malibu CBNA Loan Funding LLC | Delaware |
| Malibu CFPI Loan Funding LLC | Delaware |
| MBKP North Asian Opportunities Partners Offshore L.P. | Cayman Is. |
| MC2 Technologies, Inc. | Delaware |
| Melbourne Aircraft Ltd. | Japan |
| Mellery Aircraft Ltd. | Japan |
| Meluna Investments S.a.r.l. | Luxembourg |
| Menara Citi Holding Company Sdn. Bhd. | Malaysia |
| Midway CBNA Loan Funding LLC | Delaware |
| Millcreek CBNA Loan Funding LLC | Delaware |
| Millcreek CFPI Loan Funding LLC | Delaware |
| Milton Power Corp. | Delaware |
| MK Rock Y.K. | Japan |
| Mortgage Capital Funding Inc. | Delaware |
| MRC Holdings, Inc. | Delaware |
| MSX International, Inc. | Delaware |
| Muirfield Leasehold LLC | Delaware |
| N.C.B. Trust Limited | England |
| National Benefit Life Insurance Company | New York |
| National City Nominees Limited | England |
| National Equipment Rental Program, Inc. | Delaware |
| NCGA Holdings Limited | Hong Kong |

http://www.sec.gov/Archives/edgar/data/831001/000119312507038501...

NETB Holdings LLC                                          Delaware

Neunundzwanzigste Gamma Trans Leasing Verwaltungs
    GmbH & Co. Finanzierungs-Management KG                Germany

New Aoi Hotels and Resorts KK                             Japan

33

8:07-cv-00266-LSC-FG3   Doc # 25   Filed: 05/19/08   Page 136 of 285 - Page ID # 283

http://www.sec.gov/Archives/edgar/data/831001/000119312507038850..

**Exhibit 21.01 Citigroup Inc. Principal Subsidiaries as of December 31, 2006**

| | |
|---|---|
| Nextco Inc. | Delaware |
| Niagara II, L.P. | Tennessee |
| Nigeria International Bank Limited | Nigeria |
| Nimer & Co., L.L.C. | Delaware |
| Nippon Real Estate Investment | Cayman Is. |
| Nore Aircraft Ltd. | Japan |
| Norwich Property Trust Limited | England |
| Nostro Investment Corporation | Delaware |
| Novel Plaza Company Ltd. | Hong Kong |
| NSPL, Inc. | New York |
| NT Europe S.r.l. | Italy |
| Nueva Promotora de Sistemas de Teleinformatica, S.A. de C.V. | Mexico |
| Obsluga Funduszy Inwestycyjnych Spolka z o.o. | Poland |
| OHH Loan Funding LLC | Delaware |
| OHH2 Loan Funding LLC | Delaware |
| One Hunter Street – PGI LLC | New York |
| Oneport Originations Pty Ltd | Australia |
| OneStarz International Trade and Investments Corporation | Delaware |
| Opal Corporation (NFR) S.a r.l. | Luxembourg |
| Opal Corporation S.a.r.l. | Luxembourg |
| Opportunity Mem S.A. | Brazil |
| Opportunity Oeste S.A. | Brazil |
| Orange One Asset Securitization Specialty Limited | South Korea |
| Orbitech Limited | India |
| Orchard Aircraft Ltd. | Japan |
| Orchid Aircraft Ltd. | Japan |
| Ostrava Office a.s. | Czech Republic |
| Outsourcing Investments Pty. Limited | Australia |
| Oxford Aircraft Ltd. | Japan |
| Pacific Plan, Inc., The | Massachusetts |
| Palace Place Limited Partnership | Canada |
| Palliser Nominees Limited | New Zealand |
| Park Knoll Leasehold LLC | Delaware |
| Park Tower Holdings, Inc. | Delaware |
| Payment Services International, LLC | Delaware |

8:07-cv-00266-LSC-FG3    Doc # 25    Filed: 05/19/08    Page 137 of 285 - Page ID # 284

http://www.sec.gov/Archives/edgar/data/831009/000119312307038501...

| | |
|---|---|
| PB-SB 1983 I | New York |
| PB-SB 1985 VII | New York |
| PB-SB 1988 III | New York |
| PB-SB Investments, Inc | Delaware |

34

8:07-cv-00266-LSC-FG3 Doc # 25 Filed: 05/19/08 Page 138 of 285 - Page ID # 285
http://www.sec.gov/Archives/edgar/data/831001/00011931250703850...

**Exhibit 21.01 Citigroup Inc. Principal Subsidiaries as of December 31, 2006**

| | |
|---|---|
| PB-SB Ventures, Inc | Delaware |
| Pearl Labuan Holdings Limited | Malaysia |
| Pedcor Investments-2005-LXXIII, L.P. | Missouri |
| Pendragon Guinevere Fund LLC | England |
| Peninsula CBNA Loan Funding LLC | Delaware |
| Pensiones Banamex, S.A. de C.V., Integrante del Grupo Financiero Banamex | Mexico |
| Peny & Co., L.L.C. | Delaware |
| Peregrine Investments, LLC | Maryland |
| Perennially Green, Inc. | New York |
| PFS Investments Inc. | Georgia |
| PFS T.A., Inc. | Delaware |
| PFSL Investments Canada Ltd. | Canada |
| Phibro (Asia) Pte Ltd | Singapore |
| Phibro Energy Production, Inc. | Delaware |
| Phibro Futures and Metals Limited | England |
| Phibro GmbH | Switzerland |
| Phibro LLC | Delaware |
| Phibro Resources Corp. | Delaware |
| Phinda Pty. Limited | Australia |
| Planeación de Recursos Humanos, S.A. de C.V. | Mexico |
| Pontonia Holding (NFR) B.V. | Netherlands |
| Pontonia Holding B.V. | Netherlands |
| POP Trophy I Inc. | New York |
| POP Trophy Inc. | New York |
| Powerton Generation II, LLC | Delaware |
| PRH-Afore Banamex, S.A. de C.V. | Mexico |
| Primerica Client Services Inc. <Canada> | Canada |
| Primerica Client Services, Inc. <USA> | Delaware |
| Primerica Convention Services, Inc. | Georgia |
| Primerica Finance Corporation | Delaware |
| Primerica Financial Marketing Partnership | Delaware |
| Primerica Financial Services (Canada) Ltd. | Canada |
| Primerica Financial Services Agency of New York, Inc. | New York |
| Primerica Financial Services Home Mortgages Limited Partnership of Arizona | Delaware |

8:07-cv-00266-LSC-FG3    Doc # 25    Filed: 05/19/08    Page 139 of 285 - Page ID # 286
http://www.sec.gov/Archives/edgar/data/831001/000119312507038501...

| | |
|---|---|
| Primerica Financial Services Home Mortgages Limited Partnership of Ohio | Ohio |
| Primerica Financial Services Home Mortgages, Inc. | Georgia |
| Primerica Financial Services Insurance Marketing of Maine, Inc. | Maine |
| Primerica Financial Services Insurance Marketing of Nevada, Inc. | Nevada |
| Primerica Financial Services Insurance Marketing of Wyoming, Inc. | Wyoming |

35

**Exhibit 21.01 Citigroup Inc. Principal Subsidiaries as of December 31, 2006**

| | |
|---|---|
| Primerica Financial Services Insurance Marketing, Inc. | Delaware |
| Primerica Financial Services Ltd. | Canada |
| Primerica Financial Services of Alabama, Inc. | Alabama |
| Primerica Financial Services of New Mexico, Inc. | New Mexico |
| Primerica Financial Services, Inc. | Nevada |
| Primerica Insurance Agency of Massachusetts, Inc. | Massachusetts |
| Primerica Insurance Marketing Services of Puerto Rico, Inc. | Puerto Rico |
| Primerica Insurance Services of Louisiana, Inc. | Louisiana |
| Primerica Life Insurance Company | Massachusetts |
| Primerica Life Insurance Company of Canada | Canada |
| Primerica Services, Inc. | Georgia |
| Primerica Shareholder Services | Georgia |
| Principal Mortgage Reinsurance Co. | Vermont |
| Procesadora de Plásticos Comerciales, S.A. | Mexico |
| Promociones Inmobiliarias Banamex, S.A. de C.V. | Mexico |
| Promotora de Bienes y Servicios Banamex, S.A. de C.V. | Mexico |
| Promotora de Sistemas de Teleinformatica, S.A. de C.V. | Mexico |
| Provencred 1 | Cayman Is. |
| Provencred 2 | Cayman Is. |
| Providence Associates, Ltd. | Bahamas |
| PT. Citigroup Finance Indonesia | Indonesia |
| PT. Citigroup Securities Indonesia | Indonesia |
| PTRS CBNA Loan Funding LLC | Delaware |
| PTRS CFPI Loan Funding LLC | Delaware |
| Quebec Aircraft Ltd. | Japan |
| R-H Capital Partners, L.P. | Delaware |
| R-H Capital, Inc. | Delaware |
| R-H Venture Capital, LLC | Delaware |
| R-H/Travelers, L.P. | Delaware |
| Rangers CBNA Loan Funding LLC | Delaware |
| Rangers CFPI Loan Funding LLC | Delaware |
| RCP Capital, LLC | Delaware |
| Receivable Management Services International, Inc. | Delaware |
| Redmond Crest Corp. | British Virgin Is. |
| Registra Securita Trust GmbH | Germany |

| | | |
|---|---|---|
| Remy International, Inc. | . | Delaware |
| Renaissance Finance I, LLC | | Delaware |
| Repfin Ltda. | | Colombia |
| Ret Participacoes S.A. | | Brazil |

36

**Exhibit 21.01 Citigroup Inc. Principal Subsidiaries as of December 31, 2006**

| | |
|---|---|
| Rio Bogan Empreendimentos e Participacoes Ltda. | Brazil |
| Rivendell CBNA Loan Funding LLC | Delaware |
| Rivendell CFPI Loan Funding LLC | Delaware |
| Robinson-Humphrey Insurance Services Inc. | Georgia |
| Robinson-Humphrey Insurance Services of Alabama, Inc. | Alabama |
| Robinson-Humphrey Netlanta(sm) Fund I, L.P. | Georgia |
| Roebuck II Investments Limited | British Virgin Is. |
| Roebuck Investments Limited | British Virgin Is. |
| Rose Bay Trading Pty Limited | Australia |
| S.P.L., Inc. | Delaware |
| Sagres—Sociedade de Titularizacao de Creditos, S.A. | Portugal |
| Salomon Brothers All Cap Value Fund | New York |
| Salomon Brothers Housing Investment Inc | Delaware |
| Salomon Brothers International Operations (Japan) Inc. | Delaware |
| Salomon Brothers International Operations (Jersey) Limited | Jersey, Channel Is. |
| Salomon Brothers International Operations (Overseas) Limited | Jersey, Channel Is. |
| Salomon Brothers International Operations Inc | Delaware |
| Salomon Brothers Large Cap Core Equity Fund | New York |
| Salomon Brothers Mortgage Securities III, Inc | Delaware |
| Salomon Brothers Mortgage Securities VI, Inc | Delaware |
| Salomon Brothers Mortgage Securities VII, Inc | Delaware |
| Salomon Brothers Overseas Inc | Cayman Is. |
| Salomon Brothers Pacific Holding Company Inc | Delaware |
| Salomon Brothers Real Estate Development Corp | Delaware |
| Salomon Brothers Russia Holding Company Inc | Delaware |
| Salomon Brothers Tosca Inc. | Delaware |
| Salomon Brothers Variable Large Cap Growth Fund | New York |
| Salomon Global Horizons Global Equity Fund | Cayman Is. |
| Salomon Smith Barney AAA Energy Fund L.P. II | New York |
| Salomon Smith Barney Canada Holding Company | Canada |
| Salomon Smith Barney Diversified 2000 Futures Fund L.P. | New York |
| Salomon Smith Barney Fairfield Futures Fund L.P. | New York |
| Salomon Smith Barney Global Diversified Futures Fund L.P. | New York |
| Salomon Smith Barney Hicks Muse Partners L. P. | Delaware |

8:07-cv-00266-LSC-FG3    Doc # 25    Filed: 05/19/08    Page 143 of 285 - Page ID # 290
http://www.sec.gov/Archives/edgar/data/831001/000119512507038850...

| | |
|---|---|
| Salomon Smith Barney Orion Futures Fund L.P. | New York |
| Salomon Smith Barney/Greenwich Street Capital Partners II, L.P. | Delaware |
| Salomon Smith Barney/Travelers Real Estate Fund, L.P. | Delaware |
| Salomon Smith Barney/Travelers REF GP, LLC | Delaware |
| Salomon Swapco Inc. | Delaware |

37

**Exhibit 21.01 Citigroup Inc. Principal Subsidiaries as of December 31, 2006**

| | |
|---|---|
| Salsco, Inc. | Texas |
| Sansara Hotels India Private Limited | India |
| Saturn Ventures, LLC | Delaware |
| SB AAA Master Fund LLC | New York |
| SB Cayman Holdings I Inc. | Delaware |
| SB Cayman Holdings II Inc. | Delaware |
| SB Cayman Holdings III Inc. | Delaware |
| SB Cayman Holdings IV Inc. | Delaware |
| SB Funding Corp. | Delaware |
| SB Motel Corp. | Delaware |
| SB Plano Corporation | Texas |
| SBHU Life Agency of Arizona, Inc. | Arizona |
| SBHU Life Agency of Indiana, Inc. | Indiana |
| SBHU Life Agency of Ohio, Inc. | Ohio |
| SBHU Life Agency of Oklahoma, Inc. | Oklahoma |
| SBHU Life Agency of Texas, Inc. | Texas |
| SBHU Life Agency of Utah, Inc. | Utah |
| SBHU Life Agency, Inc. | Delaware |
| SBHU Life Insurance Agency of Massachusetts, Inc. | Massachusetts |
| SBJV, LLC | Delaware |
| SBRFC, LLC | Delaware |
| SBS Insurance Agency of Hawaii, Inc. | Hawaii |
| SBS Insurance Agency of Idaho, Inc. | Idaho |
| SBS Insurance Agency of Maine, Inc. | Maine |
| SBS Insurance Agency of Montana, Inc. | Montana |
| SBS Insurance Agency of Nevada, Inc. | Nevada |
| SBS Insurance Agency of South Dakota, Inc. | South Dakota |
| SBS Insurance Agency of Wyoming, Inc. | Wyoming |
| SBS Insurance Brokerage Agency of Arkansas, Inc. | Arkansas |
| SBS Insurance Brokers of Kentucky, Inc. | Kentucky |
| SBS Insurance Brokers of New Hampshire, Inc. | New Hampshire |
| SBS Insurance Brokers of North Dakota, Inc. | North Dakota |
| SBS Life Insurance Agency of Puerto Rico, Inc. | Puerto Rico |
| Scanports Limited | England |
| Scanports Shipping, Inc. | Delaware |

| | |
|---|---|
| Schofield Developments Limited | British Virgin Is. |
| Schroder (Malaysia) Holdings Sdn. Bhd. | Malaysia |
| Schroder Wertheim & Co. Inc. 1996 European Investment Partnership L.P. | Delaware |
| Schroder Wertheim Holdings I Inc. | Delaware |

38

**Exhibit 21.01 Citigroup Inc. Principal Subsidiaries as of December 31, 2006**

| | |
|---|---|
| Schroders Malaysia (L) Berhad | Malaysia |
| Scott Aircraft Ltd. | Japan |
| Scottish Provident (Irish Holdings) Limited | Ireland |
| SDL 1 Investor, L.P. | England and Wales |
| Seagull Aircraft Ltd. | Japan |
| Sears Life Insurance Company | Texas |
| Sechsundzwanzigste Gamma Trans Leasing Verwaltungs GmbH & Co. Finanzierungs-Management KG | Germany |
| Sechzehnte Gamma Trans Leasing Verwaltungs GmbH & Co. Finanzierungs-Management KG | Germany |
| Second Bai Yun Aircraft Ltd. | Japan |
| Secundus Nominees (Jersey) Limited | Jersey, Channel Is. |
| Seguros Banamex, S.A. de C.V., Integrante del Grupo Financiero Banamex | Mexico |
| Sepraci 1 LLC | Delaware |
| Sepraci 3 LLC | Delaware |
| Servicios Comerciales S.A.C.I.M. y F. | Argentina |
| Servicios Corporativos Afore Banamex, S.A. de C.V. | Mexico |
| Servicios Corporativos Crédito Familiar, S.A. de C.V. | Mexico |
| Servicios Corporativos de Finanzas, S.A. de C.V. | Mexico |
| Servicios Corporativos SBA, S.A. de C.V. | Mexico |
| Servicios Ejecutivos Banamex, S.A. de C.V. | Mexico |
| Servicios Financieros Citibank (Chile) S.A. | Chile |
| Servicios Vitamedica, S.A. De C.V. | Mexico |
| Servifondos, S.A. de C.V. | Mexico |
| Seven World Holdings LLC | Delaware |
| Seven World Technologies, Inc | Delaware |
| SFJV 2004-1, LLC | Delaware |
| SFJV 2004-B, LLC | Delaware |
| SFJV-2002-1, LLC | Delaware |
| SFL—Delaware LLC | Delaware |
| Shanghai Moon River Property Co. Ltd. | China |
| Shanghai Yong Tai Real Estate Development Company Ltd. | China |
| Shearson Mid-West Futures Fund | New York |
| Shearson Select Advisors Futures Fund L.P. | Delaware |

| | |
|---|---|
| Siebenundzwanzigste Gamma Trans Leasing Verwaltungs GmbH & Co. Finanzierungs-Management KG | Germany |
| Siefore Banamex De Aportaciones Voluntarias Plus, S. A. de C. V. | Mexico |
| SIL Loan Funding LLC | Delaware |
| SIL2 Loan Funding LLC | Delaware |
| Silefed S.R.L. | Argentina |

39

**Exhibit 21.01 Citigroup Inc. Principal Subsidiaries as of December 31, 2006**

| | |
|---|---|
| Skeet Nominees Pty Ltd | Australia |
| SKY CBNA Loan Funding LLC | Delaware |
| SKY CFPI Loan Funding LLC | Delaware |
| SL&H Reinsurance, Ltd. | St. Kitts & Nevis |
| SLC Student Loan Receivables I, Inc. | Delaware |
| Smith Barney (Ireland) Limited | Ireland |
| Smith Barney AAA Energy Fund L.P. | New York |
| Smith Barney Bristol Energy Fund L.P. | New York |
| Smith Barney Cayman Islands, Ltd. | Cayman Is. |
| Smith Barney Consulting Partnership, LP | Delaware |
| Smith Barney Credit Services (Cayman) Ltd. | Cayman Is. |
| Smith Barney Diversified Futures Fund L.P. | New York |
| Smith Barney Diversified Futures Fund L.P. II | New York |
| Smith Barney Europe Holdings, Ltd. | England |
| Smith Barney Global Markets Futures Fund L.P. | New York |
| Smith Barney Investors L.P. | Delaware |
| Smith Barney Life Agency Inc. | Louisiana |
| Smith Barney Mid-West Futures Fund LP II | New York |
| Smith Barney Potomac Futures Fund, L.P. | New York |
| Smith Barney Private Trust Company (Cayman) Limited | Cayman Is. |
| Smith Barney Private Trust GmbH | Switzerland |
| Smith Barney Realty, Inc. | Delaware |
| Smith Barney Risk Investors, Inc. | Delaware |
| Smith Barney Tidewater Futures Fund L.P. | New York |
| Smith Barney Venture Corp. | Delaware |
| Smith Barney Warrington Fund L.P. | New York |
| Smith Barney Westport Futures Fund L.P. | New York |
| Snowdonia (NFR) S.a r.l. | Luxembourg |
| Snowdonia S.a.r.l. | Luxembourg |
| Sociedad Financiera Associates, S.A. de C.V., Sociedad Financiera de Objeto Limitado, Grupo Financiero Associates | Mexico |
| SOL Loan Funding LLC | Delaware |
| SOL2 Loan Funding LLC | Delaware |
| SOMANAD 1 LLC | Delaware |
| SOMSC Services, Inc. | Michigan |

8:07-cv-00266-LSC-FG3     Doc # 25     Filed: 05/19/08     Page 149 of 285 - Page ID # 296

http://www.sec.gov/Archives/edgar/data/83100/000119312507038950...

| | |
|---|---|
| Southern Graphics Systems, Inc. | Delaware |
| Sparks CBNA Loan Funding LLC | Delaware |
| Sparks CFPI Loan Funding LLC | Delaware |
| Spentex (Netherlands) B.V. | Netherlands |

40

8:07-cv-00266-LSC-FG3    Doc # 25    Filed: 05/19/08    Page 150 of 285 - Page ID # 297

http://www.sec.gov/Archives/edgar/data/831001/000119312507038501...

**Exhibit 21.01 Citigroup Inc. Principal Subsidiaries as of December 31, 2006**

| | |
|---|---|
| Spentex (Singapore) Pte. Ltd. | Singapore |
| Spentex Tashkent Toytepa LLC | Uzbekistan |
| SPL 1, Inc. | New York |
| SSB BB Inc. | Delaware |
| SSB Capital Partners (Cayman) I, LP | Cayman Is. |
| SSB Capital Partners (DE-UK) I, LP | Delaware |
| SSB Capital Partners (Master Fund) I, LP | Delaware |
| SSB Capital Partners (UK) I, LP | England |
| SSB Capital Partners (US-UK) I, LP | Delaware |
| SSB Capital Partners I, LP | Delaware |
| SSB Greenwich Street Partners LLC | Delaware |
| SSB Keeper Holdings LLC | Delaware |
| SSB Private Management LLC | Delaware |
| SSB Vehicle Securities Inc. | Delaware |
| SSBCP Energy I, LLC | Delaware |
| SSBCP GP I Corp. | Delaware |
| SSBCPE Corp. | Delaware |
| SSBPIF GP Corp. | Delaware |
| St. Louis Aircraft Ltd. | Japan |
| Stamford Aircraft Ltd. | Japan |
| Stately & Co., L.L.C. | Delaware |
| Stedman CBNA Loan Funding LLC | Delaware |
| Stedman CFPI Loan Funding LLC | Delaware |
| Stewart Heights LLC | North Carolina |
| Stichting TST Dutch Foundation | Netherlands |
| STK CBNA Loan Funding LLC | Delaware |
| STK CFPI Loan Funding LLC | Delaware |
| Storms & Co., L.L.C. | Delaware |
| Strategic Industries, LLC | Maryland |
| Structured Products Corp | Delaware |
| STT, LLC | Delaware |
| Stuart & Co., L.L.C. | Delaware |
| Student Loan Corporation, The | Delaware |
| Suir Aircraft Ltd. | Japan |
| Sumter Place Housing, LLC | South Carolina |

8:07-cv-00266-LSC-FG3    Doc # 25    Filed: 05/19/08    Page 151 of 285 - Page ID # 298

http://www.sec.gov/Archives/edgar/data/851001/000119312507038 50...

| | |
|---|---|
| Sundance Investment, LLC | Delaware      . |
| SunMattoon, L.P. | Illinois |
| Super Plus Limited | Hong Kong |
| Sweeney & Co., L.L.C. | Delaware |

41

**Exhibit 21.01 Citigroup Inc. Principal Subsidiaries as of December 31, 2006**

| | |
|---|---|
| Sweet River Fund | Cayman Is. |
| Sweet River Fund Delaware LLC | Delaware |
| Sydney Aircraft Ltd. | Japan |
| T.I.M.L. S. DE R.L. DE C.V. | Mexico |
| Tampa Aircraft Ltd. | Japan |
| Targets Trust XX | Delaware |
| Targets Trust XXI | Delaware |
| Targets Trust XXII | Delaware |
| Targets Trust XXIII | Delaware |
| Targets Trust XXIV | Delaware |
| Targets Trust XXV | Delaware |
| Targets Trust XXVI | Delaware |
| Tarjetas de Chile S.A. | Chile |
| TCEP Participation Corp. | New York |
| TCP Corp. | Delaware |
| Tele Fundo de Investimento em Acoes | Brazil |
| Telecomunicaciones Holding Mx, S. de R.L. de C.V. | Mexico |
| Telinvest S.A. | Brazil |
| Tertius Nominees (Jersey) Limited | Jersey, Channel Is. |
| TGI Citigroup I Ltd. | Cayman Is. |
| TGI Citigroup II Ltd. | Cayman Is. |
| THC2 Loan Funding LLC | Delaware |
| The Associates Payroll Management Service Company, Inc. | Delaware |
| The Citigroup Private Bank Employee Co-Investment Program (Feeder), Ltd. | Cayman Is. |
| The Citigroup Private Bank Employee Co-Investment Program II, LP | Delaware |
| The CPB Employee Co-Investment Program (Feeder) II, Ltd. | Cayman Is. |
| The Geneva Companies, LLC | Delaware |
| The Geneva Group, LLC | Delaware |
| The Putman Management Limited | Hong Kong |
| The Yield Book Inc. | Delaware |
| Third Bai Yun Aircraft Ltd. | Japan |
| Tishman Speyer European Strategic Office Fund L.P. | England |
| Tishman Speyer/Citigroup Alternative Investments Associates V (Domestic), L.L.C. | Delaware |

http: /www.sec.gov/Archives/edgar/data/831001/000119312507038 50...

| | |
|---|---|
| Tishman Speyer/Citigroup Alternative Investments International Real Estate Venture V, C.V. | Netherlands |
| Tishman Speyer/Citigroup Alternative Investments International Real Estate Venture V, L.P. | Delaware |
| Tishman Speyer/Citigroup Alternative Investments Real Estate Venture IV, L.L.C. | Delaware |
| Tonawanda II, L.P. | Tennessee |
| TranSouth Financial Corporation of Iowa | Iowa |

42

**Exhibit 21.01 Citigroup Inc. Principal Subsidiaries as of December 31, 2006**

| | |
|---|---|
| Travelers Auto Leasing Corporation | Delaware |
| Travelers Group International LLC | Delaware |
| Tribeca Global Investments L.P. | Cayman Is. |
| Tribeca Global Management (Asia) Pte. Ltd. | Singapore |
| Tribeca Global Management (Europe) Ltd | England |
| Tribeca Global Management LLC | Delaware |
| Triones Amusement Holdings Y.K. | Japan |
| Triton Insurance Company | Texas |
| Trumbull THC2 CFPI Loan Funding LLC | Delaware |
| TRV Employees Investments, Inc. | Delaware |
| TST International Fund V CV, GP, L.L.C. | Delaware |
| TST International Fund V, GP, LLC | Delaware |
| Turavent Oil AG | Switzerland |
| Turkish Pharma Holdings Limited | Cayman Is. |
| Turkish Pharma Lux S.a.r.l. | Luxembourg |
| TwoStarz Trustee Limited | New Zealand |
| Tyler Limited | Cayman Is. |
| U.S.A. Institutional Tax Credit Fund LIII L.P. | Delaware |
| U.S.A. Institutional Tax Credit Fund XLIX L.P. | Delaware |
| UAS Services Japan Limited | Japan |
| ULT CBNA Loan Funding LLC | Delaware |
| ULT CFPI Loan Funding LLC | Delaware |
| Umbrella Asset Services Hong Kong Limited | Hong Kong |
| Umbrella Asset Services Korea Ltd. | South Korea |
| Umbrella Hong Kong Finance Limited | Hong Kong |
| Umut Ilaç Ticaret ve Sanayi A.S. | Turkey |
| Uniao-Gerenciamento de Bens C. p. A. | Brazil |
| United Auto Parts (Cayman) Limited | Cayman Is. |
| Universal Bancorp Services, Inc. | Delaware |
| Universal Card Services LLC | Delaware |
| Urban Park II, L.P. | Tennessee |
| UrbanEdge Hotels Private Limited | India |
| Ursus Credit Management Yugen Kaisha | Japan |
| Verdugo Trustee Service Corporation | California |
| Verochris Corporation | Delaware |

.  Vialattea LLC                                              Delaware

Vidacos Nominees Limited                                      England

Vidapass, Sociedad Anónima de Capital Variable               Mexico

Vierundzwanzigste Gamma Trans Leasing Verwaltungs
  GmbH & Co. Finanzierungs-Management KG                     Germany

43

**Exhibit 21.01 Citigroup Inc. Principal Subsidiaries as of December 31, 2006**

| | |
|---|---|
| VS CBNA Loan Funding LLC | Delaware |
| VS CFPI Loan Funding LLC | Delaware |
| VT Finance, Inc. | Delaware |
| Warrington GP LLC | Delaware |
| Warrington LP LLC | Delaware |
| Wasco Funding Corp. | New York |
| Washington & Watts LLC | Delaware |
| Washington Aircraft Ltd. | Japan |
| Watchguard Registration Services, Inc. | Indiana |
| WAVE CBNA Loan Funding LLC | Delaware |
| WAVE CFPI Loan Funding LLC | Delaware |
| Weber & Co., L.L.C. | Delaware |
| Wertheim Energy Corporation | Delaware |
| West Ocean II, LLC | Delaware |
| Western and Clay LLC | Delaware |
| White One Asset Securitization Specialty Limited | South Korea |
| White River Y.K. | Japan |
| Winthorpe LLC | Delaware |
| Wooster CBNA Loan Funding LLC | Delaware |
| Wooster CFPI Loan Funding LLC | Delaware |
| World Equity Partners, L.P. | Delaware |
| World Subordinated Debt Partners, L.P. | Delaware |
| Yonder Investment Corporation | Delaware |
| Yorkville CBNA Loan Funding LLC | Delaware |
| Yorkville CFPI Loan Funding LLC | Delaware |
| Yugen Kaisha Aries Credit Management | Japan |
| Yugen Kaisha Equus Credit Management | Japan |
| Yugen Kaisha Falco Credit Management | Japan |
| Yugen Kaisha New Harbor Property Holdings | Japan |
| Yugen Kaisha New Toko Hotel Management | Japan |
| Yugen Sekinin Chukan Houjin Amusement Holdings | Japan |
| ZAO "Citigroup Global Markets" | Russia |
| ZAO KB "Citibank" | Russia |
| Zehnte Gamma Trans Leasing Verwaltungs GmbH & Co. Finanzierungs-Management KG | Germany |

Zwoelfte Gamma Trans Leasing Verwaltungs GmbH & Co.                    .
   Finanzierungs-Management KG                    Germany

<sup>i</sup> Citigroup Inc. owns 50% of CitiStreet LLC and its subsidiaries (*) in joint venture with State Street Corporation.

44

 

FEDERAL STUDENT AID

## Lender Default Rate
## Search Results
## FY 2005

**8 Records found with specified criteria ( NAME = citibank )**
**Records from 1 to 8**

| Rec. | Lender's OPE ID | Name | Address | City | State |
|---|---|---|---|---|---|
| 1 | 80792900 | CITIBANK ELT SLC RECEIVABLES I | P O BOX 92902 | ROCHESTER | NY |
| 2 | 82687800 | CITIBANK ELT STUDENT LOAN CORP | P.O. BOX 6157 | SIOUS FALLS | SD |
| 3 | 83106700 | CITIBANK (NEW YORK STATE) SLC | P.O. BOX 6157 | SIOUX FALLS | SD |
| 4 | 82475600 | CITIBANK (NEW YORK STATE) SLC | P.O. BOX 6157 | SIOUX FALLS | SD |
| 5 | 80774300 | CITIBANK ELT STUDENT LOAN CORP | P.O. BOX 6157 | SIOUX FALLS | SD |
| 6 | 82290400 | CITIBANK ELT STUDENT LOAN CORP | P.O. BOX 6157 | SIOUX FALLS | SD |
| 7 | 82815400 | CITIBANK, NA | P.O. BOX 6157 | SIOUX FALLS | SD |
| 8 | 83136600 | CITIBANK ELT STUDENT LOAN CORP | 1716 BRIARCREST DR STE 250 | BRYAN | TX |





EXHIBIT
G

8:07-cv-00266-LSC-FG3    Doc # 25    Filed: 05/19/08    Page 159 of 285 - Page ID # 306



# U.S. DEPARTMENT OF EDUCATION
## Federal Family Education Loan Program

OMB NO: 1845-0013
Expiration Date: 12-31-2010
Previous Versions Obsolete

*LENDER'S INTEREST AND SPECIAL ALLOWANCE REQUEST AND REPORT – (LaRS/799)* PAGE 1

Read instructions for each part before completing this form.

**IDENTIFICATION AND CERTIFICATION**

1. Lender Identification Number (LID), Lender Name:

2. Servicer Identification Number, Servicer Name (if applicable):

3. Year and Quarter Ending (Complete both fields):

   1 [ ]  March 31

   2 [ ]  June 30

   3 [ ]  September 30

   YEAR   4 [ ]  December 31

**CERTIFICATION**

As an eligible Lender, Servicer, or Eligible Lender Trustee in the Federal Family Education Loan Program (FFELP) that submits the Lender Reporting System report (LaRS), I certify, by my signature below that:

The data that my organization submits to the U.S. Department of Education is correct to the best of my knowledge and belief. I certify that this submission seeks payment of only those amounts that are proper and authorized under the laws, regulations, and policies applicable to the Federal Family Education Loan Program. I understand that all documents, files, accounts and records supporting this data are subject to audit or review by the Secretary of Education or other authorized representatives the United States Government, and I agree to make all such documents, files, accounts and records available to the Secretary or such authorized representative without restriction.

4. Signature _____

5. Date _____

8:07-cv-00266-LSC-FG3    Doc # 25    Filed: 05/19/08    Page 160 of 285 - Page ID # 307

**Mail completed form to:**

U.S. Department of Education

Post Office Box 2768
Washington, D.C. 20013-2768

6. Typed Name and Title _____

_____

WARNING: Any person who knowingly and willfully submits a false statement to obtain payment may be prosecuted under Federal law, and if convicted, is subject to imprisonment for up to five years or a fine of up to $20,000, or both. 18 U.S.C. 1001, 20 U.S.C 1097. In addition, any person who knowingly makes a false claim or causes a false claim to be presented, or knowingly makes a false statement to obtain payment of a claim, may be subject to civil penalty and damages under the False Claims Act.

REPORTING BURDEN: According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless such collection displays a valid OMB control number. The valid OMB control number for this information collection is 1845-0013. The time required to complete this information collection is estimated to average 3.75 hours per response, including the time to review instructions, search existing data sources, and gather the data needed, and complete and review the information collection. **If you have any comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write directly to:** U.S. Department of Education, Washington, DC 20202-5449. If you have any comments or concerns regarding the status of your individual submission of this form, write directly to: Financial Management, Lender Reporting, Post Office Box 2768, Washington, D.C. 20013-2768.

**LENDER'S INTEREST AND SPECIAL ALLOWANCE REQUEST AND REPORT (LaRS/799)**

OMB NO: 1845-0013
Expiration Date: 12-31-2010
Previous Versions Obsolete

LID: _____ PAGE _____

| PART I – Loan Origination and Lender Loan Fees | | | | |
|---|---|---|---|---|
| Loan Type (A) | Fee Code (B) | Fee Percent (C) | Loan Interest Rate (D) | Principal Amount of Loans (E) |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

☐ Check here if submitting additional pages for Part I

8:07-cv-00266-LSC-FG3    Doc # 25    Filed: 05/19/08    Page 162 of 285 - Page ID # 309



# LENDER'S INTEREST AND SPECIAL ALLOWANCE REQUEST AND REPORT (LaRS/799)

OMB NO: 1845-0013
Expiration Date: 12-31-2010
Previous Versions Obsolete

LID: _____ PAGE _____

| PART II – Interest Benefits | | | | | |
|---|---|---|---|---|---|
| Loan Type (A) | Interest Rate (B) | Billing Code (C) | Ending Principal Balance (D) | Average Daily Principal Balance (E) | Interest Amount (Use only for Adjustments) (F) |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

☐ Check here if submitting additional pages for Part II

8:07-cv-00266-LSC-FG3 Doc # 25 Filed: 05/19/08 Page 163 of 285 - Page ID # 310



# LENDER'S INTEREST AND SPECIAL ALLOWANCE REQUEST AND REPORT (LaRS/799)

OMB NO: 1845-0013
Expiration Date: 12-31-2010
Previous Versions Obsolete

LID: _____ PAGE _____

| | PART III – Special Allowance | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Billing Code (A) | Calendar Year (B) | Quarter Code (C) | Loan Type (D) | Special Allowance Category (E) | Interest Rate (F) | Ending Principal Balance (G) | Average Daily Principal Balance (H) | Adjustments for Difference in Average Daily Principal Balance (I) |
| | | | | (D) | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

☐ Check here if submitting additional pages for Part III



# *LENDER'S INTEREST AND SPECIAL ALLOWANCE REQUEST AND REPORT (LaRS/799)*

OMB NO: 1845-0013
Expiration Date: 12-31-2010
Previous Versions Obsolete

LID: _____ PAGE _____

| PART IV: Loan Activity | | | | | |
|---|---|---|---|---|---|
| | FEDERAL STAFFORD & FISL (Except Unsubsidized) (A) | FEDERAL PLUS (B) | FEDERAL SLS (C) | FEDERAL CONSOLIDATION (D) | FEDERAL UNSUBSIDIZED STAFFORD (E) |
| 1. Beginning Principal Balance | | | | | |
| 2. Loan Principal Disbursed | | | ███ | | |
| 3. Interest Capitalized or Other Principal Increases | | | | | |
| 4. Principal of Loans Purchased | | | | | |
| 5. Principal of Loans Cured | | | | | |
| 6. Principal of Loans Sold | | | | | |
| 7. Principal Paid by Insurance Claims | | | | | |
| 8. Principal of Loans on Which the Guarantee Was Voided | | | | | |
| 9. Principal Paid by Borrowers and Other Principal Reductions | | | | | |

8:07-cv-00266-LSC-FG3     Doc # 25     Filed: 05/19/08     Page 164 of 285 - Page ID # 311

8:07-cv-00266-LSC-FG3    Doc # 25    Filed: 05/19/08    Page 165 of 285 - Page ID # 312



# LENDER'S INTEREST AND SPECIAL ALLOWANCE REQUEST AND REPORT (LaRS/799)

OMB NO: 1845-0013
Expiration Date: 12-31-2010
Previous Versions Obsolete

LID: _____ PAGE _____

| PART V – Loan Portfolio Status | | | | | |
|---|---|---|---|---|---|
| | FEDERAL STAFFORD & FISL (Except Unsubsidized) (A) | FEDERAL PLUS (B) | FEDERAL SLS (C) | FEDERAL CONSOLIDATION (D) | FEDERAL UNSUBSIDIZED STAFFORD (E) |
| 1    Loans in School and in Grace | | | | | |
| 2.    Loans in Authorized Deferment | | | | | |
| 3    Loans in Repayment or Forbearance: | | | | | |
| a.    Current or less than 31 days past due | | | | | |
| b    31-60 days past due | | | | | |
| c    61-90 days past due | | | | | |
| d.    91-120 days past due | | | | | |
| e.    121-180 days past due | | | | | |
| f.    181-270 days past due | | | | | |
| g    271 days or more past due | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| h.  Claims filed, but not yet paid, and not listed above | | | | | |
| 4.      Ending Principal Balance | | | | | |

General Instructions

## What is the Lender's Interest & Special Allowance Request and Report (LaRS)?

The LaRS form is used by the U.S. Department of Education (ED) to calculate interest subsidies and special allowance payments due to the lending institution, to calculate origination fees and Lender loan fees owed to ED, and to obtain information on your portfolio under the Federal Family Education Loan Program.

## Who should complete this form?

A lending institution that originates loans must submit this form to report fees due to ED.  The lending institution must also submit this form each quarter to receive interest and special allowance payments.  *The form must be submitted within 90 days of the quarter's end to be considered timely.*

## What help is available?

Help can be obtained by contacting Federal Student Aid (FSA) at *FSA_LR@ed.gov*.

## The Entire form must be completed.

Failure to complete all sections of the LaRS form will result in the rejection of the entire form.

## Are there any other helpful hints?

1.  It is important to put your LID on the top of each page.
2.  Number the pages sequentially using the space provided.
3.  If additional space is needed for Parts I, II, or III, make additional copies, and check the block at the bottom of each page to indicate that additional pages are being submitted.
4.  Unless otherwise stated, calculate each monetary amount to the nearest cent, round to the nearest dollar, and enter the amount on the form.
5.  Sign and date the form, and send it to the address shown on the first page.

1

LaRS Instructions

---

### Page 1

1    Lender ID, Lender Name          The Lender Identification Number (LID) is a 6-digit code assigned by ED to identify each participant in the FFEL program.  Provide the full, legal name of your institution.

2    Servicer ID, Servicer Name      The Servicer Identification Number is a 6-digit code assigned by ED to identify each participant in the FFEL program.  Provide the full, legal name of the servicing institution (if applicable).

3    Year and Quarter Ending         Provide the calendar year and associated quarter ending date covered by this form.

4    Signature                       Read the certification statement and sign the form in ink.  Forms signed with signature stamps and unsigned forms will be rejected and returned to you.

5    Date                            Enter the date the LaRS form is signed.

6    Typed Name and Title            Type or Print the name and title of the official signing the form.

2

LaRS Instructions

## Part I – Loan Origination and Lender Loan Fees

**This section is divided into 5 columns. Make separate line entries for each unique combination of Loan Type, Fee Code, Fee Percent, and Loan Interest Rate. For each line, if any column is completed, all columns for that line must be completed. If you do not have anything to report, please indicate this by inserting zeros in the first line. Report adjustments to previous quarters only if applicable. If additional space is needed, make a copy of the blank page and check the block at the bottom of each page.**

Applicability: Most FFEL Program loans are subject to a loan origination fee, which is a percentage of the loan principal and is deducted proportionately from each loan disbursement. The fee depends on the period of enrollment covered by the loan.

A    Loan Type

Provide the 2-letter code of the loan type being reported:

**SF** - Federal Stafford (except Unsubsidized Stafford)
**SL** - Federal Supplemental Loans for Students (SLS)
**PL** - Federal PLUS Loans
**CL** - Federal Consolidation Loans
**SU** - Unsubsidized Stafford Loans

B    Fee Code

Provide the code for the period and type of loan activity being reported:
**Origination fees for current quarter:**
**FN** - **N**ew Loans you have made (including those then sold) in the quarter covered by this form if you owe the origination fees
**FS** - Loans you made and **s**old in the quarter covered by this form if the purchaser owes the origination fees
**FB** - Loans you **b**ought from another Lender in the quarter covered by this form, if you owe the origination fees

**Origination fee adjustments to previously reported quarters:**
**FI** - Net **i**ncrease in loans you made or bought as reported for a previous quarter, if you owe the origination fees
**FD** - Net **d**ecrease in loans you made or bought as reported for a previous quarter, if the fees are to be credited to you

**Lender Loan fees for current quarter:**
**LN** - **N**ew loans you have made (including those then sold) in the quarter covered by this form, if you owe the Lender loan fees
**LS** - Loans you made and **s**old in the quarter covered by this form, if the purchaser owes the Lender loan fees
**LB** - Loans you **b**ought from another Lender in the quarter covered by this form, if you owe the Lender loan fees

**Lender fee adjustment to previously reported quarters:**
**LI** - Net **i**ncrease in loans you made or bought as reported for a previous quarter, if you owe the Lender fees
**LD** - Net **d**ecrease in loans you made or bought as reported for a previous quarter, if the fees are to be credited to you

Separate entries must be made for origination fees and for Lender fees. For lines containing the codes FN, FB, FI, LN, LB and LI, ED will charge you the

3

fee. For lines containing the codes FD and LD, you will receive credit toward fees due. Use the current quarter codes only for loans made, bought or sold in the quarter covered by this form.

If a loan transaction occurred in the current quarter and an adjustment was made to it in the same quarter, only report the net result. Do not report the original action and the adjustment separately. Include all loans, which can be classified under the same loan type, the same adjustment fee code, the same fee percent, and the same loan interest rate in one line item. When using an adjustment code, report the sum of all activity for loans made in all prior quarters. Do not make separate entries for each separate prior quarter.

C   Fee Percent

Provide the percentage (as a decimal) of the loan used to determine the fee

- **Loans first disbursed on or after July 1, 2007 – June 30, 2008 for periods of enrollment that either include that date or begin after that date:**
  - Federal Stafford and Unsubsidized Stafford fees are 0.015

- Loans first disbursed on or after July 1, 2006 – June 30, 2007 for periods of enrollment that either include that date or begin after that date:
  - Federal Stafford and Unsubsidized Stafford fees are 0.02
  - Federal PLUS fees are 0.03

- Loans first disbursed on or after July 1, 1994 through June 30, 2006 for periods of enrollment that either include that date or begin after that date:
  - Federal Stafford, PLUS and Unsubsidized Stafford fees are 0.03

- Loans first disbursed on or after July 1, 1994 for period of enrollment that begin *before that date and include that date:*
  - Federal SLS loans certified before July 1, 1994 is 0.03

- Period of enrollment beginning before July 1, 1994 and disbursed prior to that date:
  - Federal Stafford, Federal SLS and Federal PLUS fee is 0.05
  - Unsubsidized Stafford combined origination fee/insurance premium is 0.065

FFEL Program loans disbursed *on or after October 1, 2007* are subject to a **Lender loan fee,** which is 1% or **.01** of the loan principal and is charged proportionately against each loan disbursement.

FFEL Program loans made on or after October 1, 1993 – September 30, 2007, are subject to a **Lender loan fee,** which is ½% or **.005** of the loan principal and is charged proportionately against each loan disbursement.

D   Loan Interest Rate

Provide the applicable interest rate (as a decimal) of each group of loans.

- Use "**.068**" for Federal Stafford and Unsubsidized Stafford loans disbursed on or after 7/1/2006.
- Use "**.085**" for Federal PLUS loans disbursed on or after 7/1/2006.
- Use "**EVAR**" for Federal Stafford, Federal PLUS and Unsubsidized Stafford variable rate loans made to new borrowers on/after 10/1/92 – 6/30/2006.

4

- Use the actual rate of the loan for Consolidation loans made on/after 10/1/98.
- Use **FVAR7, FVAR8, FVAR9, FVAR10, and FVARX** respectively for converted fixed rate loans of 0.07, 0.08, 0.09, or 0.08/0.1 percent (adjustments only).

E   Principal Amount of Loans    The principal amount of the loan is the amount disbursed plus the amount of the insurance premium and origination fee deducted prior to disbursement. (The Lender loan fee is based on the same amount and is a **charge to you**. It cannot be charged to the borrower; that is, it cannot be deducted from the loan principal disbursed.)

Enter the total principal amount of loans (whole dollars only) made or bought which are covered by the transaction indicated by the Loan Type and Fee Code.  Do not include amounts representing cancellations or adjustments occurring in the same quarter that the loan was disbursed.

For a Fee Code of FI and LI, report the additional amount which was not previously reported to ED.  For a Fee Code of FD and LD, report the amount, which was previously reported but has now been cancelled or overstated in previous quarters.

LaRS Instructions

## Part II – Interest Benefits

This part is divided into 6 columns. When billing for interest for the quarter covered by the form, (Billing Code BC), make separate line entries for each different loan type and allowable interest rate. Columns A-E must be completed. Column F, Interest Amount, is for reporting adjustments only.

When billing for all other codes (BI and BD), make separate line entries for each type of adjustment. Complete columns A, C, and F. Leave the other columns blank. If additional space is needed, make a copy of the blank page and check the block at the bottom of each page.

Applicability: In general, ED will pay the interest due on:
- Subsidized Federal Stafford and FISL loans while the borrower is in school at least half time, in grace, and during a period of authorized deferment.
- Federal Consolidation loans for which the Lender received the application on/after 1/1/93 and prior to 8/10/93 during periods of authorized deferment.
- Federal Consolidation loans comprised solely of subsidized Federal Stafford Loans for which the Lender received the application on/after 8/10/93 and prior to 11/13/97, during periods of authorized deferment.
- Federal Consolidation loans whose application was received after 11/13/97, interest benefits are paid on the portion of the loan that repaid subsidized Federal Stafford, subsidized Federal Direct Stafford, FISL, subsidized Federal Consolidation, and subsidized Federal Direct Consolidation loans, during periods of authorized deferment.

A   Loan Type

Provide the 2-letter code for the loan type being reported.
SF - Federal Stafford (except Unsubsidized Stafford) and FISL
CL - Federal Consolidation

B   Interest Rate

Provide the interest rate (as a decimal) for loans or portions of loans on which you are billing interest for the quarter covered by this form, as explained above. For loans made at rates other than those shown, make separate line entries for each actual rate used (up to 5 decimal places, then round). For lines showing an adjustment (Billing Code BI or BD), leave this column blank.
- **For 6.8% enter 0.068**
- **For 8.25% enter 0.0825**

C   Billing Code

Provide the code for the period and type of loan activity being reported:
**BC** - Interest due to you for the current quarter
**BI** - Adjustment, resulting in a net increase in the interest due to you from previous quarters' billings
**BD** - Adjustment, resulting in net decrease in the interest due to you form previous quarters' billings

For lines containing the codes BC or BI, you will receive an interest payment from ED. For lines containing the code BD, you will be charged for the amount owed to ED.

If an interest transaction occurred in the current quarter and an adjustment was made to it in the same quarter, report only the net result. Do not report the original action and the adjustment separately.

Use codes BI and BD to report adjustments to interest activity for all prior

6

quarters combined, regardless of the loans' individual interest rates.

D   Ending Principal Balance        Enter the total unpaid principal balance outstanding on all loans or portions of loans eligible for interest benefits (whole dollars only) for the stated Loan Type, Interest Rate and Billing Code combination, as of the last day of the quarter covered by this form.  Complete this column only for lines with Billing Code BC.

E   Average Daily Principal Balance  For each combination of Loan Type, Interest Rate and Billing Code, enter the average (whole dollars only) of the daily principal balances of all eligible loans or portions of loans for the quarter covered by this form.  This is accomplished by adding the outstanding principal balance of all eligible loans or portions of loans for each day in the quarter and dividing by the number of days in the quarter.  This column must be completed for any line with Billing Code BC.

F   Interest Amount                 For each combination of Loan Type, Interest Rate and Billing Code enter
    (Use only for adjustments)      to the nearest penny the amount of interest due you or owed to ED.

                                    Do not use Column F for interest due for the current quarter (Billing Code is BC).  This column is required for adjustments (Billing Code is BI or BD).  Enter a positive number only.  We will use the Billing Code to determine whether you are due interest or owe money to ED.

7

LaRS Instructions

## Part III – Special Allowance

This part is divided into 9 columns. Make separate line entries for each different combination of Billing Code, Calendar Year, Quarter Code, Loan Type, Special Allowance Category, and Interest Rate. These first 6 columns *must* always be completed. If additional space is needed, make a copy of the blank page and check the block at the bottom of each page.

Applicability: In general, special allowance may be paid on all loans, except certain Federal Stafford and FISL loans and any "HEAL" portion of a Consolidation loan. For loans disbursed on/after 4/1/06, if the applicable interest rate exceeds the market rate, the lender may owe funds back the government.

A    Billing Code    Provide the code for the period and type of loan activity being reported:

**BC** - Special allowance due/owed for the current quarter
**BI** - Adjustment resulting in a net increase in the special allowance previously paid/collected for a given quarter
**BD** - Adjustment resulting in a net decrease in the special allowance previously paid/collected for a given quarter

For lines containing the codes BC and BI, **YOU** may receive a payment from ED. For a line containing the code BD, **YOU** may be charged for the amount owed to ED. If a transaction occurred in the current quarter and an adjustment was made in the same quarter, only report the net result.

B    Calendar Year    Provide the year being reported (e.g. 2006)

C    Quarter Code    Provide the digit for the quarter being reported:

**1**- March 31    **3** – September 30
**2** - June 30    **4** – December 31

D    Loan Type    Provide the 2-letter code for the loans being reported:
**SF** - Federal Stafford (except Unsubsidized Stafford) and FISL
**SL** - Federal SLS
**PL** - Federal PLUS
**CL** - Federal Consolidation
**SU** - Unsubsidized Stafford

E    Special    Provide the code for the loans being reported:
Allowance Category    **SA** -    For loans made prior to 10/1/81.
(Tax-exempt loans during this period use XA)

**SB** -    For Stafford (subsidized) and PLUS loans made on/after 10/1/81 but prior to 10/17/86, or loans made on/after 10/17/86 but prior to 11/16/86 for periods of enrollment beginning prior to 11/16/86. Also, for Consolidation loans made on/after 10/1/81 but prior to 11/16/86. (Tax-exempt loans during this period use XB)

**SC** -    Used for sequester periods only.
(Tax-exempt loans during this period use XC)

**SD** -    For Stafford (subsidized) and PLUS/SLS loans made on/after 10/17/86 but prior to 11/16/86 for periods of enrollment beginning on/after 11/16/86. Also, for

8

Stafford (subsidized), PLUS/SLS and Consolidation loans made on/after 11/16/86 but prior to 10/1/92. Also, for Stafford (unsubsidized) loans made prior to 10/1/92 for periods of enrollment beginning on/after 10/1/92.
(Tax-exempt loans during this period use XB)

**SE -**   For Stafford loans made on/after 10/1/92 but prior to 7/1/94, regardless of the enrollment period, or loans made after 7/1/94 for an enrollment period ending prior to 7/1/94. Also, for PLUS loans made on/after 10/1/92 but prior to 7/1/94. Also, for SLS loans made on/after 10/1/92 but prior to 7/1/94; or *certified* before 7/1/94 and *disbursed* after 7/1/94. Also, for Consolidation loans made on/after 10/1/92 and those for which the loan application was received by an eligible lender prior to 11/13/97.
(Tax-exempt loans during this period use XE)

**SG -**   For Stafford loans made on/after 7/1/94 but prior to 7/1/95, or loans made on/after 7/1/95 but prior to 7/1/98 during periods of repayment or forbearance. Also, for PLUS loans made on/after 7/1/94 but prior to 7/1/98. Also, for Consolidation loans for which the loan application was received by an eligible lender on/after 11/13/97 but prior to 10/1/98.
(Tax-exempt loans during this period use XG)

**SH -**   For Stafford loans made on/after 7/1/95 but prior to 7/1/98 *only* during the in-school, grace and deferment periods. Also, for PLUS loans made on/after 7/1/98 but prior to 1/1/2000.
(Tax-exempt loans during this period use XH)

**SJ -**   For Stafford loans made on/after 7/1/98 but prior to 1/1/2000 *only* during the in-school, grace and deferment periods.
(Tax-exempt loans during this period use XJ)

**SK -**   For Stafford loans made on/after 7/1/98 but prior to 1/1/2000 *only* during the repayment and forbearance periods.
(Tax-exempt loans during this period use XK)

**SL -**   Consolidation loans made on/after 10/1/98 but prior to 1/1/2000.
(Tax-exempt loans during this period use XL)

**CA -**   Stafford loans made on/after 1/1/2000 but prior to 3/31/06, *only* during the in-school, grace and deferment periods.
(Tax-exempt loans during this period use XJ)

**CB -**   Stafford loans made on/after 1/1/2000 but prior to 3/31/06, *only* during the repayment and forbearance periods.
(Tax-exempt loans during this period use XK)

**CC -**   Consolidation loans made on/after 1/1/2000 but prior to 3/31/06
(Tax-exempt loans during this period use XL)

**CD -**   PLUS loans made on/after 1/1/2000 but prior to 3/31/06.
(Tax-exempt loans during this period use XH. *Note: Effective 4/1/06, these loans should be reported as XQ).*

**CE-**   Stafford loans made on/after 4/1/2006-9/30/2007, *only* during the in-school, grace and deferment periods.
(Tax-exempt loans during this period use XM)

9

**CF -** Stafford loans made on/after 4/1/2006-9/30/2007, *only* during the repayment and forbearance periods.
(Tax-exempt loans during this period use XN)

**CG-** Consolidation loans made on/after 4/1/2006-9/30/2007.
(Tax-exempt loans during this period use XO)

**CH-** PLUS loans made on/after 4/1/2006-9/30/2007.
(Tax-exempt loans during this period use XP)

**CI-** Stafford loans made on/after 10/1/2007, *only* during the in-school, grace and deferment periods.

**CJ-** Stafford loans made on/after 10/1/2007, *only* during the repayment and forbearance periods.

**CK-** Consolidation loans made on/after 10/1/2007.

**CM-** PLUS loans made on/after 10/1/2007.

F    Interest Rate    Provide the applicable interest rate (as a decimal) for each group of loans. Allowable rates are from 3% (enter as .03) - .25. For Consolidation loans made on or after October 1, 1998, the allowable rates are from 3% - 8.25%. Other allowable rates:

**EVAR** - for variable Federal Stafford and Unsubsidized Stafford, PLUS, and SLS loans made on or after 10/1/92 – 6/30/06 and Consolidation loans made during the "Emergency Consolidation Loan Act"
**CVAR** - for Federal PLUS and SLS loans made in 1986-7 where the interest rate changes each January 1
**FVAR7, FVAR8, FVAR9, FVAR10, and FVARX** - respectively for converted fixed rate loans of 7%, 8%, 9%, 10% and 8/10%
**VAR** – for variable rate, PLUS and SLS loans made prior to 10/1/92

G    Ending    Provide the total unpaid principal balance outstanding on all loans eligible for special
    Principal Balance allowance (whole dollars only) for the stated combination of entries in columns A-F, as of the last day of the quarter covered by this form. Complete this column for Billing Code BC only.

H    Average Daily    For each combination of columns A through F, provide the average daily principal
    Principal Balance balance (whole dollars only) of all eligible loans for the quarter. Complete this column for Billing Code BC only.

I    Adjustments    Provide the difference in the Average Daily Principal Balance (whole dollars only,
    for Difference    positive number) between what should have been reported and what was originally
    in Average    reported. Complete this column for a Billing Code of BI or BD only.
    Daily Principal Balance

10

LaRS Instructions

## Part IV – Loan Activity

**Applicability**: Part IV shows the changes, which have occurred to the guaranteed loan principal in your portfolio for each type of loan for the quarter covered by this form. Loan principal includes capitalized interest as defined in line 3. This part must be completed and submitted each time you submit a LaRS form. This part has 5 columns and 9 lines. Report all amounts in whole dollars.

**Enter all loan information in the appropriate column:**
   A) Federal Stafford (except Unsubsidized Stafford) and FISL
   B) Federal PLUS
   C) Federal SLS
   D) Federal Consolidation
   E) Federal Unsubsidized Stafford


1   Beginning Principal Balance    Provide the outstanding principal balance (including the sum of capitalized interest outstanding) of loans at the start of business on the first day of the quarter. Unless an adjustment has been made, this amount must be the same as the Ending Principal Balance from the previous quarter's form.

   **PLEASE NOTE:** adjustments made to the prior quarter ending balance may be subject to review.

2   Loan Principal Disbursed    Provide the principal amount of loans disbursed during the quarter. This may be new loans or additional disbursements for loans initially disbursed in a prior quarter. Report the gross amount; that is, the amount prior to any deductions for insurance premiums or origination fees. Include amounts actually disbursed for Consolidation loans and for refinanced PLUS and SLS loans. Do not report amounts disbursed and then cancelled (e.g., checks returned uncashed) in the same quarter.

3   Interest Capitalized or Other Principal Increase    Provide the amount of interest and unpaid insurance premiums, which were added to principal during the quarter in accordance with program regulations, principal transferred from other LIDs assigned to your institution, and any other increases in your portfolio not shown elsewhere.

4   Principal of Loans Purchased    Provide the principal amount of loans purchased (including interest capitalized prior to purchase) from other Lenders. Do not include amounts disbursed to consolidate a loan.

5   Principal of Loans Cured    Provide the principal amount of loans (including the sum of interest capitalized prior to the reinstatement of the loan's insurance) on which insurance coverage was reinstated (cured) in accordance with program regulatio

6   Principal of Loans Sold    Provide the principal amount of loans sold (including interest capitalized prior to sale) to other Lenders. Do not include loans paid in full through consolidation. Also, do not include Federal PLUS and SLS loans paid in full as part of a refinancing of those loans.

7   Principal Paid by Insurance Claims    Provide the amount received from the guarantor for principal (including

11

| | | |
|---|---|---|
| | | interest capitalized prior to claim filing) for default, death, disability, bankruptcy and other claims authorized by statute, regulations, and policy. |
| 8 | Principal of Loans on Which the Guarantee Was Voided | Provide the principal amount of loans (including interest capitalized prior to the loss of guarantee) on which the insurance guarantee was voided due to a due diligence, timely filing, or other violation. |
| 9 | Principal Paid by Borrowers and other Principal Reductions | Provide the amount of payment received to reduce outstanding principal and capitalized interest, including payments from borrowers, refunds received from schools, checks returned uncashed for loans reported disbursed in prior quarters, and amounts received to pay off loans included in Federal Consolidation and refinanced Federal PLUS and SLS loans. Do not include claim payments from guarantors. |

12

LaRS Instructions

## Part V – Loan Portfolio Status

**Applicability:** Part V shows the status of the outstanding guaranteed loan principal in your portfolio for each type of loan as of the end of the quarter covered by this form. Principal includes capitalized interest. Include all guaranteed loans in this part except for ones, which the guarantee was voided. Also, include loans, which were previously voided and then cured.

This part must be completed and submitted each time you submit a LaRS form. This part has 5 columns, each covering a specific type of loan, and 4 rows (with the third containing 8 sub lines). Report all amounts in whole dollars.

## Enter all loan information in the appropriate column:

A) Federal Stafford (except unsubsidized Stafford) and FISL
B) Federal PLUS
C) Federal SLS
D) Federal Consolidation
E) Federal Unsubsidized Stafford

1   Loans in School and in Grace       Provide in the principal amount of all Stafford, FISL and Unsubsidized Stafford loans in an "in school or grace period" status. Do not include loans for which the borrower has a deferment due to returning to school after expiration of the grace period. These loans are to be included in line 2. Also, note that this status does not apply to Federal PLUS, Federal SLS or Federal Consolidation loans.

2   Loans in Authorized Deferment      Provide the principal amount of all loans in a period of authorized deferment.

3   Loans in Repayment or Forbearance  Provide the appropriate category the principal amount of all loans in a repayment for forbearance status. Include loans on which the grace period has ended and no deferment has been authorized, whether or not the borrower has made repayment arrangements or has made a payment. Do not include loans on which a claim has been filed with a guarantor in lines 3a through 3g. These loans are reported in line 3h.

4   Ending Principal Balance           Provide the principal balance of outstanding loans at the end of business on the last day of the quarter. Allowing for rounding, this must equal the sum of lines 1,2, and 3a through 3h.

$$(4) = (1) + (2) + (3a) + (3b) + (3c) + (3d) + (3e) + (3f) + (3g) + (3h)$$

13

| Federal Family Education Loan Program **Claim Form** | Guarantor Identification |
|---|---|

## I. CLAIM INFORMATION

| 1. Claim Type | 2. DCO | 3. Claim Review Type |
|---|---|---|

## II. BORROWER INFORMATION

4. Social Security #

5. Name (Last, First, MI)                          6. AKA

7. Address                                          8. Valid?

9. Home # (    )              10. Valid?       11. Other # (    )                    12. Valid?

13. Work # (    )             14. Valid?       15. Employer

16. E-mail Address

## III. LOAN INFORMATION

| 17. Loan Type | 18. Loan ID | 19. 1st Disb Dt | 20a. $ Curr Prin Bal | 20b. $ Unpd Fee/Int | 21. Dt Loan Sold | 22. Dt Servicer Resp | 23. Int Rate/Type/ Conv Dt | 24. $ Uninsured Interest |
|---|---|---|---|---|---|---|---|---|

## IV. ENDORSER/COMAKER/PLUS STUDENT (E/C/S) INFORMATION

| 25. Loan ID | 26. E/C/S Code, ID # | 27. E/C/S Name | 28. Social Security # | 29. Address | 30 Valid? | 31. Home # | 32. Valid? |
|---|---|---|---|---|---|---|---|

## V. CONVERSION TO REPAYMENT INFORMATION

| 33. OSD | 34. Notification Dt | 35. Repayment Change? | 36. 1st Pmt Due Dt |
|---|---|---|---|

## VI. REPAYMENT INFORMATION

| 37a. $ Total Borrower Pmts | 38. # Mnths Pmts | 39. # Mnths Def/Forb | 40. # Mnths Violation | 41. # Events | 42. # Reconv Mnths | 43. Pmt Due Dt |
|---|---|---|---|---|---|---|

37b. $ DI Refund

## VII. REQUESTED CLAIM AMOUNT

| 44. Total Amount Disb/Repurchased | $ _____ | 50. Int-Paid-Through Dt _____ |
|---|---|---|
| 45. Capitalized Int | + $ _____ | 51. Int Claimed as of _____ $ _____ |
| 46. Prin Repaid | - $ _____ | 52. Unpaid Cure Int not Capitalized $ _____ |
| 47. Prin Used for Int Claimed | = $ _____ | 53. Other Charges Claimed $ _____ |
| 48. Cure Int Capitalized | - $ _____ | |
| 49. Prin Claimed | = $ _____ | |

## VIII. LENDER/SERVICER INFORMATION AND CERTIFICATION

| 54. Lender ID | 55. Servicer ID |
|---|---|
| 56. Lender/Servicer Name | 57. Lender/Servicer Address |

58. Prepared By                                                        Preparer's # (    )

BY SUBMITTING THIS CLAIM TO THE GUARANTOR FOR REIMBURSEMENT, TH... ...TS KNOWLEDGE, THAT THE INFORMATION IN THIS CLAIM IS TRUE AND ACCURATE AND THAT THE LOAN(S) INCLUDED IN THE CLAIM WAS (WERE) MADE, DISBURSED (INCLUDING REMI... ...COMPLIANCE WITH ALL FEDERAL REGULATIONS AND APPROPRIATE GUARANTOR RULES. SHOULD THE GUARANTOR DETERMINE THAT THE LOAN(S) WAS (WERE) NOT SERVICE... ...AND APPROPRIATE GUARANTOR RULES, AND SUCH NON-COMPLIANCE RESULTS IN THE GUARANTOR'S INABILITY TO COLLECT FROM THE BORROWER OR IN THE GUARANTOR'S INI... ...LOAN(S), THE LENDER/HOLDER AGREES TO REPURCHASE SUCH LOAN(S) OR REFUND THE AMOUNT OF THE REINSURANCE LOSS IF REQUIRED BY THE GUARANTOR, FOR VALUE RE... ...ALL RIGHTS, TITLE, AND INTEREST IN THE LOAN(S) LISTED IN SECTION III OF THIS FORM TO THE GUARANTOR, OR ITS SUCCESSOR.

07/06

**IX. Collection History (the 270-day period prior to default date)**

| 60. Borrower's Social Security # | | | |
|---|---|---|---|
| 61. Borrower/Comaker(s) | | Endorser(s) | |
| Date/Code | Date/Code | Date/Code | Date/Code |
| | | | |

07/06

## Instructions for Completing Claim Form

This form is to be used to submit a request for claim reimbursement to the guarantor. All loans included on the Claim Form must have the same loan type, due date, interest-paid-through date, claim review status, and lender ID. (Note: Some guarantors may require separate claims for subsidized and unsubsidized Stafford loans, and/or for loans with different interest rates.) When completing this form, print or type all information and complete all fields. Use the chart in the *Common Manual* titled "Information to be Provided for Claim Form" to identify which fields are required and provide the requested information; for fields where the information is not available (or not applicable), complete alpha fields with "NA" and fill numeric/date fields with zeroes. All date fields must be completed with numerics in MM/DD/CCYY format. Address/phone "Valid" fields must be completed with a "Y" for yes or an "N" for no; indicate "Y" unless the information is known to be invalid. No claim may be submitted for an amount less than fifty dollars ($50.00). If the number of claimed loans requires more space than is provided, attach a separate Claim Form with the following information completed: Section II (social security number and name) and Section III (all applicable loan information).

*Note. Order of claim documentation will not be a reason for returning a claim to the lender. However, confusing or conflicting documentation may require claim return for lender clarification. All supporting documentation not required for claim submission must be retained by the lender in accordance with federal requirements.*

**I. CLAIM INFORMATION:**

1. **Claim Type.** Provide the appropriate claim type code from the following key.
   - BC   Bankruptcy (Chapter 12 or 13)
   - BH   Bankruptcy (with hardship petition or adversary complaint)
   - CS   Closed School
   - DB   Default (reached prior to borrower's bankruptcy filing)
   - DE   Death
   - DF   Default (failure to make monthly payments)
   - DI   Disability (total and permanent)
   - DQ   Default (failure to make quarterly or less frequent than monthly payments)
   - DU   Abbreviated Cure
   - FC   False Certification
   - IN   Ineligible (borrower is determined not eligible for the loan)
2. **DCO: Date Condition Occurred** is defined by the Claim Type indicated in Item I at the top of the form. Provide the corresponding month, day, and year as follows:
   If Claim Type is "BC" (Bankruptcy – Chapter 12 or 13), provide the date you received the Notice of First Meeting of Creditors or other acceptable evidence of the bankruptcy action, or the date the guarantor advised you to file a claim.
   If Claim Type is "BH" (Bankruptcy – with hardship petition or adversary complaint), provide the date you received the petition for undue hardship (or adversary complaint), or the date the guarantor advised you to file a claim.
   If Claim Type is "CS" (Closed School), provide the date you received the statement from the borrower certifying eligibility for a Closed School discharge or the date the guarantor advised you to file a claim.
   If Claim Type is "DB" (Default – reached prior to borrower's bankruptcy filing), provide the due date of the borrower's first unmet installment.
   If Claim Type is "DE" (Death), provide the date you received official notification of the death of the borrower or, if applicable, the student.
   If Claim Type is "DF" (Default – failure to make monthly installments), provide the due date of the borrower's first unmet installment.
   If Claim Type is "DI" (Disability – total and permanent), provide the date you received official notification that the borrower's physician certified the borrower to be totally and permanently disabled.
   If Claim Type is "DQ" (Default – failure to make quarterly or less frequent than monthly installments), provide the due date of the borrower's first unmet installment.
   If Claim Type is "DU" (Abbreviated Cure – ICA/location cure), provide the due date of the borrower's first unmet installment that resulted in the original default.
   If Claim Type is "FC" (False Certification), provide the date you received the statement from the borrower certifying eligibility for a False Certification discharge or the date the guarantor advised you to file a claim.
   If Claim Type is "IN" (Ineligible – borrower is determined not eligible for the loan), provide the date you determined or were notified of the borrower's ineligibility.
3. **Claim Review Type:** Provide one of the following numeric codes to indicate the Claim Review Type for which you currently qualify:
   - "1" Exceptional Performer Status – Expedited claim review
   - "2" Standard Review Status – Regular claim review
   - "3" Program Review Status – Monitored claim review

**II. BORROWER INFORMATION:**

4. **Social Security #:** Provide the borrower's social security number (do not submit a Claim Form without a social security number).
5. **Name (Last, First, MI):** Provide the borrower's last name, first name, and middle initial.
6. **AKA:** Provide previous or alternative name(s) used by borrower (e.g., maiden name).
7-8. **Address and Valid?:** Provide the borrower's last known complete address (apartment number, box number, street address, city, state, and zip code plus four); indicate the validity of the address by entering a "Y" or an "N" in the appropriate field. Use "Y" unless the information is known to be invalid.
9-14. **Home #, Other #, Work #, and Valid?:** Provide the home phone number, work phone number, and/or other phone number (including area code) for the borrower, if any or all are available. Indicate the validity of each number by entering a "Y" or an "N" in the appropriate field. If no number is available, enter "NA" in the number field. If it has been verified that the borrower does not have a phone, enter "Y" in the validity field. If it has not been verified that there is no phone for the borrower, enter "N" in the validity field.
15. **Employer:** Provide the name, phone number and address of the borrower's place of employment, if known.
16. **E-mail Address:** Provide borrower's current e-mail address (optional).

**III. LOAN INFORMATION:** For each loan included in this claim, provide the requested information.

17. **Loan Type:** For each loan listed, provide the loan type using one of the following codes: SF = Subsidized Stafford (including non-subsidized disbursed prior to 10/92); SU = Unsubsidized Stafford; PL = PLUS; GB = Graduate PLUS; SL = SLS; CL = Consolidation. A separate Claim Form must be submitted for each loan type. *Note: Subsidized and unsubsidized Stafford loans that have been combined into one repayment schedule may be combined into one claim, subject to guarantor requirement.*
18. **Loan ID:** For each loan listed, provide the loan identifier code, file number, guarantee date, or guarantee amount, as required by the guarantor of the loan(s).
19. **1st Disb Dt:** For each loan listed, provide the date of the first disbursement.
20a. **$ Curr Prin Bal:** For each loan, provide the current principal balance (including all insured and uninsured capitalized interest) due on the date claimed.
20b. **$ Unpd Fee/Int:** For each eligible loan, provide separately (with "/" between) the amount of unpaid origination fee and unpaid capitalized interest included in the principal balance on the date claimed. For CS, DE, or FC claims, provide zeros.
21. **Dt Loan Sold:** For each loan that has been purchased from another lender, provide the date the loan was purchased. If the loan was not purchased from another lender, enter zeroes.
22. **Dt Servicer Resp:** For each loan, provide the date on which the current servicer assumed responsibility for servicing the loan, as applicable. If the loan is not being serviced, enter zeroes.
23. **Int Rate/Type/Conv Dt:** For each loan, provide the current interest rate and indicate the type of interest rate by entering the appropriate code: F = Fixed rate; V = Variable rate; 8 = Adjustable rate (8-10%). Indicate, if applicable, the date the loan was converted as required by HEA 1986 rebate requirements or HEA 1992 rebate requirements. Provide zeroes if the loan was not converted or was not subject to rebate requirements.
24. **$ Uninsured Int:** For each loan claimed, provide the amount of cure interest capitalized and the unpaid cure interest not capitalized that accrued during period(s) the account was out of guarantee (in cure status).

**IV. ENDORSER/COMAKER/PLUS STUDENT (E/C/S) INFORMATION:** Complete this section if any claimed loan either has an endorser or comaker or is a PLUS loan.

25. **Loan ID:** Repeat the applicable Loan ID from field 18.
26. **E/C/S Code, ID #:** Provide "E" if the individual listed is an endorser; "C" if the individual listed is a comaker; "S" if the individual listed is a PLUS student. Assign each endorser and comaker a numeric identifier beginning with "1", then "2", etc. An individual who is an endorser, a comaker, or both will have a single numeric identifier regardless of the number of loans that individual has endorsed/comade.
27. **E/C/S Name:** For each loan listed, provide the last name, first name, and middle initial of any endorser, comaker, or PLUS student. If an endorser or comaker exists on a PLUS loan, list both the endorser or comaker and the PLUS student information.
28. **Social Security #:** Provide the social security number for each endorser, comaker, or PLUS student, as applicable.
29-30. **Address and Valid?:** Provide the last known complete address (apartment number, box number, street address, city, state, and zip code plus four) for each endorser, comaker, or PLUS student. Indicate the validity of the address by entering a "Y" or an "N" in the appropriate field. Use "Y" unless the information is known to be invalid.
31-32. **Home # and Valid?:** Provide the home phone number (including area code) for each endorser, comaker, or PLUS student; indicate the validity of the number by entering a "Y" or an "N" in field 32. If no number is available, enter "NA" in the number field. If it has been verified that there is no phone, enter "Y" in the validity field. If it has not been verified that there is no phone, enter "N" in the validity field.

**V. CONVERSION TO REPAYMENT INFORMATION:** Complete this section only for accounts that entered repayment. This section is not applicable for CS, FC, or IN claims. For items in this section, provide dates of the "original" conversion to repayment based upon the first verified correct OSD.

33. **OSD (Out-of-School Date):** *Stafford Loans:* Provide the most recently verified date the borrower ended enrollment on at least a half-time basis that caused the loan in Section III that first reached maturity, to enter repayment. *PLUS/Graduate PLUS/SLS Loans Immediately Deferred:* Provide the date the borrower/student ceased eligibility for the initial in-school deferment. *Consolidation Loans and PLUS/Graduate PLUS/SLS Loans Not Immediately Deferred:* Provide the date of the last disbursement. *Consolidation Loans with Add-On Loans:* Determine if the due date of the first monthly installment was changed due to an add-on. If so, provide the disbursement date of the add-on loan. If not, provide the last disbursement date of the beginning loan balance.

07/06

34. **Notification Dt:** Provide the date you were notified of the date in field 33. If the account was converted to repayment based upon the anticipated graduation date, provide zeroes in this field. For PLUS/Graduate PLUS/SLS loans entering immediate repayment, provide the date of the last disbursement. For an SLS loan converted to repayment based on an alignment forbearance with a corresponding Stafford loan, provide the last day of the alignment forbearance. For Consolidation loans, provide the date of the last disbursement or the date of the add-on disbursement if that is what was used in field 33. For repurchased loans (including rehabilitated loans), provide the date used to convert the loan back to a repayment status.

35. **Repayment Change?:** If the OSD provided in field 33 was received after the loan entered repayment, and the resulting 1st payment due date is prior to the notification date, provide a "Y" (yes). If there was no change to the OSD after the loan entered repayment or the receipt of the OSD provided in field 33 resulted in establishing a new 1st payment due date that is later than the notification date, provide an "N" (no). For repurchased loans (including rehabilitated loans), provide an "N" (no).

36. **1st Pmt Due Dt:** Provide the due date of the first monthly installment established following the OSD provided in field 33. If this claim includes loans that entered repayment at different times, provide the due date of the first monthly installment for the first loan entering repayment. For repurchased loans (including rehabilitated loans), provide the due date established following the notification date provided in field 34.

**VI. REPAYMENT INFORMATION:** Complete this section only for accounts that entered repayment. Data in fields 38 through 43 must only reflect events occurring on or after the date provided in field 36. (Fields 38 through 43 are not applicable for CS, FC, or IN claims.)

37a. **$ Total Borrower Pmts:** Provide the total amount of payments made by or on behalf of the borrower (for CS or FC claims, provide principal, interest, and any collection costs paid by the borrower that may be subject to refund, not including payments made by third parties).

37b. **$ DI Refund:** For DI claims only, provide the total amount of payments made by or on behalf of the borrower that were received by the lender/servicer after the date the borrower became unable to work and earn money.

38. **# Mnths Pmts:** Provide the number of months the due date was advanced by payments made by or on behalf of the borrower. Use the loan with the highest number of months advanced by payments. Do not include payments that did not advance the due date of the borrower's account.

39. **# Mnths Def/Forb:** Provide separately (with "/" between) the number of regular monthly installments deferred and forborne. Provide the higher or highest number when multiple loans are included in the claim and their use of deferment and/or forbearance differs. When there are overlapping periods of deferment/forbearance on multiple loans, count those months only once. Do not include forbearance periods covering uninsured months.

40. **# Mnths Violation:** Determine the number of days the account was out of guarantee (i.e., in cure status and uninsured). Divide the total number of days by 30 and round up. Provide the total number of violation months. Include forbearance periods covering uninsured months.

41. **# Events:** Provide the total number of non-continuous individual periods of deferment and forbearance granted on this account. (A deferment or forbearance immediately followed by another deferment or forbearance must be considered one event.) Include all uninsured months, whether a forbearance period was granted or not.

42. **# Reconv Mnths:** For Stafford and SLS loans, multiply the number of events listed in field 41 times 3.0 months (90 days); use 2.0 months (60 days) for PLUS, Graduate PLUS, and Consolidation loans.

43. **Pmt Due Dt:** Provide the due date of the first unmet installment of the borrower's delinquency. In the case of DB, DF, DQ, or DU claims, this date would be the same as the Date Condition Occurred (DCO). With BC, BH, DE, or DI claims, enter "NA" in this field unless the account was delinquent prior to the DCO, in which case this date must be prior to the DCO.

**VII. REQUESTED CLAIM AMOUNT:**

44. **Total Amount Disb/Repurchased:** Provide the total original principal value of loans disbursed to the borrower. (For CS or FC claims that include Stafford, PLUS, Graduate PLUS, or SLS loans that have been paid in full as a result of a Consolidation loan, provide the amount paid by the consolidation lender to the prior holder on the applicable underlying loan(s).) For repurchased loans (including rehabilitated loans), provide the amount restored to servicing excluding uninsured interest, if identified by the guarantor.

45. **Capitalized Int:** Provide (and add) the total amount of interest capitalized (added to the total principal amount) and disclosed to the borrower. (Not applicable for CS or FC claims that include Stafford, PLUS, Graduate PLUS, or SLS loans that have been paid in full as a result of a Consolidation loan.) For repurchased loans (including rehabilitated loans), all interest capitalized after resumption of servicing of the rehabilitation or repurchase should be included in this field, including uninsured interest excluded per instructions for field 44.

46. **Prin Repaid:** Provide (and subtract) the total principal (only) repaid on the borrower's account before and after entering repayment, including any cancellations after disbursement, post-withdrawal return of funds, third party payments, and prepayments to principal. (Not applicable for CS or FC claims that include Stafford, PLUS, Graduate PLUS, or SLS loans that have been paid in full as a result of a Consolidation loan.) For repurchased loans (including rehabilitated loans), include only those payments applied to principal following the repurchase or rehabilitation.

47. **Prin Used For Int Claimed:** Provide the total principal value of the borrower's debt, including insured and uninsured capitalized interest. Interest claimed should be calculated based upon this principal amount.

48. **Cure Int Capitalized:** Provide (and subtract) any capitalized interest amount that is not eligible for claim payment because it accrued during a violation period when the account was out of guarantee. Do not include this amount in field 49 or field 51. (Not applicable for CS or FC claims that include Stafford, PLUS, Graduate PLUS, or SLS loans that have been paid in full as a result of a Consolidation loan.)

49. **Prin Claimed:** Based upon the calculations above, provide the total principal value of the claim.

50. **Int-Paid-Through Dt:** Provide the date through which interest was last paid. (For CS or FC claims that include Stafford, PLUS, Graduate PLUS, or SLS loans that have been paid in full as a result of a Consolidation loan, this date will be the date of the consolidation, unless a subsidized deferment applied to the Consolidation loan requires adjustment to a later date.)

51. **Int Claimed As Of:** Provide the date through which interest claimed was accrued and the amount of outstanding accrued insured interest claimed. Do not include any uninsured interest (unpaid cure interest not capitalized) in this field. (For CS or FC claims that include Stafford, PLUS, Graduate PLUS, or SLS loans that have been paid in full as a result of a Consolidation loan, provide the amount of interest accrued from the date of consolidation through the date interest was claimed on the amount of the applicable underlying loan(s).)

52. **Unpaid Cure Int Not Capitalized:** Provide the amount of unpaid interest that accrued during period(s) the account was out of guarantee that was not capitalized. (Not applicable for CS or FC claims that include Stafford, PLUS, Graduate PLUS, or SLS loans that have been paid in full as a result of a Consolidation loan.)

53. **Other Charges Claimed:** Provide the amount of any other insured costs incurred by the lender on this account (e.g., guarantor collection cost repurchased or collection costs incurred on CS or FC claims). Do not include late charges.

**VIII. LENDER/SERVICER INFORMATION AND CERTIFICATION:** With this claim submission, the lender certifies full compliance as indicated in this section of the Claim Form.

54. **Lender ID:** Provide the six-digit Department of Education lender code and, as applicable, the four-digit non-Department of Education suffix of the lender or the current holder.

55. **Servicer ID:** If the account is being serviced, provide the six-digit Department of Education servicer code.

56. **Lender/Servicer Name:** If the account is being serviced, provide the servicer's name; if there is no servicer, provide the lender's name.

57. **Lender/Servicer Address:** If the account is being serviced, provide the servicer's address; if there is no servicer, provide the lender's address.

58. **Prepared By:** Provide an identifier of the person or unit responsible for answering questions about information provided on this form.

59. **Preparer's #:** Provide the phone number (including area code) where the preparer may be reached.

**IX. COLLECTION HISTORY (THE 270-DAY PERIOD PRIOR TO DEFAULT DATE):**

60. **Borrower's Social Security #:** Provide the borrower's social security number.

61. **Collection History:** Provide the month, day, and year (MM/DD/CCYY) of each collection activity. Provide the appropriate Collection Activity Code and/or Skiptracing Activity Code from below. Endorser and/or comaker collection activity, if applicable, must include the numeric identifier assigned to the endorser/comaker in Section IV (e.g., LC2 = letter contact to the endorser or comaker designated "2"). List the collection activity for the comaker who also is an endorser in the Borrower/Comaker section. *Note: Even if the address and/or phone number of the borrower or endorser were invalid before the account became delinquent (prior to DCO), provide the date you were notified of the invalid address/phone and any skiptracing performed prior to the delinquency, in order to demonstrate that skip requirements were satisfied. Also, do not complete this section for CS or FC claims. Do not complete this section for DE, DI, BC or BH claims, unless the borrower's loans were delinquent prior to the DCO. However, for all DE claims, the "DD" collection activity code and corresponding date must be provided. For IN claims, final demand information must be provided; for DU claims, Intensive Collection Activities (ICA) must be provided. NOTE: Provide all activities after day 270 pertinent to the collection of the account.*

| | | | |
|---|---|---|---|
| BL | Date borrower located (for ICA/Location cures only) | PC | Lender requested default aversion assistance |
| CR | The date on which the payment was reversed due to nonsufficient funds for one monthly installment (when reporting nonsufficient funds that includes multiple installments, provide a CR code for each installment) | PR | The date on which one monthly installment was satisfied by payment or prepayment (when reporting a payment that includes multiple installments, provide a PR code for each installment) |
| DB | Deferment period/post deferment grace period, begin date | TA | Attempted phone contact with borrower |
| DD | Date of death | TC | Phone contact or contact in person with borrower |
| DE | Deferment period/post deferment grace period, end date | TR | Account converted from one servicing system to another |
| DS | Date disclosure sent (for ICA/Location cures only) | VA | Lender became aware of valid address for borrower |
| FB | Forbearance period begin date | VT | Lender became aware of valid phone number for borrower |
| FD | Final demand letter | | |
| FE | Forbearance period end date | | **Skiptracing Activity Codes (to obtain address/phone number)** |
| IA | Lender became aware of invalid address for borrower | SA | Contact attempted with reference or endorser by phone or a reference skiptracing activity |
| IR | Lender became aware of borrower's incarceration, or lender became aware of borrower's residence outside a State, Mexico, or Canada, or borrower has no phone service | SD | Contact with Directory Assistance for borrower, endorser, or comaker |
| IT | Lender became aware of invalid phone number for borrower | SO | Other skiptracing activity including contact or contact attempt to a relative, individual, borrower, or other entity by phone or letter |
| LC | Letter contact with borrower | SR | Contact with reference or endorser by phone or letter |
| LN | Lender approved a deferment or forbearance with ending date prior to lender's receipt of documentation or adjusted OSD that changes the delinquency | SS | Contact with borrower's school by phone or letter |

07/06

# NELNET INC (NNI)

121 SOUTH 13TH ST
STE 201
LINCOLN, NE 68508
402-458-2370
http://www.nelnet.net/

# EX-99.1

**CREDIT AGREEMENT**
**8-K Filed on 08/25/2005 - Period: 08/19/2005**
File Number 001-31924



LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

Exhibit 99.1

=================================================================================

CREDIT AGREEMENT

dated as of

August 19, 2005

among

Nelnet, Inc.

The Lenders Party Hereto,

JPMorgan Chase Bank, N.A.,
as Administrative Agent

and

Citibank, N.A.,
as Syndication Agent

-----------------------------

J.P. Morgan Securities Inc., and
Citigroup Global Markets, Inc.

Joint Lead Arrangers
and Joint Bookrunners

=================================================================================

TABLE OF CONTENTS
--------------------------

PAGE

## ARTICLE 1
## DEFINITIONS

Section 1.01.   DEFINED TERMS.................................................2
Section 1.02.   CLASSIFICATION OF LOANS AND BORROWINGS...........................2
Section 1.03.   TERMS GENERALLY...............................................2
Section 1.04.   ACCOUNTING TERMS; GAAP........................................2

## ARTICLE 2
## THE CREDITS

Section 2.01.   COMMITMENTS..................................................2
Section 2.02.   LOANS AND BORROWINGS.........................................2
Section 2.03.   REQUESTS FOR BORROWINGS......................................2
Section 2.04.   FUNDING OF BORROWINGS........................................2
Section 2.05.   INTEREST ELECTIONS...........................................2
Section 2.06.   TERMINATION AND REDUCTION OF COMMITMENTS.......................2
Section 2.07.   REPAYMENT OF LOANS; EVIDENCE OF DEBT...........................2
Section 2.08.   PREPAYMENT OF LOANS..........................................2
Section 2.09.   FEES........................................................2
Section 2.10.   INTEREST.....................................................2
Section 2.11.   ALTERNATE RATE OF INTEREST...................................2
Section 2.12.   INCREASED COSTS..............................................2
Section 2.13.   BREAK FUNDING PAYMENTS.......................................2
Section 2.14.   TAXES.......................................................2
Section 2.15.   PAYMENTS GENERALLY; PRO RATA TREATMENT; SHARING OF SET-OFFS.....2
Section 2.16.   MITIGATION OBLIGATIONS; REPLACEMENT OF LENDERS..................2
Section 2.17.   INCREASED COMMITMENTS; ADDITIONAL LENDERS......................2

i

ARTICLE 3
REPRESENTATIONS AND WARRANTIES

Section 3.01.   ORGANIZATION; POWERS..............................................2
Section 3.02.   AUTHORIZATION; ENFORCEABILITY.....................................2
Section 3.03.   GOVERNMENTAL APPROVALS; NO CONFLICTS..............................2
Section 3.04.   FINANCIAL CONDITION; NO MATERIAL ADVERSE CHANGE...................2
Section 3.05.   PROPERTIES........................................................2
Section 3.06.   LITIGATION AND ENVIRONMENTAL MATTERS..............................2
Section 3.07.   COMPLIANCE WITH LAWS AND AGREEMENTS...............................2
Section 3.08.   INVESTMENT AND HOLDING COMPANY STATUS.............................2
Section 3.09.   TAXES.............................................................2
Section 3.10.   ERISA.............................................................2
Section 3.11.   DISCLOSURE........................................................2

ARTICLE 4
CONDITIONS

Section 4.01.   EFFECTIVE DATE....................................................2
Section 4.02.   EACH BORROWING....................................................2

ARTICLE 5
AFFIRMATIVE COVENANTS

Section 5.01.   FINANCIAL STATEMENTS; RATINGS CHANGE AND OTHER INFORMATION......2
Section 5.02.   NOTICES OF MATERIAL EVENTS........................................2
Section 5.03.   EXISTENCE; CONDUCT OF BUSINESS....................................2
Section 5.04.   PAYMENT OF OBLIGATIONS............................................2
Section 5.05.   MAINTENANCE OF PROPERTIES; INSURANCE..............................2
Section 5.06.   BOOKS AND RECORDS; INSPECTION RIGHTS..............................2
Section 5.07.   COMPLIANCE WITH LAWS..............................................2
Section 5.08.   USE OF PROCEEDS...................................................2

ARTICLE 6
NEGATIVE COVENANTS

Section 6.01.   LIENS.............................................................2
Section 6.02.   FUNDAMENTAL CHANGES...............................................2
Section 6.03.   MINIMUM CONSOLIDATED NET WORTH....................................2
Section 6.04.   ADJUSTED EBITDA TO CORPORATE DEBT INTEREST........................2
Section 6.05.   SUBSIDIARY INDEBTEDNESS...........................................2
Section 6.06.   NON-FFELP LOANS TO ALL LOANS......................................2

ARTICLE 7
EVENTS OF DEFAULT

ARTICLE 8
THE ADMINISTRATIVE AGENT

ii

ARTICLE 9
MISCELLANEOUS

Section 9.01.    NOTICES........................................................2
Section 9.02.    WAIVERS; AMENDMENTS............................................2
Section 9.03.    EXPENSES; INDEMNITY; DAMAGE WAIVER.............................2
Section 9.04.    SUCCESSORS AND ASSIGNS........................................2
Section 9.05.    SURVIVAL......................................................2
Section 9.06.    COUNTERPARTS; INTEGRATION; EFFECTIVENESS......................2
Section 9.07.    SEVERABILITY..................................................2
Section 9.08.    RIGHT OF SETOFF...............................................2
Section 9.09.    GOVERNING LAW; JURISDICTION; CONSENT TO SERVICE OF PROCESS......2
Section 9.10.    WAIVER OF JURY TRIAL..........................................2
Section 9.11.    HEADINGS......................................................2
Section 9.12.    CONFIDENTIALITY...............................................2
Section 9.13.    USA PATRIOT ACT...............................................2


SCHEDULES:

Commitment Schedule
Pricing Schedule
Schedule 3.06 - Disclosed Matters
Schedule 6.01 - Existing Liens
Schedule 6.04 - Eligible Securities


EXHIBITS:

Exhibit A - Form of Assignment and Assumption
Exhibit B - Form of Opinion of Borrower's Counsel
Exhibit C - Form of Opinion of Davis Polk & Wardwell
Exhibit D - Form of Compliance Certificate

iii

CREDIT AGREEMENT dated as of August 19, 2005, among NELNET, INC., the LENDERS party hereto, JPMORGAN CHASE BANK, N.A., as Administrative Agent, and CITIBANK, N.A., as Syndication Agent

The parties hereto agree as follows:

## ARTICLE 1
## DEFINITIONS

SECTION 1.01. DEFINED TERMS. As used in this Agreement, the following terms have the meanings specified below:

"ABR", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

"ADJUSTED EBITDA" means, for any period, an amount equal to Pre-Tax Income for such period, PLUS, (a) without duplication and to the extent deducted in determining Pre-Tax Income for such period, the sum of (i) the amount of Corporate Debt Interest for such period, (ii) all amounts attributable to depreciation and amortization for such period, (iii) the amount of 9.5% excess statutory yield related to loans previously financed with tax-exempt obligations issued prior to October 1, 1993 (if negative) and (iv) the derivatives market value adjustment for such period (if negative), MINUS, (b) without duplication and to the extent added in determining Pre-Tax Income for such period, the sum of (i) the amount of variable-rate floor income during such period, (ii) the amount of 9.5% excess statutory yield related to loans previously financed with tax-exempt obligations issued prior to October 1, 1993 (if positive) and (iii) the derivatives market value adjustment for such period (if positive).

"ADJUSTED LIBO RATE" means, with respect to any Eurodollar Borrowing for any Interest Period, an interest rate per annum (rounded upwards, if necessary, to the next 1/16 of 1%) equal to (a) the LIBO Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate.

"ADMINISTRATIVE AGENT" means JPMorgan Chase Bank, N.A., in its capacity as administrative agent for the Lenders hereunder.

"ADMINISTRATIVE QUESTIONNAIRE" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"AFFILIATE" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

.

"AGREEMENT" means this Credit Agreement, including the Schedules and Exhibits hereto, as the same may be amended and in effect from time to time.

"ALTERNATE BASE RATE" means, for any day, a rate per annum equal to the greater of (a) the Prime Rate in effect on such day and (b) the Federal Funds Effective Rate in effect on such day plus 1/2 of 1%. Any change in the Alternate Base Rate due to a change in the Prime Rate or the Federal Funds Effective Rate shall be effective from and including the effective date of such change in the Prime Rate or the Federal Funds Effective Rate, respectively.

"APPLICABLE PERCENTAGE" means, with respect to any Lender, the percentage of the total Commitments represented by such Lender's Commitment. If the Commitments have terminated or expired, the Applicable Percentages shall be determined based upon the Commitments most recently in effect, giving effect to any assignments.

"APPROVED FUND" has the meaning assigned to such term in Section 9.04.

"ASSIGNMENT AND ASSUMPTION" means an assignment and assumption entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 9.04), and accepted by the Administrative Agent, in the form of Exhibit A or any other form approved by the Administrative Agent.

"AVAILABILITY PERIOD" means the period from and including the Effective Date to but excluding the earlier of the Maturity Date and the date of termination of the Commitments.

"BOARD" means the Board of Governors of the Federal Reserve System of the United States of America.

"BORROWER" means Nelnet, Inc., a Nebraska corporation.

"BORROWING" means Loans of the same Type, made, converted or continued on the same date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect.

"BORROWING REQUEST" means a request by the Borrower for a Borrowing in accordance with Section 2.03.

"BUSINESS DAY" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed; PROVIDED that, when used in connection with a Eurodollar Loan, the term "BUSINESS DAY" shall also exclude any day on which banks are not open for dealings in dollar deposits in the London interbank market.

"CAPITAL LEASE OBLIGATIONS" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

2

"CHANGE IN CONTROL" means (a) the acquisition of ownership, directly or indirectly, beneficially or of record, by any Person or group (within the meaning of the Securities Exchange Act of 1934 and the rules of the Securities and Exchange Commission thereunder as in effect on the date hereof) other than the Existing Control Persons, of Equity Interests representing more than 20% of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of the Borrower, but only if at the time the Existing Control Persons do not beneficially own Equity Interests representing a majority in voting power of all issued and outstanding Equity Interests of the Borrower; (b) occupation of a majority of the seats (other than vacant seats) on the board of directors of the Borrower by Persons who were neither (i) nominated by the board of directors of the Borrower nor (ii) appointed by directors so nominated; or (c) the acquisition of direct or indirect Control of the Borrower by any Person or group (other than the Existing Control Persons).

"CHANGE IN LAW" means (a) the adoption of any law, rule or regulation after the date of this Agreement, (b) any change in any law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) compliance by any Lender (or, for purposes of Section 2.12(b), by any lending office of such Lender or by such Lender's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement.

"CODE" means the Internal Revenue Code of 1986, as amended from time to time.

"COMMITMENT" means, with respect to each Lender, the commitment of such Lender to make Loans hereunder, expressed as an amount representing the maximum aggregate amount of such Lender's Credit Exposure hereunder, as such commitment may be (a) reduced from time to time pursuant to Section 2.06 and (b) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to Section 9.04. The initial amount of each Lender's Commitment is set forth on the Commitment Schedule, or in the Assignment and Assumption pursuant to which such Lender shall have assumed its Commitment, as applicable. The initial aggregate amount of the Lenders' Commitments is $500,000,000.

"COMMITMENT SCHEDULE" means the Commitment Schedule attached hereto.

3

"CONSOLIDATED NET INCOME" means, for any fiscal period, the net income of the Borrower and its Consolidated Subsidiaries, determined on a consolidated basis for such period, PLUS to the extent deducted in determining such net income, the derivatives market value adjustment for such period (if negative) and MINUS to the extent added in determining such net income, the derivatives market value adjustment for such period (if positive).

"CONSOLIDATED NET WORTH" means at any date the consolidated stockholders' equity of the Borrower and its Consolidated Subsidiaries, determined as of such date.

"CONSOLIDATED SUBSIDIARY" means at any date any entity the accounts of which would be consolidated with those of the Borrower in its consolidated financial statements if such statements were prepared as of such date.

"CONTROL" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "CONTROLLING" and "CONTROLLED" have meanings correlative thereto.

"CORPORATE DEBT INTEREST" means, for any period, the interest expense of the Borrower on a parent-only basis for such period.

"CREDIT EXPOSURE" means, with respect to any Lender at any time, the sum of the outstanding principal amount of such Lender's Loans at such time.

"DEFAULT" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"DISCLOSED MATTERS" means the actions, suits and proceedings and the environmental matters disclosed in Schedule 3.06.

"DOLLARS" or "$" refers to lawful money of the United States of America.

"EFFECTIVE DATE" means the date on which the conditions specified in Section 4.01 are satisfied (or waived in accordance with Section 9.02).

"ELIGIBLE ASSETS" means (i) Eligible Securities and (ii) any other assets which would be properly presented on a consolidated balance sheet of the Borrower and its Consolidated Subsidiaries as "student loans receivable", "cash and cash equivalents", "accrued interest receivable" or "accounts receivable".

"ELIGIBLE SECURITIES" means the securities set forth on Schedule 6.04.

4

"ENVIRONMENTAL LAWS" means all laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, notices or binding agreements issued, promulgated or entered into by any Governmental Authority, relating in any way to the environment, preservation or reclamation of natural resources, the management, release or threatened release of any Hazardous Material or to health and safety matters.

"ENVIRONMENTAL LIABILITY" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of the Borrower or any Subsidiary directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"EQUITY INTERESTS" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such equity interest.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA AFFILIATE" means any trade or business (whether or not incorporated) that, together with the Borrower, is treated as a single employer under Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA EVENT" means (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder with respect to a Plan (other than an event for which the 30 day notice period is waived); (b) the existence with respect to any Plan of an "accumulated funding deficiency" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived; (c) the filing pursuant to Section 412(d) of the Code or Section 303(d) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (d) the incurrence by the Borrower or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan; (e) the receipt by the Borrower or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan; (f) the incurrence by the Borrower or any of its ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan; or (g) the receipt by the Borrower or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from the Borrower or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA.

5

"EURODOLLAR", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

"EURODOLLAR MARGIN" has the meaning set forth in the Pricing Schedule.

"EVENT OF DEFAULT" has the meaning assigned to such term in Article 7.

"EXCLUDED TAXES" means, with respect to the Administrative Agent, any Lender, or any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder, (a) taxes, duties, levies, imposts, deductions, charges or withholdings imposed on or measured by net income, profits (including taxes in the nature of branch profit taxes) or overall gross receipts and franchise or similar taxes imposed by a jurisdiction under the laws of which such Lender or Administrative Agent (as the case may be) is organized or resident or in which its principal executive office is located or in which applicable lending office is located or with which the Administrative Agent or Lender has any other connection (other than a connection that is deemed to arise solely by reason of BOTH (i) the transactions contemplated by this Agreement and (ii) the Borrower or a Subsidiary being organized, maintaining an office in, conducting business in, or having a connection with, such jurisdiction) and (b) in the case of a Foreign Lender (other than an assignee pursuant to a request by the Borrower under Section 2.12), any withholding tax that is imposed on amounts payable to such Foreign Lender at the time such Foreign Lender becomes a party to this Agreement (or designates a new lending office) or is attributable to such Foreign Lender's failure to comply with Section 2.14, except to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from the Borrower with respect to such withholding tax pursuant to Section 2.14.

"EXISTING CONTROL PERSONS" means Michael S. Dunlap, Stephen F. Butterfield, the members of their immediate families (parents, siblings, children and spouses) and any trust created for the benefit of any of the foregoing.

"FACILITY FEE RATE" has the meaning set forth in the Pricing Schedule.

"FEDERAL FUNDS EFFECTIVE RATE" means, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

6

"FINANCIAL OFFICER" means the chief financial officer, principal accounting officer, treasurer or controller of the Borrower.

"FOREIGN LENDER" means any Lender that is organized under the laws of a jurisdiction other than that in which the Borrower is located. For purposes of this definition, the United States of America, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"GAAP" means generally accepted accounting principles in the United States of America.

"GOVERNMENTAL AUTHORITY" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"GUARANTEE" of or by any Person (the "GUARANTOR") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "PRIMARY OBLIGOR") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation; provided, that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business.

"HAZARDOUS MATERIALS" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"INDEBTEDNESS" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person upon which interest charges are customarily paid, (d) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (e) all obligations of such Person in respect of the deferred purchase price of property or services (excluding current accounts payable incurred in the ordinary course of business), (f) all

7

Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (g) all Guarantees by such Person of Indebtedness of others, (h) all Capital Lease Obligations of such Person, (i) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty and (j) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"INDEMNIFIED TAXES" means Taxes other than Excluded Taxes.

"INFORMATION MEMORANDUM" means the Confidential Information Memorandum dated July 25, 2005 relating to the Borrower and the Transactions.

"INTERCOMPANY INDEBTEDNESS" means Indebtedness of any Subsidiary to the Borrower or any other Subsidiary.

"INTEREST ELECTION REQUEST" means a request by the Borrower to convert or continue a Borrowing in accordance with Section 2.05.

"INTEREST PAYMENT DATE" means (a) with respect to any ABR Loan, the last day of each March, June, September and December and (b) with respect to any Eurodollar Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part and, in the case of a Eurodollar Borrowing with an Interest Period of more than three months' duration, each day prior to the last day of such Interest Period that occurs at intervals of three months' duration after the first day of such Interest Period.

"INTEREST PERIOD" means with respect to any Eurodollar Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is one, two, three or six months thereafter, as the Borrower may elect. For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"LENDERS" means the Persons listed on the Commitment Schedule and any other Person that shall have become a party hereto pursuant to an Assignment and Assumption, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Assumption.

8

"LIBO RATE" means, with respect to any Eurodollar Borrowing for any Interest Period, the rate appearing on Page 3750 of the Dow Jones Market Service (or on any successor or substitute page of such Service, or any successor to or substitute for such Service, providing rate quotations comparable to those currently provided on such page of such Service, as determined by the Administrative Agent from time to time for purposes of providing quotations of interest rates applicable to dollar deposits in the London interbank market) at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period, as the rate for dollar deposits with a maturity comparable to such Interest Period. In the event that such rate is not available at such time for any reason, then the "LIBO RATE" with respect to such Eurodollar Borrowing for such Interest Period shall be the rate at which dollar deposits of $5,000,000 and for a maturity comparable to such Interest Period are offered by the principal London office of the Administrative Agent in immediately available funds in the London interbank market at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period.

"LIEN" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities (unless such option, call or similar right is granted in connection with a merger, acquisition, divestiture or similar transaction).

"LOANS" means the loans made by the Lenders to the Borrower pursuant to this Agreement.

"MATERIAL ADVERSE EFFECT" means a material adverse effect on (a) the business, assets, operations, prospects or condition, financial or otherwise, of the Borrower and the Subsidiaries taken as a whole, (b) the ability of the Borrower to perform any of its obligations under this Agreement or (c) the rights of or benefits available to the Lenders under this Agreement.

"MATERIAL INDEBTEDNESS" means Indebtedness (other than the Loans), or obligations in respect of one or more Swap Agreements, of any one or more of the Borrower and its Subsidiaries in an aggregate principal amount exceeding $15,000,000. For purposes of determining Material Indebtedness, the "PRINCIPAL AMOUNT" of the obligations of the Borrower or any Subsidiary in respect of any Swap Agreement at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that the Borrower or such Subsidiary would be required to pay if such Swap Agreement were terminated at such time.

"MATURITY DATE" means August 19, 2010.

9

"MOODY'S" means Moody's Investors Service, Inc.

"MULTIEMPLOYER PLAN" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"NON-FFELP LOANS" means student loans not originated under the Federal Family Education Loan Program of the U.S. Department of Education.

"OTHER TAXES" means any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement.

"PARTICIPANT" has the meaning set forth in Section 9.04.

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"PERMITTED ENCUMBRANCES" means:

(a) Liens imposed by law for taxes that are not yet due or are being contested in compliance with Section 5.04;

(b) carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by law, arising in the ordinary course of business and securing obligations that are not overdue by more than 30 days or are being contested in compliance with Section 5.04;

(c) pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations;

(d) deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business;

(e) judgment liens in respect of judgments that do not constitute an Event of Default under clause (k) of Article 7; and

(f) easements, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property or interfere with the ordinary conduct of business of the Borrower or any Subsidiary;

PROVIDED that the term "PERMITTED ENCUMBRANCES" shall not include any Lien securing Indebtedness.

10

"PERSON" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"PLAN" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which the Borrower or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "EMPLOYER" as defined in Section 3(5) of ERISA.

"PRE-TAX INCOME" means, for any period, the net income of the Borrower and its Consolidated Subsidiaries for such period, before income taxes, minority interests and extraordinary items (if any), determined on a consolidated basis for such period.

"PRICING SCHEDULE" means the Pricing Schedule attached hereto.

"PRIME RATE" means the rate of interest per annum publicly announced from time to time by JPMorgan Chase Bank, N.A. as its prime rate in effect at its principal office in New York City; each change in the Prime Rate shall be effective from and including the date such change is publicly announced as being effective.

"REGISTER" has the meaning set forth in Section 9.04.

"RELATED PARTIES" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"REQUIRED LENDERS" means, at any time, Lenders having Credit Exposures and unused Commitments representing more than 50% of the sum of the total Credit Exposures and unused Commitments at such time.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc.

"STATUTORY RESERVE RATE" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board to which the Administrative Agent is subject for eurocurrency funding (currently referred to as "EUROCURRENCY LIABILITIES" in Regulation D of the Board). Such reserve percentages shall include those imposed pursuant to such Regulation D. Eurodollar Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation. The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

11

"SUBSIDIARY" means, with respect to any Person (the "PARENT") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"SUBSIDIARY" means any subsidiary of the Borrower.

"SWAP AGREEMENT" means any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; PROVIDED that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Borrower or the Subsidiaries shall be a Swap Agreement.

"SYNDICATION AGENT" means Citibank, N.A. in its capacity as Syndication Agent in respect of this Agreement. Nothing herein shall impose on the Syndication Agent in such capacity any duty or liability whatsoever.

"TAXES" means any and all present or future taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any Governmental Authority.

"TRANSACTIONS" means the execution, delivery and performance by the Borrower of this Agreement, the borrowing of Loans and the use of the proceeds thereof.

"TYPE", when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Adjusted LIBO Rate or the Alternate Base Rate.

"UNENCUMBERED ASSETS" means, at any date, (a) the consolidated amount of Eligible Assets of the Borrower and its Consolidated Subsidiaries at such date which are not subject to any Lien (or are subject to release from any Lien thereon within 60 days of request of the Borrower, which release is not subject to any condition that has not been met) less (b) the aggregate principal amount of unsecured Indebtedness of Consolidated Subsidiaries (other than Intercompany Indebtedness) at such date.

12

"WITHDRAWAL LIABILITY" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

SECTION 1.02. CLASSIFICATION OF LOANS AND BORROWINGS. For purposes of this Agreement, Loans and Borrowings may be classified and referred to by Type (e.g., a "Eurodollar Loan" or a "ABR Borrowing").

SECTION 1.03. TERMS GENERALLY. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

Section 1.04. ACCOUNTING TERMS; GAAP. Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; PROVIDED that, if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the date hereof in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

13

ARTICLE 2
THE CREDITS

SECTION 2.01. COMMITMENTS. Subject to the terms and conditions set forth herein, each Lender agrees to make Loans to the Borrower from time to time during the Availability Period in an aggregate principal amount that will not result in such Lender's Credit Exposure exceeding such Lender's Commitment. Within the foregoing limits and subject to the terms and conditions set forth herein, the Borrower may borrow, prepay and reborrow Loans.

SECTION 2.02. LOANS AND BORROWINGS. (a) Each Loan shall be made as part of a Borrowing consisting of Loans made by the Lenders ratably in accordance with their respective Commitments. The failure of any Lender to make any Loan required to be made by it shall not relieve any other Lender of its obligations hereunder; PROVIDED that the Commitments of the Lenders are several and no Lender shall be responsible for any other Lender's failure to make Loans as required.

(b) Subject to Section 2.11, each Borrowing shall be comprised entirely of ABR Loans or Eurodollar Loans as the Borrower may request in accordance herewith. Each Lender at its option may make any Eurodollar Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; PROVIDED that any exercise of such option shall not affect the obligation of the Borrower to repay such Loan in accordance with the terms of this Agreement.

(c) At the commencement of each Interest Period for any Eurodollar Borrowing, such Borrowing shall be in an aggregate amount that is an integral multiple of $1,000,000 and not less than $5,000,000. At the time that each ABR Borrowing is made, such Borrowing shall be in an aggregate amount that is an integral multiple of $1,000,000 and not less than $1,000,000; PROVIDED that an ABR Borrowing may be in an aggregate amount that is equal to the entire unused balance of the total Commitments. Borrowings of more than one Type may be outstanding at the same time; PROVIDED that there shall not at any time be more than a total of 10 Eurodollar Borrowings outstanding.

(d) Notwithstanding any other provision of this Agreement, the Borrower shall not be entitled to request, or to elect to convert or continue, any Borrowing if the Interest Period requested with respect thereto would end after the Maturity Date.

SECTION 2.03. REQUESTS FOR BORROWINGS. To request a Borrowing, the Borrower shall notify the Administrative Agent of such request by telephone (a) in the case of a Eurodollar Borrowing, not later than 11:00 a.m., New York City time, three Business Days before the date of the proposed Borrowing or (b) in the case of an ABR Borrowing, not later than 11:00 a.m., New York City time, one Business Day before the date of the proposed Borrowing. Each such telephonic Borrowing Request shall be irrevocable and shall be confirmed promptly by hand delivery or telecopy to the Administrative Agent of a written Borrowing Request in a form approved by the Administrative Agent and signed by the Borrower. Each such telephonic and written Borrowing Request shall specify the following information in compliance with Section 2.02:

14

(i) the aggregate amount of the requested Borrowing;

(ii) the date of such Borrowing, which shall be a Business Day;

(iii) whether such Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing;

(iv) in the case of a Eurodollar Borrowing, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "INTEREST PERIOD"; and

(v) the location and number of the Borrower's account to which funds are to be disbursed, which shall comply with the requirements of Section 2.04.

If no election as to the Type of Borrowing is specified, then the requested Borrowing shall be an ABR Borrowing. If no Interest Period is specified with respect to any requested Eurodollar Borrowing, then the Borrower shall be deemed to have selected an Interest Period of one month's duration. Promptly following receipt of a Borrowing Request in accordance with this Section, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing.

SECTION 2.04. FUNDING OF BORROWINGS. Each Lender shall make each Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds by 12:00 noon, New York City time, to the account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders. The Administrative Agent will make such Loans available to the Borrower by promptly crediting the amounts so received, in like funds, to an account of the Borrower maintained with the Administrative Agent in New York City and designated by the Borrower in the applicable Borrowing Request.

(b) Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with paragraph (a) of this Section and may, in reliance upon such assumption, make available to the Borrower a corresponding amount. In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, the applicable Lender (and if such Lender fails to do so, then the Borrower) agrees to pay to the Administrative Agent forthwith on demand such corresponding amount

15

with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent, at (i) in the case of such Lender, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation or (ii) in the case of the Borrower, the interest rate applicable to ABR Loans. If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Loan included in such Borrowing.

SECTION 2.05. INTEREST ELECTIONS. (a) Each Borrowing initially shall be of the Type specified in the applicable Borrowing Request and, in the case of a Eurodollar Borrowing, shall have an initial Interest Period as specified in such Borrowing Request. Thereafter, the Borrower may elect to convert such Borrowing to a different Type or to continue such Borrowing and, in the case of a Eurodollar Borrowing, may elect Interest Periods therefor, all as provided in this Section. The Borrower may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing.

(b) To make an election pursuant to this Section, the Borrower shall notify the Administrative Agent of such election by telephone by the time that a Borrowing Request would be required under Section 2.03 if the Borrower were requesting a Borrowing of the Type resulting from such election to be made on the effective date of such election. Each such telephonic Interest Election Request shall be irrevocable and shall be confirmed promptly by hand delivery or telecopy to the Administrative Agent of a written Interest Election Request in a form approved by the Administrative Agent and signed by the Borrower.

(c) Each telephonic and written Interest Election Request shall specify the following information in compliance with Section 2.02:

(i) the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clauses (iii) and (iv) below shall be specified for each resulting Borrowing);

(ii) the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii) whether the resulting Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing; and

16

(iv) if the resulting Borrowing is a Eurodollar Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "INTEREST PERIOD".

If any such Interest Election Request requests a Eurodollar Borrowing but does not specify an Interest Period, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.

(d) Promptly following receipt of an Interest Election Request, the Administrative Agent shall advise each Lender of the details thereof and of such Lender's portion of each resulting Borrowing.

(e) If the Borrower fails to deliver a timely Interest Election Request with respect to a Eurodollar Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be continued for an additional Interest Period of one month. Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing and the Administrative Agent, at the request of the Required Lenders, so notifies the Borrower, then, so long as an Event of Default is continuing (i) no outstanding Borrowing may be converted to or continued as a Eurodollar Borrowing and (ii) unless repaid, each Eurodollar Borrowing shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto.

SECTION 2.06. TERMINATION AND REDUCTION OF COMMITMENTS. (a) Unless previously terminated, the Commitments shall terminate on the Maturity Date.

(b) The Borrower may at any time terminate, or from time to time reduce, the Commitments; PROVIDED that (i) each reduction of the Commitments shall be in an amount that is an integral multiple of $5,000,000 and not less than $25,000,000 and (ii) the Borrower shall not terminate or reduce the Commitments if, after giving effect to any concurrent prepayment of the Loans in accordance with Section 2.08, the sum of the Credit Exposures would exceed the total Commitments.

(c) The Borrower shall notify the Administrative Agent of any election to terminate or reduce the Commitments under paragraph (b) of this Section at least three Business Days prior to the effective date of such termination or reduction, specifying such election and the effective date thereof. Promptly following receipt of any notice, the Administrative Agent shall advise the Lenders of the contents thereof. Each notice delivered by the Borrower pursuant to this Section shall be irrevocable; PROVIDED that a notice of termination of the Commitments delivered by the Borrower may state that such notice is conditioned upon the effectiveness of other credit facilities, in which case such notice may be revoked by the Borrower (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied. Any termination or reduction of the Commitments shall be permanent. Each reduction of the Commitments shall be made ratably among the Lenders in accordance with their respective Commitments.

17

SECTION 2.07. REPAYMENT OF LOANS; EVIDENCE OF DEBT. (a) The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender the then unpaid principal amount of each Loan on the Maturity Date.

(b) Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(c) The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, the Type thereof and the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d) The entries made in the accounts maintained pursuant to paragraph (b) or (c) of this Section shall be prima facie evidence of the existence and amounts of the obligations recorded therein; PROVIDED that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Loans in accordance with the terms of this Agreement.

(e) Any Lender may request that Loans made by it be evidenced by a promissory note. In such event, the Borrower shall prepare, execute and deliver to such Lender a promissory note payable to the order of such Lender (or, if requested by such Lender, to such Lender and its registered assigns) and in a form approved by the Administrative Agent. Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 9.04) be represented by one or more promissory notes in such form payable to the order of the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

SECTION 2.08. PREPAYMENT OF LOANS. (a) The Borrower shall have the right at any time and from time to time to prepay any Borrowing in whole or in part, subject to prior notice in accordance with paragraph (b) of this Section.

(b) The Borrower shall notify the Administrative Agent by telephone (confirmed by telecopy) of any prepayment hereunder (i) in the case of prepayment of a Eurodollar Borrowing, not later than 11:00 a.m., New York City time, three Business Days before the date of prepayment, or (ii) in the case of

18

prepayment of an ABR Borrowing, not later than 11:00 a.m., New York City time, one Business Day before the date of prepayment. Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of each Borrowing or portion thereof to be prepaid; PROVIDED that, if a notice of prepayment is given in connection with a conditional notice of termination of the Commitments as contemplated by Section 2.06, then such notice of prepayment may be revoked if such notice of termination is revoked in accordance with Section 2.06. Promptly following receipt of any such notice relating to a Borrowing, the Administrative Agent shall advise the Lenders of the contents thereof. Each partial prepayment of any Borrowing shall be in an amount that would be permitted in the case of an advance of a Borrowing of the same Type as provided in Section 2.02. Each prepayment of a Borrowing shall be applied ratably to the Loans included in the prepaid Borrowing. Prepayments shall be accompanied by accrued interest to the extent required by Section 2.10.

SECTION 2.09. FEES. (a) The Borrower agrees to pay to the Administrative Agent for the account of each Lender a facility fee, which shall accrue at the Facility Fee Rate on the daily amount of the Commitment of such Lender (whether used or unused) during the period from and including August 19, 2005 to but excluding the date on which such Commitment terminates; PROVIDED that, if such Lender continues to have any Credit Exposure after its Commitment terminates, then such facility fee shall continue to accrue on the daily amount of such Lender's Credit Exposure from and including the date on which its Commitment terminates to but excluding the date on which such Lender ceases to have any Credit Exposure. Accrued facility fees shall be payable in arrears on the last day of March, June, September and December of each year and on the date on which the Commitments terminate, commencing on the first such date to occur after the date hereof; PROVIDED that any facility fees accruing after the date on which the Commitments terminate shall be payable on demand. All facility fees shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(b) The Borrower agrees to pay to the Administrative Agent, for its own account, fees payable in the amounts and at the times separately agreed upon between the Borrower and the Administrative Agent.

(c) All fees payable hereunder shall be paid on the dates due, in immediately available funds, to the Administrative Agent for distribution, in the case of facility fees, to the Lenders. Fees paid shall not be refundable under any circumstances.

SECTION 2.10. INTEREST. The Loans comprising each ABR Borrowing shall bear interest at the Alternate Base Rate.

(b) The Loans comprising each Eurodollar Borrowing shall bear interest, at the Adjusted LIBO Rate for the Interest Period in effect for such Borrowing plus the Eurodollar Margin.

19

(c) Notwithstanding the foregoing, if any principal of or interest on any Loan or any fee or other amount payable by the Borrower hereunder is not paid when due, whether at stated maturity, upon acceleration or otherwise, such overdue amount shall bear interest, after as well as before judgment, at a rate per annum equal to (i) in the case of overdue principal of any Loan, 2% plus the rate otherwise applicable to such Loan as provided in the preceding paragraphs of this Section or (ii) in the case of any other amount, 2% plus the rate applicable to ABR Loans as provided in paragraph (a) of this Section.

(d) Accrued interest on each Loan shall be payable in arrears on each Interest Payment Date for such Loan and upon termination of the Commitments; PROVIDED that (i) interest accrued pursuant to paragraph (c) of this Section shall be payable on demand, (ii) in the event of any repayment or prepayment of any Loan (other than a prepayment of an ABR Loan prior to the end of the Availability Period), accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment and (iii) in the event of any conversion of any Eurodollar Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion.

(e) All interest hereunder shall be computed on the basis of a year of 360 days, except that interest computed by reference to the Alternate Base Rate at times when the Alternate Base Rate is based on the Prime Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day). The applicable Alternate Base Rate or Adjusted LIBO Rate shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

SECTION 2.11. ALTERNATE RATE OF INTEREST. If prior to the commencement of any Interest Period for a Eurodollar Borrowing, adequate and reasonable means do not exist for ascertaining the Adjusted LIBO Rate for such Interest Period, then the Administrative Agent shall give notice thereof to the Borrower and the Lenders by telephone or telecopy as promptly as practicable thereafter and, until the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, (i) any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Borrowing shall be ineffective, and (ii) if any Borrowing Request requests a Eurodollar Borrowing, such Borrowing shall be made as an ABR Borrowing.

SECTION 2.12. INCREASED COSTS. If any Change in Law shall:

(i) impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender (except any such reserve requirement reflected in the Adjusted LIBO Rate); or

20

.

(ii) impose on any Lender or the London interbank market any other condition affecting this Agreement or Eurodollar Loans made by such Lender (other than a Tax, as to which the provisions of Section 2.14 apply);

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Eurodollar Loan (or of maintaining its obligation to make any such Loan), or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or otherwise), then the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b) If any Change in Law regarding capital requirements has or would have the effect of reducing the rate of return on any Lender's capital or on the capital of any Lender's holding company, if any, as a consequence of this Agreement or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c) A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section shall be delivered to the Borrower and shall be conclusive absent manifest error. The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

(d) Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation; PROVIDED that the Borrower shall not be required to compensate a Lender pursuant to this Section for any increased costs or reductions incurred more than 180 days prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor.

SECTION 2.13. BREAK FUNDING PAYMENTS. In the event of (a) the payment of any principal of any Eurodollar Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion of any Eurodollar Loan other than on the last day of the Interest Period applicable thereto, (c) the failure to borrow, convert, continue or prepay any Eurodollar Loan on the date specified in any notice delivered pursuant hereto (regardless of whether such notice may be revoked under Section 2.08(b) and is revoked in accordance therewith), or (d) the assignment of any Eurodollar Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrower pursuant to Section 2.16, then,

21

in any such event, the Borrower shall compensate each Lender for the loss, cost and expense attributable to such event. In the case of a Eurodollar Loan, such loss, cost or expense to any Lender shall be deemed to include an amount determined by such Lender to be the excess, if any, of (i) the amount of interest which would have accrued on the principal amount of such Loan had such event not occurred, at the Adjusted LIBO Rate that would have been applicable to such Loan, for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue, for the period that would have been the Interest Period for such Loan), over (ii) the amount of interest which would accrue on such principal amount for such period at the interest rate which such Lender would bid were it to bid, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the eurodollar market. A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section shall be delivered to the Borrower and shall be conclusive absent manifest error. The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

SECTION 2.14. TAXES. Any and all payments by or on account of any obligation of the Borrower hereunder shall be made free and clear of and without deduction for any Indemnified Taxes or Other Taxes; PROVIDED that if the Borrower shall be required to deduct any Indemnified Taxes or Other Taxes from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section) the Administrative Agent or Lender (as the case may be) receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrower shall make such deductions and (iii) the Borrower shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(b) In addition, the Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c) The Borrower shall indemnify the Administrative Agent and each Lender within 10 days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes paid by the Administrative Agent or such Lender on or with respect to any payment by or on account of any obligation of the Borrower hereunder (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender, or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

22

(d) As soon as practicable after any payment of Indemnified Taxes or Other Taxes by the Borrower to a Governmental Authority, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e) Any Foreign Lender that is entitled to an exemption from or reduction of withholding tax under the law of the jurisdiction in which the Borrower is located, or any treaty to which such jurisdiction is a party, with respect to payments under this Agreement shall deliver to the Borrower (with a copy to the Administrative Agent), at the time or times prescribed by applicable law, such properly completed and executed documentation prescribed by applicable law or reasonably requested by the Borrower as will permit such payments to be made without withholding or at a reduced rate.

(f) If the Administrative Agent or a Lender receives a refund of any Taxes or Other Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section 2.14, it shall pay over such refund to the Borrower (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section 2.14 with respect to the Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the Administrative Agent or such Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided, that the Borrower, upon the request of the Administrative Agent or such Lender, agrees to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority. This Section shall not be construed to require the Administrative Agent or any Lender to make available its tax returns (or any other information relating to its taxes which it deems confidential) to the Borrower or any other Person.

SECTION 2.15. PAYMENTS GENERALLY; PRO RATA TREATMENT; SHARING OF SET-OFFS. (a) The Borrower shall make each payment required to be made by it hereunder (whether of principal, interest, fees, or of amounts payable under Sections 2.12, 2.13, 2.14 or otherwise) prior to 2:00 p.m., New York City time, on the date when due, in immediately available funds, without set off or counterclaim. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to the Administrative Agent at its offices at 270 Park Avenue, New York, New York, except that payments pursuant to Sections 2.12, 2.13, 2.14 and 9.03 shall be made directly to the Persons entitled thereto. The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof. If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension. All payments hereunder shall be made in dollars.

23

(b) If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied (i) first, towards payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) second, towards payment of principal then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

(c) If any Lender shall, by exercising any right of set off or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans; PROVIDED that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to the Borrower or any Subsidiary or Affiliate thereof (as to which the provisions of this paragraph shall apply). The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

(d) Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due. In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

24

(e) If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.04(b) or 2.15(d), then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

SECTION 2.16. MITIGATION OBLIGATIONS; REPLACEMENT OF LENDERS. (a) If any Lender requests compensation under Section 2.12, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.14, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.12 or 2.14, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.

(b) If any Lender requests compensation under Section 2.12, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.14, or if any Lender defaults in its obligation to fund Loans hereunder, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all its interests, rights and obligations under this Agreement to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); PROVIDED that (i) the Borrower shall have received the prior written consent of the Administrative Agent, which consent shall not unreasonably be withheld, (ii) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts) and (iii) in the case of any such assignment resulting from a claim for compensation under Section 2.12 or payments required to be made pursuant to Section 2.14, such assignment will result in a reduction in such compensation or payments. A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

25

SECTION 2.17. INCREASED COMMITMENTS; ADDITIONAL LENDERS. (a) From time to time subsequent to the Effective Date, the Borrower may, upon at least 30 days' notice to the Administrative Agent (which shall promptly provide a copy of such notice to the Lenders), propose to increase the aggregate amount of the Commitments to an aggregate amount not to exceed $600,000,000 (the amount of any such increase, the "INCREASED COMMITMENTS"). Each Lender party to this Agreement at such time shall have the right (but no obligation), for a period of 15 days following receipt of such notice, to elect by notice to the Borrower and the Administrative Agent to increase its Commitment by a principal amount which bears the same ratio to the Increased Commitments as its then Commitment bears to the aggregate Commitments then existing.

(b) If any Lender party to this Agreement shall not elect to increase its Commitment pursuant to subsection (a) of this Section, the Borrower may, within 10 days of the Lender's response, designate one or more of the existing Lenders or other financial institutions acceptable to the Administrative Agent and the Borrower (which consent of the Administrative Agent shall not be unreasonably withheld) which at the time agree to (i) in the case of any such Person that is an existing Lender, increase its Commitment and (ii) in the case of any other such Person (an "ADDITIONAL LENDER"), become a party to this Agreement as a Lender. The sum of the increases in the Commitments of the existing Lenders pursuant to this subsection (b) plus the Commitments of the Additional Lenders shall not in the aggregate exceed the unsubscribed amount of the Increased Commitments.

(c) An increase in the aggregate amount of the Commitments pursuant to this Section 2.17 shall become effective upon the receipt by the Administrative Agent of an agreement in form and substance satisfactory to the Administrative Agent signed by the Borrower by each Additional Lender and by each other Lender whose Commitment is to be increased, setting forth the new Commitments of such Lenders and setting forth the agreement of each Additional Lender to become a party to this Agreement as a Lender and to be bound by all the terms and provisions hereof, together with such evidence of appropriate corporate authorization on the part of the Borrower with respect to the Increased Commitments and such opinions of counsel for the Borrower with respect to the Increased Commitments as the Administrative Agent may reasonably request.

(d) Upon any increase in the aggregate amount of the Commitments pursuant to this Section 2.17 that is not pro rata among all Lenders, (x) within five Domestic Business Days, in the case of any ABR Borrowing then outstanding, and (y) at the end of the then current Interest Period with respect thereto, in the case of any Eurodollar Borrowing then outstanding, the Borrower shall prepay such Borrowing in its entirety and, to the extent the Borrower elects to do so and subject to the conditions specified in Article 4 the Borrower shall reborrow Loans from the Lenders in proportion to their respective Commitments after giving effect to such increase, until such time as all outstanding Loans are held by the Lenders in such proportion.

26

ARTICLE 3
REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants to the Lenders that:

SECTION 3.01. ORGANIZATION; POWERS. Each of the Borrower and its Subsidiaries is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, has all requisite power and authority to carry on its business as now conducted and, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required.

SECTION 3.02. AUTHORIZATION; ENFORCEABILITY. The Transactions are within the Borrower's corporate powers and have been duly authorized by all necessary corporate and, if required, stockholder action. This Agreement and any promissory note of the Borrower hereunder have been, or will be, in the case of any such promissory note executed and delivered hereafter, duly executed and delivered by the Borrower and constitute, or will constitute, in the case of any such promissory note executed and delivered hereafter, a legal, valid and binding obligation of the Borrower, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

SECTION 3.03. GOVERNMENTAL APPROVALS; NO CONFLICTS. The Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except such as have been obtained or made and are in full force and effect, (b) will not violate any applicable law or regulation or the charter, by-laws or other organizational documents of the Borrower or any of its Subsidiaries or any order of any Governmental Authority, (c) will not violate or result in a default under any indenture, agreement or other instrument binding upon the Borrower or any of its Subsidiaries or its assets, or give rise to a right thereunder to require any payment to be made by the Borrower or any of its Subsidiaries, and (d) will not result in the creation or imposition of any Lien on any asset of the Borrower or any of its Subsidiaries.

SECTION 3.04. FINANCIAL CONDITION; NO MATERIAL ADVERSE CHANGE. (a) The Borrower has heretofore furnished to the Lenders its consolidated balance sheet and statements of income, stockholders equity and cash flows (i) as of and for the fiscal year ended December 31, 2004, reported on by KPMG LLP, independent public accountants, and as of and for the fiscal quarter and the portion of the fiscal year ended June 30, 2005, certified by its chief financial officer. Such financial statements present fairly, in all material respects, the financial position and results of operations and cash flows of the Borrower and its consolidated Subsidiaries as of such dates and for such periods in accordance with GAAP, subject to year end audit adjustments and the absence of footnotes in the case of the statements referred to in clause (ii) above.

27

(b) Since December 31, 2004, there has been no material adverse change in the business, assets, operations, prospects or condition, financial or otherwise, of the Borrower and its Subsidiaries, taken as a whole.

SECTION 3.05. PROPERTIES. (a) Each of the Borrower and its Subsidiaries has good title to, or valid leasehold interests in, all its real and personal property material to its business, except for minor defects in title that do not interfere with its ability to conduct its business as currently conducted or to utilize such properties for their intended purposes.

(b) Each of the Borrower and its Subsidiaries owns, or is licensed to use, all trademarks, tradenames, copyrights, patents and other intellectual property material to its business, and the use thereof by the Borrower and its Subsidiaries does not infringe upon the rights of any other Person, except for any such infringements that, individually or in the aggregate, may not reasonably be expected to result in a Material Adverse Effect.

SECTION 3.06. LITIGATION AND ENVIRONMENTAL MATTERS. (a) There are no investigations, actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of the Borrower, threatened against or affecting the Borrower or any of its Subsidiaries (i) as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, may reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect (other than the Disclosed Matters) or (ii) that involve this Agreement or the Transactions.

(b) Except with respect to any matters that, individually or in the aggregate, may not reasonably be expected to result in a Material Adverse Effect, neither the Borrower nor any of its Subsidiaries (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, (iii) has received notice of any claim with respect to any Environmental Liability or (iv) knows of any basis for any Environmental Liability.

SECTION 3.07. COMPLIANCE WITH LAWS AND AGREEMENTS. Each of the Borrower and its Subsidiaries is in compliance with all laws, regulations and orders of any Governmental Authority applicable to it or its property and all indentures, agreements and other instruments binding upon it or its property, except (i) to the extent, if any, that the Borrower and its Subsidiaries may not be in such compliance in connection with the Disclosed Matters or (ii) where the failure to do so, individually or in the aggregate, may not reasonably be expected to result in a Material Adverse Effect. No Default has occurred and is continuing.

28

SECTION 3.08. INVESTMENT AND HOLDING COMPANY STATUS. Neither the Borrower nor any of its Subsidiaries is (a) an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940 or (b) a "holding company" as defined in, or subject to regulation under, the Public Utility Holding Company Act of 1935.

SECTION 3.09. TAXES. Each of the Borrower and its Subsidiaries has timely filed or caused to be filed all Tax returns and reports required to have been filed and has paid or caused to be paid all Taxes required to have been paid by it, except (a) Taxes that are being contested in good faith by appropriate proceedings and for which the Borrower or such Subsidiary, as applicable, has set aside on its books adequate reserves or (b) to the extent that the failure to do so may not reasonably be expected to result in a Material Adverse Effect.

SECTION 3.10. ERISA. No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events for which liability is reasonably expected to occur, may reasonably be expected to result in a Material Adverse Effect.

SECTION 3.11. DISCLOSURE. The Borrower has disclosed to the Lenders all agreements, instruments and corporate or other restrictions to which it or any of its Subsidiaries is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. Neither the Information Memorandum nor any of the other reports, financial statements, certificates or other information furnished by or on behalf of the Borrower to the Administrative Agent or any Lender in connection with the negotiation of this Agreement or delivered hereunder (as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; PROVIDED that, with respect to projected financial information, the Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.

ARTICLE 4
CONDITIONS

SECTION 4.01. EFFECTIVE DATE. The obligations of the Lenders to make Loans hereunder shall not become effective until the date on which each of the following conditions is satisfied (or waived in accordance with Section 9.02):

(a) The Administrative Agent (or its counsel) shall have received from each party hereto either (i) a counterpart of this Agreement signed on behalf of such party or (ii) written evidence satisfactory to the Administrative Agent (which may include telecopy transmission of a signed signature page of this Agreement) that such party has signed a counterpart of this Agreement.

29

(b) The Administrative Agent shall have received a favorable written opinion (addressed to the Administrative Agent and the Lenders and dated the Effective Date) of The Perry Law Firm, counsel for the Borrower, substantially in the form of Exhibit B, and covering such other matters relating to the Borrower, this Agreement or the Transactions as the Required Lenders shall reasonably request. The Borrower hereby requests such counsel to deliver such opinion.

(c) The Administrative Agent shall have received such documents and certificates as the Administrative Agent or its counsel may reasonably request relating to the organization, existence and good standing of the Borrower, the authorization of the Transactions and any other legal matters relating to the Borrower, this Agreement or the Transactions, all in form and substance satisfactory to the Administrative Agent and its counsel.

(d) The Administrative Agent shall have received a certificate, dated the Effective Date and signed by the President, a Vice President or a Financial Officer of the Borrower, confirming compliance with the conditions set forth in paragraphs (a) and (b) of Section 4.02.

(e) The Administrative Agent shall have received all fees and other amounts due and payable on or prior to the Effective Date, including, to the extent invoiced, reimbursement or payment of all out of pocket expenses required to be reimbursed or paid by the Borrower hereunder.

(f) The Administrative Agent shall have received a favorable written opinion (addressed to the Administrative Agent and the Lenders and dated the Effective Date) of Davis Polk & Wardwell, substantially in the form of Exhibit C, and covering such other matters relating to the Agreement or the Transactions as the Required Lenders shall reasonably request.

(g) The Administrative Agent shall have received written evidence satisfactory to the Administrative Agent of the cancellation and payment in full of the Borrower's previous $35,000,000 operating line of credit.

The Administrative Agent shall notify the Borrower and the Lenders of the Effective Date, and such notice shall be conclusive and binding. Notwithstanding the foregoing, the obligations of the Lenders to make Loans hereunder shall not become effective unless each of the foregoing conditions is satisfied (or waived pursuant to Section 9.02) at or prior to 3:00 p.m., New York City time, on August 23, 2005 (and, in the event such conditions are not so satisfied or waived, the Commitments shall terminate at such time).

SECTION 4.02. EACH BORROWING. The obligation of each Lender to make a Loan on the occasion of any Borrowing is subject to the satisfaction of the following conditions:

30

(a) The representations and warranties of the Borrower set forth in this Agreement (with the exception, in the case of a Borrowing subsequent to the Effective Date, of the representations and warranties in Sections 3.04(b) and Section 3.06) shall be true and correct on and as of the date of such Borrowing.

(b) At the time of and immediately after giving effect to such Borrowing no Default shall have occurred and be continuing.

Each Borrowing shall be deemed to constitute a representation and warranty by the Borrower on the date thereof as to the matters specified in paragraphs (a) and (b) of this Section.

## ARTICLE 5
## AFFIRMATIVE COVENANTS

Until the Commitments have expired or been terminated and the principal of and interest on each Loan and all fees payable hereunder shall have been paid in full, the Borrower covenants and agrees with the Lenders that:

SECTION 5.01. FINANCIAL STATEMENTS; RATINGS CHANGE AND OTHER INFORMATION. The Borrower will furnish to the Administrative Agent and each Lender:

(a) within 90 days after the end of each fiscal year of the Borrower, its audited consolidated balance sheet and related statements of operations, stockholders' equity and cash flows as of the end of and for such year, setting forth in each case in comparative form the figures for the previous fiscal year, all reported on by KPMG LLP or other independent public accountants of recognized national standing (without a "GOING CONCERN" or like qualification or exception and without any qualification or exception as to the scope of such audit) to the effect that such consolidated financial statements present fairly in all material respects the financial condition and results of operations of the Borrower and its Consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied;

(b) within 45 days after the end of each of the first three fiscal quarters of each fiscal year of the Borrower, its consolidated balance sheet and related statements of operations, stockholders' equity and cash flows as of the end of and for such fiscal quarter and the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by one of its Financial Officers as presenting fairly in all material respects the financial condition and results of operations of the Borrower and its Consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, subject to year-end audit adjustments and the absence of footnotes;

31

(c) concurrently with any delivery of financial statements under clause (a) or (b) above, (i) the balance sheet of the Borrower as of the date of such financial statements and the related statements of operations, stockholders' equity and cash flows for the fiscal year or portion thereof then ended, setting forth in each case in comparative form the corresponding figures from the previous fiscal year, all certified by a Financial Officer as presenting fairly in all material respects the financial condition and results of operations of the Borrower on a stand alone basis in accordance with GAAP consistently applied, subject to the absence of footnotes and (in the case of such financial statements delivered concurrently with those under clause (b) above) to year-end audit adjustments and (ii) a certificate of a Financial Officer of the Borrower in substantially the form of Exhibit D (x) certifying as to whether a Default has occurred and, if a Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto, (y) setting forth reasonably detailed calculations demonstrating compliance with Sections Section 6.03 to 6.06 and (z) stating whether any change in GAAP or in the application thereof has occurred since the date of the audited financial statements referred to in Section 3.04 and, if any such change has occurred, specifying the effect cf such change on the financial statements accompanying such certificate;

(d) promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and other materials filed by the Borrower or any Subsidiary with the Securities and Exchange Commission, or any Governmental Authority succeeding to any or all of the functions of said Commission, or with any national securities exchange, or distributed by the Borrower to its shareholders generally, as the case may be;

(e) promptly after Moody's or S&P shall have announced a change in the Borrower's credit rating, written notice of such rating change; and

(f) promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of the Borrower or any Subsidiary, or compliance with the terms of this Agreement, as the Administrative Agent or any Lender may reasonably request.

Financial statements and other documents required to be delivered pursuant to this Section 5.01 may be delivered electronically and if so delivered, shall be deemed to have been delivered (i) to the extent such documents are included in materials otherwise filed with the Securities and Exchange Commission, when such filing is available to the Lenders on the EDGAR website or (ii) in any case, on the date on which such documents are posted on the Borrower's behalf on an Internet website to which each Lender and the Administrative Agent has access and the Borrower notifies the Administrative Agent and the Lenders of such posting. If the Borrower provides the financial statements and other documents required to be delivered pursuant to this Section 5.01 electronically pursuant to the preceding sentence, the Borrower will provide printed versions of such financial statements and other documents to any Lender upon such Lender's request.

32

SECTION 5.02. NOTICES OF MATERIAL EVENTS. The Borrower will furnish to the Administrative Agent and each Lender prompt written notice of the following:

(a) the occurrence of any Default;

(b) the filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority against or affecting the Borrower or any Affiliate thereof that, if adversely determined, may reasonably be expected to result in a Material Adverse Effect;

(c) the occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, may reasonably be expected to result in a Material Adverse Effect; and

(d) any other development that results in, or may reasonably be expected to result in, a Material Adverse Effect.

Each notice delivered under this Section shall be accompanied by a statement of a Financial Officer or other executive officer of the Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

SECTION 5.03. EXISTENCE; CONDUCT OF BUSINESS. The Borrower will, and will cause each of its Subsidiaries to, do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, licenses, permits, privileges and franchises material to the conduct of its business; PROVIDED that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under Section 6.02.

SECTION 5.04. PAYMENT OF OBLIGATIONS. The Borrower will, and will cause each of its Subsidiaries to, pay its obligations, including Tax liabilities, that, if not paid, could result in a Material Adverse Effect before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, (b) the Borrower or such Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP and (c) the failure to make payment pending such contest may not reasonably be expected to result in a Material Adverse Effect.

SECTION 5.05. MAINTENANCE OF PROPERTIES; INSURANCE. The Borrower will, and will cause each of its Subsidiaries to, (a) keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted, and (b) maintain, with financially sound and reputable insurance companies, insurance in such amounts and against such risks as are customarily maintained by companies engaged in the same or similar businesses operating in the same or similar locations.

33

SECTION 5.06. BOOKS AND RECORDS; INSPECTION RIGHTS. The Borrower will, and will cause each of its Subsidiaries to, keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities. The Borrower will, and will cause each of its Subsidiaries to, permit any representatives designated by the Administrative Agent or any Lender, upon reasonable prior notice, to visit and inspect its properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times and as often as reasonably requested.

SECTION 5.07. COMPLIANCE WITH LAWS. The Borrower will, and will cause each of its Subsidiaries to, comply with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its property, except (i) to the extent, if any, that the Borrower and its Subsidiaries may not be in such compliance in connection with the Disclosed Matters or (ii) where the failure to do so, individually or in the aggregate, may not reasonably be expected to result in a Material Adverse Effect.

SECTION 5.08. USE OF PROCEEDS. The proceeds of the Loans will be used for general corporate purposes, including without limitation acquisitions and any payments required to be made in connection with the Disclosed Matters. No part of the proceeds of any Loan will be used, whether directly or indirectly, for any purpose that entails a violation of any of the Regulations of the Board, including Regulations T, U and X.

ARTICLE 6
NEGATIVE COVENANTS

Until the Commitments have expired or terminated and the principal of and interest on each Loan and all fees payable hereunder have been paid in full, the Borrower covenants and agrees with the Lenders that:

SECTION 6.01. LIENS. The Borrower will not create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, or assign or sell any income or revenues (including accounts receivable) or rights in respect of any thereof, except:

(a) Permitted Encumbrances;

(b) any Lien on any property or asset of the Borrower existing on the date hereof and set forth in Schedule 6.01; PROVIDED that (i) such Lien shall not apply to any other property or asset of the Borrower or any Subsidiary and (ii) such Lien shall secure only those obligations which it secures on the date hereof and extensions, renewals and replacements thereof that do not increase the outstanding principal amount thereof;

34

(c) any Lien existing on any property or asset prior to the acquisition thereof by the Borrower PROVIDED that (i) such Lien is not created in contemplation of or in connection with such acquisition, (ii) such Lien shall not apply to any other property or assets of the Borrower and (iii) such Lien shall secure only those obligations which it secures on the date of such acquisition or the date such Person becomes a Subsidiary, as the case may be and extensions, renewals and replacements thereof that do not increase the outstanding principal amount thereof;

(d) Liens on fixed or capital assets acquired, constructed or improved by the Borrower PROVIDED that (i) such security interests and the Indebtedness secured thereby are incurred prior to or within 180 days after such acquisition or the completion of such construction or improvement and (ii) such security interests shall not apply to any other property or assets of the Borrower or any Subsidiary; and

(e) Liens not otherwise permitted by the following clauses of this Section securing Indebtedness or other obligations in an aggregate principal or face amount not at any time exceeding $15,000,000.

For avoidance of doubt, the provisions of this Section 6.01 do not restrict Liens on property or assets of Subsidiaries.

SECTION 6.02. FUNDAMENTAL CHANGES. (a) The Borrower will not merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or sell, transfer, lease or otherwise dispose of (in one transaction or in a series of transactions) all or substantially all of the Borrower's assets or liquidate or dissolve, except that, if at the time thereof and immediately after giving effect thereto no Default shall have occurred and be continuing, any Person may merge into the Borrower in a transaction in which the Borrower is the surviving corporation.

(b) The Borrower will not, and will not permit any of its Subsidiaries to, engage to any material extent in any business other than businesses of the type conducted by the Borrower and its Subsidiaries on the date of execution of this Agreement and businesses reasonably related thereto, including other businesses reasonably related to education services.

SECTION 6.03. MINIMUM CONSOLIDATED NET WORTH. Consolidated Net Worth shall be no less than the sum of (i) $314,000,000, (ii) an amount equal to 50% of Consolidated Net Income for (x) the six month period ending December 31, 2005 and (y) each subsequent fiscal year of the Borrower, in each case, for which such Consolidated Net Income is positive (but with no deduction on account of negative Consolidated Net Income for any such fiscal period) and (iii) 100% of the amount of any increase in Consolidated Net Worth attributable to the issuance of capital stock of the Borrower subsequent to June 30, 2005.

35

.

SECTION 6.04. ADJUSTED EBITDA TO CORPORATE DEBT INTEREST. The ratio of Adjusted EBITDA to Corporate Debt Interest for each period of four consecutive fiscal quarters shall be (a) not less than 3:1, if the Borrower has Unencumbered Assets of less than $250,000,000 on the last day of such period, or (b) not less than 2.5:1, if the Borrower has Unencumbered Assets at least $250,000,000 on the last day of such period.

SECTION 6.05. SUBSIDIARY INDEBTEDNESS. The Borrower will not permit any Subsidiary to create, incur, assume or suffer to exist any unsecured Indebtedness, except (i) Intercompany Indebtedness and (ii) other unsecured Indebtedness in the aggregate principal amount at any time outstanding not to exceed $25,000,000.

SECTION 6.06. NON-FFELP LOANS TO ALL LOANS. The Borrower will not permit the ratio of (a) the aggregate amount of Non-FFELP Loans owned by the Borrower and its Consolidated Subsidiaries to (b) the aggregate amount of all student loans receivable owned by the Borrower and its Consolidated Subsidiaries at any time to equal or exceed 0.10:1.

ARTICLE 7
EVENTS OF DEFAULT

If any of the following events ("EVENTS OF DEFAULT") shall occur:

(a) the Borrower shall fail to pay any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b) the Borrower shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount referred to in clause (a) of this Article) payable under this Agreement, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of five Business Days;

(c) any representation or warranty made or deemed made by or on behalf of the Borrower in or in connection with this Agreement or any amendment or modification hereof or waiver hereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with this Agreement or any amendment or modification hereof or waiver hereunder, shall prove to have been incorrect when made or deemed made;

(d) the Borrower shall fail to observe or perform any covenant, condition or agreement contained in Section 5.02(a), 5.03 (with respect to the Borrower's existence) or in Article 6; PROVIDED that in the case of Section 6.01 or 6.05, such failure shall continue unremedied for a period of 30 days after an executive officer of the Borrower first becomes aware of such failure;

36

(e) the Borrower shall fail to observe or perform any covenant, condition or agreement contained in this Agreement (other than those specified in clause (a), (b) or (d) of this Article), and such failure shall continue unremedied for a period of 30 days after notice thereof from the Administrative Agent to the Borrower (which notice will be given at the request of any Lender);

(f) the Borrower or any Subsidiary shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness, when and as the same shall become due and payable;

(g) any event or condition occurs that (i) results in any Material Indebtedness becoming due prior to its scheduled maturity or (ii) is continuing (after any applicable grace period or cure period has expired) so as to enable or permit the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity; PROVIDED that (x) this clause (g) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness and (y) a Swap Agreement shall be considered to become due prior to its schedule maturity only if it becomes so due upon termination resulting from the Borrower's default thereunder;

(h) an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of the Borrower or any Subsidiary or its debts, or of a substantial part of its assets, under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Borrower or any Subsidiary or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered;

(i) the Borrower or any Subsidiary shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (h) of this Article, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Borrower or any Subsidiary or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any action indicating its consent to, approval of, or acquiescence in any of the foregoing;

37

(j) the Borrower or any Subsidiary shall become unable, admit in writing its inability or fail generally to pay its debts as they become due;

(k) one or more judgments for the payment of money in an aggregate amount in excess of $15,000,000 shall be rendered against the Borrower, any Subsidiary or any combination thereof and the same shall remain undischarged for a period of 30 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of the Borrower or any Subsidiary to enforce any such judgment;

(l) an ERISA Event shall have occurred that, in the opinion of the Required Lenders, when taken together with all other ERISA Events that have occurred, may reasonably be expected to result in a Material Adverse Effect; or

(m) a Change in Control shall occur;

then, and in every such event (other than an event with respect to the Borrower described in clause (h) or (i) of this Article), and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the request of the Required Lenders shall, by notice to the Borrower, take either or both of the following actions, at the same or different times: (n) terminate the Commitments, and thereupon the Commitments shall terminate immediately, and (o) declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower; and in case of any event with respect to the Borrower described in clause (h) or (i) of this Article, the Commitments shall automatically terminate and the principal of the Loans then outstanding, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower.

## ARTICLE 8
## THE ADMINISTRATIVE AGENT

Each of the Lenders hereby irrevocably appoints the Administrative Agent as its agent and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof, together with such actions and powers as are reasonably incidental thereto.

38

The bank serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent, and such bank and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if it were not the Administrative Agent hereunder.

The Administrative Agent shall not have any duties or obligations except those expressly set forth herein. Without limiting the generality of the foregoing, (a) the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (b) the Administrative Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby that the Administrative Agent is required to exercise in writing as directed by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.02), and (c) except as expressly set forth herein, the Administrative Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Subsidiaries that is communicated to or obtained by the bank serving as Administrative Agent or any of its Affiliates in any capacity. The Administrative Agent shall not be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.02) or in the absence of its own gross negligence or wilful misconduct. The Administrative Agent shall be deemed not to have knowledge of any Default unless and until written notice thereof is given to the Administrative Agent by the Borrower or a Lender, and the Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement, (ii) the contents of any certificate, report or other document delivered hereunder or in connection herewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Article 5 or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper Person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person, and shall not incur any liability for relying thereon. The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

39

The Administrative Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by the Administrative Agent. The Administrative Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers through their respective Related Parties. The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.

Subject to the appointment and acceptance of a successor Administrative Agent as provided in this paragraph, the Administrative Agent may resign at any time by notifying the Lenders and the Borrower. Upon any such resignation, the Required Lenders shall have the right, in consultation with the Borrower, to appoint a successor. If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may, on behalf of the Lenders, appoint a successor Administrative Agent which shall be a bank with an office in New York, New York, or an Affiliate of any such bank. Upon the acceptance of its appointment as Administrative Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations hereunder. The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the Administrative Agent's resignation hereunder, the provisions of this Article and Section 9.03 shall continue in effect for the benefit of such retiring Administrative Agent, its sub agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while it was acting as Administrative Agent.

Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any related agreement or any document furnished hereunder or thereunder.

40

ARTICLE 9
MISCELLANEOUS

SECTION 9.01 . NOTICES. (a) Except in the case of notices and other communications expressly permitted to be given by telephone (and subject to paragraph (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, as follows:

(i) if to the Borrower, to it at 121 South 13th Street, Suite 201, Lincoln, NE 68508, Attention of Terry J. Heimes (Telecopy No. (402) 458-2399);

(ii) if to the Administrative Agent, to JPMorgan Chase Bank, N.A., Loan and Agency Services Group, 1111 Fannin, 10th Floor, Houston, TX 77002-8069, Attention of Missy Barbosa (Telecopy No. (713) 750-2223; Telephone No. (713) 750-3570);

(iii) if to any other Lender, to it at its address (or telecopy number) set forth in its Administrative Questionnaire.

(b) Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative Agent; PROVIDED that the foregoing shall not apply to service of process pursuant to Section 9.09 or otherwise under applicable law, or to notices pursuant to Article 2 unless otherwise agreed by the Administrative Agent and the applicable Lender. The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; PROVIDED that approval of such procedures may be limited to particular notices or communications.

(c) Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties hereto. All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt.

SECTION 9.02. WAIVERS; AMENDMENTS. (a) No failure or delay by the Administrative Agent or any Lender in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Administrative Agent and the Lenders hereunder are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or consent to any departure by the Borrower therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.

41

Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether the Administrative Agent or any Lender may have had notice or knowledge of such Default at the time.

(b) Neither this Agreement nor any provision hereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Borrower and the Required Lenders or by the Borrower and the Administrative Agent with the consent of the Required Lenders; PROVIDED that no such agreement shall (i) increase the Commitment of any Lender without the written consent of such Lender, (ii) reduce the principal amount of any Loan or reduce the rate of interest thereon, or reduce any fees payable hereunder, without the written consent of each Lender affected thereby, (iii) postpone the scheduled date of payment of the principal amount of any Loan, or any interest thereon, or any fees payable hereunder, or reduce the amount of, waive or excuse any such payment, or postpone the scheduled date of expiration of any Commitment, without the written consent of each Lender affected thereby, (iv) change Section 2.15(b) or (c) in a manner that would alter the pro rata sharing of payments required thereby, without the written consent of each Lender, or (v) change any of the provisions of this Section or the definition of "REQUIRED LENDERS" or any other provision hereof specifying the number or percentage of Lenders required to waive, amend or modify any rights hereunder or make any determination or grant any consent hereunder, without the written consent of each Lender; provided further that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent hereunder without the prior written consent of the Administrative Agent.

SECTION 9.03. EXPENSES; INDEMNITY; DAMAGE WAIVER. (a) The Borrower shall pay (i) all reasonable out of pocket expenses incurred by the Administrative Agent and its Affiliates, including the reasonable fees, charges and disbursements of counsel for the Administrative Agent, in connection with the syndication of the credit facilities provided for herein, the preparation and administration of this Agreement or any amendments, modifications or waivers of the provisions hereof (whether or not the transactions contemplated hereby or thereby shall be consummated) and (ii) all out-of-pocket expenses incurred by the Administrative Agent or any Lender, including the fees, charges and disbursements of any counsel for the Administrative Agent or any Lender, in connection with the enforcement or protection of its rights in connection with this Agreement, including its rights under this Section, or in connection with the Loans made hereunder, including all such out-of pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans.

42

.

(b) The Borrower shall indemnify the Administrative Agent and each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "INDEMNITEE") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including the reasonable fees, charges and disbursements of any counsel for any Indemnitee, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement or any agreement or instrument contemplated hereby, the performance by the parties hereto of their respective obligations hereunder or the consummation of the Transactions or any other transactions contemplated hereby, (ii) any Loan or the use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by the Borrower or any of its Subsidiaries, or any Environmental Liability related in any way to the Borrower or any of its Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; PROVIDED that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from (x) the Indemnitee's bad faith breach of its express contractual obligations under this Agreement or (y) the gross negligence or wilful misconduct of such Indemnitee.

(c) To the extent that the Borrower fails to pay any amount required to be paid by it to the Administrative Agent under paragraph (a) or (b) of this Section, each Lender severally agrees to pay to the Administrative Agent such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; PROVIDED that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent in its capacity as such.

(d) To the extent permitted by applicable law, the Borrower shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the Transactions, any Loan or the use of the proceeds thereof.

(e) All amounts due under this Section shall be payable promptly after written demand therefor.

SECTION 9.04. SUCCESSORS AND ASSIGNS. (a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations

43

hereunder except in accordance with this Section. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in paragraph (c) of this Section) and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)(i) Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld) of:

(A) the Borrower, PROVIDED that no consent of the Borrower shall be required for an assignment to a Lender, an Affiliate of a Lender, an Approved Fund or, if an Event of Default has occurred and is continuing, any other assignee; and

(B) the Administrative Agent.

(ii) Assignments shall be subject to the following additional conditions:

(A) except in the case of an assignment to a Lender or an Affiliate of a Lender or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $5,000,000 unless each of the Borrower and the Administrative Agent otherwise consent, PROVIDED that no such consent of the Borrower shall be required if an Event of Default has occurred and is continuing;

(B) each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement;

(C) the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500; and

44

(D) the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.

For the purposes of this Section 9.04(b), the term "APPROVED FUND" has the following meaning:

"APPROVED FUND" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

(iii) Subject to acceptance and recording thereof pursuant to paragraph (b)(iv) of this Section, from and after the effective date specified in each Assignment and Assumption the assignee thereunder shall be party hereto as a Lender with respect to the interest assigned and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement in addition to any rights and obligations theretofore held by it as a Lender hereunder (if any), and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.12, 2.13, 2.14 and 9.03). Any assignment or transfer by a Lender of rights or obligations under this Agreement that purports to be effective notwithstanding a failure to comply with this Section 9.04 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c) of this Section.

(iv) The Administrative Agent, acting for this purpose as an agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitment of, and principal amount of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "REGISTER"). The entries in the Register shall be conclusive, and the Borrower, the Administrative Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower and any Lender at any reasonable time and from time to time upon reasonable prior notice.

45

(v) Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section and any written consent to such assignment required by paragraph (b) of this Section, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(c) (i) Any Lender may, without the consent of the Borrower or the Administrative Agent, sell participations to one or more banks or other entities (a "PARTICIPANT") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans owing to it); PROVIDED that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; PROVIDED that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to Section 9.02(b) that affects such Participant. Subject to paragraph (c)(ii) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.12, 2.13 and 2.14 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.08 as though it were a Lender, provided such Participant agrees to be subject to Section 2.15(c) as though it were a Lender.

(ii) A Participant shall not be entitled to receive any greater payment under Section 2.12 or 2.14 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent. A Participant that would be a Foreign Lender if it were a Lender shall not be entitled to the benefits of Section 2.14 unless the Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Borrower, to comply with Section 2.14(e) as though it were a Lender.

46

(d) Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including without limitation any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section shall not apply to any such pledge or assignment of a security interest; PROVIDED that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

SECTION 9.05. SURVIVAL. All covenants, agreements, representations and warranties made by the Borrower herein and in the certificates or other instruments delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent, or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid and so long as the Commitments have not expired or terminated. The provisions of Sections 2.12, 2.13, 2.14 and 9.03 and Article 8 shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Commitments or the termination of this Agreement or any provision hereof.

SECTION 9.06. COUNTERPARTS; INTEGRATION; EFFECTIVENESS. This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and any separate letter agreements with respect to fees payable to the Administrative Agent constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. Delivery of an executed counterpart of a signature page of this Agreement by telecopy shall be effective as delivery of a manually executed counterpart of this Agreement.

SECTION 9.07. SEVERABILITY. Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

47

SECTION 9.08. RIGHT OF SETOFF. If an Event of Default shall have occurred and be continuing, each Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by such Lender or Affiliate to or for the credit or the account of the Borrower against any of and all the obligations of the Borrower now or hereafter existing under this Agreement held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement and although such obligations may be unmatured. The rights of each Lender under this Section are in addition to other rights and remedies (including other rights of setoff) which such Lender may have.

SECTION 9.09. GOVERNING LAW; JURISDICTION; CONSENT TO SERVICE OF PROCESS. (a) This Agreement shall be construed in accordance with and governed by the law of the State of New York.

(b) The Borrower hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement shall affect any right that the Administrative Agent, or any Lender may otherwise have to bring any action or proceeding relating to this Agreement against the Borrower or its properties in the courts of any jurisdiction.

(c) The Borrower hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in any court referred to in paragraph (b) of this Section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d) Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.01. Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

48

SECTION 9.10. WAIVER OF JURY TRIAL. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

SECTION 9.11. HEADINGS. Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

SECTION 9.12. CONFIDENTIALITY. Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to it and its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory or self-regulatory authority, (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party to this Agreement, (e) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or the enforcement of rights hereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement, (g) with the consent of the Borrower or (h) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to the Administrative Agent, or any Lender on a nonconfidential basis from a source other than the Borrower. For the purposes of this Section, "INFORMATION" means all information received from the Borrower relating to the Borrower or its business, other than any such information that is available to the Administrative Agent, or any Lender on a nonconfidential basis prior to

49

disclosure by the Borrower; PROVIDED that, in the case of information received from the Borrower after the date hereof, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information. The provisions of this Section 9.12 are without prejudice to any other confidentiality undertakings the Administrative Agent or any Lender may enter into with the Borrower as to any particular information.

SECTION 9.13. USA PATRIOT ACT. Each Lender hereby notifies the Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "ACT"), it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender to identify the Borrower in accordance with the Act.

50

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized representatives as of the day and year first above written.

NELNET, INC.

By:    /s/  Jeffrey R. Noordheok
       -----------------------------------
       Name:  Jeffrey R. Noordheok
       Title: Executive Director

51

.

JPMORGAN CHASE BANK, N.A., individually
and as Administrative Agent

By:    /s/    Christine Herrick
----------------------------------
Name:    Christine Herrick
Titleb: Vice President
         JPMorgan Chase Bank, NA


52

CITIBANK, N.A., individually and as
      Syndication Agent

By:      /s/  Yoko Otani
      --------------------------------
      Name:  Yoko Otani
      Title: Managing Director


53

.

BANK OF AMERICA, N.A.

By:     /s/  Shelly K. Harper
        --------------------------------
        Name:  Shelly K. Harper
        Title: Senior Vice President

54

CREDIT SUISSE, CAYMAN ISLANDS BRANCH

By:    /s/    Karl Studer
-----------------------------------
Name:  Karl Studer
Title: Director

By:    /s/    Karim Blasetti
-----------------------------------
Name:  Karim Blasetti
Title: Associate

55

DEUTSCHE BANK AG NEW YORK BRANCH

By:     /s/  Gayma Z. Shivnarain
        ---------------------------------
        Name:  Gayma Z. Shivnarain
        Title: Director


By:     /s/  Richard Herder
        ---------------------------------
        Name:  Richard Herder
        Title: Managing Director


56

MORGAN STANLEY BANK

By:      /s/    Daniel Twenge
         --------------------------------
         Name:  Daniel Twenge
         Title: Vice President
                Morgan Stanley Bank

57

SUNTRUST BANKS, INC.

By:     /s/    Michael A. Green
        -----------------------------------
        Name:   Michael A. Green
        Title:  First Vice President

58

```
                                ABN AMRO BANK N.V.

                    By:     /s/    Neil R. Stein
                            ----------------------------------
                            Name:    Neil R. Stein
                            Title:   Director


                    By:     /s/    Michael DeMarco
                            ----------------------------------
                            Name:    Michael DeMarco
                            Title:   Assistant Vice President


                    59
```

```
                              BARCLAYS BANK PLC

                    By:    /s/  Alison A. McGuigan
                           --------------------------------
                           Name:  Alison A. McGuigan
                           Title: Associate Director
```

60

```
                                  FIFTH THIRD BANK

                          By:    /s/    Andrew D. Jones
                                 ---------------------------------
                                 Name:  Andrew D. Jones
                                 Title: Corporate Banking Officer


                          61
```

FIRST NATIONAL BANK OF OMAHA

By:     /s/  Josh Tresemer
        -----------------------------------
        Name:  Josh Tresemer
        Title: Correspondent Banking Officer

62

ROYAL BANK OF CANADA

By:    /s/  Howard Lee
             -----------------------------------
        Name:  Howard Lee
        Title: Authorized Signatory

63

SOCIETE GENERALE

By:      /s/  Barry Groveman
         -------------------------------
         Name:  Barry Groveman
         Title: Vice President


64

COMMITMENT SCHEDULE

| Lender | Commitment |
| --- | --- |
| JPMorgan Chase Bank N.A. | $ 60,000,000 |
| Citibank, N.A. | 60,000,000 |
| Bank of America, N.A. | 47,500,000 |
| Credit Suisse, Cayman Islands Branch | 47,500,000 |
| Deutsche Bank AG New York Branch | 47,500,000 |
| Morgan Stanley Bank | 47,500,000 |
| SunTrust Banks, Inc. | 40,000,000 |
| ABN AMRO Bank N.V. | 25,000,000 |
| Barclays Bank PLC | 25,000,000 |
| Fifth Third Bank | 25,000,000 |
| First National Bank of Omaha | 25,000,000 |
| Royal Bank of Canada | 25,000,000 |
| Societe Generale | 25,000,000 |
| TOTAL | $500,000,000 |

65

PRICING SCHEDULE

Each of "FACILITY FEE RATE" and "EURO-DOLLAR MARGIN" means, for any date, the rate set forth below in the row opposite such term and in the column corresponding to the "Status" and "Utilization" that exist on such date:

| STATUS | LEVEL I | LEVEL II | LEVEL III | LEVEL IV | LEVEL V |
|---|---|---|---|---|---|
| Facility Fee Rate | .0700% | .0900% | .1100% | .1500% | .2000% |
| Euro-Dollar Margin | | | | | |
| Utilization < 50% | .2800% | .3100% | .3400% | .4750% | .5500% |
| Utilization > 50% | .3800% | .4100% | .4400% | .5750% | .6500% |

For purposes of this Schedule, the following terms have the following meanings, subject to the concluding paragraph of this Schedule:

"LEVEL I STATUS" exists at any date if, at such date, the Borrower's credit rating is A- or higher by S&P OR A3 or higher by Moody`s.

"LEVEL II STATUS" exists at any date if, at such date, (i) the Borrower's credit rating is BBB+ or higher by S&P OR Baa1 or higher by Moody's and (ii) Level I Status does not exist.

"LEVEL III STATUS" exists at any date if, at such date, (i) the Borrower's credit rating is BBB or higher by S&P OR Baa2 or higher by Moody's and (ii) neither Level I Status nor Level II Status exists.

"LEVEL IV STATUS" exists at any date if, at such date, (i) the Borrower's credit rating is BBB- or higher by S&P OR Baa3 or higher by Moody's and (ii) none of Level I Status, Level II Status and Level III Status exists.

"LEVEL V STATUS" exists at any date if, at such date, no other Status exists.

"STATUS" refers to the determination of which of Level I Status, Level II Status, Level III Status, Level IV Status or Level V Status exists at any date.

"UTILIZATION" means at any date the percentage equivalent of a fraction (i) the numerator of which is the aggregate outstanding principal amount of the Loans at such date, after giving effect to any borrowing or payment on such date, and (ii) the denominator of which is the aggregate amount of the Commitments at such date, after giving effect to any reduction of the Commitments on such date. For purposes of this Schedule, if for any reason any Loans remain outstanding after termination of the Commitments, the Utilization for each date on or after the date of such termination shall be deemed to be 100%.

66

The credit ratings to be utilized for purposes of this Schedule are those assigned to the senior unsecured long-term debt securities of the Borrower without third-party credit enhancement, and any rating assigned to any other debt security of the Borrower shall be disregarded. The rating in effect at any date is that in effect at the close of business on such date. In the case of split ratings from S&P's and Moody's, the rating to be used to determine which Status applies is the higher of the two; PROVIDED that if the split is more than one notch, a rating one notch higher than the lower of the two shall be used.

67

.

Schedule 3.06

DISCLOSED MATTERS

Investigation by United States Securities and Exchange Commission and audit by United States Department of Education Office of Inspector General (as described further in the Borrower's Form 10Q filed with the US Securities and Exchange Commission for the period ended June 30, 2005 at Part I, Item 2 "Management's Discussion and Analysis of Financial Condition and Results of Operations" under the heading "Political/Regulatory Risk" as well as Part II, Item 1 "Legal Proceedings"), and any findings, orders, judgments or requirements of any Government Authority resulting therefrom or related thereto.

68

.

Schedule 6.04

ELIGIBLE SECURITIES

"Eligible Securities" are:

(a) direct obligations of, or obligations on which the timely payment of the principal of and interest on which are unconditionally and fully guaranteed by, the United States of America;

(b) interest-bearing time or demand deposits, certificates of deposit or other similar banking arrangements with a maturity of 12 months or less with any bank, trust company, national banking association or other depository institution, provided that, at the time of deposit or purchase such depository institution has commercial paper which is rated "A-1+" by S&P and "F1" or higher by Fitch and has the required ratings from Moody's corresponding to the duration of such investment set forth below;

(c) interest -bearing time or demand deposits, certificates of deposit or other similar banking arrangements with a maturity of 24 months or less, but more than 12 months, with any bank, trust company, national banking association or other depository institution, provided that, at the time of deposit or purchase such depository institution has senior debt rated "A" or higher by S&P and "A" or higher by Fitch, if commercial paper is outstanding, commercial paper which is rated "A-1+" by S&P and "F1" or higher by Fitch and has the required ratings from Moody's corresponding to the duration of such investment set forth below;

(d) interest -bearing time or demand deposits, certificates of deposit or other similar banking arrangements with a maturity of more than 24 months with any bank, trust company, national banking association or other depository institution, provided that, at the time of deposit or purchase such depository institution has senior debt rated "AA" or higher by S&P and "AA" or higher by Fitch, if commercial paper is outstanding, commercial paper which is rated "A-1+" by S&P, "P-1" by Moody's and "F1" or higher by Fitch and has the required ratings from Moody's corresponding to the duration of such investment set forth below;

(e) bonds, debentures, notes or other evidences of indebtedness issued or guaranteed by any of the following agencies: Federal Farm Credit Banks, Federal Home Loan Mortgage Corporation; the Export-Import Bank of the United States; the Federal National Mortgage Association; the Farmers Home Administration; Federal Home Loan Banks provided such obligation is rated "AAA" by S&P, "Aaa" by Moody's and "AAA" by Fitch; or any agency or instrumentality of the United States of America which shall be established for the purposes of acquiring the obligations of any of the foregoing or otherwise providing financing therefor;

69

(f) repurchase agreements and reverse repurchase agreements, other than overnight repurchase agreements and overnight reverse repurchase agreements, with banks which are members of the Federal Deposit Insurance Corporation or firms which are members of the Securities Investors Protection Corporation, in each case whose outstanding, unsecured debt securities are rated "A" or higher by S&P and "A" or higher by Fitch, if commercial paper is outstanding, commercial paper which is rated "A-1+" by S&P and "F1" or higher by Fitch and has the required ratings from Moody's corresponding to the duration of such investment set forth below;

(g) overnight repurchase agreements and overnight reverse repurchase agreements at least 101% collateralized by securities described in subparagraph (a) of this definition and with a counterparty that has senior debt rated "A" or higher by S&P and "A" or higher by Fitch, if commercial paper is outstanding, commercial paper which is rated "A-1+" by S&P and "F1" or higher by Fitch and has the required ratings from Moody's corresponding to the duration of such investment set forth below, or a counterparty approved in writing by S&P, Moody's and Fitch, respectively;

(h) investment agreements or guaranteed investment contracts, which may be entered into by the Borrower and any bank, bank holding company, corporation or any other financial institution, whose outstanding (i) commercial paper is rated "A-1+" by S&P and "F1" or higher by Fitch for agreements or contracts with a maturity of 12 months or less and has the required ratings from Moody's corresponding to the duration of·such investment set forth below; (ii) unsecured long-term debt is rated "A" or higher by S&P and "A" or higher by Fitch and, if commercial paper is outstanding, commercial paper which is rated "A-1+" by S&P and "F1" or higher by Fitch for agreements or contracts with a maturity of 24 months or less, but more than 12 months and has the required ratings from Moody's corresponding to the duration of such investment set forth below, or (iii) unsecured long-term debt is rated "A" or higher by S&P and "A" or higher by Fitch and, if commercial paper is outstanding, commercial paper which is rated "A-1+" by S&P and "F1" or higher by Fitch for agreements or contracts with a maturity of more than 24 months and has the required ratings from Moody's corresponding to the duration of such investment set forth below, or, in each case, by an insurance company whose claims-paying ability is so rated;

(i) "tax exempt bonds" as defined in Section 150(a)(6) of the Code, other than "specified private activity bonds" as defined in Section 57(a)(5)(C) of the Code, that are rated in the highest category by S&P and Fitch for long-term or short-term debt, or shares of a so-called money market or mutual fund rated "AAAm/AAAm-G" or higher by S&P, and "AA/F1+" or higher by Fitch and has the required ratings from Moody's corresponding to the duration of such investment set forth below, that do not constitute "investment property" within the meaning of Section 148(b)(2) of the Code, provided that the fund has all of its assets invested in obligations of such rating quality;

70

(j) commercial paper which is rated in the single highest classification, "A-1+" by S&P and "F1" or higher by Fitch and has the required ratings from Moody's corresponding to the duration of such investment set forth below, and which matures not more than 270 days after the date of purchase; and

(k) investments in a money market fund rated at least "AAAm" or "AAAm-G" by S&P, "Aaa" by Moody's and "AA" or "F1" or higher by Fitch.

Each Eligible Security or the provider of such Eligible Security (other than those described in paragraphs (a), (e) and (k) of this definition) shall have the following Moody's long-term and or short-term ratings corresponding to the duration of such investment:

| Maximum Maturity | Minimum Ratings |
|---|---|
| One Month | "A2" or "Prime-1" |
| Three Months | "A1" and "Prime-1" |
| Six Months | "Aa3" and "Prime-1" |
| Greater than Six Months | "Aaa" and "Prime-1" |

71

.

EXHIBIT A

ASSIGNMENT AND ASSUMPTION

This Assignment and Assumption (the "ASSIGNMENT AND ASSUMPTION") is dated as of the Effective Date set forth below and is entered into by and between [INSERT NAME OF ASSIGNOR] (the "ASSIGNOR") and [INSERT NAME OF ASSIGNEE] (the "ASSIGNEE"). Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below (as amended, the "CREDIT AGREEMENT"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below (i) all of the Assignor's rights and obligations in its capacity as a Lender under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of the Assignor under the respective facilities identified below and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned pursuant to clauses (i) and (ii) above being referred to herein collectively as the "ASSIGNED INTEREST"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by the Assignor.

1.    Assignor:    _____

2.    Assignee:    _____ [and
                   is an Affiliate/Approved Fund of [IDENTIFY
                   LENDER]\1]

3.    Borrower(s):    Nelnet, Inc. ("NELNET")

\1 Select as applicable.

A-1

.

4.      Administrative Agent:    JPMorgan Chase Bank, N.A.
                                 ("JPMCB") as the administrative agent under the
                                 Credit Agreement

5.      Credit Agreement:        The Credit Agreement dated as
                                 of August 19, 2005 among Nelnet, the Lenders
                                 parties thereto, JPMCB, as Administrative
                                 Agent, and Citibank, N.A., as Syndication
                                 Agent, as amended and in effect from time to
                                 time

6.      Assigned Interest:

| Facility Assigned \2 | Aggregate Amount of Commitment/Loans for all Lenders | Amount of Commitment/Loans Assigned | Percentage Assigned of Commitment/ Loans \3 |
|---|---|---|---|
| | $ | $ | % |
| | $ | $ | % |
| | $ | $ | % |

Effective Date: _____ ___, 20___ [TO BE INSERTED BY
ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF
TRANSFER IN THE REGISTER THEREFOR.]

-------------------------
        \2 Fill in the appropriate terminology for the Types of facilities
under the Credit Agreement that are being assigned under this Assignment
(e.g., "Eurodollar" or "ABR")

        \3 Set forth, to at least 9 decimals, as a percentage of the
Commitment/Loans of all Lenders thereunder.

A-2

The terms set forth in this Assignment and Assumption are hereby agreed to:

                                        ASSIGNOR

                                               [NAME OF ASSIGNOR]
                                        By:
                                           ------------------------------------
                                              Title:


                                        ASSIGNEE

                                               [NAME OF ASSIGNEE]
                                        By:
                                           ------------------------------------
                                              Title:


Consented to and Accepted:

JPMORGAN CHASE BANK, N.A., as
    Administrative Agent
By:
       ------------------------------------
       Title:

                                        A-3

ANNEX 1

CREDIT AGREEMENT dated as of August 19, 2005 among NELNET, INC., the LENDERS party thereto, JPMORGAN CHASE BANK, N.A., as Administrative Agent, and CITIBANK,N.A., as Syndication Agent

STANDARD TERMS AND CONDITIONS FOR
ASSIGNMENT AND ASSUMPTION

1. REPRESENTATIONS AND WARRANTIES.

1.1 ASSIGNOR. The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document , (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of the Borrower, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document or (iv) the performance or observance by the Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document.

1.2. ASSIGNEE. The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it satisfies the requirements, if any, specified in the Credit Agreement that are required to be satisfied by it in order to acquire the Assigned Interest and become a Lender, (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it has received a copy of the Credit Agreement, together with copies of the most recent financial statements delivered pursuant to Section 5.01 thereof, as applicable, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase the Assigned Interest on the basis of which it has made such analysis and decision independently and without reliance on the Administrative Agent or any other Lender, and (v) if it is a Foreign Lender , attached to the Assignment and Assumption is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by the Assignee; and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

A-4

2. PAYMENTS. From and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date.

3. GENERAL PROVISIONS. This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns. This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment and Assumption by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment and Assumption. This Assignment and Assumption shall be governed by, and construed in accordance with, the law of the State of New York.

A-5

EXHIBIT B

OPINION OF COUNSEL FOR THE BORROWER

August 19, 2005

To the Lenders and the Administrative
  Agent Referred to Below
c/o JPMorgan Chase Bank, N.A., as
  Administrative Agent
270 Park Avenue
New York, New York 10017

Dear Sirs:

    We have acted as counsel for Nelnet, Inc., a Nebraska corporation (the "BORROWER"), in connection with the Credit Agreement dated as of August 19, 2005 (the "CREDIT Agreement"), among the Borrower, the banks and other financial institutions identified therein as Lenders, and JPMorgan Chase Bank, as Administrative Agent. Terms defined in the Credit Agreement are used herein with the same meanings.

    We have examined originals or copies, certified or otherwise identified to my/our satisfaction, of such documents, corporate records, certificates of public officials and other instruments and have conducted such other investigations of fact and law as we have deemed necessary or advisable for purposes of this opinion. In our examination, we have assumed the genuineness of the signatures of Persons signing the Credit Agreement, the authority of such Persons signing on behalf of the parties thereto (other than the Borrower) and the due authorization, execution and delivery of all documents by the parties thereto (other than the Borrower).

    Upon the basis of the foregoing, we are of the opinion that:

    1. The Borrower (a) is a corporation duly organized, validly existing and in good standing under the laws of Nebraska, (b) has all requisite power and authority to carry on its business as now conducted and (c) except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required.

    2. The Transactions are within the Borrower's corporate powers and have been duly authorized by all necessary corporate and, if required, stockholder action. The Credit Agreement has been duly executed and delivered by the Borrower and constitutes a legal, valid and binding obligation of the Borrower, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

B-1

3. The Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except such as have been obtained or made and are in full force and effect, (b) will not violate any applicable law or regulation or the charter, by-laws or other organizational documents of the Borrower or any of its Subsidiaries or any order of any Governmental Authority, (c) will not violate or result in a default under any indenture, agreement or other instrument binding upon the Borrower or any of its Subsidiaries or its assets, or give rise to a right thereunder to require any payment to be made by the Borrower or any of its Subsidiaries, and (d) will not result in the creation or imposition of any Lien on any asset of the Borrower or any of its Subsidiaries.

4. There are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to our knowledge, threatened against or affecting the Borrower or any of its Subsidiaries (a) as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, could reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect (other than the Disclosed Matters) or (b) that involve the Credit Agreement or the Transactions.

5. Neither the Borrower nor any of its Subsidiaries is (a) an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940 or (b) a "holding company" as defined in, or subject to regulation under, the Public Utility Holding Company Act of 1935.

We are members of the bar of the State of Nebraska and the foregoing opinion is limited to the laws of the State of Nebraska and the Federal laws of the United States of America. We note that the Credit Agreement is governed by the laws of the State of New York and, for purposes of the opinion expressed in paragraphs 2 and 3 above, we have assumed that the laws of the State of New York do not differ from the laws of Nebraska in any manner that would render such opinion incorrect. This opinion is rendered solely to you in connection with the above matter. This opinion may not be relied upon by you for any other purpose or relied upon by any other Person (other than your successors and assigns as Lenders and Persons that acquire participations in your Loans) without our prior written consent.

Very truly yours,

B-2

EXHIBIT C

OPINION OF DAVIS POLK & WARDWELL

August 19, 2005

To the Lenders and the Administrative
  Agent Referred to Below
c/o JPMorgan Chase Bank, N.A., as
  Administrative Agent
270 Park Avenue
New York, New York 10017

Ladies and Gentlemen:

        We have participated in the preparation of the Credit Agreement (the
"CREDIT Agreement") dated as of August 19, 2005 among Nelnet, Inc., a Nebraska
corporation (the "BORROWER"), the Lenders from time to time parties thereto (the
"LENDERS"), JPMorgan Chase Bank, N.A., as Administrative Agent (the
"ADMINISTRATIVE AGENT"), and Citibank, N.A., as Syndication Agent, and have
acted as special counsel to the Administrative Agent for the purpose of
rendering this opinion pursuant to Section 4.01(f) of the Credit Agreement.
Terms defined in the Credit Agreement are used herein as therein defined.

        We have examined originals or copies, certified or otherwise identified
to our satisfaction, of such documents, corporate records, certificates of
public officials and other instruments and have conducted such other
investigations of fact and law as we have deemed necessary or advisable for
purposes of this opinion.

        Upon the basis of the foregoing, we are of the opinion that the Credit
Agreement constitutes a valid and binding agreement of the Borrower enforceable
in accordance with its terms except as the same may be limited by bankruptcy,
insolvency or similar laws affecting creditors' rights generally and by general
principles of equity.

        We are members of the Bar of the State of New York and the foregoing
opinion is limited to the laws of the State of New York and the federal laws of
the United States of America. In giving the foregoing opinion, (i) we have
assumed without independent investigation that the execution, delivery and
performance by the Borrower of the Credit Agreement are within the Borrower's
corporate powers and have been duly authorized by all necessary corporate action
and (ii) we express no opinion as to the effect (if any) of any law of any
jurisdiction (except the State of New York) in which any Lender is located which
limits the rate of interest that such Lender may charge or collect.

C-1

This opinion is rendered solely to you in connection with the above matter. This opinion may not be relied upon by you for any other purpose or relied upon by any other person without our prior written consent.

Very truly yours,

C-2

EXHIBIT D

FORM OF COMPLIANCE CERTIFICATE

JPMorgan Chase Bank, N.A.,
   as Administrative Agent

Attention: _____

            Re:    Compliance Certificate

Ladies and Gentlemen:

        Reference is made to the Credit Agreement dated as of August 19, 2005 among Nelnet, Inc., (the "BORROWER") and the Lenders and Agents from time to time parties thereto (such agreement, as amended and in effect from time to time, the "AGREEMENT"); capitalized terms used herein without definition shall have the meanings assigned those terms in the Agreement.

        This Certificate is furnished to the Administrative Agent for the benefit of the Lenders pursuant to Section 5.01 of the Agreement.

        The undersigned, _____, hereby certifies to the Administrative Agent for the benefit of the Lenders as follows:

    1.  Authority. I am the duly elected, qualified and acting _____ of the Borrower.

    2.  Fiscal Period. This certificate is for the fiscal period ended _____ __, 200__ (the "CERTIFICATION DATE").

    3.  Financial Statements.
        (a) The accompanying consolidated statements of operations, stockholders' equity and cash flows of the Borrower and its Consolidated Subsidiaries for the fiscal quarter ended on the Certification Date [and for the then elapsed portion of the fiscal year] and the related consolidated balance sheet of the Borrower and its Consolidated Subsidiaries as at the Certification Date, together in each case with the corresponding figures in comparative form for the previous fiscal year, present fairly in all material respects the financial condition and results of operations of the Borrower and its Consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, subject to year-end audit adjustments and the absence of footnotes.

        [(b)] The accompanying statements of operations, stockholders' equity and cash flows for the fiscal quarter ended on the Certification Date [and for the then elapsed portion of the fiscal year] and the related balance sheet of the Borrower as at the Certification Date, together in each case with the corresponding figures in comparative form for the previous fiscal year, present fairly in all material respects the financial condition and results of operations of the Borrower on a consolidated basis in accordance with GAAP consistently applied, subject to [year-end audit adjustments and] the absence of footnotes.

D-1

4. No Default. To my knowledge, no Default has occurred or is continuing as of the date of this certificate, except as set forth below:

5. Minimum Consolidated Net Worth (Section 6.03).
    (a) Consolidated Net Worth at Certification Date      $_____

    (b) Calculation of Compliance Level

        (i)  Compliance level at preceding Certification Date (from prior Compliance Certificate)      $_____

        (ii) Increase in Consolidated Net Worth attributable to the issuance of capital stock of the Borrower since the preceding Certification Date      $_____

    [(iii) 50% of Consolidated Net Income for the fiscal year ended at the Certification Date]      [$_____]

      Compliance Level at Certification Date ((i) plus (ii) [plus (iii)])      $_____

    [(c)  Calculation of Consolidated Net Income
    Consolidated net income (from income statement)      $_____

    [plus] [minus] Derivatives market value adjustment      $_____

    Consolidated Net Income      [$_____]

D-2

6. Adjusted EBITDA to Corporate Debt Interest (Section 6.04)

    (a) Unencumbered Assets at Certification Date

        (I)    Eligible Assets at Certification Date not subject to any Lien:

| | | | |
|---|---|---|---|
| (i) | Eligible Securities | $_____ |
| (ii) | Student loans receivable | $_____ |
| (iii) | Cash and cash equivalents | $_____ |
| (iv) | Accrued interest receivable | $_____ |
| (v) | Accounts receivable | $_____ |
| (vi) | Total (i) - (v) | $_____ |

        (II)    Eligible Assets subject to release from any Lien within 60 days from the Certification Date:

| | | | |
|---|---|---|---|
| (i) | Eligible Securities | $_____ |
| (ii) | Student loans receivable | $_____ |
| (iii) | Cash and cash equivalents | $_____ |
| (iv) | Accrued interest receivable | $_____ |
| (v) | Accounts receivable | $_____ |
| (vi) | Total (i) - (v) | $_____ |

        (III)   Unencumbered Assets at Certification Date ((I)(vi) plus (II)(vi))    $_____

    (b) Calculation of Adjusted EBITDA

        (I)    Pre-Tax Income (consolidated net income before income taxes, minority interests and extraordinary items, if any)    $_____

        (II)   Additions to the extent deducted in determining Pre-Tax Income:

.

(i)   Corporate Debt Interest                              $_____

(ii)  Depreciation and amortization                       $_____

(iii) 9.5% excess statutory yield amount
      (if negative)                                        $_____
(iv)  Derivatives market value adjustment
      (if negative)                                        $_____

(v)   Total additions                                      $_____

(III) Deductions from Pre-Tax Income to the extent
      included therein:                                    $_____

      (i)   Variable-rate floor income                     $_____

      (ii)  9.5% excess statutory yield amount
            (if positive)                                  $_____
      (iii) Derivatives market value adjustment
            (if positive)                                  $_____

      (iv)  Total deductions                               $_____

(IV)  Adjusted EBITDA (I plus II(v) minus III(iv))         $_____

(c) Calculation of Ratio
    (b)(iv) / (b)(II)(ii) (must be not less
    than 3.0, if (a)(III) above is less than
    $250,000,000, and not less than 2.50 if
    (a)(III) above is $250,000,000 or more)                _____

7.  Subsidiary Indebtedness (Section 6.05) Aggregate
    principal amount of Indebtedness of Subsidiaries
    (other than Intercompany Indebtedness) outstanding
    at the Certification Date (must not exceed $25,000,000)
                                                           $_____

8.  Non-FFELP Loans To All Loans (Section 6.06)            $_____

    (a)    Aggregate amount of Non-FFELP Loans owned by the
    Borrower and its Consolidated Subsidiaries at the
    Certification Date                                     $_____

    (b)    Aggregate amount of all student loans receivable owned
    by the Borrower and its Consolidated Subsidiaries at the
    Certification Date                                     $_____

    (c)    (a) / (b) (must not equal or exceed 0.10)       _____

D-4

IN WITNESS WHEREOF, the undersigned has executed this Certificate on the date set forth below.

------------------------------------
Name:
Title:

Dated: _____, 200__

# Office of Student Financial Assistance

government's first performance-based organization.



### U.S. Department of Education Lender/Servicer
#### Organization Participation Agreement

If you are an ELIGIBLE LENDER:

Lender Name_____

Lender Identification (LID) Number(s)_____

Authorizing Official for LID Number(s) (please print):_____

Original Signature_____ Date_____

If you are a lender SERVICER:

Servicer Name_____

Servicer Identification Number filed on behalf of LID Numbers_____

_____

Authorizing Official for Servicer (please print):_____

Original Signature_____ Date_____

If you are an Eligible Lender TRUSTEE:

Eligible Lender Trustee Name_____

LID Number(s)_____

Authorizing Official of Lender for ID Number(s) (please print):_____

_____

Original Signature_____ Date_____

Name of Entity(ies) for whom the Trustee is acting:_____

By completing and signing this agreement, the Lender, Servicer, or Eligible Lender Trustee agrees to submit data on the quarterly Lender Reporting System report (LaRS) to the U.S. Department of Education and to receive information and data from the Department electronically.

**NOTE:** in the event that more space is needed on this first page, please attach additional copies of this first page completed with the informa_____riginal signatures as appropriate.

**U.S. Department of Education Lender/Servicer** *Organization Participation Agreement*

---

**Certification:**

As an eligible Lender, Servicer, or Eligible Lender Trustee in the Federal Family Education Loan Program (FFELP) that submits the Lender Reporting System report (LaRS) electronically, I certify, by my signature above that:

The data that my organization or its agent, or its third-party servicer, will submit to the U.S. Department of Education electronically pursuant to this Agreement is and will be correct to the best of my knowledge and belief. I certify that it conforms to the laws, regulations, and policies applicable to the Federal Family Education Loan Program. I understand that all documents, files, accounts and records supporting this data are subject to audit or review by the Secretary of Education or other authorized representatives of the United States Government (including representatives of any guaranty agency that provides the guarantees on loans included in data submitted electronically), and I agree to make all such documents, files, accounts and records available to the Secretary or such authorized representatives without restriction.

**Warning:**

Any person who submits false or inaccurate data may be subject to civil action and/or criminal penalties under the laws of the United States. Any person who knowingly and willfully destroys or conceals any record(s) relating to the provision of assistance under Title IV of the Higher Education Act of 1965, as amended, or attempts to so destroy or conceal with intent to defraud the United States or to prevent the United States from enforcing any right obtained by subrogation under Part B of Title IV, shall upon conviction thereof, be fined not more than $20,000, or imprisoned not more than 5 years, or both, under the provisions of 20 U.S.C. 1097.

---

**Term of Agreement:**

This Agreement terminates on September 30, 2004 unless extended by consent of both parties. Either party may terminate this Agreement prior to that date by providing written notice of the termination to the other party no less than 30 calendar days prior to the effective date of the termination. This Agreement automatically terminates if the Lender, Servicer, or Eligible Lender Trustee merges or otherwise combines with another organization. If the Agreement is executed by an Eligible Lender Trustee, it applies only to data submitted by the Trustee or its agent in connection with loans made by the Trustee under an Agreement with the Entities identified on the first page of this Agreement. In the event of a merger or new trustee relationship, the Lender, Servicer, or Eligible Lender Trustee must submit a new Agreement to the Department at least 30 days prior to the event. A lender, servicer, or eligible lender trustee that does not have an Agreement in effect with the Department will not be authorized to exchange data with the Department electronically which may delay the payment of funds by the Department.

---

**U.S. Department of Education Lender/Servicer** *Organization Participation Agreement*

**WHERE TO SEND THIS AGREEMENT:**

U.S. Department of Education
Lender Reporting
P.O. Box 2768
Washington, DC 20013-2768

If you have any questions, please contact us at fsa_lr@ed.gov or call 202-377-3326

**Original signatures are required.  Stamped or photocopied signatures will not be accepted.**

United States Department of Education Use Only!

Signature of Authorized U.S. Department of Education Representative
Date

**Instructions:**

Please read the below narrative carefully to ensure that you have provided the correct number of signatures and have properly completed your Organization Participation Agreement.   It is important that you complete each section on page 1 that applies to your particular situation. For example, if you are an institution that functions as a lender, a servicer, and a trustee bank, you will need to provide information that pertains to each function.

I.    **Definition of key terms/Who Signs the Agreement:**

The Lender or Servicer ID Number: is the 6-digit identification code issued to your organization by the United States Department of Education (the Department).

The Lender or Servicer Name is the name of the organization, which participates in the FFELP.

**U.S. Department of Education Lender/Servicer** *Organization Participation Agreement*

A third-party servicer is any organization or individual that acts on behalf of another party in administering any aspect of the FFELP as defined in 34 C.F.R., 682.200. A third-party servicer may submit data under this Agreement only if it is authorized to do so by the Lender or Eligible Lender Trustee for which it is acting.

The Authorizing Official for the ID Number is the name of the person in your organization responsible for submitting correct financial data and has the authority to commit the organization's or company's funding.

## II. The Lender/Servicer agrees to:

- Transmit documents to the Department via an ED-administered website.

- Provide and maintain, at its expense, all machines, and programs necessary to effectively and reliably transmit and receive data.

- Submit Lender Reporting System report (LaRS) using File Transfer methodology or data entry in accordance with the Department's requirements and directions. Provide the Department with the name and address of the person legally responsible for the data transmissions to SFA.

- Certify the accuracy and completeness of the data electronically transmitted to SFA's Financial Management System.

- Accurately complete all steps on the Agreement and promptly notify SFA of any change to the information provided herein.

## III. If the Lender or Servicer submits this Agreement to the Department and completes the on-line Lender Application Process (LAP), the Department will:

1. Allow web submission of Lender Reporting System report (LaRS) data to Student Financial Assistance Lender/Servicer Reporting, using File Transfer methodology or data entry.

2. Acknowledge web submissions by receipt that includes date and time of the transaction.

**U.S. Department of Education Lender/Servicer** *Organization Participation Agreement*

3.    Notify the Lender or Servicer if it does not accept the substance of the received web data.

**IV.    Miscellaneous/When is an Agreement Submitted:**

1.    The Lender or Servicer agrees to submit data in the format specified by the U.S. Department of Education.

2.    For an institution that is acting in more than one capacity (e.g., Lender and Trust Bank), only one Agreement is required.

3.    Complete and valid Agreements must be mailed to the Department for an institution to successfully complete the on-line LAP and begin submitting LaRS reports.

| |
|---|
| For Office Use Only |
| Date _____ |

**U.S. Department of Education Guaranty Agency**
*Organization Participation Agreement*

Guaranty Agency Code _____

Name of Guaranty Agency _____

Authorizing Official _____

By completing this form and signing the certification, you are agreeing to electronically submit and receive information and data required to be submitted on the ED Form 2000 or Guaranty Agency Financial Report to the Department of Education (ED). You may choose 'site' points at your organization or at a third-party servicer to send and receive data on your organization's behalf. By signing this certification, you certify that all information submitted to the Department is and will be accurate and correct.

**Attention: A guaranty agency must complete all parts of this form and certification to participate in the Office of Student Financial Assistance's electronic information and data exchange with the financial management system (FMS).**

**Any questions please contact us at FSA_GAR@ed.gov.**

For Office Use Only

Date _____



## U.S. Department of Education Guaranty Agency
*Organization Participation Agreement*

---

**Certification:**

As an authorized participant in the electronic submission of the Guaranty Agency Financial Report, I certify, by my signature below that:

The data that my organization or its agent will submit to the U.S. Department of Education electronically pursuant to this agreement is and will be correct to the best of my knowledge and belief. I certify that it conforms to laws, regulations, and policies applicable to the Federal Family Education Loan Program. I certify under threat of penalty (including loss of reinsurance) that diligent attempts have been made to locate borrowers through reasonable skip tracing techniques for which default claims are filed herein. I understand that all documents, files, accounts and records supporting this data are subject to audit or review by the Secretary of Education or other authorized representatives of the United States Government and I agree to make all such documents, files, accounts and records available to the Secretary or such authorized representatives without restriction.

**Warning:**
Any person who submits false or inaccurate data may be subject to civil action and/or criminal penalties under the laws of the United States. Any person who knowingly and willfully destroys or conceals any record(s) relating to the provision of assistance under Title IV of the Higher Education Act of 1965, as amended, or attempts to so destroy or conceal with intent to defraud the United States or to prevent the United States from enforcing any right obtained by subrogation under Part B of Title IV, shall upon conviction thereof, be fined not more than $20,000, or imprisoned not more than 5 years, or both, under the provisions of 20 U.S.C. 1097.

---

Designating Organization/Guaranty Agency Authorizing Official (Destination Point Administrator)

Name (please print) _____    Title _____

Signature _____    Date _____

---

**Original signatures are required. Stamped or photocopied signatures will not be accepted.**

---

United States Department of Education Use Only!

Signature of Authorized U.S. Department of Education Representative          Date

---

**U.S. Department of Education Guaranty Agency**

*Organization Participation Agreement*

## I.    Definition of terms:

The Guaranty Agency is the entity which participates in the electronic Student Financial Assistance Guarantor Payment program with the United States Department of Education, hereafter referred to as the Department.

A site point is the organization actually transmitting data to or receiving data from the Department.

The Guaranty Agency may designate a site point as a particular office or person in the agency, or a separate third-party servicer acting on the guaranty agency's behalf.

## II.        The Guaranty Agency agrees to:

Transmit documents to the Department via a link from the following website:
http://www.fp.ed.gov/

Participate in tests of its electronic processing system and procedures with Department staff.  Upon successful completion of testing, the Department will begin using the electronic processing system to exchange data and information with the guaranty agency unless the guaranty agency violates the terms of this agreement and certification.

Provide and maintain, at own expense, all machines, and programs necessary to effectively and reliably transmit and receive data.

Submit Guaranty Agency Financial Reports using File Transfer Protocol (FTP) or data entry in accordance with the Department's requirements and directions.  Provide the Department with the name and address of the person legally responsible for the accuracy of the data and the transmissions to FSA.

Certify the accuracy and completeness of the data electronically transmitted to FSA's Financial Management System.

Accurately complete all steps on the Agreement and Certification and promptly notify FSA of any change to the information provided herein.

Any Guaranty Agency that fails to comply with the Department's procedures for electronic processing or violates applicable Federal laws or regulations regarding the submission of Guaranty Agency Financial Report data will be immediately suspended from participation in all electronic FSA Financial Management System services and may be subject to limitation, suspension or termination of its participation in the Federal Family Education Loan program.

**U.S. Department of Education Guaranty Agency**

*Organization Participation Agreement*

## III.   Security

Any Guaranty Agency submitting Guaranty Agency Financial Report data via FSA's Financial Management System shall follow these security practices:

| | |
|---|---|
| **ID and Password Responsibilities** | Individual general users, service administrators, and product administrators are responsible for practicing effective password management.  Users are responsible for maintaining the secrecy of their IDs as well as their passwords.  Authorized users will be held responsible for all data transmitted to FSA under their user ID. |
| **Logging Off Unattended Terminals** | Terminals should be logged off the network before they are turned off or left unattended.  Logged-on terminals should not be left unattended.  If terminals are to be left unattended for any reason, keyboard locks should be used. |
| **Physical Security Procedures And Responsibilities** | The Guaranty Agency is responsible for the physical security of facilities at the sites that are connected to the network.  This includes but is not limited to terminals, PCs, printers and so on.  Guaranty Agencies are to report to FSA immediately any security incidents involving access to FSA's Financial Management System. |
| **Reporting Suspected Security Breaches** | All users are responsible for bringing suspected security breaches to the attention of their management. |
| **Security Breaches and Termination of Service** | If FSA suspects misuse of the client network connection, FSA will immediately suspend direct access pending an inquiry.  The client will be notified as to why access has been suspended. |
| **ID and Password Re-Assignment** | The Guaranty Agency will notify FSA each time a user ID is reassigned to a new responsible party, and will ensure a new password is used by the new user of the reassigned user ID.

This responsibility includes placing stringent controls over user ID passwords.  In our experience, these are the single most neglected security mechanisms.  We recommend using passwords of at least six characters, making them hard to guess, and changing them frequently.

If the information assets controlled by the application are of considerable value -- and only you can make that determination – you should employ additional control measures. |

Page 4 of 5

## U.S. Department of Education Guaranty Agency
*Organization Participation Agreement*

**IV.    If the guaranty agency meets the requirements for participation in the electronic processing system, the Department will:**

1.    Allow web submission of Guaranty Agency Financial Report data to Student Financial Assistance Guaranty Agency Reporting processing, using File Transfer Protocol (FTP) or data entry.

2.    Acknowledge web submissions by receipt that includes date and time of the transaction.

3.    Notify the Guaranty Agency if it does not accept the substance of the received web data.

4.    Using FSA's Financial Management System security protocol, establish an identification and password for each Guaranty Agency.

**V.    Miscellaneous:**

1.    This Agreement is in effect for two years or until terminated by the guaranty agency or the Department.  Termination is achieved by providing written notice to the other party at least 30 days in advance.

2.    The Guaranty Agency agrees to submit data in the format specified by the U.S. Department of Education.

8:07-cv-00266-LSC-FG3   Doc # 25   Filed: 05/19/08   Page 284 of 285 - Page ID # 431

# Direct Loans

William D. Ford Federal Direct Loan Program

## Federal Direct Consolidation Loan Verification Certificate

OMB No. 1845-0053
Form Approved
Exp Date 1/31/2005

The borrower identified in Item 3 of this Verification Certificate (certificate) has requested consolidation of his or her education loan(s). The Federal Direct Consolidation Loan Program (Direct Consolidation Loan Program) enables borrowers to apply for a loan to consolidate outstanding education loans pursuant to Title IV of the Higher Education Act of 1965, as amended. Loans that may be consolidated are listed in the instructions on the back of this certificate. This certificate is used to verify the payoff amount of the borrower's outstanding education loan(s) selected for consolidation. As part of the Federal Direct Consolidation Loan Application and Promissory Note, the borrower named in Item 3 has authorized your disclosure of information regarding the education loan(s) listed in Item 5. Please confirm that the information provided is accurate, complete blank items, and return within 10 business days of the date received to the address given on the back of this certificate.

For information or assistance when completing this certificate, please call the Loan Origination Center's Consolidation Department at **1-800-557-7392**.

**(1) Holder/Servicer Information**

Holder/Servicer is: ☐ Lender   ☐ Guarantor
(check only one)   ☐ Servicer for Lender   ☐ Servicer for Guarantor

Name _____

Street _____

City, State, Zip Code _____

Area Code/Telephone # _____

Area Code/Fax # _____

**(4)** Certification Date _____

See the reverse side for instructions.

**(2) Institution and Address to which payoff amount should be sent**
(If different from Item 1)

Name _____

Street _____

City, State, Zip Code _____

Area Code/Telephone # _____

Area Code/Fax # _____

Contact's Name _____

**(3) Borrower Information**

Name _____

Social Security # _____

Street _____

City, State, Zip Code _____

Area Code/Telephone # _____

| Accl ID | (5) Account Number | (6) Loan Type | (7) Interest Rate (%) | (8) Principal Balance Outstanding | (9) Interest thru Certification Date (Item 4) | (10) Fees and Late Charges | (11) Collection Costs | (12) Total Due | (14) First/Only Disbursement Date | (15) In-School Period (Yes/No) | (16) ED School Code | (17) Anticipated/ Actual Completion Date | (18) Defaulted (Yes/No) | (19) Satisfactory Repayment Arrangement (Yes/No) | (20) Judgment (Yes/No) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| #5 |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| #6 |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |

**(13) Total Payoff Amount** _____

**(21)** Additional Comments _____

**(22) Holder/Servicer Certification:** I certify that: (1) To the best of my knowledge and belief, the information on this certificate is accurate and complete; (2) Each loan identified above is a legal, valid, and binding obligation of the borrower; (3) Each such loan was made and serviced in compliance with all applicable laws and regulations; and (4) In the case of Federal Stafford Loans [subsidized and unsubsidized (GSL)], Federal PLUS Loans, Federal Supplemental Loans for Students (SLS) [and Auxiliary Loans to Assist Students (ALAS)], and Federal Insured Student Loans (FISL), the insurance on each such loan is in full force and effect. The loan amount(s) confirmed includes the amount(s) necessary to discharge the loan(s). This certificate will be relied on by the U.S. Department of Education in paying off the listed loan(s).

_____
Signature of Authorized Official

_____
Name and Title of Authorized Official (Please Print)

_____
Holder/Servicer Name

_____
Area Code/Telephone Number

_____
Date

# Federal Direct Consolidation Loan Verification Certificate Instructions

The borrower named in this certificate has requested a Federal Direct Consolidation Loan (Direct Consolidation Loan) to repay an eligible federal education loan(s). The borrower has identified a loan(s) you hold as one of the loans to be considered in the application process. As part of the application process for a Direct Consolidation Loan, each loan holder/servicer identified by the borrower must complete this Verification Certificate (certificate). After receiving the certificate from you and determining that the loan(s) is eligible for consolidation, the U.S. Department of Education (ED) will pay off the borrower's debt to you using the information you provide on this certificate. Upon receipt of payment from ED, you must inform the borrower that the loan(s) from you has been paid in full. An overpayment from ED or any payments from the borrower after you receive ED's payment must be sent to ED for application to the borrower's Direct Consolidation Loan. If the borrower calls you about his or her account while the Direct Consolidation Loan application is in process, the borrower should be told to continue to make regularly scheduled payments on the loan to avoid default.

Pursuant to 34 CFR 685.220 (f)(1)(i), this certificate must be completed and returned within 10 business days of the date received to the address given below.

## Holder/Servicer Instructions:

Please complete the blank items and confirm that the information provided is accurate.

**Item 1:** Correct or complete the holder/servicer's information.

**Item 2:** If the payoff check should be sent to a different institution and/or address than that in Item 1, enter the requested information.

**Item 3:** Correct or complete the borrower's full name, social security number, current address, and current area code and telephone number.

**Item 4:** Enter the date you complete this certificate.

**Note:** If you are no longer the holder of one or more of the loans listed, complete the information for the loan(s) you hold and indicate the new holder for the other loan(s) in Item 21.

**Item 5:** Enter the account number assigned to the borrower's education loan(s) if not provided. Assume the borrower wants to consolidate all loans of the type provided. If the borrower provided an incomplete account number, you must correct the account number and complete this certificate. If you have multiple accounts for this borrower, you must list them as Account #1, Account #2, etc. If the account number is the same for each loan, enter "same" on the subsequent lines.

**Item 6:** Enter the correct loan type, using the codes as noted below in bold print.

### Subsidized Loans:

A  Subsidized Federal Stafford Loans
B  Guaranteed Student Loans (GSL)
C  Federal Insured Student Loans (FISL)
D  Federal Direct Stafford/Ford Loans
E  Federal Direct Subsidized Consolidation Loans
F  Federal Perkins Loans
M  National Direct Student Loans (NDSL)
N  National Defense Student Loans (NDSL)

O  Subsidized Federal Consolidation Loans

### Unsubsidized Loans:

G  Unsubsidized Federal Stafford Loans (including Non-Subsidized Stafford Loans made prior to 10/1/92)
H  Federal Supplemental Loans for Students (SLS)
J  Unsubsidized Federal Consolidation Loans
K  Federal Direct Unsubsidized Consolidation Loans
L  Federal Direct Unsubsidized Stafford/Ford Loans
P  Auxiliary Loans to Assist Students (ALAS)
Q  Health Professions Student Loans (HPSL)
R  Health Education Assistance Loans (HEAL)
S  Federal PLUS Loans
T  Parent Loans for Undergraduate Students (PLUS)
U  Federal Direct PLUS Loans
V  Federal Direct PLUS Consolidation Loans
Y  Nursing Student Loans (NSL)
Z  Loans for Disadvantaged Students (LDS)
W  Other education loans that may not be consolidated

**Note:** Loan type W should be used for other types of education loans that may not be consolidated, but that can be included as part of the borrower's total indebtedness when assigning a repayment term. The reason a loan(s) may not be consolidated must be explained in Item 21.

**Item 7:** Enter the current annual interest rate (percent) on the loan.

**Item 8-11:** Provide the payoff amount for each loan, which is the sum of the following, as of the certification date in Item 4:

**Item 8:** Principal outstanding (including capitalized interest)

**Item 9:** Unpaid accrued interest

**Item 10:** Unpaid fees and late charges, if applicable (as defined by federal regulations)

**Item 11:** Collection costs, if applicable (as defined by federal regulations)

**Item 12:** Enter the total combined amounts of Items 8 through 11.

**Item 13:** Enter the total payoff amount due to the holder shown on this certificate.

**Item 14:** Enter the first, or only, disbursement date for the loan.

**Item 15:** Enter "Yes" if the loan is in an in-school period (has not yet entered the grace period). Enter "No" if the loan is in grace or in repayment. (A loan in "in-school" deferment is in repayment.)

**Item 16:** If the loan has not yet entered the grace period, enter the current school code of the school of attendance. Otherwise, enter the school code of the school that certified the loan.

**Item 17:** If the loan has not yet entered the grace period, enter the anticipated completion date of the borrower's program. Otherwise, enter the date the borrower completed the program, graduated, or dropped below half-time enrollment at an eligible school (separated).

**Item 18:** Enter "Yes" if the loan is in default and proceed to Item 19. Enter "No" if this account is not in default and proceed to Item 20.

**Item 19:** Enter "Yes" if a satisfactory repayment arrangement has been made. Enter "No" if a satisfactory repayment arrangement has not been made.

**Item 20:** Enter "Yes" if a judgment has been obtained on this loan. Enter "No" if a judgment has not been obtained on this loan.

**Item 21:** Enter any appropriate comments. If unable to complete this certificate, please provide an explanation here.

**Item 22:** Sign, date, and provide other requested information to complete this certificate.

**Note:** When the consolidation process is complete, a lender or school will receive payment for the sum of principal, interest, and allowable collection costs and fees. A guarantor will receive payment for allowable collection costs and fees. However, a guarantor's principal and interest balances will be accounted for with a Treasury form SF 1081.

Return this form to:

**U.S. Department of Education
Consolidation Department
Loan Origination Center
P.O. Box 1723
Montgomery, AL  36102-1723**

**Pursuant to 34 CFR 685.220 (f)(1)(i), you must complete and return this certificate within 10 business days of the date received.**

### Paperwork Reduction Notice

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a currently valid OMB control number. The valid OMB control number for this information collection is 1845-0053. The time required to complete this information collection is estimated to average 0.15 hours (9 minutes) per response, including the time to review instructions, search existing data resources, gather and maintain the data needed, and complete and review the information collection. If you have any comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: U.S. Department of Education, Washington, DC 20202-4651. If you have any comments or concerns regarding the status of your individual submission of this form, write directly to:

**U.S. Department of Education
Consolidation Department
Loan Origination Center
P.O. Box 1723
Montgomery, AL  36102-1723**