## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel*. RUDY VIGIL, | ) ) ) | CASE NO. 8:07CV266 |
| Plaintiffs, | ) ) | |
| v. | ) ) | MEMORANDUM AND ORDER |
| NELNET, INC., JP MORGAN CHASE & CO., and CITIGROUP INC., | ) ) ) | |
| Defendants. | ) ) | |

This matter is before the Court on the Defendants' Motions to Dismiss (Filing Nos. 78, 80, 82).  Defendants Nelnet, Inc. ("Nelnet"), JP Morgan Chase & Co. ("JP Morgan"), and Citigroup Inc. ("Citigroup") (collectively "Defendants") have moved to dismiss the Third Amended Complaint ("TAC," Filing No. 25), pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6).  For the reasons discussed below, the Defendants' Motions will be granted and Plaintiff Relator Rudy Vigil's claims will be dismissed, with prejudice.

### FACTUAL AND PROCEDURAL BACKGROUND

The Court accepts as true, for purposes of the pending motion, the following factual allegations in the TAC:

### 1.    The Parties

Plaintiff Relator Rudy Vigil ("Vigil") was employed by Nelnet from 2003 through 2004 as a telemarketer or loan advisor.  (Filing No. 25, TAC, ¶ 8.)  Nelnet is a Delaware corporation with its principal place of business in Lincoln, Nebraska.  (*Id*. ¶ 10.)  While employed with Nelnet, Vigil marketed Federal Family Educational Loan Program ("FFELP") student loans designed to consolidate pre-existing FFELP student loans for debtors.  (*Id.* ¶ 8.)  Nelnet trained Vigil according to its nationally standardized marketing practices.  (*Id.*)

Through FFELP, the United States Department of Education ("DOE") subsidizes certain student loans by, *inter alia*, insuring against borrower default.  (*Id.* ¶ 9.)  Nelnet is a large provider of student loans and loan servicing for companies holding FFELP loans.  (*Id.* ¶ 10.)  At least one of Nelnet's employees had the authority to apply for and receive funds from DOE on Nelnet's behalf.  (*Id.*)

Defendants JP Morgan and Citigroup are both Delaware corporations with their principal places of business in New York, New York.  (*Id*. ¶¶ 11, 12.)  Nelnet entered into contracts with JP Morgan and Citgroup for student loan servicing, and marketing services.  (*Id*. ¶ 14.)  Nelnet also entered into a credit agreement with JP Morgan and Citigroup, and agreed to be their claims agent.  (*Id*.)

**2.     The Process**

The Higher Education Act of 1965 ("HEA") established the Guaranteed Student Loan Program and FFELP to "assist in making available the benefits of postsecondary education to eligible students . . . in institutions of higher education." 20 U.S.C. § 1070(a)*; see also* 20 U.S.C. §§ 1070 *et seq*.  Under the relevant portion of the FFELP, the federal government provides interest subsidies and special allowances to eligible lenders, and insures against borrower default.  *See* 20 U.S.C. §§ 1078(a)(3) & (c); § 1087-1; 34 C.F.R. § 682.302(a).  The program aims to minimize the traditional risks inherent in making student loans.  Under FFELP, private lenders advance their own funds to eligible students; state and private guaranty agencies ("Agencies") guarantee these loans against default; and DOE acts as ultimate reinsurer of the Agencies' losses should diligent efforts to procure repayment from the borrowers prove unsuccessful.  *See* 20 U.S.C. § 1078(c)(1).

To receive payment for claims from the federal government, private lenders submit claim forms to the Agencies. *See* 20 U.S.C. § 1078(b)(1). Nelnet entered into insurance agreements with Agencies that guaranteed Nelnet's private loans made to borrowers. (TAC ¶ 18). When a student borrower defaulted, the Agencies paid the lender up to 97 percent[1] of the unpaid principal on the loan. § 1078(b)(1)(G)(ii). The DOE thereafter replenished the Agencies' funds. 34 C.F.R. § 682.419.

### 3. Defendants' Alleged Wrongdoing

#### a. Nelnet's Fraudulent Marketing

Vigil alleges that Nelnet's liability stems from its fraudulent conduct in falsely certifying that its loans were made in compliance with federal law. (TAC ¶ 64.) He claims that Nelnet's certifications were false because it offered (1) prohibited inducements, and (2) false and misleading advertising, both in violation of FFELP statutes and regulations. (*Id*. ¶¶ 65-66.)

##### I. Nelnet's Inducements

While Vigil was employed by Nelnet, he and Nelnet's other loan advisors were required to make 100 or more telephone calls per day using an automated dialing system. (*Id*. ¶ 25.) During these calls, Vigil and other loan advisors solicited people to complete applications for FFELP loan consolidation. (*Id*.) Nelnet also required its loan advisors to process 15 hard copy applications and 15 e-signed applications bi-weekly (the "15/15 minimum"). (*Id*.) Nelnet paid its loan advisors a $15 to $18 bonus for each loan

---

[1] Through December 31, 2007, a lender could also receive 99-100 percent reimbursement for default claims it presented to an Agency if the Secretary of Education deemed the lender was an "exceptional performer." *See* 20 U.S.C. 1078-9 (repealed 2007); Filing No. 87-4 at 4 (a copy of § 1078-9(b) as it read prior to repeal).

consolidation application the loan advisor persuaded a borrower to complete in excess of the 15/15 minimum. (*Id.*) Thus, bonus payments were based on the number of applications a loan advisor was able to persuade borrowers to complete. (*Id.* ¶ 30.) Vigil's commissions made up 25 to 33 percent of his income and were reflected as a separate item on his paycheck. (*Id.* ¶ 29.)

Nelnet also entered into agreements with financial aid offices and alumni associations of institutions of higher education throughout the country. (*Id.* ¶¶ 31-32.) As part of Nelnet's agreements with these institutions, the financial aid offices and alumni associations steered graduates to use Nelnet's exit counseling software and website to fulfill certain exit counseling requirements. (*Id.* ¶ 31.) Vigil alleges this arrangement was improper because it induced institutions to steer students to Nelnet's exit counseling and because, through these agreements, Nelnet discharged the institutions' legal duty to ensure exit counseling occurred. (*Id.* ¶¶ 31, 33.)

### ii.    Nelnet's Misleading Statements to Consumers

Vigil alleges that Nelnet instructed its loan advisors to tell potential applicants that loan consolidation was available only during the first six months following graduation, a statement he claims was misleading. (*Id.* ¶ 26.) He also alleges that Nelnet's website represented that consumers who consolidated student loans with Nelnet would save thousands of dollars in interest payments over the life of the consolidation loan, while in reality those who consolidated would pay more interest. (*Id.*) He further alleges that Nelnet's website stated that consumers who consolidated with Nelnet were entitled to a six-month forbearance on FFELP loans. (*Id.* ¶ 27.)

### b.   Nelnet's False Certifications and Claims to DOE

To present claims for subsidies and interest payments, lenders are required to execute a Lender/Servicer Organization Participation Agreement ("OPA") (*Id*. ¶ 36.) Vigil claims the OPA executed by Nelnet was a false record or statement because Nelnet was not an eligible lender due to its illegal marketing activities. (*Id*.) Lenders submitting claims also present quarterly billing statements to DOE using a Lender's Interest and Special Allowance Request and Report (form "LaRS/799"). (*Id*. ¶ 37.) The entity submitting the LaRS/799 must certify it is eligible for the claimed subsidies. (*Id*.) Vigil alleges that Nelnet is not eligible because of its conduct and did not seek payments for amounts that were proper under FFELP laws, regulations, and policies. (*Id*.) In sum, on each default claim Nelnet presented on its behalf or on behalf of JP Morgan or Citigroup, it certified that the underlying loans were made, disbursed and serviced in compliance with federal law. (*Id*. ¶ 41.) The TAC states, "This [certification] is a lie because of Nelnet's non-compliant marketing tactics. The Agency pays the claims, out of U.S. funds, because of that lie." (*Id*.)

### c.   Connection to JP Morgan and Citigroup

During Vigil's employment with Nelnet and through the present time, Nelnet entered into contracts with lenders and agreed to perform services for them. (*Id*. ¶ 19.) These services included making claims to DOE for special allowance payments, interest subsidies, and default claims. (*Id*.) Vigil does not have access to copies of the agreements, but asserts that Nelnet performed such services for JP Morgan and Citigroup. (*Id*.) He also alleges that lenders such as JP Morgan and Citigroup used companies like

5

Nelnet as a conduit to make claims on FFELP loans to (a) conceal the fact that they were the entity actually making the claims, and (b) take advantage of Nelnet's "exceptional performer" designation.   (*Id*.)   He alleges that due to the nature of the contractual relationship, JP Morgan and Citigroup knew or should have known that Nelnet's servicing and marketing activities violated HEA and DOE policies. (*Id*. ¶¶ 19-22.)  He claims that the servicing agreements with JP Morgan and Citigroup induced Nelnet to make false or fraudulent claims.  (*Id*. ¶ 19.)  He asserts, therefore, that JP Morgan and Citigroup are vicariously liable for Nelnet's violations.  (*Id*.)

### 4.      Procedural History and Causes of Action

Vigil filed his original complaint on July 11, 2007; an amended complaint on August 15, 2007; a second amended complaint on November 7, 2007; and the TAC on May 19, 2008.  On June 5, 2008, the Court granted his motion for *nunc pro tunc* relief as to the second and third amended complaints; deemed the documents properly filed; and the TAC became the operative complaint in this case.  (Filing No. 27.)  After investigation, the United States decided not to intervene in this action, noting that the action would proceed in the name of the United States under 31 U.S.C. § 3730(b)(1).  (Filing No. 47.)

The TAC presents five causes of action. First, Vigil alleges that Nelnet violated the False Claims Act ("FCA"), at 31 U.S.C. § 3729(a)(1) by presenting false and fraudulent claims to Agencies.   (TAC ¶¶ 68-72.) This allegation is based on Nelnet's alleged certification that it complied with federal law despite offering illegal inducements and misleading advertising.  (*Id*. ¶ 70.)  Vigil also asserts that JP Morgan and Citigroup are vicariously liable for Nelnet's violations.  (*Id*. ¶ 71.)  Second, he claims that Defendants

violated the FCA at § 3729(a)(2) by causing false certifications to be made to obtain payment on a claim.  (*Id.* ¶¶ 73-77.)  Third, he alleges that Defendants conspired to defraud the United States by obtaining false or fraudulent claims paid by DOE and the Agencies.  (*Id.* ¶ 79.)  Fourth, he claims that under the former version of 20 U.S.C. § 1078-9(g), Defendants are liable *per se* based on Nelnet's status as an "exceptional performer" and its noncompliance with HEA regulations. (*Id.* ¶¶ 82-85.)  Fifth, he claims that Nelnet used its false certifications to avoid payment of obligations to the United States government.  (*Id.* ¶¶ 86-89.)

Defendants have moved to dismiss the TAC, with prejudice, for failure to plead fraud with particularity under Federal Rule of Civil Procedure 9(b), and failure to state a claim upon which relief can be granted under Rule 12(b)(6).  Defendants also argue that Vigil should not be granted leave to cure the deficiencies in the TAC because he has amended his complaint three times.  For the reasons discussed in detail below, the Court will grant Defendants' motions, and this case will be dismissed, with prejudice.

**STANDARD OF REVIEW**

**1.     Particularity Under Rule 9(b)**

Under the Federal Rules of Civil Procedure, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Federal Rule of Civil Procedure 9(b), however, requires that fraud be alleged with particularity.   The Eighth Circuit Court recently described Rule 9(b)'s particularity requirement:

> Under Rule 9(b), the circumstances constituting fraud ... shall be stated with particularity.  Rule 9(b)'s particularity requirement demands a higher degree

7

of notice than that required for other claims, and is intended to enable the defendant to respond specifically and quickly to the potentially damaging allegations. To satisfy the particularity requirement of Rule 9(b), the complaint must plead such facts as the time, place, and content of the defendant's false representations, as well as the details of the defendant's fraudulent acts, including when the acts occurred, who engaged in them, and what was obtained as a result. Put another way, the complaint must identify the "who, what, where, when and how" of the alleged fraud.

*United States ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 556 (8th Cir. 2006) (internal citations omitted).

A plaintiff must state an underlying basis for its assertions sufficient to provide indicia of reliability. *Id.* at 557 (citing *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1013-14 (11th Cir. 2005)). While a plaintiff need not allege specific details of every alleged fraud, the plaintiff must provide some representative examples of the alleged misconduct. *Id.*

## 2. Failure to State a Claim Under Rule 12(b)(6)

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, . . . a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal punctuation and citations omitted). The complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* Specifically, the complaint must contain "enough fact to raise a reasonable expectation that discovery will reveal evidence" to substantiate the necessary elements of the plaintiff's claim. *Id.* at 556.

When ruling on a defendant's motion to dismiss, a judge must rule "on the assumption that all the allegations in the complaint are true," and "a well-pleaded complaint

8

may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that recovery is very remote and unlikely.'" *Id.* (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974)). The complaint, however, must still "include sufficient factual allegations to provide the grounds on which the claim rests." *Gregory v. Dillard's, Inc.*, 565 F.3d 464, 473 (8th Cir. 2009).

"Two working principles underlie . . . *Twombly*. First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Twombly*, 550 U.S. at 555). "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 1950 (citing *Twombly,* 550 U.S. at 556). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

## DISCUSSION

### 1.     Application and Scope of Rule 9(b) to the False Claims Act

Vigil's FCA claims will be dismissed because his TAC fails to plead fraud with particularity. The FCA subjects entities to civil liability when they knowingly submit, or conspire to submit, false claims to the federal government for approval or payment. 31 U.S.C. § 3729*; see also Joshi*, 441 F.3d at 556. The Eighth Circuit Court has stated that "[b]ecause the FCA is an anti-fraud statute, complaints alleging violations of the FCA must comply with Rule 9(b)." *Joshi*, 441 F.3d at 556. Every other circuit has determined that

complaints under the FCA must be pled with specificity under Rule 9(b).  *United States ex rel. Kinney v. Stoltz*, 327 F.3d 671, 674 (8th Cir. 2003) (citing *United States ex rel. Totten v. Bombardier*, 286 F.3d 542, 551-553 (D.C. Cir.2002); *Bly-Magee v. California*, 236 F.3d 1014, 1018 (9th Cir.2001); *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir.1997); *Gold v. Morrison-Knudsen Co.*, 68 F.3d 1475, 1476-77 (2d Cir.1995)).  Rule 9(b) requires that a complaint set forth specifics regarding time, place, persons, and the fraudulent nature of the alleged acts.  *See United States ex rel. Costner v. Unites States*, 317 F.3d 883, 888 (8th Cir. 2003).  Courts have dismissed FCA claims for failing to state the "who, what, when, where, and how" of the fraud.  *See id.*; *see also Joshi*, 441 F.3d at 557.  Rule 9(b) requires more than generalized and conclusory allegations.  *Joshi*, 441 F.3d at 558.

Vigil has failed to plead fraud with particularity under Rule 9(b).  The TAC fails to allege that Nelnet was an ineligible lender under FFELP statutes and regulations, and it fails to allege the circumstances surrounding Nelnet's submission of its claims with sufficient particularity.

### a.    Failure to Allege that Defendants were not "Eligible Lenders"

To the extent that Vigil's FCA claims are premised on the assumption that Nelnet or other Defendants were not "eligible lenders" under FFELP laws, his claims must fail. Vigil's asserts that each of Nelnet's FFELP consolidation-loan claims was false because of illegal inducements and misleading advertising, and "[i]f the Agency or [DOE] representatives had known of the truth of such statements, no such claims or funds would have been paid to Nelnet, and Nelnet would have been found *ineligible* to claim any federal

10

subsidies and been obligated to re-pay U.S. money received pursuant to 20 U.S.C. § 1085(d)(5)."  (TAC ¶ 50) (emphasis added).

Vigil claims that the Defendants held themselves out as "eligible lenders" under FFELP laws.  (TAC ¶ 42; Filing No. 87, Vigil's Brief, at 2.)  He fails to allege, however, that Nelnet fraudulently misrepresented its "eligible lender" status.  He does not allege that Nelnet or any Defendant was stripped of such status through the required administrative process.  Section 1085(d) defines "eligible lender," while § 1085(d)(5) defines what an eligible lender cannot do.   "The term 'eligible lender' does not include any lender *that the Secretary[2] determines, after notice and opportunity for a hearing*, has" engaged in a variety of prohibited behavior including offering inducements or using false or misleading marketing.  20 U.S.C. § 1085(d)(5)(emphasis and footnote added).  Thus, an eligible lender may be stripped of its status if the Secretary of Education, after notice and a hearing, determines the lender has engaged in prohibited behavior.

Vigil does not allege that Nelnet or the other Defendants were at no time eligible lenders under the statute.  Instead, he alleges "Nelnet is not eligible [for the claimed subsidies] because of Nelnet's offering of prohibited inducements and acts of misleading consumers in violation of federal statues and regulations."  (TAC ¶ 37.)  Vigil argues that Nelnet became ineligible to claim certain subsidies by virtue of engaging in conduct forbidden by § 1085(d)(5).  Even if Nelnet's actions did violate the statute, an eligible lender does not become ineligible at the instant it violates the law.  Under the statute, a lender loses its eligibility only after the Secretary of Education determines, after notice and

---

[2] "The term 'Secretary' means the Secretary of Education."  20 U.S.C. § 1003(17).

opportunity for a hearing, that the lender engaged in prohibited conduct. Absent an allegation that Nelnet was stripped of its status as an eligible lender in the manner prescribed by the statute, Nelnet's certification that it was an eligible lender was not false or fraudulent.

### b.    Failure to Plead Representative Examples of Fraudulent Claims

Vigil's allegation that the Defendants engaged in a systematic practice of submitting fraudulent claims also fails for lack of specific examples of fraudulent claims. In *Joshi*, the relator argued that his complaint put the defendants on notice that "every" claim submitted for payment was fraudulent. *Joshi*, 441 F.3d at 557. The Eighth Circuit Court recognized that the relator was pleading a systematic practice of submitting fraudulent claims, and that the relator was not required to allege specific details of every allegedly fraudulent claim. *Id.* at 558. However, that Court stated that the relator "must provide some representative examples" of the allegedly fraudulent conduct. *Id.* The complaint in Joshi was therefore dismissed because it was "void of a single, specific instance of fraud, much less any representative examples." *Id.*

The Eighth Circuit Court found the Eleventh Circuit's reasoning persuasive in *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1011 (11th Cir. 2005). In *Corsello*, the relator alleged violations of the FCA by his former employers, asserting they falsely obtained Medicare payments. *Id.* The relator was a sales employee who did not work in the billing department and did not allege any details about the claims actually submitted for payment. Instead, the relator in *Corsello* vaguely alleged a pervasive and wide-reaching fraudulent scheme to submit false claims. *Id.* at 1013. Thus, the Eleventh Circuit concluded that the

12

relator failed to state a "factual basis to conclude fraudulent claims were ever actually submitted to the government in violation of the [FCA]." *Id.* Thus, although the relator alleged detailed information about an alleged method to defraud the government, the complaint did not identify any specific claims submitted, or the dates on which those claims were submitted. *Id*.

As in *Corsello*, Vigil has failed to allege any details about claims actually submitted for payment. His only allegation regarding the veracity of the data submitted to DOE is the sweeping allegation that "the amount of each subsidy claimed due by Nelnet is false." (TAC ¶ 37.) This allegation falls short of the particularity requirements of Rule 9(b). Vigil also alleges that Nelnet concealed inducements offered to its loan advisors, and to institutions, and concealed its misleading advertising scheme in order to obtain payment from the government. Vigil states that these actions violate applicable FFELP statutes and regulations. However, he does not refer to any specific claim or the date when any fraudulent claim was submitted, other than to state the months in which Nelnet submitted its quarterly billing statements on the LaRS/799 forms. In essence, the TAC asserts that Nelnet must be liable because it could not have obtained payment for claims without submitting false claims. Although the scheme alleged by Vigil is somewhat detailed, he has not alleged any detail of a specific fraudulent claim. Without some specific example of fraud, the TAC fails to meet the standard of Rule 9(b) with respect to claims under the FCA.

**2.      Failure to State a Claim**

The TAC also fails to state the elements of a claim under the FCA.  The FCA prohibits any person from knowingly presenting a false claim for payment or approval by the federal government.  31 U.S.C. § 3729(a)(1).  To state a prima facie case under the FCA, the statue requires that the complaint allege "(1) the defendant made a claim against the United States; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent."  *United States ex rel. Quirk v. Madonna Towers, Inc.*, 278 F.3d 765, 767 (8th Cir. 2002).  The parties do not dispute that Nelnet made a claim against the federal government.  Thus, the Court must address whether the TAC states that Nelnet submitted a fraudulent claim, and that it knew the claim was false or fraudulent.

The crux of Vigil's *qui tam* action is that Nelnet's LaRS/799 and OPA forms (collectively "the claim forms") violated FFELP statutes and regulations, making Nelnet directly liable and JP Morgan and Citigroup vicariously liable under the FCA.  The FCA encompasses two types of claims: factually false claims and legally false claims.  *United States ex rel. Conner v. Salina Regional Health Center, Inc.*, 543 F.3d 1211, 1217 (10th Cir. 2008); *see also* S. Rep. No. 99-345, at 9, reprinted in 1986 U.S.C.C.A.N. 5266, 5274 ("a false claim may take many forms, the most common being a claim for goods or services not provided or *provided in violation of contract terms, specification, statute, or regulation*.") (emphasis added).  In an FCA claim based on legal falsehood, the relator must show the defendants "'certifie[d] compliance with a statute or regulation as a condition to government payment,' yet knowingly failed to comply with such statute or regulation."  *Conner*, 543 F.3d at 1217 (quoting *Mikes v. Straus*, 274 F.3d 687, 697 (2d. Cir. 2001)).  In the present case,

the TAC does not state that Nelnet's certification was fraudulent under applicable law. Further, the TAC fails to allege that the claim forms required a certification of compliance with all FFELP statutes.

### a.     False Certification of Compliance with FFELP Law

As noted above, the TAC does not allege that Nelnet and the other Defendants were ineligible lenders as determined through the requisite administrative process.  The TAC suggests that the Defendants became ineligible lenders simply by participating in illegal inducements and misleading marketing.  (TAC ¶ 37.)  Even assuming that Nelnet's actions violated FFELP statutes, 20 U.S.C. § 1085(d)(5) provides that a lender loses its eligibility only after the Secretary of Education determines the lender engaged in prohibited conduct.  Therefore, the TAC fails to state a claim based on false certification with respect to the Defendants' status as eligible lenders.

### b.     False Certification of the Claim Forms

The claim forms do not expressly require compliance with FFELP statutes and regulations as a condition of repayment.  The certification section of the LaRS/799 states:

> I certify, by my signature below that:
>
> . . .
>
> The *data* that my organization submits to the [DOE] is correct to the best of my knowledge and belief.  I certify that this submission *seeks payment of only those amounts that are proper and authorized under the laws, regulations, and policies applicable to the [FFELP]*

(TAC at CM/ECF p. 159, Exhibit H) (emphasis added).

Similarly, the certification requirement of the OPA states:

> I certify by my signature above that:

15

. . .

> The *data* that my organization or its agent, or its third-party servicer, will submit to the [DOE] electronically pursuant to this Agreement is and will be correct to the best of my knowledge and belief. *I certify that it conforms to the laws, regulations and policies applicable to the [FFELP]*.

(TAC at CM/ECF p. 275, Exhibit K) (emphasis added)

The Claim Forms require that the signatory certify that the "data" comply with FFELP laws, regulations, and policies. These Claim Forms do not require that the signor or lender certify its compliance with all FFELP or DOE laws and regulations, only that the data comply. No reading of the Claim Forms supports a conclusion that lack of compliance with FFELP statutes and regulations renders the data false or fraudulent. Further, the TAC does not assert that the data submitted by the Defendants violated the underlying statutes and regulations.[3] Thus, the TAC fails to state that Nelnet falsely certified compliance with a statute, regulation, or contractual term.

### 3.   FCA Violation Per Se

Finally, Vigil asserts that the TAC states a claim under the FCA because an earlier version of 20 U.S.C. § 1078-9(g) created *per se* liability. Under the former version of § 1078-9, a lender designated for exceptional performance by the Secretary of Education was entitled to a larger percentage of unpaid principal and interest payments for student loans. The former § 1078-9(g) also stated that a lender designated as an exceptional performer "failing to service loans or otherwise comply with applicable program regulations

---

[3] The TAC sweepingly states that "the data does not comply with FFELP statutes, regulations or policies as a result of Nelnet's offering of prohibited inducements and fraudulent advertising." (TAC ¶ 36.) As noted above, neither this statement nor any other allegation by Vigil attacks the accuracy of the actual data.

16

shall be considered in violation of section 3729 of title 31." Section 1078-9 as it previously read was repealed in its entirety effective October 1, 2007. Vigil argues that the TAC states a claim for relief under the former § 1078-9(g) for the period in which Nelnet was designated as an exceptional performer, between May 26, 2004 and December 31, 2007. He asserts that because the TAC alleges conduct in violation of FFELP statutes and regulations it states a claim, because the Court should read the former § 1078-9 to impose *per se* liability under the FCA.

Assuming Vigil's action could have gone forward under the statute prior to its repeal, the structure of the FCA and FFELP statutes and regulations strongly suggests that § 1078-9 does not create such sweeping FCA liability. As discussed above, Eighth Circuit precedent requires a *qui-tam* FCA claim to be pled with particularity under Rule 9(b). Vigil's reading of the former § 1078-9(g) would allow *qui-tam* plaintiffs to circumvent the requirements of Rule 9(b) simply by pleading a failure to comply with FFELP regulations. This interpretation would be contrary to established FCA case law.

Vigil's interpretation of § 1078-9 would allow the Court to determine whether a lender violated FFELP statutes and regulations. However, FFELP statutes require that this function first be carried out by the Secretary of Education and the administrative process. For example, 20 U.S.C. § 1082(g) permits the Secretary of Education to impose civil penalties, after notice and the opportunity for a hearing, on lenders who violate FFELP statutes. Nothing indicates that Congress intended to allow *qui tam* relators to circumvent the administrative process for FCA claims. Vigil cannot cite any decision interpreting a federal statute to create such *per se* liability. Instead, he attempts to compare the former § 1078-9 and the FCA to the Rackateer Influenced and Corrupt Organizations Act

("RICO"), that lists several statutes that form "predicate acts" for violating RICO.  The Court finds Vigil's analogy unpersuasive.  The Eighth Circuit Court has expressly rejected an analogous connection between the FCA and RICO.  *See Joshi*, 441 F.3d at 561 n.4.  Thus, the requirements of Rule 9(b) should not be relaxed under the former § 1078-9(g).  For the reasons discussed above, the TAC fails to state a claim under the FCA and fails to plead fraud with particularity, and will be dismissed.

## CONCLUSION

Regarding Nelnet's allegedly false claims, the TAC fails to plead fraud with particularity under Rule 9(b), and fails to state a claim under the FCA, warranting dismissal under Rule 12(b)(6).  Because the TAC fails to state claims against Nelnet, the Court need not address Citigroup and JP Morgan's vicarious liability.  The Court also concludes that Nelnet cannot be held liable *per se* for allegations of improper conduct.  The TAC will be dismissed, with prejudice.

Accordingly,

IT IS ORDERED:

1.      Defendants' Motions to Dismiss (Filing Nos. 78, 80, 82) are granted;

2.      Plaintiff United States of America ex rel. Rudy Vigil's claims in the Third Amended Complaint are dismissed, with prejudice; and

3.      A separate judgment will be entered.

DATED this 1st day of April, 2010.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge

18